1  KREINDLER & KREINDLER LLP
   Mark Labaton (#159555)
2  707 Wilshire Boulevard
   Los Angeles, California  90017
3  Telephone:  (213) 622-6469
   Facsimile:   (213) 622-6019
4
5  *Local and Liaison Counsel for Plaintiff and
   the Class*
6  CAULEY BOWMAN CARNEY &
   WILLIAMS, PLLC
7  J. Allen Carney
   Randall K. Pulliam
8  Bart Dalton (#187930)
   11311 Arcade Dr., Suite 200
9  Little Rock, Arkansas 72212
   Telephone:  (501) 312-8500
10 Facsimile:   (501) 312-8505

11 BARON & BUDD, P.C.
   Russell Budd
12 Burton LeBlanc
   3102 Oak Lawn Avenue, Suite 1100
13 Dallas, Texas  75219
   Telephone:  (214) 521-3605
14 Facsimile:   (214) 520-1181

15 *Lead Counsel for Lead Plaintiff*

16 LABATON SUCHAROW LLP
   Christopher J. Keller
17 Jonathan Gardner
   140 Broadway
18 New York, New York  10005
   Telephone:  (212) 907-0700
19 Facsimile:   (212) 818-0477

20 *Counsel for Lead Plaintiff*

21          **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
22

23 IN RE: SEMTECH CORPORATION      )
   SECURITIES LITIGATION           )  Civil Action No.:  2:07-CV-07114-
24                                 )  CAS (FMOX)
                                   )  **Jury Trial Demanded**
25                                 )
                                   )
26 _____    )

27     **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

28

---
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

1.     Lead Plaintiff Mississippi Public Employees' Retirement System ("MPERS") ("Lead Plaintiff"),  by and through its attorneys Cauley Bowman Carney & Williams PLLC,  and Baron & Budd, P.C., (collectively "Lead Counsel"), individually and on behalf of all other similarly situated persons and entities, hereby alleges the following based upon personal knowledge as to it and its own acts, and upon information and belief as to all other matters.

2.     Lead Plaintiff's information and belief is based upon all of the facts set forth below, which were obtained through an investigation by and through Lead Counsel, which has included, *inter alia*, (i) a review and analysis of Semtech Corporation's ("Semtech" or the "Company") filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) interviews with former Semtech employees; (iii) a review and analysis of other publicly available information and data concerning Semtech and its historical stock option practices and (iv) discussions with, and review of studies prepared by, various experts.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

3.     Lead Plaintiff brings this federal securities class action on behalf of itself and all other persons and entities other than Defendants and certain other excluded persons specified below, who purchased or otherwise acquired Semtech securities during the period between August 27, 2002 and July 19, 2006, inclusive (the "Class Period") and who were injured thereby.

4.     This case involves an ***admitted*** fraudulent scheme orchestrated by Semtech's senior officers.  Indeed, the Company has conceded that, for more than seven (7) years, it was a regular practice at Semtech for stock option grants to be backdated, often to dates on which the price of Semtech common stock reached its lowest point in weeks, if not months.  As demonstrated herein, these perfectly-timed option grants, for which each of the Individual Defendants exercised

1   substantial responsibility, were not the result of mere coincidence.  Indeed, the

2   leading expert on the options backdating scandal completed an analysis for Lead

3   Counsel which reveals that the mathematical probability that Semtech's option

4   grants between 1994 and 2002 could achieve the historical low points on which

5   they were purportedly granted without improper manipulation is 1 in

6   35,184,372,088,332 (a probability of 0.0000%)![1]

7        5.    "Backdating" is a practice by which a stock option is reported to have

8   been granted on a certain date, but is actually granted days or months later and is

9   backdated to a earlier date when the company's stock price is trading at a lower

10  price.  Backdating allows option grantees to realize an immediate unearned and

11  undisclosed financial gain at the expense of the company's stockholders.

12       6.    Defendants' fraudulent backdating scheme was akin to betting on a

13  horse race after the horses crossed the finish line.  And, not surprisingly,

14  Defendants won.  Indeed, Defendants Poe, Franz and Baumann received millions

15  of dollars of backdated stock options, which the Company systematically failed to

16  account for in accordance with Generally Accepted Accounting Principles

17  ("GAAP") and the Company's own stated accounting policies, set forth in

18  documents publicly filed with the SEC and signed by each Defendant.  This

19  misconduct rendered Semtech's Class Period financial statements materially false

20  and misleading, as the Company materially *understated* its reported compensation

21  expense and materially *overstated* its reported net income.  Simultaneously,

22  Defendants' undisclosed, fraudulent acts exposed Semtech and the Individual

23  Defendants to material liabilities – including criminal exposure, fines and

24  penalties, disgorgement of illegitimate profits, increased legal, regulatory and

25  _____

26  [1] An analysis of option grants from 1994 through 2007 (which includes the
    time period subsequent to the enactment of Sarbanes-Oxley in 2002) reveals that

27  the mathematical probability that Semtech's option grants could achieve historical
    low points without improper manipulation is 1 in 10,537,447,360 (0.00000%).  For

28  further discussion of this issue, see ¶¶ 154 through 161, supra.

compliance costs, and potential and actual loss of faith and confidence in the Company and its senior executives.  Consequentially, throughout all relevant times during the Class Period, the Company's securities traded at artificially inflated prices.

7.      Defendants' scheme began to unravel when, on May 16, 2006, the Center for Financial Research and analysis ("CFRA") published a research report on stock option backdating that listed Semtech as a company at risk for such practices.  The report unleashed a series of events including an SEC inquiry and a grand jury investigation led by the U.S. Attorney for the Southern District of New York.  It culminated with an admission that certain of Semtech's most senior officers, including the former Chairman and CEO, the CFO and the Treasurer intentionally backdated stock options, the forced departure of those executives, and a $91 million restatement of Semtech's historical financial statements.

8.      Semtech's stock price reacted strongly to the series of announcements about options backdating.  On May 19, 2006, the day prior to the Company's announcement of the SEC inquiry, the Company's stock price closed at $16.05 per share.  Despite the Company's downplaying of the significance of the "informal" inquiry, the Company's stock price closed at $15.36 on May 22, 2006 on very heavy volume of over 1.2 million shares traded.  On May 23, 2006 it closed down at $15.27 on volume of over 1.3 million shares trades.

9.      The stock price continued its downward move on each successive announcement, closing at $14.90 on June 13, 2006, down from the prior day's close of $15.12; closing at $14.60 on June 15, 2006, on very heavy volume of over 2.3 million shares traded; closing at $14.40 on June 16, 2006 on volume of over 2.1 million; and closing at $14.26 on June 19, 2006.

10.     Subsequently, on July 20, 2006, when Semtech announced an intention to restate its financial statements, Semtech's stock price fell from $13.19 to $12.37.  On the very next trading day, the stock fell yet another 6.22% to close

1   at $11.60.  Thus, as a result of the manipulation of Semtech's options granting

2   process being made known to the market, Semtech's stock price fell 27.72% from

3   $16.05 to $11.60.

### JURISDICTION AND VENUE

5   11.   The claims asserted herein arise under and pursuant to Sections 10(b)

6   and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

7   promulgated thereunder, 17 C.F.R. § 240.10b-5.

8   12.   This Court has jurisdiction over the subject matter of this action

9   pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §

10  78aa.

11  13.   Venue is proper in this judicial district pursuant to Section 27 of the

12  Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged

13  herein occurred in substantial part in this district.  Additionally, the Company

14  maintained its headquarters in this district throughout the Class Period.

15  14.   In connection with the acts, conduct and other wrongs alleged herein,

16  Defendants, directly or indirectly, used the means and instrumentalities of

17  interstate commerce, including, but not limited to, the United States mails,

18  interstate telephone communications and the facilities of the National Association

19  of Securities Dealers Automated Quotation System ("NASDAQ").

### PARTIES

21  **Lead Plaintiff**

22  15.   Lead Plaintiff MPERS, an institutional investor, is the retirement

23  system for nearly all non-federal public employees in Mississippi, serving

24  employees of the state, public school districts, municipalities, counties, community

25  colleges, state universities and such other public entities as libraries and water

26  districts.  Established by the Mississippi Legislature in 1952, MPERS provides

27  benefits to over 75,000 retirees, and future benefits to more than 250,000 current

28  and former public employees.  As set forth in its certification, a copy of which is

attached hereto as Exhibit A, Mississippi purchased shares of common stock of Semtech during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

**Defendant Semtech**

16.     Defendant Semtech is a Delaware corporation with its headquarters at 200 Flynn Road, Camarillo, California, 93012-8790.  Semtech describes itself as "a leading supplier of analog and mixed-signal semiconductor products."  The Company's stock is publicly traded on NASDAQ under the ticker symbol "SMTC."

**Individual Defendants**

17.     Defendant John D. Poe ("Poe") became Semtech's Chairman of the Board in 1998.  Poe also served as Chief Executive Officer ("CEO") of the Company from October 1985 to October 2003 and as an interim CEO from September 2005 to April 2006.  On August 17, 2006, he stepped down from his position as Chairman, taking a leave of absence while the Board investigated the Company's historic options practices and accounting.  On October 23, 2006, at the request of a Special Committee of the Board, Poe resigned as Chairman.  On April 16, 2007, Poe left the Company completely, resigning from Semtech's Board of Directors.  While employed by Semtech and while serving on the Company's Board, Defendant Poe directly participated in, approved, and concealed the options backdating scheme at issue in this case, and assisted in the preparation of Semtech's proxy statements, and its quarterly and annual reports since the start of the Class Period.  He also signed the Company's Forms 10-Q and 10-K and the Certifications contained therein, as well as the Company's proxy statements.  During the Class Period, Defendant Poe sold 812,122 shares of Semtech stock for proceeds of $17.47 million, while knowing of the options backdating scheme described herein.

18. Defendant Jason L. Carlson ("Carlson") served as CEO and as a director of Semtech from October 2003 to October 2005. While serving as the Company's CEO, Carlson signed the Company's Forms 10-Q and 10-K and the Certifications contained therein, notwithstanding the fact that those SEC filings contained materially misleading statements regarding the Company's finances and compliance with Generally Accepted Accounting Principles.

19. Defendant Mohan R. Maheswaran ("Maheswaran") has served as President, CEO, and as a director of Semtech since 2006. While serving as the Company's CEO, Maheswaran signed the Company's Form 10-K dated April 16, 2006 and the Certification contained therein, notwithstanding the fact that the SEC filing contained materially misleading statements regarding the Company's finances and compliance with Generally Accepted Accounting Principles.

20. Defendant David G. Franz, Jr. ("Franz") served as Semtech's Vice President of Finance and Chief Financial Officer ("CFO") from 1993 to 2006. Franz' employment with the Company terminated on January 22, 2007. While employed by Semtech and while serving on the Company's Board, Franz directly participated in, approved, and concealed the options backdating scheme at issue in this case, and assisted in the preparation of Semtech's proxy statements, and its quarterly and annual reports since the start of the Class Period. He also signed all of the Company's Forms 10-Q and 10-K and the Certifications contained therein. During the Class Period, Franz sold 132,000 shares of Semtech stock for proceeds of $2.9 million, while knowing of the options backdating scheme described herein.

21. Defendant John M. Baumann ("Baumann") served as Semtech's Treasurer beginning in 1994, until his employment was terminated on January 31, 2007. Baumann directly participated in, approved, and concealed the options backdating scheme at issue in this case, and assisted in the preparation of Semtech's proxy statements, and its quarterly and annual reports. During the Class

1    Period, Baumann sold 35,000 shares of Semtech stock for proceeds in excess of

2    $728,000, while knowing of the options backdating scheme described herein.

3          22.    Defendants Poe, Carlson, Maheswaran, Franz and Baumann are

4    collectively referred to as the "Individual Defendants."  Because of their senior

5    executive positions at the Company, they each had access to adverse undisclosed

6    information about Semtech's stock option practices, compliance with GAAP, and

7    internal controls, as set forth below.  Throughout the Class Period, the Individual

8    Defendants also had access to such information based on their direct involvement

9    in the options granting process.

10          23.    Each of the Individual Defendants, by virtue of their positions,

11   directly participated in the management of Semtech, were directly involved in the

12   day-to-day operations of the Company at the highest levels, and were privy to

13   confidential proprietary information concerning the Company and its business,

14   operations, growth, financial statements, and financial condition, as alleged herein.

15   The Individual Defendants were involved in drafting, producing, reviewing and/or

16   disseminating the false and misleading statements and information alleged herein,

17   were aware, or recklessly disregarded, the fact that the false and misleading

18   statements were being issued regarding the Company, and approved or ratified

19   these statements, in violation of the federal securities laws.

20          24.    As officers and controlling persons of a publicly-held company whose

21   shares are registered with the SEC pursuant to the Exchange Act, traded on the

22   NASDAQ, and governed by the federal securities laws, each of the Individual

23   Defendants had a duty to disseminate promptly, accurate and truthful information

24   with respect to Semtech, and to correct any previously issued statements that had

25   become materially misleading or untrue, so that the market price of the Company's

26   publicly-traded common stock would be based upon truthful and accurate

27   information.  Defendants Poe, Carlson, Maheswaran, Franz and Baumann each

28   violated these specific requirements and obligations during the Class Period.

25.     The Individual Defendants, because of their positions of control and authority as senior officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the false and misleading statements detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein.

## CLASS ACTION ALLEGATIONS

26.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired Semtech securities between August 27, 2002 and July 19, 2006, inclusive, and who were injured thereby.  Excluded from the Class are Defendants, the Company's officers and directors during all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded are Semtech employees who acquired Semtech securities through exercise of stock options.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Semtech common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Semtech or its transfer agent and

may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Lead Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class purchased Semtech securities during the Class Period and sustained damages as a result of Defendants' wrongful conduct complained of herein.

29.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Semtech;

(c)     the extent to which the price of Semtech's securities were artificially inflated during the Class Period; and

(d)     the extent to which the members of the Class have sustained damages and the appropriate measure of such damages.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

# SUBSTANTIVE ALLEGATIONS

## How Stock Options Work

32.     Stock options are agreements that allow individuals to purchase publicly traded stock at a predetermined, fixed price on a later date.  Stock options yield a profit if the market price of the subject stock exceeds the price at which the options were granted, known as the "strike price" or "exercise price."  As discussed below, GAAP requires companies to recognize compensation expense, and thereby reduce their net income, for each option granted with an exercise price less than the market price of the subject stock on the date of the grant (*i.e.*, an "in the money" option).

33.     For example, if a company grants an employee an option to purchase 100 shares with an exercise price of $10 per share, the employee can buy 100 shares for $1,000 regardless of the actual market price of the stock on the date that the employee exercises their stock options.  In this example, if the price of the stock rises during the option term from $10 to $20 per share, the employee exercising the option at $10 per share will pay a total of $1,000 for 100 shares of stock that are, at the time of purchase, worth $20 per share or $2,000.  This employee will immediately realize a $1,000 profit.  However, if the strike price is greater than the market price of the company's stock, the option is described as "underwater" or "out of the money."

34.     When a company grants stock options to one of its employees, it must do so under a written stock option plan that is filed with the SEC, so that investors have an accurate understanding of the compensation being paid to certain employees and have an accurate view of the company's financial position.  Given that the stock option plan is publicly filed, the company's management and directors, particularly those who sign the SEC filings attaching the plan, are familiar with the terms of the plan and how it is designed to operate.

**Semtech's Stock Option Plans**

35.     As discussed more fully below, the Company admits that, from 1998 through 2003, thousands of Semtech's stock option grants were intentionally backdated.  During that same period of time, all of Semtech's stock option grants were "administered," as that term is defined in the documents referred to below, by the Compensation Committee of the Board of Directors and/or its designee and were granted pursuant to Semtech's written stock option plans, including: (i) the 1994 Long Term Stock Inventive Plan (the "1994 Plan");  (ii) the 1994 Non-Employee Directors Stock Option Plan; and (iii) the 1998 Long Term Stock Inventive Plan (the "1998 Plan") (collectively the "Stock Option Plans").[2]

36.     The 1998 Plan defines its purpose "to promote the longer-term financial success of Semtech Corporation (the "Company") by providing a means to attract, retain and award individuals who can and do contribute to such success. By using stock-based compensation, the recipients of awards under the Plan will identify their interests with those of the Company's stockholders."  Similarly, the purpose of the 1994 Plan "is to enable the Company and its subsidiaries to attract, retain and motivate its officers and key employees by providing for or increasing their proprietary interests in the Company and to align their interests with those of the Company's stockholders."

37.     Importantly, the 1998 Plan specifically states that "for Plan purposes, all stock options and stock appreciation rights shall have an exercise price which shall reflect the average traded price of a share of Common Stock, on the date as determined by the Plan Administrator, or if the Common Stock is not traded on such date, the average price on the next preceding day on which such Common

---

[2] Per the Company's 1998 Proxy  Statement (Schedule 14A), the 1998 Plan "is intended to consolidate the Company's 1994 Long-Term Stock Incentive Plan and 1994 Non-Employee Directors Stock Option Plan."

1   Stock is traded.  The applicable date shall be the date on which the award is

2   granted."  1998 Plan ¶ 2(c).  Similarly, the 1994 Plan provides:

3        Each Award Agreement governing an Option shall state

4        the Exercise Price.  The Exercise Price of any Incentive

5        Option granted under the Plan shall not be less than the

6        Fair Market Value of the Common Stock on the date of

7        the grant, and in the case of an incentive Stock Option

8        granted to an Eligible Participant who, at the time such

9        Incentive Stock Option is granted, is a Ten-Percent

10       Stockholder, then the Exercise Price of such Incentive

11       Stock Option shall not be less than one hundred ten

12       percent (110%) of the Fair Market Value of the Shares

13       covered by the Incentive Stock Option on the date of

14       grant.  The Exercise Price of any Non-Qualified Stock

15       Option shall not be less than eighty-five percent (85%) of

16       the Fair Market Value of the Common Stock on the date

17       of grant.  1994 Plan ¶ 6.2.

18       38.    Moreover, in relevant part, the 1998 Plan describes the Compensation

19  Committee's other responsibilities as follows:

20       (a)    Committee.  The Plan shall be administered by a

21       Committee, appointed by the Board of Directors of the

22       Company.  So long as the Company's common stock, par

23       value $.01 per share ("Common Stock") remain

24       registered under the Securities and Exchange Act of

25       1934, as amended (the "Exchange Act") and Section 16

26       Participants may receive awards, any committee

27       authorized by the Board to administer the Plan shall be

28       comprised solely of two or more directors of the

Company who are Non-Employee Directors within the meaning on Rule 16b-3(b)(3)(1) promulgated under the Exchange Act. Notwithstanding the foregoing, the Board of Directors of the Company (the "Board") may assume, at its sole discretion, administration of the Plan. The administrator of the Plan, whether a committee of the Board or the full Board, is referred to herein as the "Plan Administrator."

(b) Powers and Authority. The Plan Administrator's powers and authority include, but are not limited to, selecting individuals who are (1) employees of the Company or any subsidiary of the Company or other entity in which the Company has a significant equity or other interest as determined by the Plan Administrator, or (2) members of the Board; determining the types and terms and conditions of all awards granted, including performance and other earnout and/or vesting contingencies; permitting transferability of awards to third parties; interpreting the Plan's provisions; and administering the Plan in a manner that is consistent with its purpose.

39.     The Stock Option Plans also provide that each recipient of Semtech stock options must enter into a "written agreement" with the Company with respect to each option grant. 1998 Plan ¶ 4(a); *See also* 1994 Plan ¶ 19 ("The Notice shall be accompanied by a written Award Agreement.")

40.     Thus, each recipient of Semtech stock options – including Individual Defendants Poe, Franz and Baumann, all of whom received backdated stock options – could ascertain, from the face of the Option Agreement, the purported

1   grant date and the designated strike price associated with each of their option

2   grants.  Based on this information, there is simply no dispute that Individual

3   Defendants Poe, Franz and Baumann either knew or recklessly disregarded that the

4   grant date(s) and exercise price(s) reflected on each of their Option Agreement(s)

5   were not contemporaneous with the actual grant date(s), and either knew or

6   recklessly disregarded that this "discrepancy" failed to comport with GAAP (given

7   the Company's failure to record the options as an expense) and the Stock Option

8   Plans.

9   **APB 25:  Accounting for Stock Options Issued to Employees**

10        41.    Accounting for option grants is subject to GAAP, which are those

11   principles recognized by the accounting profession as the conventions, rules and

12   procedures necessary to define accepted accounting practice at a particular time.

13   SEC Regulation S-X, 17 C.F.R. § 210.4-01(a), states that financial statements filed

14   with the SEC which are not prepared in compliance with GAAP are ***presumed*** to

15   be misleading and inaccurate irrespective of footnote or other disclosure.

16        42.    Accounting Principles Board Opinion No. 25 ("APB 25") was the

17   relevant GAAP at issue with respect to accounting for option grants.  This

18   longstanding and well-settled GAAP provision simply required that a company

19   must record a compensation expense if it issues a stock option with an exercise

20   price lower than the market price on the date of the grant, *i.e.*, an "in the money"

21   option.  Conversely, if an option was issued at an exercise price equal to the extant

22   market price on the date of grant (*i.e.*, "at the money"), the Company did not need

23   to record a compensation expense.

24        43.    Thus, where an option has intrinsic value on the date of grant, *i.e.*, the

25   market price of the stock exceeds the option's exercise price on the date of grant,

26   compensation cost is calculated by multiplying the total number of options granted

27   by the difference between the exercise price of the option and the market price of

28

1    the stock on the date of grant.  Compensation cost is then amortized and

2    recognized as an expense over the option's vesting period.

3        44.    Failure to properly account for "in the money" option grants results in

4    the misstatement of a company's financials because the extent to which the fair

5    market value of a security exceeds the exercise price on the date of grant is in

6    essence a direct form of compensation that must be accounted for as a cost to the

7    corporation.  Thus, a company that fails to record and properly amortize the

8    intrinsic value of an "in the money" option grant will consequentially *understate*

9    its reported compensation costs and *overstate* its reported net income during the

10   year of the option grant, as well as each year, thereafter, as the option vests.

11       45.    Notably, the SEC has adopted the view that a company's failure to

12   properly account for "in the money" options violates the federal securities laws.

13   For example, in a complaint filed by the SEC against Peregrine Systems, Inc. in

14   June 2003, the SEC alleged that Peregrine's option plan administrator used a "look

15   back" process between quarterly Board meetings to identify the day with the

16   lowest stock price over the interval and then declared this date to be the grant date.

17   The SEC viewed this conduct as a form of financial fraud because it resulted in the

18   understatement of compensation expenses.  Specifically, the SEC stated that,

19   "[u]nder the applicable accounting rules, any positive difference in the stock price

20   between the exercise price and that on the measurement date … had to be

21   accounted for as compensation expense.  By failing to record the compensation

22   expense, Peregrine understated its expenses by approximately $90 million."

23       46.    Proper application of APB 25 rests significantly upon a company's

24   determination of a stock option's ***"measurement date,"*** *i.e.*, the date upon which

25   the compensation cost is to be measured.  Specifically, paragraph 10(b) of APB 25

26   defines the "measurement date" as "the first date on which are known both (1) the

27   number of shares that an individual employee is entitled to receive and (2) the

28   option or purchase price if any."

47.     Stated differently, even if documents related to an award of options are dated as of an earlier date or have been manipulated to reflect an earlier date, the actual "measurement date" cannot occur until the date the terms of the stock option award, including the number of shares that a particular employee is going to receive, as well as the strike price, are actually determined.  Thus, in assessing the legitimacy of a company's compensation costs calculated pursuant to APB 25, it is crucial to determine whether a company's stock option granting practices resulted in an award of stock options with an exercise price that was less than the fair market value of the underlying stock at the date on which the number of shares that an individual employee is entitled to receive as well as the strike price have been determined with finality.

**The Backdating Epidemic of 2006**

48.     In the spring of 2006, corporations throughout the United States gradually disclosed that they were under investigation for manipulating the terms of their stock options, including the exercise price and grant date, thus ensuring that such options were "in the money" immediately upon receipt.  This resulted in a direct form of compensation to the employee because the company was required to deliver stock to the employee at below fair market value, and the company met its obligation to deliver the stock either by purchasing such shares at a higher price in the open market or delivering treasury stock, which had a higher fair market value, to the employee.  All option grants must be made in accordance with the stock option plan on file with the SEC, otherwise truthfully disclosed to the market, and properly accounted for in the company's financial statements.

49.     On May 6, 2006, the *Wall Street Journal* ran the following story by reporters Charles Forelle and James Bandler, which described the evolving options backdating crisis:

**Backdating Probe Widens as 2 Quit Silicon Valley Firm --- Power Integrations Officials Leave Amid Options Scandal; 10 Companies Involved So Far**

(Copyright (c) 2006, Dow Jones & Company, Inc.)

The stock-options backdating scandal continued to intensify, with the announcement by a Silicon Valley chip maker that its chairman and its chief financial officer had abruptly resigned. That brought to eight the number of officials at various companies to leave their posts amid scrutiny of how companies grant stock options.

Power Integrations Inc., of San Jose, Calif., said Chairman Howard Earhart, who is a former chief executive, and finance chief John Cobb had resigned. It also said it probably will need to restate nearly seven years of financial results because of options-granting problems.

50.     Forelle and Bandler explain that the option granting improprieties have not only caused numerous companies to commence internal investigations of their compensation practices, but have also drawn the attention of the SEC, federal prosecutors and investors.  The article, in relevant part, states as follows:

So far, at least 10 companies have been caught up in the stock-options-dating matter, with several already in effect acknowledging that some improper dating occurred. A number of companies are conducting their own investigations or are the subjects of Securities and Exchange Commission probes. In one case, company

practices have attracted the attention of federal
prosecutors examining possible fraud violations.
The matter also is drawing concern from investors, who
have bid down the stock prices of some of the companies
caught up in the various probes. Chip maker Vitesse
Semiconductor Corp. has seen shares fall about 40%
since suspending three executives, while shares in giant
health insurer UnitedHealth Group Inc. have fallen 18%
since questions about its options-granting practices
surfaced in mid-March, shaving more than $13 billion off
its market capitalization.

[…]

At UnitedHealth, at least 11 executives, including CEO
William McGuire and the company's general counsel,
received at least one option grant dated on the lowest
price of a quarter in 2000. Many executives also shared
propitious option dates with Dr. McGuire through the
years. The company has called its granting practices
"appropriate," but its board is conducting a probe.
UnitedHealth also has stopped giving option grants to
some senior executives, including Dr. McGuire.

51.     As noted by Forelle and Bandler, suspicious patterns of sharp price
inclines following the granting of options, similar to those alleged herein, are
"statistically unlikely" and "raise questions about whether there has been
backdating or other gaming of the system."  The article, in relevant part, states as
follows:

UnitedHealth, Comverse Technology Inc. and Vitesse
were among six companies whose options practices were

examined in a March article in The Wall Street Journal. *The article found that the CEOs of the companies routinely received grants dated ahead of sharp rises in share price, and that the likelihood of those beneficial grant dates having occurred randomly was minute.* All six companies have since said they've begun probes by outside directors and lawyers into their granting practices. (The Journal contacted Power Integrations for the March article but didn't cite it.) [emphasis added.]

[…]

Typically, stock options are granted by boards of directors. They are generally supposed to carry exercise prices equal to the fair market value of the company's stock at the time of the grant. But at a number of companies, grants to top executives show an unusual pattern: *They're frequently dated just before [a] sharp rise in the share price, and at or near the bottom of a steep dip. The patterns, statistically unlikely, raise questions about whether there has been backdating or other gaming of the system.* [emphasis added.]

[…]

The SEC began examining options backdating more than a year ago. Its attention apparently was piqued by *academic research that found unusual patterns of stock activity around the time of options grants, suggestive of possible backdating.* The research indicates that a dating problem could go beyond the cluster of companies already under scrutiny. [emphasis added.]

52.     Forelle and Bandler also noted that several of these investigations have already led companies to announce restatements, and in certain situations have led to the suspension of corporate executives.  The article, in relevant part, states as follows:

> Both Power Integrations and Comverse, a New York maker of telecommunications software, have said their reviews indicate that some options grants carried dates that "differed" from the grants' actual dates.
>
> Both companies, whose reviews continue, said they expect to restate financial results to record "additional noncash charges." Under accounting rules, companies need to report an expense for grants of "in the money" options -- those that carry an exercise price below the market price at the time of the grant. Any options backdated to a day when the stock was lower would be in-the-money.
>
> Another company, Vitesse, has suspended three executives, including CEO Louis R. Tomasetta, because of issues relating to "integrity of documents" in the options-granting process.
>
> […]
>
> It's possible any executives who participated in backdating could be open to civil or criminal fraud charges of enriching themselves through false or misleading records or filings. Lawyers cautioned that any such criminal charges would require that an executive who took part in backdating did so intentionally.
>
> […]

Comverse, for one, acted swiftly. Within days of beginning a probe led by outside directors, it said it would probably have to restate results. Within weeks, the investigation led to the resignation of Kobi Alexander, who founded Comverse more than two decades ago and built it into a major supplier of voice-messaging software and other products. Two other executives also resigned.

53.   Arthur Levitt, former Chairman of the SEC, recently described backdating schemes as "represent[ing] the ultimate in greed.  It is stealing, in effect.  It is ripping off shareholders in an unconscionable way."  SEC Chairman Christopher Cox, in testimony before the U.S. Committee on Banking, Housing, and Urban Affairs on September 6, 2006, similarly explained why options backdating schemes like Semtech's cause "real harm" to companies and their shareholders:

Thank you for inviting me to testify today about options backdating.  This issue is one of intense public interest because it strikes at the heart of the relationship among a public company's management, its directors, and its shareholders.

[…]

There are many variations on the backdating theme.  But here is a typical example of what some companies did:  They granted an "in-the-money" option—that is, an option with an exercise price lower than that day's market price.  They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was

1    lower.  That, of course, is what is meant by abusive

2    "backdating" in today's parlance.

3

4    The purpose of disguising an in-the-money option

5    through backdating is to allow the person who gets the

6    option grant to realize larger potential gains—without the

7    company having to show it as compensation on the

8    financial statements.

9

10   Rather obviously, this fact pattern results in a violation of

11   the SEC's disclosure rules, a violation of accounting

12   rules, and also a violation of the tax laws.

13

14   The SEC has been after the problem of abusive options

15   backdating for several years.

16   […]

17   But just as option compensation increased, so did the

18   potential for abuse.

19   […]

20   These [Brocade Communications Systems and Comverse

21   Technology, Inc.] cases demonstrate some of the

22   variations on the basic theme of fraudulent backdating

23   that the Commission has uncovered.  They involve

24   backdated option grants that are more profitable to

25   recipients; backdated option exercises that reduce

26   recipients' taxes at the expense of shareholders; options

27   granted to top executives; and options granted to rank

28   and file employees.  They involve actual personal gain to

1  wrongdoers, and real harm to companies that failed to
2  properly account for the options practices.
3  (http://www.sec.gov/news/testimony/2006/ts090606cc.htm).

4  54.    Moreover, Harvey Pitt, former Chairman of the SEC, recently stated
5  that "[t]hose who backdate options grants violate federal and state law.  And those
6  on whose watch this conduct occurs are also potentially liable:  *If they knew about*
7  *the backdating, they're participants in fraudulent and unlawful conduct.*  If they
8  didn't know about the backdating, the question will be:  Should they have done
9  more to discover it?"  (emphasis added).

10  55.    As demonstrated below, through an analysis of stock options that
11  Semtech granted from 1997 through 2005 and into 2006 and, as conceded by the
12  Restatement, it is evident that Defendants likewise engaged in a fraudulent
13  backdating scheme during the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

**The August 27, 2002 Press Release and**
**Form 10-Q for the Quarter Ending July 28, 2002**

18  56.    The Class Period begins on August 27, 2002, when the Company filed
19  a Form 8-K with the SEC and issued a press release announcing the Company's
20  earnings for the quarter ending July 28, 2002.  According to the Form 8-K and
21  press release, the Company's net income for the second quarter of fiscal 2003 was
22  $11.1 million or $.14 per diluted share.  Those net income and EPS numbers were
23  repeated in the Company's Form 10-Q for the quarter ending July 28, 2002 filed
24  with the SEC on September 11, 2002.

25  57.    The Company's Form 10-Q filed on September 11, 2002 contains the
26  following language:

27  The consolidated condensed financial statements
28  included herein have been prepared by the Company,

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CIVIL ACTION NO.:  2:07-CV-07114-CAS (FMOX)

23

1    without audit, pursuant to the rules and regulations of the

2    Securities and Exchange Commission.  Certain

3    information and footnote disclosures normally included

4    in financial statements prepared in accordance with

5    accounting principles generally accepted in the United

6    States have been condensed or omitted pursuant to such

7    rules and regulations, although the Company believes

8    that the disclosures are adequate to make the information

9    presented not misleading. These condensed financial

10   statements should be read in conjunction with the

11   consolidated financial statements and notes thereto

12   included in the Company's latest annual report on

13   Form 10-K.

14

15   In the opinion of the Company, these unaudited

16   statements contain all adjustments (consisting of normal

17   recurring adjustments) necessary to present fairly the

18   financial position of Semtech Corporation and

19   subsidiaries as of July 28, 2002, and the results of their

20   operations for the three and six months then ended and

21   their cash flows for the six months then ended.

22        58.    The Form 10-Q filed September 11, 2002 was signed by Defendants

23   Poe and Franz, and contained the following disclosure immediately above each of

24   their signatures:

25        1.     I have reviewed this quarterly report on Form 10-Q

26   of Semtech Corporation;

27        2.     Based on my knowledge, this quarterly report does

28   not contain any untrue statement of a material fact, or

omit to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading with respect to the period covered by this quarterly report; and

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

59.     The statements set forth above in ¶¶ 56 - 58 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form10-Q filed September 11, 2002 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Poe and Franz were materially false and misleading because Semtech underreported its expense and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations. Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

**The November 25, 2002 Press Release and The**

**Form 10-Q for the Quarter Ending October 27, 2002**

60.     On November 25, 2002, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending October 27, 2002.  According to the Form 8-K and press release, the Company's net income for the second quarter of fiscal 2003 was $13.0 million or $.17 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending October 27, 2002 filed with the SEC on December 11, 2002.

61.     The Company's Form 10-Q filed on December 11, 2002 contains the following language:

> The consolidated condensed financial statements
> included herein have been prepared by the Company,
> without audit, pursuant to the rules and regulations of the
> Securities and Exchange Commission.  Certain
> information and footnote disclosures normally included
> in financial statements prepared in accordance with
> accounting principles generally accepted in the United
> States have been condensed or omitted pursuant to such
> rules and regulations, although the Company believes
> that the disclosures are adequate to make the information
> presented not misleading. These condensed financial
> statements should be read in conjunction with the
> consolidated financial statements and notes thereto
> included in the Company's latest annual report on
> Form 10-K.

1           In the opinion of the Company, these unaudited

2           statements contain all adjustments (consisting of normal

3           recurring adjustments) necessary to present fairly the

4           financial position of Semtech Corporation and

5           subsidiaries as of October 27, 2002 and the results of

6           their operations for the three and nine months then ended

7           and their cash flows for the nine months then ended.

8      62.    The Form 10-Q dated December 11, 2002 was signed by Defendants

9 Poe and Franz, and contained the following disclosures immediately above each of

10 their signatures:

11          1.    I have reviewed this quarterly report on Form 10-Q

12          of Semtech Corporation;

13          2.    Based on my knowledge, this quarterly report does

14          not contain any untrue statement of a material fact, or

15          omit to state a material fact necessary to make the

16          statements made, in light of the circumstances under

17          which such statements were made, not misleading with

18          respect to the period covered by this quarterly report; and

19          3.    Based on my knowledge, the financial statements,

20          and other financial information included in this quarterly

21          report, fairly present in all material respects the financial

22          condition, results of operations and cash flows of the

23          registrant as of, and for, the periods presented in this

24          quarterly report;

25          4.    The registrant's other certifying officers and I are

26          responsible for establishing and maintaining disclosure

27          controls and procedures (as defined in the Exchange Act

28          Rules 13a-14 and 15d-14) for the registrant and we have:

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT           27

CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

(a)     Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures as of the date within 90 days prior to the filing of this quarterly report (the "Evaluation Date"); and

(c)     Presented in this [annual/quarterly] report our conclusions about the effectiveness of the disclosure controls and procedures based no our evaluation as of the Evaluation Date;

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditor and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.      The registrant's other certifying officers and I have indicated in this quarterly report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

63.   The statements set forth above in ¶¶ 60 - 62 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.1 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed December 11, 2002 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Poe and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations. Further, the statements were materially false and misleading because the Defendants undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

**The 2002 Form 10-K**

64.   On April 24, 2003, the Company filed a Form 10-K with the SEC. According to the Form 10-K, the Company's net income for the fiscal year ended January 26, 2003 was $34.2 million or $.44 per diluted share.

65.     The From 10-K dated April 24, 2003 was signed by Defendants Poe and Franz, and contained the following more detailed disclosures immediately above each of their signatures:

> 1.     I have reviewed this annual report on Form10-K of Semtech Corporation;
>
> 2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report; and
>
> 4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>
> (a)     Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

1          (b)     Evaluated the effectiveness of the

2  registrant's disclosure controls and procedures as of the

3  date within 90 days prior to the filing of this

4  [annual/quarterly] report (the "Evaluation Date"); and

5          (c)     Presented in this quarterly report our

6  conclusions about the effectiveness of the disclosure

7  controls and procedures based no our evaluation as of the

8  Evaluation Date;

9  5.     The registrant's other certifying officers and I have

10  disclosed, based on our most recent evaluation, to the

11  registrant's auditor and the audit committee of

12  registrant's board of directors (or persons performing the

13  equivalent functions):

14          (a)     All significant deficiencies in the design or

15  operation of internal controls which could adversely

16  affect the registrant's ability to record, process,

17  summarize and report financial data and have identified

18  for the registrant's auditors any material weaknesses in

19  internal controls; and

20          (b)     Any fraud, whether or not material, that

21  involves management or other employees who have a

22  significant role in the registrant's internal controls; and

23  6.     The registrant's other certifying officers and I have

24  indicated in this quarterly report whether there were

25  significant changes in internal controls or in other factors

26  that could significantly affect internal controls

27  subsequent to the date of our most recent evaluation,

28

1        including any corrective actions with regard to significant

2        deficiencies and material weaknesses.

3       66.    The Form 10-K filed with the SEC on April 24, 2003 falsely

4 represented that the Company accounted for its stock option grants pursuant to

5 APB No. 25:

6        The Company accounts for its employee stock plan under

7        the intrinsic value method prescribed by Accounting

8        Principles Board Opinion ("APB") No. 25, "Accounting

9        for Stock Issued to Employees," and related

10      interpretations, and has adopted the disclosure-only

11      provisions of SFAS No. 123, "Accounting for Stock-

12      Based Compensation" and as amended by SFAS No.

13      148, "Accounting for Stock-Based Compensation -

14      Transition and Disclosure, and amendment of FASB

15      Statement No. 123."

16      67.    The statements set forth above in ¶¶ 64 - 66 were materially false and

17 misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because

18 Semtech had backdated options, causing them to have intrinsic value on the date of

19 grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A

20 discloses that, had these options been properly accounted for, the Company would

21 have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million,

22 $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The Sarbanes-

23 Oxley certifications signed by Poe and Franz were materially false and misleading

24 because Semtech underreported its expenses and overstated net income, and

25 therefore its financial statements did not fairly present its financial condition and

26 results of operations.   Further, the statements were materially false and misleading

27 because the Defendants' undisclosed fraudulent and systemic backdating of option

28 grants had exposed the Company to material liabilities as set forth above.

68.     In the Form 10-K filed on April 24, 2003, the CEO and the CFO also signed and submitted Certifications pursuant to 18 U.S.C. 1350 as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Annual Report of Semtech Corporation (the "Company") on Form 10K for the fiscal year ended January 26, 2003 as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1.     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2.     The information contained in the Report fairly presents, in all material respects, the financial condition of the Company.

**The May 27, 2003 Press Release and The**

**Form 10-Q for the Quarter Ending April 27, 2003**

69.     On May 27, 2003, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending April 27, 2003.  According to the Form 8-K and press release, the Company's net income for the first quarter of fiscal 2004 was $8.3 million or $.11 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending April 27, 2003 filed with the SEC on June 11, 2003.

70.     The Company's Form 10-Q filed on June 11, 2003 contains the following language:

1    The consolidated condensed financial statements
2    included herein have been prepared by the Company,
3    without audit, pursuant to the rules and regulations of the
4    Securities and Exchange Commission.  Certain
5    information and footnote disclosures normally included
6    in financial statements prepared in accordance with
7    accounting principles generally accepted in the United
8    States have been condensed or omitted pursuant to such
9    rules and regulations, although the Company believes
10   that the disclosures are adequate to make the information
11   presented not misleading. These condensed financial
12   statements should be read in conjunction with the
13   consolidated financial statements and notes thereto
14   included in the Company's latest annual report on
15   Form 10-K.

16   In the opinion of the Company, these unaudited
17   statements contain all adjustments (consisting of normal
18   recurring adjustments) necessary to present fairly the
19   financial position of Semtech Corporation and
20   subsidiaries as of April 27, 2003, and the results of their
21   operations for the three months then ended and their cash
22   flows for the three months then ended.

23   71.    The Form 10-Q dated June 11, 2003 was signed by Defendants Poe
24   and Franz, and contained the following more detailed disclosures immediately
25   above each of their signatures:

26   1.    I have reviewed this quarterly report on Form 10-Q
27   of Semtech Corporation;

28

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact, or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and

3.      Based on my knowledge, this financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in the Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

(a)      Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures as of the date within 90 days prior to the filing of this quarterly report (the "Evaluation Date"); and

(c)      Presented in this quarterly report our conclusions about the effectiveness of the disclosure

controls and procedures based no our evaluation as of the

Evaluation Date;

5.      The registrant's other certifying officers and I have

disclosed, based on our most recent evaluation, to the

registrant's auditor and the audit committee of

registrant's board of directors (or persons performing the

equivalent functions):

(a)      All significant deficiencies in the design or

operation of internal controls which could adversely

affect the registrant's ability to record, process,

summarize and report financial data and have identified

for the registrant's auditors any material weaknesses in

internal controls; and

(b)      Any fraud, whether or not material, that

involves management or other employees who have a

significant role in the registrant's internal controls; and

6.      The registrant's other certifying officers and I have

indicated in this quarterly report whether there were

significant changes in internal controls or in other factors

that could significantly affect internal controls

subsequent to the date of our most recent evaluation,

including any corrective actions with regard to significant

deficiencies and material weaknesses.

72.      The statements set forth above in ¶¶ 69 - 71 were materially false and

misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because

Semtech had backdated options, causing them to have intrinsic value on the date of

grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A

discloses that, had these options been properly accounted for, the Company would

have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed June 11, 2003 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Poe and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations. Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

**The August 26, 2003 Press Release and The**

**Form 10-Q for the Quarter Ending July 27, 2003**

73.     On August 26, 2003, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending July 27, 2003.  According to the Form 8-K and press release, the Company's net income for the second quarter of fiscal 2004 was $2.4 million or $.03 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending July 27, 2003 filed with the SEC on September 10, 2003.

74.     The Company's Form 10-Q filed on September 10, 2003 contains the following language:

> The consolidated condensed financial statements
> included herein have been prepared by the Company,
> without audit, pursuant to the rules and regulations of the
> Securities and Exchange Commission.  Certain
> information and footnote disclosures normally included
> in financial statements prepared in accordance with

accounting principles generally accepted in the United

States have been condensed or omitted pursuant to such

rules and regulations, although the Company believes

that the disclosures are adequate to make the information

presented not misleading. These condensed financial

statements should be read in conjunction with the

consolidated financial statements and notes thereto

included in the Company's latest annual report on

Form 10-K.

In the opinion of the Company, these unaudited

statements contain all adjustments (consisting of normal

recurring adjustments) necessary to present fairly the

financial position of Semtech Corporation and

subsidiaries as of July 27, 2003, and the results of their

operations for the three and six months then ended and

their cash flows for the six months then ended.

75.     The Form 10-Q dated September 10, 2003 was signed by Defendants

Poe and Franz, and contained the following detailed (and slightly changed from

prior reporting periods) disclosures immediately above each of their signatures:

1.     I have reviewed this quarterly report on Form 10-Q

of Semtech Corporation;

2.     Based on my knowledge, this report does not

contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements

made, in light of the circumstances under which such

statements were made, not misleading with respect to the

period covered by this report;

3.      Based on my  knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is

reasonably likely to materially affect, the registrant's

internal control over financial reporting; and

5.      The registrant's other certifying officers and I have

disclosed, based on our most recent evaluation of internal

control over financial reporting, to the registrant's

auditors for the audit committee of registrant's board of

directors (or persons performing the equivalent

functions):

(a)      All significant deficiencies and material

weaknesses in the design or operation of internal control

over financial reporting which are reasonably likely to

adversely affect the registrant's ability to record, process,

summarize and report financial information; and

(b)      Any fraud, whether or not material, that

involves management or other employees who have a

significant role in the registrant's internal control over

financial reporting.

76.      The statements set forth above in ¶¶ 73 - 75 were materially false and

misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because

Semtech had backdated options, causing them to have intrinsic value on the date of

grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A

discloses that, had these options been properly accounted for, the Company would

have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million,

$5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form

10-K/A further discloses that such amounts were required to be amortized over the

related service period, demonstrating that the Form 10-Q filed September 10, 2003

/overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications

signed by Poe and Franz were materially false and misleading because Semtech

1   underreported its expenses, and overstated net income, and therefore its financial

2   statements did not fairly present its financial condition and results of operations.

3          77.     In the Form 10-Q filed on September 10, 2003, the CEO and the CFO

4   also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted

5   Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as

6   follows:

7                  In connection with the Quarterly Report of Semtech

8                  Corporation (the "Company") on Form 10-Q for the

9                  period ended [date] as filed with the Securities Exchange

10                 Commission on the date hereof (the "Report"), I,

11                 [officer's name and title], hereby certify pursuant to 18

12                 USC 1350, as adopted pursuant to Section 906 of the

13                 Sarbanes-Oxley Act of 2002, that:

14                 1.      The Report fully complies with the requirements

15                 of section 13(a) or 15(d) of the Securities Exchange Act

16                 of 1934; and

17                 2.      The information contained in the Report fairly

18                 presents, in all material respects, the financial condition

19                 of the Company.

20  **The November 24, 2003 Press Release and The**

21  **Form 10-Q for the Quarter Ending October 26, 2003**

22         78.     On November 24, 2003, the Company filed a Form 8-K with the SEC

23  and issued a press release announcing the Company's earnings for the quarter

24  ending October 26, 2003.  According to the Form 8-K and press release, the

25  Company's net income for the third quarter of fiscal was $9.3 million or $.12 per

26  diluted share.  Those net income and EPS numbers were repeated in the

27  Company's Form 10-Q for the quarter ending October 26, 2003.

28

79.     The Company's Form 10-Q filed on December 10, 2003 contains the following language:

> The consolidated condensed financial statements
> included herein have been prepared by the Company,
> without audit, pursuant to the rules and regulations of the
> Securities and Exchange Commission.  Certain
> information and footnote disclosures normally included
> in financial statements prepared in accordance with
> accounting principles generally accepted in the United
> States have been condensed or omitted pursuant to such
> rules and regulations, although the Company believes
> that the disclosures are adequate to make the information
> presented not misleading. These condensed financial
> statements should be read in conjunction with the
> consolidated financial statements and notes thereto
> included in the Company's latest annual report on
> Form 10-K.
>
> In the opinion of the Company, these unaudited
> statements contain all adjustments (consisting of normal
> recurring adjustments) necessary to present fairly the
> financial position of Semtech Corporation and
> subsidiaries as of October 26, 2003, and the results of
> their operations for the three and nine months then ended
> and their cash flows for the nine months then ended.

80.     The Form 10-Q dated December 10, 2003 was signed by Defendants Carlson and Franz, and contained the following detailed and slightly changed disclosures immediately above each of their signatures:

1.      I have reviewed this quarterly report on Form 10-Q of Semtech Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my  knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

1    effectiveness of the disclosure controls and procedures,

2    as of the end of the period covered by this report based

3    on such evaluation; and

4         (c)    Disclosed in this report any change in the

5    registrant's internal control over financial reporting that

6    occurred during the registrant's most recent fiscal quarter

7    (the registrant's fourth fiscal quarter in the case of an

8    annual report) that has materially affected, or is

9    reasonably likely to materially affect, the registrant's

10   internal control over financial reporting; and

11   5.    The registrant's other certifying officers and I have

12   disclosed, based on our most recent evaluation of internal

13   control over financial reporting, to the registrant's

14   auditors for the audit committee of registrant's board of

15   directors (or persons performing the equivalent

16   functions):

17        (a)    All significant deficiencies and material

18   weaknesses in the design or operation of internal control

19   over financial reporting which are reasonably likely to

20   adversely affect the registrant's ability to record, process,

21   summarize and report financial information; and

22        (b)    Any fraud, whether or not material, that

23   involves management or other employees who have a

24   significant role in the registrant's internal control over

25   financial reporting.

26       81.    The statements set forth above in ¶¶ 78 - 80 were materially false and

27   misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because

28   Semtech had backdated options, causing them to have intrinsic value on the date of

1  grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A

2  discloses that, had these options been properly accounted for, the Company would

3  have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million,

4  $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form

5  10-K/A further discloses that such amounts were required to be amortized over the

6  related service period, demonstrating that the Form 10-Q filed December 10, 2003

7  overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications

8  signed by Poe and Franz were materially false and misleading because Semtech

9  underreported its expenses and overstated net income, and therefore its financial

10 statements did not fairly present its financial condition and results of operations.

11 Further, the statements were materially false and misleading because the

12 Defendants' undisclosed fraudulent and systemic backdating of option grants had

13 exposed the Company to material liabilities as set forth above.

14       82.    In the Form 10-Q filed on December 10, 2003, the CEO and the CFO

15 also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted

16 Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as

17 follows:

18              In connection with the Quarterly Report of Semtech

19              Corporation (the "Company") on Form 10-Q for the

20              period ended October 26, 2003 as filed with the

21              Securities Exchange Commission on the date hereof (the

22              "Report"), I, [officer's name and title], hereby certify

23              pursuant to 18 USC 1350, as adopted pursuant to Section

24              906 of the Sarbanes-Oxley Act of 2002, that:

25              1.    The Report fully complies with the requirements

26              of section 13(a) or 15(d) of the Securities Exchange Act

27              of 1934; and

28

2.     The information contained in the Report fairly presents, in all material respects, the financial condition of the Company.

**The 2003 Form 10-K**

83.     On April 9, 2004, the Company filed a Form 10-K with the SEC. According to the Form 10-K, the Company's net income for the fiscal year ended January 25, 2004 was $32.5 million or $.42 per diluted share.

84.     The Form 10-K dated April 9, 2004 was signed by Defendants Carlson and Franz, and contained the following more detailed disclosures immediately above each of their signatures:

1.     I have reviewed this annual report on Form 10-K of Semtech Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my  knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:

1          (a)     Designed such disclosure controls and

2    procedures, or caused such disclosure controls and

3    procedures to be designed under our supervision, to

4    ensure that material information relating to the registrant,

5    including its consolidated subsidiaries, is made known to

6    us by others within those entities, particularly during the

7    period in which this report is being prepared;

8          (b)     Evaluated the effectiveness of the

9    registrant's disclosure controls and procedures and

10   presented in this report our conclusions about the

11   effectiveness of the disclosure controls and procedures,

12   as of the end of the period covered by this report based

13   on such evaluation; and

14         (c)     Disclosed in this report any change in the

15   registrant's internal control over financial reporting that

16   occurred during the registrant's most recent fiscal quarter

17   (the registrant's fourth fiscal quarter in the case of an

18   annual report) that has materially affected, or is

19   reasonably likely to materially affect, the registrant's

20   internal control over financial reporting; and

21   5.     The registrant's other certifying officers and I have

22   disclosed, based on our most recent evaluation of internal

23   control over financial reporting, to the registrant's

24   auditors for the audit committee of registrant's board of

25   directors (or persons performing the equivalent

26   functions):

27         (a)     All significant deficiencies and material

28   weaknesses in the design or operation of internal control

over financial reporting which are reasonably likely to

adversely affect the registrant's ability to record, process,

summarize and report financial information; and

(b)     Any fraud, whether or not material, that

involves management or other employees who have a

significant role in the registrant's internal control over

financial reporting.

85.     The Form 10-K filed with the SEC on April 9, 2004 falsely represented that the Company accounted for its stock option grants pursuant to APB No. 25:

The Company accounts for its employee stock plan under

the intrinsic value method prescribed by Accounting

Principles Board Opinion ("APB") No. 25, "Accounting

for Stock Issued to Employees," and related

interpretations, and has adopted the disclosure-only

provisions of SFAS No. 123, "Accounting for Stock-

Based Compensation" and as amended by SFAS No.

148, "Accounting for Stock-Based Compensation -

Transition and Disclosure, and amendment of FASB

Statement No. 123."

86.     The statements set forth above in ¶¶ 83 - 85 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and

1    misleading because Semtech underreported its expenses and overstated net income,

2    and therefore its financial statements did not fairly present its financial condition

3    and results of operations.   Further, the statements were materially false and

4    misleading because the Defendants' undisclosed fraudulent and systemic

5    backdating of option grants had exposed the Company to material liabilities as set

6    forth above.

7           87.    In the Form 10-K filed on April 9, 2004, the CEO and the CFO also

8    signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant

9    to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

10                In connection with the Annual Report of Semtech

11                Corporation (the "Company") on Form 10K for the fiscal

12                year ended January 25, 2004 as filed with the Securities

13                Exchange Commission on the date hereof (the "Report"),

14                I, [officer's name and title], hereby certify pursuant to 18

15                USC 1350, as adopted pursuant to Section 906 of the

16                Sarbanes-Oxley Act of 2002, that:

17                1.     The Report fully complies with the requirements

18                of section 13(a) or 15(d) of the Securities Exchange Act

19                of 1934; and

20                2.     The information contained in the Report fairly

21                presents, in all material respects, the financial condition

22                of the Company.

23   **The May 25, 2004 Press Release and the**

24   **Form 10-Q for the Quarter Ending April 25, 2004**

25          88.    On May 25, 2004, the Company filed a Form 8-K with the SEC and

26   issued a press release announcing the Company's earnings for the quarter ending

27   April 25, 2004.  According to the Form 8-K and press release, the Company's net

28   income for the first quarter of fiscal 2005 was $14.8 million or $.19 per diluted

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                                    49
CIVIL ACTION NO.:  2:07-CV-07114-CAS (FMOX)

1 share.  Those net income and EPS numbers were repeated in the Company's Form

2 10-Q for the quarter ending April 25, 2004 filed with the SEC on June 4, 2004.

3        89.    The Company's Form 10-Q filed on June 4, 2004 contains the

4 following language:

> The consolidated condensed financial statements
> included herein have been prepared by the Company,
> without audit, pursuant to the rules and regulations of the
> Securities and Exchange Commission.  Certain
> information and footnote disclosures normally included
> in financial statements prepared in accordance with
> accounting principles generally accepted in the United
> States have been condensed or omitted pursuant to such
> rules and regulations, although the Company believes
> that the disclosures are adequate to make the information
> presented not misleading. These condensed financial
> statements should be read in conjunction with the
> consolidated financial statements and notes thereto
> included in the Company's latest annual report on
> Form 10-K.
>
> In the opinion of the Company, these unaudited
> statements contain all adjustments (consisting of normal
> recurring adjustments) necessary to present fairly the
> financial position of Semtech Corporation and
> subsidiaries as of April 25, 2004, and the results of their
> operations for the three months then ended and their cash
> flows for the three months then ended.

90.     The Form 10-Q filed June 4, 2004 was signed by Defendants Carlson and Franz, and contained the following detailed disclosures immediately above each of their signatures:

1.      I have reviewed this quarterly report on Form 10-Q of Semtech Corporation;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

1      (b)     Evaluated the effectiveness of the

2      registrant's disclosure controls and procedures and

3      presented in this report our conclusions about the

4      effectiveness of the disclosure controls and procedures,

5      as of the end of the period covered by this report based

6      on such evaluation; and

7      (c)     Disclosed in this report any change in the

8      registrant's internal control over financial reporting that

9      occurred during the registrant's most recent fiscal quarter

10     (the registrant's fourth fiscal quarter in the case of an

11     annual report) that has materially affected, or is

12     reasonably likely to materially affect, the registrant's

13     internal control over financial reporting; and

14     5.      The registrant's other certifying officers and I have

15     disclosed, based on our most recent evaluation of internal

16     control over financial reporting, to the registrant's

17     auditors for the audit committee of registrant's board of

18     directors (or persons performing the equivalent

19     functions):

20     (a)     All significant deficiencies and material

21     weaknesses in the design or operation of internal control

22     over financial reporting which are reasonably likely to

23     adversely affect the registrant's ability to record, process,

24     summarize and report financial information; and

25     (b)     Any fraud, whether or not material, that

26     involves management or other employees who have a

27     significant role in the registrant's internal control over

28     financial reporting.

91.     The statements set forth above in ¶¶ 88 - 90 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed June 4, 2004 /overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations.   Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

92.     In the Form 10-Q filed on June 4, 2004, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Quarterly Report of Semtech
> Corporation (the "Company") on Form 10-Q for the
> period ended April 25, 2004 as filed with the Securities
> Exchange Commission on the date hereof (the "Report"),
> I, [officer's name and title], hereby certify pursuant to 18
> USC 1350, as adopted pursuant to Section 906 of the
> Sarbanes-Oxley Act of 2002, that:

1.      The Report fully complies with the requirements
of section 13(a) or 15(d) of the Securities Exchange Act
of 1934; and

2.      The information contained in the Report fairly
presents, in all material respects, the financial condition
of the Company.

**The August 24, 2004 Press Release and the**

**Form 10-Q for the Quarter Ending July 25, 2004**

93.     On August 24, 2004, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending July 25, 2004. According to the Form 8-K and press release, the Company's net income for the second quarter of fiscal 2005 was $17.4 million or $.22 per diluted share. Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending July 25, 2004 filed with the SEC on September 3, 2004.

94.     The Form 10-Q dated September 3, 2004 was signed by Defendants Carlson and Franz, and contained the following detailed disclosures immediately above each of their signatures:

1.      I have reviewed this quarterly report on Form 10-Q
of Semtech Corporation;

2.      Based on my knowledge, this report does not
contain any untrue statement of a material fact or omit to
state a material fact necessary to make the statements
made, in light of the circumstances under which such
statements were made, not misleading with respect to the
period covered by this report;

3.      Based on my knowledge, the financial statements,
and other financial information included in this report,

fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors for the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

95.      The statements set forth above in ¶¶ 93 - 94 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed September 3, 2004 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of

operations.   Further, the statements were materially false and misleading because the Defendants undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

96.   In the Form 10-Q filed on September 3 2004, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Quarterly Report of Semtech Corporation (the "Company") on Form 10-Q for the period ended [date] as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1.   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2.   The information contained in the Report fairly presents, in all material respects, the financial condition of the Company.

**The November 29, 2004 Press Release and the**
**Form 10-Q for the Quarter Ending October 31, 2004**

97.   On November 29, 2004, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending October 31, 2004.  According to the Form 8-K and press release, the Company's net income for the third quarter of fiscal 2005 was $14.6 million or $.19 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending October 31, 2004.

98. The Company's Form 10-Q filed on December 10, 2004 contains the following language:

> The accompanying consolidated condensed financial statements have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the information presented not misleading. These consolidated condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's latest annual report on Form 10-K. Certain amounts for prior periods have been reclassified to confirm to the current presentation.
>
> In the opinion of the Company, these unaudited statements contain all adjustments (consisting of normal recurring adjustments) necessary to present fairly, in all material respects, the financial position of Semtech Corporation and subsidiaries as of October 31, 2004 the results of their operations for the third quarter and the three quarters then ended and their cash flows for the three quarters then ended.

99.     The Form 10-Q dated December 10, 2004 was signed by Defendants Carlson and Franz, and contained the following detailed disclosures immediately above each of their signatures:

> 1.     I have reviewed this quarterly report on Form 10-Q of Semtech Corporation;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report.
>
> 4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15e and 15d-15(e)) for the registrant and have:
>
> (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors for the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

100.   The statements set forth above in ¶¶ 97 - 99 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed December 10, 2004 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations.   Further, the statements were materially false and misleading because the Defendants undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

101.   In the Form 10-Q filed on December 10, 2004, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Quarterly Report of Semtech Corporation (the "Company") on Form 10-Q for the period ended October 3, 2004 as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1    1.  The Report fully complies with the requirements

2    of section 13(a) or 15(d) of the Securities Exchange Act

3    of 1934; and

4    2.  The information contained in the Report fairly

5    presents, in all material respects, the financial condition

6    of the Company.

**The 2004 Form 10-K**

8   102. On April 15, 2005, the Company filed a Form 10-K with the SEC. According to the Form 10-K, the Company's net income for the fiscal year ended January 30, 2005 was $58.9 million or $.75 per diluted share.

   103. The Form 10-K dated April 15, 2005 was signed by Defendants Carlson and Franz, and contained the following more detailed disclosures, again changed, immediately above each of their signatures:

    1.  I have reviewed this report on Form 10-K of Semtech Corporation;

    2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report;

    3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this reported our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that

occurred during the registrant's most recent fiscal quarter
(the registrant's fourth fiscal quarter in the case of an
annual report) that has materially affected, or is
reasonably likely to materially affect, the registrant's
internal control over financial reporting; and

    5.    The registrant's other certifying officer(s) and I
have disclosed, based on our most recent evaluation of
internal control over financial reporting, to the
registrant's auditors and the audit committee of the
registrant's board of directors (or persons performing the
equivalent functions):

    (a)    All significant deficiencies and material
weaknesses in the design or operation of internal control
over financial reporting which are reasonably likely to
adversely affect the registrant's ability to record, process,
summarize and report financial information; and

    (b)    Any fraud, whether or not material, that
involves management or other employees who have a
significant role in the registrant's internal control over
financial reporting.

104.    The Form 10-K filed with the SEC on April 15, 2005 falsely
represented that the Company accounted for its stock option grants pursuant to
APB No. 25:

    The Company accounts for its employee stock plan under
the intrinsic value method prescribed by Accounting
Principles Board Opinion ("APB") No. 25, "Accounting
for Stock Issued to Employees," and related
interpretations, and has adopted the disclosure-only

provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" and as amended by SFAS No. 148, "Accounting for Stock-Based Compensation - Transition and Disclosure, and amendment of FASB Statement No. 123."

105.   The statements set forth above in ¶¶ 102 - 104 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations.   Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

106.   In the Form 10-K filed on April 15, 2005, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

In connection with the Annual Report of Semtech Corporation (the "Company") on Form 10K for the fiscal year ended January 30, 2005 as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18

1    USC 1350, as adopted pursuant to Section 906 of the

2    Sarbanes-Oxley Act of 2002, that:

3        (a)    The Report fully complies with the requirements

4    of section 13(a) or 15(d) of the Securities Exchange Act

5    of 1934; and

6        (b)    The information contained in the Report fairly

7    presents, in all material respects, the financial condition

8    of the Company.

**The May 31, 2005 Press Release and the**

**Form 10-Q for the Quarter Ending May 1, 2005**

11       107.   On May 31, 2005, the Company filed a Form 8-K with the SEC and

12   issued a press release announcing the Company's earnings for the quarter ending

13   May 1, 2005.  According to the Form 8-K and press release, the Company's net

14   income for the first quarter of fiscal 2006 was $10.8 million or $.14 per diluted

15   share.  Those net income and EPS numbers were repeated in the Company's Form

16   10-Q for the quarter ending May 1, 2005 filed with the SEC on June 10, 2005.

17       108.   The Company's Form 10-Q filed on June 10, 2005 contains the

18   following language:

19       The accompanying consolidated condensed financial

20       statements have been prepared by the Company, without

21       audit, pursuant to the rules and regulations of the

22       Securities and Exchange Commission. Certain

23       information and footnote disclosures normally included

24       in financial statements prepared in accordance with

25       accounting principles generally accepted in the United

26       States have been condensed or omitted pursuant to such

27       rules and regulations, although the Company believes

28       that the disclosures are adequate to make the information

1    presented not misleading. These consolidated condensed

2    financial statements should be read in conjunction with

3    the consolidated financial statements and notes thereto

4    included in the Company's latest annual report on Form

5    10-K. Certain amounts for prior periods have been

6    reclassified to confirm to the current presentation.

7

8    In the opinion of the Company, these unaudited

9    statements contain all adjustments (consisting of normal

10   recurring adjustments) necessary to present fairly, in all

11   material respects, the financial position of Semtech

12   Corporation and subsidiaries as of May 1, 2005, the

13   results of their operations for the first quarter then ended,

14   and their cash flows for the first quarter then ended.

15          109.   The Form 10-Q dated June 10, 2005 was signed by Defendants

16   Carlson and Franz, and contained the following detailed disclosures, which were

17   again changed, immediately above each of their signatures:

18          1.     I have reviewed this report on Form 10-Q of

19   Semtech Corporation;

20          2.     Based on my knowledge, this report does not

21   contain any untrue statement of a material fact or omit to

22   state a material fact necessary to make the statements

23   made, in light of the circumstances under which

24   statements were made, not misleading with respect to the

25   period covered by this report;

26          3.     Based on my knowledge, the financial statements,

27   and other financial information included in this report,

28   fairly present in all material respects the financial

condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this reported our conclusions about the effectiveness of the disclosure controls and procedures,

as of the end of the period covered by this report based on such evaluation; and

      (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

110.    The statements set forth above in ¶¶ 107 - 109 were materially false and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A, because Semtech had backdated options, causing them to have intrinsic value on the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-

K/A discloses that, had these options been properly accounted for, the Company would have recognized additional expenses of $36.4 million, $13.4 million, $9.2 million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The 2006 Form 10-K/A further discloses that such amounts were required to be amortized over the related service period, demonstrating that the Form 10-Q filed June 10, 2005 overstated net income for the quarterly periods.  The Sarbanes-Oxley certifications signed by Carlson and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations.   Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

111.   In the Form 10-Q filed on June 10, 2005, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Quarterly Report of Semtech Corporation (the "Company") on Form 10-Q for the period ended May 1, 2005 as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1.      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

1        2.     The information contained in the Report fairly

2        presents, in all material respects, the financial condition

3        of the Company.

**The August 30, 2005 Press Release and the**

**Form 10-Q for the Quarter Ending July 31, 2005**

112.   On August 30, 2005, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending July 31, 2005.  According to the Form 8-K and press release, the Company's net income for the second quarter of fiscal year 2006 was $7.4 million or $.10 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending July 31, 2005 filed with the SEC on September 9, 2005.

113.   The Company's Form 10-Q filed on September 9, 2005 contains the following language:

The accompanying consolidated condensed financial statements have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the information presented not misleading. These consolidated condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's latest annual report on Form

10-K. Certain amounts for prior periods have been reclassified to confirm to the current presentation.

In the opinion of the Company, these unaudited statements contain all adjustments (consisting of normal recurring adjustments) necessary to present fairly, in all material respects, the financial position of Semtech Corporation and subsidiaries as of July 31, 2005, the results of their operations for the second quarter and the two quarters then ended, and their cash flows for the two quarters then ended.

114.   The Form 10-Q dated September 9, 2005 was signed by Defendants Carlson and Franz, and contained the following detailed disclosures, which were again changed, immediately above each of their signatures:

1.   I have reviewed this report on Form 10-Q of Semtech Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this reported our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that

occurred during the registrant's most recent fiscal quarter
(the registrant's fourth fiscal quarter in the case of an
annual report) that has materially affected, or is
reasonably likely to materially affect, the registrant's
internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I
have disclosed, based on our most recent evaluation of
internal control over financial reporting, to the
registrant's auditors and the audit committee of the
registrant's board of directors (or persons performing the
equivalent functions):

(a)      All significant deficiencies and material
weaknesses in the design or operation of internal control
over financial reporting which are reasonably likely to
adversely affect the registrant's ability to record, process,
summarize and report financial information; and

(b)      Any fraud, whether or not material, that
involves management or other employees who have a
significant role in the registrant's internal control over
financial reporting.

115.   The statements set forth above in ¶¶ 112 - 114 were materially false
and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A,
because Semtech had backdated options, causing them to have intrinsic value on
the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-
K/A discloses that, had these options been properly accounted for, the Company
would have recognized additional expenses of $36.4 million, $13.4 million, $9.2
million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The
2006 Form 10-K/A further discloses that such amounts were required to be

1    amortized over the related service period, demonstrating that the Form 10-Q filed

2    September 9, 2005 overstated net income for the quarterly periods.  The Sarbanes-

3    Oxley certifications signed by Carlson and Franz were materially false and

4    misleading because Semtech underreported its expenses and net income, and

5    therefore its financial statements did not fairly present its financial condition and

6    results of operations.   Further, the statements were materially false and misleading

7    because the Defendants' undisclosed fraudulent and systemic backdating of option

8    grants had exposed the Company to material liabilities as set forth above.

9        116.   In the Form 10-Q filed on September 9, 2005, the CEO and the CFO

10    also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted

11    Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as

12    follows:

13              In connection with the Quarterly Report of Semtech

14              Corporation (the "Company") on Form 10-Q for the

15              period ended July 31, 2005 as filed with the Securities

16              Exchange Commission on the date hereof (the "Report"),

17              I, [officer's name and title], hereby certify pursuant to 18

18              USC 1350, as adopted pursuant to Section 906 of the

19              Sarbanes-Oxley Act of 2002, that:

20              1.     The Report fully complies with the requirements

21              of section 13(a) or 15(d) of the Securities Exchange Act

22              of 1934; and

23              2.     The information contained in the Report fairly

24              presents, in all material respects, the financial condition

25              of the Company.

26

27

28

**The November 29, 2005 Press Release and the**

**Form 10-Q for the Quarter Ending October 30, 2005**

117.   On November 29, 2005, the Company filed a Form 8-K with the SEC and issued a press release announcing the Company's earnings for the quarter ending October 30, 2005.  According to the Form 8-K and press release, the Company's net income for the third quarter of fiscal 2006 was $11.5 million or $.15 per diluted share.  Those net income and EPS numbers were repeated in the Company's Form 10-Q for the quarter ending October 30, 2005 and filed with the SEC on December 9, 2005.

118.   The Company's Form 10-Q filed on December 9, 2005 contains the following language:

> The accompanying consolidated condensed financial statements have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations, although the Company believes that the disclosures are adequate to make the information presented not misleading. These consolidated condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in the Company's latest annual report on Form 10-K. Certain amounts for prior periods have been reclassified to confirm to the current presentation.

1     In the opinion of the Company, these unaudited

2     statements contain all adjustments (consisting of normal

3     recurring adjustments) necessary to present fairly, in all

4     material respects, the financial position of Semtech

5     Corporation and subsidiaries as of October 30, 2005, the

6     results of their operations for the third quarter and the

7     three quarters then ended, and their cash flows for the

8     three quarters then ended.

9          119.   The Form 10-Q dated December 9, 2005 was signed by Defendants

10   Poe and Franz, and contained the following detailed disclosures, which were again

11   changed, immediately above each of their signatures:

12             1.     I have reviewed this report on Form 10-Q of

13             Semtech Corporation;

14             2.     Based on my knowledge, this report does not

15             contain any untrue statement of a material fact or omit to

16             state a material fact necessary to make the statements

17             made, in light of the circumstances under which

18             statements were made, not misleading with respect to the

19             period covered by this report;

20             3.     Based on my knowledge, the financial statements,

21             and other financial information included in this report,

22             fairly present in all material respects the financial

23             condition, results of operations and cash flows of the

24             registrant as of, and for, the periods presented in this

25             report;

26             4.     The registrant's other certifying officers and I are

27             responsible for establishing and maintaining disclosure

28             controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this reported our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is

1    reasonably likely to materially affect, the registrant's

2    internal control over financial reporting; and

3    5.    The registrant's other certifying officer(s) and I

4    have disclosed, based on our most recent evaluation of

5    internal control over financial reporting, to the

6    registrant's auditors and the audit committee of the

7    registrant's board of directors (or persons performing the

8    equivalent functions):

9    (a)    All significant deficiencies and material

10    weaknesses in the design or operation of internal control

11    over financial reporting which are reasonably likely to

12    adversely affect the registrant's ability to record, process,

13    summarize and report financial information; and

14    (b)    Any fraud, whether or not material, that

15    involves management or other employees who have a

16    significant role in the registrant's internal control over

17    financial reporting.

18    120.    The statements set forth above in ¶¶ 117 - 119 were materially false

19    and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A,

20    because Semtech had backdated options, causing them to have intrinsic value on

21    the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-

22    K/A discloses that, had these options been properly accounted for, the Company

23    would have recognized additional expenses of $36.4 million, $13.4 million, $9.2

24    million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The

25    2006 Form 10-K/A further discloses that such amounts were required to be

26    amortized over the related service period, demonstrating that the Form 10-Q filed

27    December 9, 2005 overstated net income for the quarterly periods.  The Sarbanes-

28    Oxley certifications signed by Poe and Franz were materially false and misleading

1  because Semtech underreported its expenses and overstated net income, and

2  therefore its financial statements did not fairly present its financial condition and

3  results of operations.   Further, the statements were materially false and misleading

4  because the Defendants' undisclosed fraudulent and systemic backdating of option

5  grants had exposed the Company to material liabilities as set forth above.

6       121.   In the Form 10-Q filed on December 9, 2005, the CEO and the CFO

7  also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted

8  Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as

9  follows:

10         In connection with the Quarterly Report of Semtech

11         Corporation (the "Company") on Form 10-Q for the

12         period ended October 30, 2005 as filed with the

13         Securities Exchange Commission on the date hereof (the

14         "Report"), I, [officer's name and title], hereby certify

15         pursuant to 18 USC 1350, as adopted pursuant to Section

16         906 of the Sarbanes-Oxley Act of 2002, that:

17         1.    The Report fully complies with the requirements

18         of section 13(a) or 15(d) of the Securities Exchange Act

19         of 1934; and

20         2.    The information contained in the Report fairly

21         presents, in all material respects, the financial condition

22         of the Company.

23  **The 2005 Form 10-K**

24       122.   On April 14, 2006, the Company filed a Form 10-K with the SEC.

25  According to the Form 10-K, the Company's net income for the fiscal year ended

26  January 29, 2006 was $43 million or $.57 per diluted share.

27

28

123.   The Form 10-K dated April 14, 2006 was signed by Defendants Maheswaran and Franz, and contained the following more detailed disclosures, again changed, immediately above each of their signatures:

1.   I have reviewed this report on Form 10-K of Semtech Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this reported our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

1           (a)     All significant deficiencies and material

2           weaknesses in the design or operation of internal control

3           over financial reporting which are reasonably likely to

4           adversely affect the registrant's ability to record, process,

5           summarize and report financial information; and

6           (b)     Any fraud, whether or not material, that

7           involves management or other employees who have a

8           significant role in the registrant's internal control over

9           financial reporting.

10       124.   The Form 10-K filed with the SEC on April 14, 2006 falsely

11   represented that the Company accounted for its stock option grants pursuant to

12   APB No. 25:

13           The Company accounts for its employee stock plan under

14           the intrinsic value method prescribed by Accounting

15           Principles Board Opinion ("APB") No. 25, "Accounting

16           for Stock Issued to Employees," and related

17           interpretations, and has adopted the disclosure-only

18           provisions of SFAS No. 123, "Accounting for Stock-

19           Based Compensation" and as amended by SFAS No.

20           148, "Accounting for Stock-Based Compensation -

21           Transition and Disclosure, and amendment of FASB

22           Statement No. 123."

23       125.   The statements set forth above in ¶¶ 122 - 124 were materially false

24   and misleading.  As was ultimately disclosed in Semtech's 2006 Form 10-K/A,

25   because Semtech had backdated options, causing them to have intrinsic value on

26   the date of grant, the Company underreported expenses.  Semtech's 2006 Form 10-

27   K/A discloses that, had these options been properly accounted for, the Company

28   would have recognized additional expenses of $36.4 million, $13.4 million, $9.2

million, $5.6 million, and $1.5 million fiscal years 2002-2006 respectively. The Sarbanes-Oxley certifications signed by Mahezwaran and Franz were materially false and misleading because Semtech underreported its expenses and overstated net income, and therefore its financial statements did not fairly present its financial condition and results of operations.   Further, the statements were materially false and misleading because the Defendants' undisclosed fraudulent and systemic backdating of option grants had exposed the Company to material liabilities as set forth above.

126.   In the Form 10-K filed on April 14, 2006, the CEO and the CFO also signed and submitted Certifications pursuant to 18 USC 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which stated as follows:

> In connection with the Annual Report of Semtech Corporation (the "Company") on Form 10K for the fiscal year ended January 29, 2006 as filed with the Securities Exchange Commission on the date hereof (the "Report"), I, [officer's name and title], hereby certify pursuant to 18 USC 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> 1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2.    The information contained in the Report fairly presents, in all material respects, the financial condition of the Company.

## REVELATION OF THE FRAUDULENT SCHEME

127.   Defendants' scheme began to unravel when, on May 16, 2006, the Center for Financial Research and Analysis ("CFRA") published a research report

1   on stock option backdating.  The CFRA report listed Semtech as a company at risk

2   for such practices.

3        128.   Following the CFRA report, on May 18, 2006, the Securities and

4   Exchange Commission ("SEC") sent the Company a letter requesting that it

5   voluntarily provide information regarding stock options granted since January 1,

6   1997.  On May 22, 2006, the Company issued a press release announcing that it

7   received the SEC letter and stated it "intends to fully cooperate with the SEC's

8   informal inquiry."  The press release down-played the news stating that Semtech

9   was one of 30 companies mentioned in the report, and noted that the report

10  referenced only four of the Company's option grants; two in 1997, one in 1999,

11  and one in 2002.

12       129.   On June 9, 2006, the Company filed a Form 12b-25 with the SEC

13  announcing that, in addition to the SEC investigation, the Company was

14  conducting its own internal review.  According to the filing, due to the volume of

15  data subject to the internal review, the Company was unable to complete and

16  timely file its 10-Q for the quarter ending April 20, 2006.

17       130.   On June 14, 2006, the Company issued a press release announcing

18  that the filing of its April 30, 2006 Form 10-Q would be delayed past the extended

19  June 14, 2006 due date, and as a result in the delay in filing, the Company expected

20  it might receive a delisting notice from the NASDAQ.  The press release also

21  announced that Semtech's Audit Committee had launched its own internal

22  investigation, and that on June 13, 2006, the Company received a grand jury

23  subpoena dated June 8, 2006 from the United States District Court for the Southern

24  District of New York with respect to the production of documents relating to the

25  Company's stock option practices.

26       131.   On June 20, 2006, the Company issued a press release announcing

27  that it received a delisting notice from the NASDAQ due to the Company's failure

28  to timely file its Form 10-Q for the quarter ended April 30, 2006.

132.    On July 20, 2006, the Company filed a Form 8-K with the SEC revealing that, although the Company's internal investigation was far from complete, it determined that "the accounting measurement dates for certain stock options granted primarily during fiscal years 1998 through 2003…differ from the measurement dates previously used for such awards."  Accordingly, the Company announced that it expects to "record additional noncash compensation expense and expects the amount of such additional expense to be material."

133.    The July 20, 2006 Form 8-K further revealed that, "[a]s a result of these adjustments, the Company expects to restate its financial statements for fiscal years 2002 through 2006," and that the Company's previously issued financial statements, earnings press releases and similar communications should no longer be relied upon.

134.    Semtech's stock price reacted strongly to the series of announcements about the backdating investigation.  On May 19, 2006, the day prior to the Company's announcement of the SEC inquiry, the Company's stock price closed at $16.05 per share.  Despite the Company's downplaying of the significance of the "informal" inquiry, the Company's stock price closed at $15.36 on May 22, 2006 on very heavy volume of over 1.2 million shares traded.  On May 23, 2006 it closed down at $15.27 on volume of over 1.3 million shares traded.

135.    The stock price continued its downward move on each successive announcement, closing at $14.90 on June 13, 2006, down from the prior day's close of $15.12; closing at $14.60 on June 15, 2006, on very heavy volume of over 2.3 million shares traded; closing at $14.40 on June 16, 2006 on volume of over 2.1 million; and closing at $14.26 on June 19, 2006.

136.    The stock price continued to drop after the Company finally revealed it expected to record material amounts of additional compensation expense and restate its financial results from fiscal 2002 through 2006, and that its prior financial statements should not be relied upon.  Semtech's stock price closed at

1  $12.37 on July 20, 2006, down from the prior day's close of $13.19, and again

2  closed down at $11.60 on July 21, 2006.

3  **Post-Class Period Events**

4      137.   In the wake of the stock option scandal, Semtech announced a series

5  of executive departures.

6      138.   On August 25, 2006, the Company issued a press release announcing

7  that defendant Poe had "stepped down" as the Company's chairman in the wake of

8  the backdating scandal.

9      139.   On October 25, 2006, the Company also filed a Form 8-K with the

10  SEC announcing that on October 23, 2006, it received a letter from defendant Poe

11  announcing his intention to resign from the Board.

12      140.   On November 8, 2006, the Company filed a Form 8-K with the SEC

13  announcing that defendant Franz "resigned" as the Company's CFO, and defendant

14  Baumann "resigned" as the Company's Treasurer.

15      141.   On March 29, 2007, the Company filed its Annual Report on Form

16  10-K/A for the fiscal year ending January 29, 2006 with the SEC that revealed the

17  true extent of the stock options manipulation and serves as a powerful indictment

18  of the Individual Defendants' conduct.  According to the Form 10-K/A, the

19  Company's investigation uncovered 1,153 grants to continuing employees

20  requiring restatement, 343 grants to new employees, 33 grants lacking evidence of

21  approval, 83 grants modified after ratification, 68 post-termination arrangements,

22  and 393 pricing exceptions.  All told, the options manipulations required a massive

23  $91 million in pre-tax stock option related adjustments.

24      142.   Remarkably, the Form 10-K/A concedes that the options manipulation

25  was intentional.

26      **[T]he Special Committee concluded that the evidence**

27      **supports a finding of intentional manipulation by the**

28      **former CEO [defendant Poe], that a former human**

1        **resources executive who was with the Company from**

2        **October 1999 through May 2002 ("Former HR VP")**

3        **participated in this conduct, and that the Chief**

4        **Financial Officer ("Former CFO") [defendant Franz]**

5        **and the Treasurer ("Former Treasurer") [defendant**

6        **Baumann] at the time the Special Committee's report**

7        **was issued knew, or should have known, of the**

8        **manipulation and initiated or participated in some**

9        **manipulative acts.  One other executive ("Former**

10       **Executive") who left the Company in early January**

11       **2007 was found to be significantly less culpable in that**

12       **he evidenced a willingness to acquiesce in**

13       **manipulative conduct.**

14       (Emphasis added).

15       143.  Moreover, the Form 10-K/A revealed that the decision for Poe, Franz

16 and Baumann to "resign" was not theirs, as the Company's prior Form 8-K's

17 implied.  Instead, the Form 10-K/A revealed that Poe and the Former HR VP

18 declined to be interviewed by the Special Committee.  Following the Special

19 Committee's report to the Board on October 2, 2006, the Board accepted the

20 recommendation of the Special Committee that Poe be asked to resign, and Poe

21 was asked to immediately resign from the Board.  Likewise, the Special

22 Committee recommended that Franz and Baumann be asked to resign as well.

23       144.  The 2006 Form 10-K/A explains the genesis of the backdating scandal

24 as follows:

25       We first learned of issues associated with our past stock

26       option grants on May 17, 2006 when Nasdaq alerted us to

27       a research report published on May 16, 2006 by the

28       Center for Financial Research and Analysis ("CFRA").

1    On May 18, 2006, we received a letter from the SEC

2    requesting that we voluntarily provide certain

3    information and documents relating to stock option

4    grants dating back to January 1, 1997 (the "SEC Letter").

5

6    Upon learning of the CFRA report and receiving the SEC

7    Letter, we began a review of our historical stock option

8    practices with the assistance of outside counsel, Paul,

9    Hastings, Janofsky & Walker LLP.  During the course of

10    these efforts, our in-house counsel discovered documents

11    indicating irregularities with respect to certain stock

12    option grants for new employees in fiscal year 2001

13    (which ended on January 28, 2001).  We alerted the

14    Board of  Directors ("Board") to the existence of these

15    documents and immediately began investigating the new

16    hire grants referenced in the documents.  After detecting

17    apparent irregularities in these and other new hire grants,

18    we expanded our review to include a more thorough

19    examination of employment files for new hires on and

20    after January 1, 1997.  We also began investigating other

21    stock option matters, including delegation authorities for

22    stock option grants, grants to continuing employees, and

23    procedural steps associated with the stock option grant

24    process.  We retained Kroll, Inc. to conduct a

25    comprehensive review of the stock option grant issues

26    and FTI Consulting, Inc. to assist in analyzing related

27    accounting issues.

28    145.  Faced with the discovery of such "irregularities," and,

1    After receiving several management reports on this
2    matter in accordance with previously established
3    procedures regarding accounting complaints, the Audit
4    Committee, at that time comprised of Directors Burra,
5    Hankin and Lindstrom, determined that it should retain
6    independent counsel to assist in conducting an
7    investigation of our stock option grant practices.  On
8    June 9, 2006, the Audit Committee retained the law firm
9    of Fenwick & West LLP ("Fenwick"), a law firm not
10   previously used by the Company, to assist in conducting
11   this investigation.  Fenwick retained Navigant
12   Consulting, Inc. as its forensic accounting advisor.
13   Directors Burra and Hankin, who had previously served
14   on the Compensation Committee, recused themselves
15   from the investigation early in July 2006 after Fenwick
16   learned of a new hire stock option grant to an officer in
17   1996 that was approved by the Compensation Committee
18   and that would be a subject of the investigation.  On July
19   12, 2006, the Board appointed Directors Lindstrom and
20   Piotrowski as a Special Committee ("Special Committee
21   fully authorized and empowered to continue the
22   investigation.

23       146.    The 2006 Form 10-K/A  describes the Company's subsequent actions
24   as follows:

25   After the initial phase of the investigation, which focused
26   on the processes used to establish option exercise prices
27   and obtain approvals of stock option grants, including
28   procedures relating to initial stock option grants to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CIVIL ACTION NO.:  2:07-CV-07114-CAS (FMOX)

90

newly-hired employees and the related measurement
dates used for financial reporting purposes, the Special
Committee concluded that, pursuant to the requirements
of Accounting Principles Board Opinion No. 25,
Accounting for Stock Issued to Employees ("APB 25")
and related authoritative guidance, the accounting
measurement dates for certain stock options granted
primarily during fiscal years 1998 through 2003 required
correction. On July 20, 2006, we announced that
financial statements and the related reports of our
independent public accountants, earnings press releases,
and similar communications we previously issued should
no longer be relied upon pending restatement of our
financial statements for fiscal years 2002 through 2006 to
record a material level of additional non-cash
compensation expense. We also announced that the
restatement would affect financial statements for earlier
fiscal years and that adjustments for those earlier years
would be reflected as part of the opening balances in the
financial statements for the restatement period

147.   As set forth in the 2006 Form 10-K/A, the following table shows the aggregate financial statement impact of each category of adjustment:

| Category | Number of grants | Expense for all grants | Expense for grants to Section 16 group (1) | Percent of total expense related to Section 16 group |
|---|---|---|---|---|
| (A) Grants to continuing employees | 1,153 | $ 50,473 | $ 7,567 | 15% |
| (B) Grants to new employees | 343 | 19,425 | — | 0% |
| (C) Grants lacking evidence of approval | 33 | 149 | — | 0% |
| (D) Grants modified after ratification | 83 | 4,545 | — | 0% |
| (E) Post-termination arrangements | 68 | 20,854 | 16,396 | 79% |
| (F) Pricing exceptions | 393 | 733 | 107 | 15% |
| | | $ 96,179 | $ 24,070 | 25% |
| Adjustment for duplication among categories | | (5,151) | (107) | 2% |
| Total pre-tax stock option related adjustments | | $ 91,028 | 23,963 | 26% |
| Amount capitalized into inventory | | (30) | | |
| **Total pre-tax stock option compensation expense** | | $ 90,998 | | |
| **Tax benefits** | | (28,688) | | |
| **Net adjustment (2) (3)** | | $ 62,310 | | |

(1)      Expense related to grants made to, or modifications made for, directors,

officers and key executives subject to Section 16 of the Securities Exchange Act of

1934 at the time of grant or modification.

(2)      The additional non-cash compensation expense is net of forfeitures

related to employee terminations.

(3)      Amortization of the expense by category is shown in Section (IV) below.

148.   The six (6) situations involving the improper backdating of options are described by the Company below.  In developing the explanatory narrative, the Company

applied APB 25 in determining the correct measurement

date in each situation described below.  Under APB 25,

the measurement date is the first date on which are

known both the number of shares that an individual

employee is entitled to receive and the option or purchase

price, if any.  Any intrinsic value that exists at the

measurement date must be recognized as compensation

cost, generally as a charge to compensation expense in the income statement.

*(A)  Grants made by Former Chief Executive Officer John D. Poe ("Former CEO") from April 1997 to May 2002 to continuing employees*

In April 1997, the Compensation Committee delegated authority to the Former CEO to make option grants as an agent of the Committee for the stated purpose of granting options on a more timely basis.  Grants made by the Former CEO were subsequently submitted to the Compensation Committee for approval.  The Former CEO granted options under this authority to existing executive and non-executive level employees through May 2002.

Based on the reviews conducted by management and the Special Committee, the Company has concluded that the elements of APB 25 were not satisfied as of the stated grant dates for fifteen of the seventeen grant dates selected….There is evidence of intentional manipulation on nine of these grant dates, representing approximately 42% of the shares and approximately 76% of the expense in this category.  Based primarily on evidence of the Former CEOs willingness to manipulate grant dates, the Company determined that the grants made during this period were not final until approved by the

Compensation Committee.  Although the reviews found no specific documentary evidence of manipulation for certain grants, the fact that those grants lack adequate contemporaneous documentation to corroborate the establishment of the grant date, combined with evidence of manipulation of other grants during this period, led to the Company's conclusion that the original measurement date was in error because the terms of the grant were not determined with finality.

The appropriate measurement date for all grants in this category is the date of Compensation Committee ratification, unless the measurement date for a particular grant has been further revised due to one of the issues discussed below.

In August 2002, the Compensation Committee determined that options for continuing employees would be granted in conjunction with regularly scheduled Compensation Committee meetings, thus restoring the delegated authority to the Compensation Committee.

This category also includes adjustments related to miscellaneous grant scenarios, primarily related to acquisitions. The non-cash compensation expense related to these miscellaneous items is approximately $4.6 million pretax.

1     (B)  Grants to new employees

2

3     In April 1997, the Compensation Committee stated that

4     all option grants communicated via an offer letter would

5     be granted to each employee on his or her start date.

6     The reviews revealed inconsistencies in grant practices to

7     new hires from April 1997 to August 2002 and evidence

8     of management's willingness to intentionally select

9     favorable grant dates for new hires during this period.

10    More specifically, it was found that a majority of grants

11    during this period were not made as of the recipient's

12    start date. Of those who received a new hire grant on a

13    date other than the actual hire date, approximately 90%

14    received a more favorable price. Of the grants that were

15    made on the hire date, approximately 95% were priced

16    favorably when compared to the price of the stock on the

17    date of the relevant Compensation Committee meeting.

18    The appropriate measurement date for all new hire grants

19    during this period is the date of Compensation

20    Committee approval, unless the measurement date for a

21    particular grant has been further revised due to one of the

22    issues discussed below.

23

24    The reviews also identified 76 stock option grants, made

25    between November 1996 and May 2002, that were made

26    to persons before they became employees, including

27    through assignment of the employee to leave of absence

28    status prior to the date the employee began performing

services. The appropriate measurement date for these options is the employee's start date. However, a later measurement date tied to the Compensation Committee's approval was applied in a significant number of these cases because grant terms were not determined with finality on the hire date. Compensation expense is amortized over the vesting period, the end of which, for the grants in this group, remains the same but starts at the date of employment. For grants with a measurement date after the stated grant date, amortization related to the first vesting period is accelerated, which could result in more than twelve months of amortization in a fiscal year.

Following a leadership change in the Human Resources Department, the procedures were more fully explained to the HR staff and better enforced, such that beginning in August 2002, new hire grants were made consistently as of the employee's hire date.

In February 2006, the Compensation Committee determined to align the procedure for new hire grants and promotional grants with the procedure in place for annual grants to continuing employees. That is, new hire option grants are now awarded at Compensation Committee meetings rather than on the date of hire.

*(C)  Grants lacking evidence of Compensation Committee approval*

The reviews identified 33 grants that lacked evidence of
Compensation Committee ratification. The lack of
evidence is believed to be the result of administrative
issues. For example, some grants to new hires appear in
the Company's stock option database without evidence of
having been presented to the Compensation Committee
for approval. Others in this group were presented to the
Compensation Committee for approval then excluded
from the Compensation Committee meeting minutes
because the employee had terminated following the
meeting or was about to terminate. For grants in this
category, management used available relevant
information, such as personnel records and
Compensation Committee records, to determine the most
likely grant date. The Special Committee found these
conclusions to be reasonable.

*(D)  Grants modified after ratification by the
Compensation Committee*

The reviews revealed 84 grants, out of more than 1,600
grants over 23 grant dates, with changes between the
grant lists distributed with the Compensation Committee
agendas, on which basis the grants were ratified, and the
grant lists attached to the minutes for the related
meetings. More specifically, the reviews showed 31 new
grants, 32 deleted grants (apparently related to employees

who terminated in the interim), 12 increased grants, 8
decreased grants, and 1 addition specifically approved by
the Compensation Committee. In most cases, these
changes were not significant individually or in the
aggregate, were not significantly concentrated within
individual grant dates, and appear to be the result of
administrative error and not indicative of an open-
allocation process. The exceptions to these
determinations are (i) one grant date in May 1999 for
which there is evidence indicating the grant process for
ten employees in two departments was incomplete on the
award approval date, (ii) 21 grants to continuing
employees on one grant date in May 2000 for which the
grant process was found to be incomplete on the award
approval date, and (iii) five grants to new hires
concentrated on one grant date in December 2000 that
were made prior to the employees' start dates, but not
indicative of an open allocation process.

For grants that were added or changed, the measurement
date is the date that the Compensation Committee
approved the minutes that reflected the changes. With
respect to the May 1999 grant, we revised the
measurement date for grants to all employees in the two
departments with the open allocation process rather than
revising the measurement date for only the modified
awards. Similarly, with respect to the May 2000 grant,
we revised the measurement date for awards to all

continuing employees on the second quarter grant list
because the list was not finalized on the award approval
date.

*(E)  Post-termination arrangements*

The reviews identified 21 employees with termination
arrangements whereby options were modified through
continued vesting and/or extension of the exercise period.
Two of these arrangements involved executive level
employees transitioned from full-time status to on-call
status in anticipation of full retirement. Of the remaining
agreements, many involved placing terminated
employees below the vice-president level on leave of
absence status for stock option purposes. In each of these
instances, it has been concluded that the modifications
were made in recognition of past services. Specifically,
the individuals on leave of absence were no longer
required to provide substantive services for the Company
and the executives on call did not perform substantive
services during the on-call period. Thus, compensation
cost for the options affected by the termination
arrangements was remeasured on the modification dates
and the incremental compensation cost, plus any
originally measured but unrecognized compensation cost,
has been expensed entirely at the time of modification.
These costs were recorded even if the options were
exercised by the employee within the originally permitted

1    window following termination of substantive
2    employment.
3
4    *(F)  Pricing exceptions*
5
6    The reviews identified that approximately 9% of the
7    grants made in fiscal years 1996 through 2006 had
8    exercise prices that were determined in a manner
9    inconsistent with our convention of pricing options at the
10   closing price on the day before the grant. The significant
11   majority of the exceptions relate to the use of the closing
12   price on the date of grant. The majority of these grants
13   had pricing exceptions that resulted in pricing
14   unfavorable to the employee, leading to the conclusion
15   that the exceptions were administrative errors. The
16   measurement of compensation cost was corrected to
17   consistently measure compensation cost based on the
18   closing price on the day before the grant date.
19
20   For many years we have used the prior date closing
21   methodology set forth in our 1994 stock option plans to
22   determine the exercise price and measure the
23   compensation cost of our employee stock options.
24   Although this methodology is not consistent with the
25   terms of our later option plans, which call for using the
26   weighted-average traded price on date of grant, we have
27   determined, and our accounting advisors and the Special
28   Committee's forensic accountant have concurred, that

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

100

1    continued use of the prior date closing methodology was

2    reasonable and acceptable. The Board also concurred and

3    ratified past use of the prior date closing methodology.

4    However, in October 2006 we amended the operative

5    stock option plans to establish the exercise price based on

6    the closing stock price on the grant date. This change in

7    methodology is not expected to have a material effect on

8    our financial statements.

9    149.    The 2006 Form 10-K/A reveals that the improper and illegal stock

10   option grants were not limited to low-level employees, instead,

11   The Company's management team during fiscal years

12   1996 through 2006 included 28 individuals who at

13   various times were subject to the provisions of Section 16

14   of the Securities Act of 1934 ("Section 16") due to their

15   positions as officers or key executives.  The eight

16   individuals who served as independent directors at

17   various times during the same period were also subject to

18   Section 16.  None of the additional non-cash

19   compensation expense relates to options awarded to

20   independent directors.  Approximately 8% of the

21   additional pre-tax non-cash compensation expense is

22   related to options granted to 15 employees after they

23   became officers or key executives subject to Section 16.

24   This expense is almost entirely attributable to Category

25   A, with a small portion attributable to Category F.  No

26   Section 16 executive accounted for more than 2.2% of

27   the total non-cash compensation expense due to Category

28   A and F errors.  An additional 18% of the total non-cash

1        compensation expense is related to "on-call"

2        arrangements intended to provide continuity to the

3        Company by transitioning two executives from full-time

4        employment into retirement.  Our review indicated that

5        although one executive provided some services during

6        the on-call period, there is no evidence that the other

7        performed any.  We determined that since neither

8        employee performed sufficient services to meet the

9        substantive services requirement set forth by current

10        interpretations of applicable accounting standards, the

11        options held by the employees were modified to extend

12        the exercise period and by current interpretations of

13        applicable accounting standards, the options held by the

14        employees were modified to extend the exercise period

15        and by current interpretations of applicable accounting

16        standards, the options held by the employees were

17        modified to extend the exercise period and by current

18        interpretations of applicable accounting standards, the

19        options held by the employees were modified to extend

20        the exercise period and to effectively accelerate vesting

21        on the date they ceased full-time employment and,

22        therefore, a new measurement date was required by

23        APB 25.

24        150.   Perhaps most damning, the Special Committee concluded, with the

25 assistance of a team of attorneys and forensic accountants, that the Company's

26 senior executives had acted purposefully and with full knowledge of the nature of

27 their impropriety.  More particularly,

28

1       In considering the situations described in (A) through (F)
2       above, the Special Committee concluded that the
3       evidence supports a finding of intentional manipulation
4       of stock option grant dates directed by the Former CEO,
5       that a former human resources executive who was with
6       the Company from October 1999 through May 2002
7       ("Former HR VP") participated in this conduct, and that
8       the Chief Financial Officer ("Former CFO") and the
9       Treasurer ("Former Treasurer") at the time the Special
10      Committee's report was issued knew, or should have
11      known, of the manipulation and initiated or participated
12      in some manipulative acts. One other executive ("Former
13      Executive") who left the Company in early January 2007
14      was found to be significantly less culpable in that he
15      evidenced a willingness to acquiesce in manipulative
16      conduct.

17

18      As previously announced, the Former CEO stepped down
19      from his position as Chairman of the Board on August
20      17, 2006. He also took a leave of absence from the
21      Board, effective the same date, pending the conclusion of
22      the investigation. The Former CEO informed us he was
23      taking these actions to avoid even the appearance of a
24      conflict of interest. Both he and the Former HR VP
25      declined to be interviewed by the Special Committee.
26      Following the Special Committee's report to the Board
27      on October 2, 2006, the Board accepted the
28      recommendation of the Special Committee that the

1   Former CEO be asked to resign and, if he does not do so,
2   that he not be nominated to stand for reelection as a
3   Director at the next annual meeting of shareholders. The
4   Former CEO was asked to immediately resign from the
5   Board. As reported in the Form 8-K we filed on October
6   25, 2006, we received an October 20, 2006 letter from
7   the Former CEO advising us that he intends to resign his
8   position as a Director effective as of the first date,
9   subsequent to the filing of the Company's restated
10  financial statements, on which the Company regains
11  compliance with Nasdaq continued listing standards and
12  the window for trading by officers and directors of the
13  Company is reasonably expected to be open for a period
14  of at least 30 days.

15

16  The Special Committee recommended that the Former
17  CFO and Former Treasurer be asked to resign within a
18  time consistent with Company needs and an orderly
19  transition. As previously announced, the Former CFO
20  and Former Treasurer resigned their positions on
21  November 7, 2006, although they remained with the
22  Company on special assignments through January 22,
23  2007 and January 31, 2007, respectively.

24

25  The Special Committee found some personal benefit to
26  these five individuals in the form of options that were in-
27  the-money, but unvested, at the date of grant. Grants to
28  these five individuals had intrinsic value, meaning value

1   equal to the number of options multiplied by the

2   difference between the stated exercise price and the price

3   on the correct measurement date, of approximately $4.8

4   million. Options granted by the Company typically vest

5   in equal annual installments over three or four years,

6   beginning on the first anniversary of the grant. After

7   considering unvested options that were forfeited upon

8   termination, the aggregate additional non-cash

9   compensation expense related to grants to these five

10  individuals is approximately $4.5 million.

11

12  Approximately 5% of the intrinsic value related to grants

13  to these five individuals has been realized through

14  exercise of the options. Exercise of options was not

15  permitted during the restatement process. Approximately

16  41% of the intrinsic value will not be realized because

17  the options have lapsed due to the fixed term of the

18  options expiring during the restatement process or

19  because the 30 day post-termination period for exercising

20  the employee options expired during the restatement

21  process. Approximately 43% of the vested options that

22  expired or lapsed had intrinsic value and 57% had no

23  intrinsic value.

24

25  The Board formed a Special Litigation Committee

26  ("Special Litigation Committee") comprised of Director

27  Baker and Director Edwards, independent Directors who

28  joined the Board in October 2006, to evaluate the

existence and extent of any potential claims against these five individuals. The Special Litigation Committee directed management to cancel and rescind all of the outstanding options held by the Former CEO, which amount to over 1.2 million options on a split-adjusted basis, and management has done so. Approximately 19% of the cancelled options had intrinsic value and 81% of the cancelled options had no intrinsic value. Almost all of the cancelled options were vested or would immediately vest upon termination of Board service.

The cancelled, expired and lapsed options had split-adjusted exercise prices ranging from $2.41 to $31.91 per share.

The Special Litigation Committee directed management to cancel one of the Former CFOs grants and to reprice the remainder of his outstanding vested options. However, all of the Former CFOs options (including those to be cancelled) expired or lapsed during the restatement process except for one grant of 240,000 options (split-adjusted) that was issued under one of the Company's prior option plans and is subject to a 90 day post-termination exercise period. Those options have been repriced from $5.31 per share to $6.59 per share (split-adjusted), such that the intrinsic value associated with the options will not be realized by the Former CFO.

The Former Treasurer also has one outstanding grant for 30,000 options (split-adjusted) at an exercise price of $5.88 (split-adjusted) that is subject to a 90 day post-termination exercise period. There is no intrinsic value associated with that grant. The Special Litigation Committee took no action with respect to the Former Treasurer.

151. The status of the intrinsic value associated with options granted in the five individuals identified in the preceding paragraph are as follows:

| | Former CEO | Former CFO | Three Other Former Executives | Total | |
|---|---|---|---|---|---|
| Realized | $ 19 | $ 16 | $ 193 | $ 228 | 5% |
| Never Vested | — | — | $ 269 | $ 269 | 6% |
| Expired or Lapsed | — | 1,649 | 316 | 1,965 | 41% |
| Cancelled | 1,989 | — | — | 1,989 | 42% |
| Repriced | — | 307 | — | 307 | 6% |
| Will Not be Realized | $ 1,989 | $ 1,956 | $ 585 | $ 4,530 | 95% |
| Total Intrinsic Value | $ 2,008 | $ 1,972 | $ 778 | $ 4,758 | 100% |
| Total Intrinsic Value | 42.2 | 41.4% | 16.4% | 100% | |

152. Application of APB 25 reveals that stock-based compensation expenses the Company should have recognized are as follows:

| Fiscal Year | Additional Compensation Expense | Tax Benefit | Additional Compensation Expense, Net of Tax |
|---|---|---|---|
| 1996 | $ 10 | $ (3) | $ 7 |
| 1997 | 95 | (37) | 58 |
| 1998 | 1,002 | (390) | 612 |
| 1999 | 2,826 | (1,034) | 1,792 |
| 2000 | 6,862 | (2,174) | 4,688 |
| 2001 | 14,050 | (4,017) | 10,033 |
| 2002 | 36,354 | (12,465) | 23,889 |
| 2003 | 13,401 | (3,912) | 9,489 |
| Subtotal Fiscal Years 1996 - 2003 | 74,600 | (24,032) | 50,568 |
| 2004 | 9,234 | (2,566) | 6,668 |
| 2005 | 5,637 | (1,657) | 3,980 |
| 2006 | 1,527 | (433) | 1,094 |
| Total Fiscal Years 1996 - 2006 | $ 90,998 | $ (28,688) | $ 62,310 |

153.   Recognition of these expenses would have had a material adverse impact on the Company's earnings for each year 2002-2006, as follows:

| | Fiscal Year Ended | | | | |
| | Jan 29 2006 | Jan 30 2005 | Jan 25 2004 | Jan 26 2003 | Jan 27 2002 |
|---|---|---|---|---|---|
| **NET SALES** | $ — | $ — | $ — | $ — | $ — |
| Cost of sales | 213 | 702 | 1,303 | 1,811 | 3,335 |
| **Gross profit** | (213) | (702) | (1,303) | (1,811) | (3,335) |
| **Operating costs and expenses:** | | | | | |
| Selling, general and administrative | 920 | 3,115 | 4,983 | 6,562 | 23,974 |
| Product development and engineering | 394 | 1,820 | 2,948 | 5,028 | 9,045 |
| Acquisition-related items | — | — | — | — | — |
| Total operating costs and expenses | 1,314 | 4,935 | 7,931 | 11,590 | 33,019 |
| **Operating income** | (1,527) | (5,637) | (9,234) | (13,401) | (36,354) |
| Interest expense | — | — | — | — | — |
| Interest and other income | — | — | — | — | — |
| **Income before taxes** | $ (1,527) | $ (5,637) | $ (9,234) | $ (13,401) | $ (36,354) |
| Provision for taxes | 433 | 1,657 | 2,566 | 3,912 | 12,465 |
| **NET INCOME** | $ (1,094) | $ (3,980) | $ (6,668) | $ (9,489) | $ (23,889) |
| **Earnings per share -** | | | | | |
| Basic | ($ 0.02) | ($ 0.05) | ($ 0.09) | ($ 0.13) | ($ 0.34) |
| Diluted | ($ 0.02) | ($ 0.05) | ($ 0.09) | ($ 0.12) | ($ 0.30) |

## **ADDITIONAL INDICIA OF SCIENTER**

1.   **The Statistical Probability of These Option Grants Demonstrates Scienter**

154.   As part of their investigation, Lead Plaintiff retained a professor of finance who has authored several articles on the subject of options manipulation and is a recognized expert in the field to conduct an analysis of Semtech's incentive stock option grants between 1994 and 2007, based on information available to Lead Plaintiffs.  The professor's analysis reveals that the near-perfect timing of the Company's option grants could not have resulted from chance.  Indeed, as set forth below, the mathematical probability that Semtech's option

1    grants could achieve the number of historical low points that they did without
2    manipulation was one in ***35,184,372,088,832***  (or a probability of 0.00000%).

3        155.   The professor analyzed the option grants as follows.  First, the
4    professor determined the Company's incentive stock option grants between 1994
5    and July 2007 from various SEC filings, including Semtech insiders' statements of
6    beneficial ownership in Semtech securities filed on Forms 4 and 5, and Semtech's
7    annual proxy statements filed on Forms 14A.  In total, the professor identified
8    seventy-six instances (*i.e.*, distinct dates) where Semtech granted incentive stock
9    options to its officers and directors between February 1996 and October 2007.

10       156.   The professor ranked each of the trading days in each month.  For
11   example, in a month with 20 trading days, a rank of 1 indicates the date on which
12   Semtech's stock closed at its lowest price during that calendar month, and a rank of
13   20 indicating the date on which Semtech's stock closed at its highest price during
14   that calendar month.

15       157.   Based on these seventy-six option grants, the professor determined
16   that twenty-one of the seventy-six grants were purportedly awarded on dates
17   associated with a rank of 1 (*i.e.*, the lowest closing price of the calendar month).

18       158.   The professor also calculated the probability that these options grants
19   occurred at random by using a binomial distribution probability function, where:
20   (i) the number of occurrences were based on the number of grant dates involving
21   options with a rank of 1; (ii) the number of observations was the total number of
22   grant dates; and (iii) the probability was calculated by determining the number of
23   trading days per month.  (The binomial distribution probability function is used in
24   problems, such as the one at hand, with a fixed number of tests or trials, when the
25   outcomes of any trial are only success or failure, when trials are independent, and
26   when the probability of success is constant throughout the problem.  For example,
27   the function can calculate the probability that two of the next three babies born are
28   male.)

159. Based on a pool consisting of all seventy-six option grants between 1994 and 2007, the professor calculated the probability that Semtech's stock options were granted randomly (*i.e.*, without manipulation) at or near the lowest price during the calendar month, as 1 in 10,537,447,360 (or a 0.00000% likelihood). In short, these are very statistically significant results and strongly suggest that these nineteen option grants were intentionally manipulated.

160. The professor also discerned a statistically significant improbability when looking at a subset of thirty-seven option grants, which excluded scheduled grants and post-SOX grants (which were included in the analysis above) where the grantees filed their Form 4's within two days of the purported grant date, as required by SOX. Based on this pool of thirty-seven option grants, 18 of which occurred on the lowest monthly trading prices, the professor calculated the probability that Semtech's stock options were granted randomly at or near the lowest price during the calendar month, as 1 in 35,184,372,088,832 (or a 0.00000% likelihood).

161. Additionally, numerous option grants were timed by the Defendants through hindsight to coincide with historic lows in the Company's stock price. The following charts graphically demonstrate numerous option grants that were timed by Defendants to coincide with low or near low points in Semtech stock price:

































11/12/97 Options Grant
Semtech Closing Stock Price
65.00
62.00
59.00
56.00
53.00
50.00
47.00
44.00
41.00
11/12/1997
42.50
10/13/1997
10/20/1997
10/27/1997
11/3/1997
11/10/1997
11/17/1997
11/24/1997
12/1/1997
12/8/1997
Date

2/18/99 Options Grant
Semtech Closing Stock Price
42.00
40.00
38.00
36.00
34.00
32.00
30.00
28.00
26.00
24.00
2/18/1999
27.12
1/15/1999
1/22/1999
1/29/1999
2/5/1999
2/12/1999
2/19/1999
2/26/1999
3/5/1999
3/12/1999
3/19/1999
Date

11/1/99 Options Grant
Semtech Closing Stock Price
55.00
52.00
49.00
46.00
43.00
40.00
37.00
34.00
31.00
11/1/1999
37.25
10/1/1999
10/8/1999
10/15/1999
10/22/1999
10/29/1999
11/5/1999
11/12/1999
11/19/1999
11/26/1999
Date

12/15/99 Options Grant
Semtech Closing Stock Price
67.00
64.00
61.00
58.00
55.00
52.00
49.00
46.00
43.00
40.00
12/15/1999
41.38
11/15/1999
11/22/1999
11/29/1999
12/6/1999
12/13/1999
12/20/1999
12/27/1999
1/3/2000
1/10/2000
Date

12/21/00 Options Grant
Semtech Closing Stock Price
30.00
28.00
26.00
24.00
22.00
20.00
18.00
16.00
14.00
12/21/2000
15.38
11/22/2000
11/29/2000
12/6/2000
12/13/2000
12/20/2000
12/27/2000
1/3/2001
1/10/2001
1/17/2001
Date

2/28/01 Options Grant
Semtech Closing Stock Price
35.00
34.00
33.00
32.00
31.00
30.00
29.00
28.00
27.00
26.00
25.00
24.00
23.00
2/28/2001
25.06
2/1/2001
2/8/2001
2/15/2001
2/22/2001
3/1/2001
3/8/2001
3/15/2001
3/22/2001
3/29/2001
Date

4/4/01 Options Grant
Semtech Closing Stock Price
35.00
34.00
33.00
32.00
31.00
30.00
29.00
28.00
27.00
26.00
25.00
24.00
23.00
22.00
4/4/2001
23.44
3/5/2001
3/12/2001
3/19/2001
3/26/2001
4/2/2001
4/9/2001
4/16/2001
4/23/2001
4/30/2001
5/7/2001
Date

10/2/01 Options Grant
Semtech Closing Stock Price
42.00
39.00
36.00
33.00
30.00
27.00
24.00
10/2/2001
25.67
9/4/2001
9/11/2001
9/18/2001
9/25/2001
10/2/2001
10/9/2001
10/16/2001
10/23/2001
10/30/2001
Date

## 2. **Defendants' Scheme Systematically Violated GAAP and SEC Regulations**

162.   Semtech admits that, from 1997 through 2003, thousands of its block option grants were improperly backdated.  As a result of this misconduct, the Company's financial statements filed with the SEC from 2002-2006 were materially misstated.  This long-term practice systematically caused the Company to violate GAAP and SEC Regulations both for the proper reporting of its financial condition generally, and the reporting of its compensation costs specifically.

163.   According to SEC regulations, public companies must prepare their financial statements in accordance with GAAP.  By failing to comply with GAAP, the Company's financial statements are presumptively in violation of those regulations.

164.   GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association.  Through three successor groups AICPA has also established:  the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB") with the permission of the SEC (Accounting Series Release 150).

165.   SEC Rule 4-01(a) of SEC Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).  Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. § 210.10-01(a).

166.   As noted in AICPA auditing standard ("AU"), § 110.02, a public company's management is responsible for preparing financial statements in conformity with GAAP:

> The financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

167.   As demonstrated by the long-term, pervasive nature of the backdating scheme, Defendants wholly failed to adopt sound accounting policies and to maintain internal controls designed to ensure that the Company's public filings were fairly presented.

168.   The SEC also regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." Public Statements by Corporate Representatives, Exchange Act Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,096, 17 C.F.R. § 241.20560, 1984 WL 126134 (Jan. 20, 1984).

169.   Under SEC regulations, the management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." Timely Disclosure of Material Corporate

1    Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH)

2    ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995, 1970 WL 10576 (Oct. 15, 1970).

3    Defendants violated this regulation throughout the Class Period by deliberately

4    and/or recklessly misrepresenting that Semtech was complying with APB 25 and

5    its own stated accounting policies.

6        170.   In Securities Act Release No. 6349, 23 S.E.C. Docket 962 (Sept. 28,

7    1981), the SEC stated that:

8            It is the responsibility of management to identify and

9            address those key variables and other qualitative and

10           quantitative factors which are peculiar to and necessary

11           for an understanding and evaluation of the individual

12           company.

13       171.   Defendants violated this basic precept by concealing from the public a

14   complete understanding of material facts relating to: (i) Semtech's historical stock

15   option practices and compliance with GAAP and its own stated accounting

16   policies; (ii) the true compensation costs the Company would have incurred had it

17   properly accounted for the backdated stock options; (iii) material weaknesses in the

18   Company's internal controls; and (iv) the material liabilities Defendants'

19   undisclosed fraudulent acts exposed the Company to.  (See ¶ 125).

20       172.   In Accounting Series Release 173 (July 2, 1975), the SEC reiterated

21   the duty of management to present a true representation of a company's operations:

22           [I]t is important that the overall impression created by the

23           financial statements be consistent with the business

24           realities of the company's financial position and

25           operations.

26       173.   For the reasons stated above, Defendants failed to present a correct

27   impression of Semtech's business realities.

28

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                                      121
Civil Action No.:  2:07-cv-07114-CAS (FMOX)

174.   Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations, requires the issuer to furnish information required by Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

175.   On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989)), which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

176.   As discussed *infra*, Defendants nowhere explained in the MD&A sections of their annual and quarterly SEC filings that, as a result of their

1  backdating scheme, the Company failed to comply with GAAP or the terms of the

2  Stock Option Plan.

3      177.   Pursuant to GAAP, as set forth in Accounting Principles Board

4  Opinion No. 20 ("APB No. 20"),[3]  restatements are required to correct material

5  accounting errors, whether unintentional or fraudulent, that existed at the time the

6  financial statements were issued, and are permitted for the purpose of correcting

7  improper accounting only when it results in material misstatements.  By restating

8  Semtech's financial statements, the Company admitted that each document

9  publishing the original financial statements contained untrue statements and/or

10  omissions of material fact.  Similarly, by restating, the Company also conceded

11  that each of the press releases disseminated to the investing public and each of the

12  annual and quarterly reports on Form10-K and Form 10-Q that were filed with the

13  SEC during the Class Period, contained untrue statements of material fact, and/or

14  failed to disclose material facts.

15      178.   Finally, Semtech's options accounting violated, *inter alia*, the

16  following fundamental principles of GAAP:

17          •   the principle that financial reporting should provide

18              information that is useful to present and potential

19              investors and creditors and other users in making

20              rational investment, credit and similar decisions.

21              (FASB Statement of Financial Accounting Concepts

22              ("FASCON") No. 1);

23          •   the principle that financial reporting should provide

24              information about the economic resources of an

25

26      ───────────

   [3]   As of December 2005, APB No. 20 was replaced by Statement of Financial

27  Accounting Standard No. 154, which carries forward without change the guidance
   contained in APB No. 20 for reporting the correction of an error in previously

28  issued financial statements.

enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (Id.);

- the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (Id.);

- the principle that financial reporting should provide information about an enterprise's financial performance during a certain time period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Id.);

- the principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (FASCON No. 2);

- the principle that information should be reliable as well as relevant.  The reliability of a measure rests on the faithfulness with which it represents what it purports to represent. (Id.);

- the principle of completeness, that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (Id.);

- the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Id.); and

- the principle that recognition of revenues, expenses, gains and losses and the related increments or decrements in assets and liabilities… is the essence of using accrual accounting to measure performance of entities. (FASCON No. 6).

### 3.     Semtech's Lack of Internal Controls

179.   The Company's total lack of adequate internal controls during the Class Period also supports a strong inference of scienter.  Semtech admitted, and its external auditors confirmed, in the Restatement that it did not maintain an effective internal control environment based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Specifically, Semtech failed to maintain internal controls relating to its stock option grants.  The Company admitted that these deficient controls permitted certain former members of senior management to override controls and retroactively price stock option grants, and ultimately resulted in the Company's failure to properly account for such option grants.

180.    The Restatement described Semtech's weak internal control environment as follows:

**Disclosure Controls and Procedures**

The Company carried out an evaluation, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Company's disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) as of January 29, 2006. Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded in April 2006, in connection with the filing of the Original Report, that such disclosure controls and procedures were effective in alerting them in a timely manner to material information relating to the Company required to be included in its periodic reports filed with the Securities and Exchange Commission.

When we conducted the updated assessment of internal control described below, we also updated our previous assessment of our disclosure controls and procedures as of January 29, 2006. Based upon the updated evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of January 29, 2006 because of the material weakness in internal control over financial reporting described below. More specifically,

the Former CEO and Former CFO, who were determined to have varying degrees of culpability with respect to improprieties in the Company's historical stock option practices, had key roles in the disclosure process as of January 29, 2006. This situation has been remediated by the departure of these individuals from active management of the Company in the third and fourth quarters of fiscal year 2007.

Internal Control Over Financial Reporting

*Management's Consideration of the Restatement and its Underlying Circumstances*

We recently completed an investigation of our historical stock option practices since the beginning of fiscal year 1996. During the course of the review, we identified stock option grants to continuing employees and new hires for which an incorrect measurement date was used for financial accounting purposes. We also found incorrect accounting for some stock option grants that lacked evidence of Compensation Committee approval or that were modified after ratification by the Compensation Committee. We also determined that incorrect accounting was used with respect to certain stock option grants that were modified through post-termination arrangements and that some stock option grants were priced in a manner inconsistent with our convention of pricing options at the closing price on the day before grant.

1

2       The Special Committee of the Board of Directors

3       separately investigated the stock option granting

4       practices and found evidence that intentional

5       manipulation of stock option grant dates occurred prior to

6       fiscal year 2003 and made various levels of adverse

7       findings as to certain former members of management.

8       More specifically, the Special Committee found the

9       Former CEO to have manipulated stock option grants in

10      the past and that the Former CFO knew, or should have

11      known, of the past manipulation and initiated or

12      participated in some manipulative acts.

13  181.  The Company further revealed,

14      *Management's Conclusion Regarding Internal Controls*

15

16      Notwithstanding the items discussed above, the

17      overriding factor in the reassessment was that during

18      fiscal year 2006 the Company was under the leadership

19      of the Former CEO, who was found by the Special

20      Committee to have manipulated option grants in the past,

21      and the Former CFO, who the Special Committee found

22      to have known or should have known of the past

23      manipulation and initiated or participated in some

24      manipulative acts.

25

26      After considering the provisions of Public Company

27      Accounting Oversight Board Auditing Standard No. 2,

28      An Audit of Internal Control Over Financial Reporting

1    Performed in Conjunction with An Audit of Financial

2    Statements, we concluded that a material weakness in

3    internal control over financial reporting existed as of

4    January 29, 2006 because there was a material weakness

5    in the Company's control environment. A material

6    weakness is a control deficiency, or combination of

7    control deficiencies, that results in more than a remote

8    likelihood that a material misstatement of the annual or

9    interim financial statements will not be prevented or

10   detected. Specifically, at January 29, 2006 the Company

11   was under the leadership of the Former CEO, who was

12   found by the Special Committee to have manipulated

13   option grants in prior fiscal years, and the Former CFO,

14   who the Special Committee found to have known or

15   should have known of the past manipulation and initiated

16   or participated in some manipulative acts in prior fiscal

17   years. Two other executives active in the management of

18   the Company during fiscal year 2006 were also found to

19   have some degree of culpability.

20

21   The material weakness discussed above was remediated

22   after January 29, 2006 by the departure of the implicated

23   executives from active management of the Company

24   through resignation from office in November and

25   December 2006 and subsequent termination of

26   employment or, in the case of the Former CEO, through a

27   leave of absence from the Board of Directors in August

28

1    2006 and a determination by the Board not to nominate

2    him for re-election.

3        182.    Management's Report on Internal Control Over Financial Reporting

4    included in Semtech's Form 10-K/A for 2006, provides:

5        Our management is responsible for establishing and

6        maintaining adequate internal control over financial

7        reporting, as such term is defined in Exchange Act Rule

8        13a-15(f). Under the supervision and with the

9        participation of our management, including our principal

10       executive officer and principal financial officer, we

11       conducted an evaluation of the effectiveness of our

12       internal control over financial reporting based on the

13       framework set forth in Internal Control - Integrated

14       Framework issued by the Committee of Sponsoring

15       Organizations of the Treadway Commission. Based on

16       our evaluation under the framework in Internal Control –

17       Integrated Framework, including provisions regarding

18       restatements and antifraud programs and controls, our

19       management has concluded that as of January 29, 2006

20       the Company's internal control over financial reporting

21       was not effective to provide reasonable assurance

22       regarding the reliability of financial reporting and the

23       preparation of financial statements for external purposes

24       in accordance with generally accepted accounting

25       principles because there was a material weakness in the

26       Company's control environment. Specifically, as of

27       January 29, 2006 the Company was under the leadership

28       of the Former CEO, who was found by the Special

1           Committee to have manipulated option grants in prior

2           fiscal years, and the Former CFO, who the Special

3           Committee found to have known or should have known

4           of the past manipulation and initiated or participated in

5           some manipulative acts in prior fiscal years.

6      183.  The Company's total failure to maintain effective internal controls

7 regarding its stock option procedures – dating as far back as 1996, if not earlier –

8 demonstrates a conscious awareness or a high degree of recklessness on the part of

9 both the Individual Defendants, each of whom were responsible for ensuring that

10 Semtech's internal controls were adequate with respect to its stock option

11 practices.  Moreover, there is no dispute that the Defendants failed to comply with

12 the Company's own policies regarding the timing of option grants, which

13 purported to require that such options be priced on the date of issuance.  *See* ¶ 142.

14      **4.**    **Plaintiffs' Confidential Witness Statements**

15      184.  Lead Plaintiffs have also obtained relevant information from a former

16 Semtech employee who has come forward on a confidential basis.  These

17 averments further support a strong inference of scienter.

18      185.  <u>Confidential Witness ("CW") No. 1</u>:  CW 1's day-to-day

19 responsibilities included performing all necessary paperwork for Semtech's

20 employee stock options.  CW 1 explained that Semtech's Board of Directors would

21 meet at Semtech's corporate office on a quarterly basis.  During these meetings,

22 the Board approved any grants for new hires and/or existing employees.  Following

23 the Board approval, CW 1 would work with human resources department to create

24 paper grants, distribute them and monitor their return receipt.  According to CW 1,

25 the Vice President of Human Resources approved all of her paperwork before it

26 went out to employees.  In addition, CW1 was in charge of inputting the options

27 data into Semtech's computer system.  Critically, CW1 advised that she would be

28

1  given the dates and prices from human resources and was not to rely on the Board

2  of Directors meeting.

3      186.  CW 1 further stated that she was aware of an option granting and

4  pricing problem during her tenure.  According to CW 1, her awareness came for

5  her "legal" background.[4]  She noted that she was under the impression that options

6  should be awarded based on the approval of the Board of Directors' meeting.  CW

7  1 assumed this was correct until she was reprimanded for her mis-dating the

8  options.  She was told by defendant Poe that she had "made mistakes" in dating the

9  options and they would have to "redo" the entire grant.  She explained that she had

10  entered the grant date as the date approved by the Board of Directors.  According

11  to Poe, this was not a correct method in dating the options.  Poe told CW 1 that the

12  correct date should be "the date of hire" (even if the Board of Director had not

13  approved until months later).

14      **5.**    **Sarbanes-Oxley Certifications**

15      187.  Each Form 10-Q and Form 10-K filed during the Class Period (after

16  the June 11, 2003 Form 10-Q) contained similar Certifications signed by

17  Defendant Franz as CFO, as well as the then-current CEO.

18      188.  Defendant Poe served as Chief Executive Officer and executed all of

19  the Sarbanes-Oxley Certifications until the Form 10-Q dated December 10, 2003,

20  which was signed and certified by CEO Carlson. Carlson signed the Certifications

21  on all Forms 10-Q and 10-K until and including the Form 10-Q filed on September

22  9, 2005. Defendant Poe, serving as Interim CEO, signed the Certifications for the

23  Form 10-Q filed on December 9, 2005. Defendant Maheswaran signed the

24  Certifications as CEO for the Form 10-K filed on April 14, 2006.

25      189.  The Certifications were materially false and misleading because as

26  stated above, the Forms 10-Q and Forms 10-K contained false and misleading

27

28      [4]  CW1 is a trained court reporter and legal secretary.

financial information and failed to disclose the options backdating scheme. The Company did not account for its employee stock option grants in accordance with APB No. 25 because it failed to recognize as compensation expense the amount by which a granted option was in the money.  Defendants' assurances that the reports were free from error and accurately conveyed Semtech's financial results were untrue and deceived investors.  In addition, the Company's disclosure controls and procedures were not adequate. To the contrary, the controls were woefully inadequate, allowing the backdating scheme, and the attendant false accounting that inflated earnings by hundreds of millions of dollars, to flourish for years.

190.   The certifications were materially false and misleading because as stated above, the Forms 10-Q and Form10-Q contained false financial information and failed to disclose the option backdating scheme.  The Company did not account for its employee stock option grants in accordance with APB No. 25 because it failed to recognize as compensation expense the amount by which a granted option was in the money.  Defendants' assurances that the reports were free from error and accurately conveyed Semtech's financial results were untrue and deceived investors.  In addition, the Company's disclosure controls and procedures were not adequate. To the contrary, the controls were woefully inadequate, allowing the backdating scheme, and the attendant false accounting that inflated earnings by hundreds of millions of dollars, to flourish for years.

**6.   Insider Sales**

191.   During the Class Period, Individual Defendants Poe, Franz and Baumann were motivated to use the options backdating scheme to enrich themselves with insider trading proceeds.  Specifically, as set forth in the table below.

**Semtech Insider Trading Activity**
**From September 11, 2002 through July 19, 2006**

| Insider | Total Shares | Total Proceeds |
|---|---|---|
| Poe, John D. | 786,422 | $17,466,467.80 |
| Franz, Jr., David G. | 130,500 | $2,895,655.50 |
| Baumann, John M. | 35,000 | $728,162.57 |
| **Totals** | **951,922** | **$21,090,285.87** |

7.      **Additional Scienter Allegations**

192.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the truth regarding Semtech, their control over, and/or receipt and/or modification of Semtech's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Semtech, participated in the fraudulent scheme alleged herein.

**UNDISCLOSED ADVERSE FACTS**

193.    The market for Semtech securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Semtech's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Semtech securities relying upon the integrity of the market and market information relating to Semtech, and have been damaged thereby.

194.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Semtech securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

195.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements arising from, or relating to, Semtech's improper stock option practices.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Semtech and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  When Defendants revealed the true facts about Semtech, the price inflation caused by their prior misrepresentations and omissions was removed from the price of Semtech stock.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Semtech securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

196.   As detailed herein, throughout the Class Period, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Semtech securities.  Specifically, as part of the backdating scheme, Defendants violated GAAP and the Stock Option Plan by failing to record compensation expenses for Semtech's issuance of "in the money"

1   options.  Consequentially, throughout the Class Period, the Company materially

2   overstated its reported net income and materially understated its reported

3   compensation expense.  Moreover, Defendants' misrepresentations and material

4   omissions misled investors as to the value of compensation the Company was

5   granting to its senior officers and directors, as to the reliability of Semtech's

6   internal control systems, and as to the honesty and integrity of the Company's

7   management.

8       197.   During the Class Period, Lead Plaintiffs and the Class purchased

9   Semtech securities at artificially inflated prices and suffered an economic loss

10  when the artificial inflation was removed from Semtech's stock price.

11      **APPLICABILITY OF PRESUMPTION OF RELIANCE:**

12      **FRAUD ON THE MARKET DOCTRINE**

13      198.   At all relevant times, the market for Semtech securities was an

14  efficient market for the following reasons, among others:

15      (a)   Semtech's common stock met the requirements for listing, and

16  was listed and actively traded on the NASDAQ, a highly efficient market;

17      (b)   As a regulated issuer, Semtech filed periodic public reports

18  with the SEC and the NASDAQ;

19      (c)   Semtech regularly communicated with public investors via

20  established market communication mechanisms, including through regular

21  disseminations of press releases on the national circuits of major newswire services

22  and through other wide-ranging public disclosures, such as communications with

23  the financial press and other similar reporting services; and

24      (d)   Semtech was followed by several securities analysts employed

25  by major brokerage firms who wrote reports which were distributed to the sales

26  force and certain customers of their respective brokerage firms.  These reports

27  were publicly available and entered the public marketplace.

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CIVIL ACTION NO.:  2:07-CV-07114-CAS (FMOX)

136

199.   As a result of the foregoing, the market for Semtech securities promptly digested current information regarding Semtech from all publicly available sources and reflected such information in Semtech's stock price.  Under these circumstances, all purchasers of Semtech securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

200.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Semtech who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5(a), (b), and (c) Promulgated Thereunder
### Against All Defendants

201.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

202.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Semtech common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Semtech securities at artificially inflated prices.

203.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually, took the actions set forth herein.  Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Semtech's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  All of the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

204.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 et seq.) and S-K (17 C.F.R. §§ 229.01 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market prices of the Company's securities would be based on truthful, complete and accurate information.

205.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's historical stock option practices, and Semtech's improper reporting and accounting thereof.

206.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Semtech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Semtech and its stock option practices in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Semtech securities during the Class Period.

207.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's

1  dissemination of information to the investing public which they knew or recklessly

2  disregarded was materially false and misleading.

3      208.   Defendants had actual knowledge of the misrepresentations and

4  omissions of material facts set forth herein, or acted with reckless disregard for the

5  truth in that they failed to ascertain and to disclose such facts, even though such

6  facts were available to them.  Defendants' material misrepresentations and/or

7  omissions were done knowingly or recklessly and for the purpose and effect of

8  concealing Semtech's true operating condition and future business prospects from

9  the investing public and supporting the artificially inflated price of its securities.

10  As demonstrated by Defendants' overstatements and misstatements of the

11  Company's business, operations and earnings throughout the Class Period,

12  Defendants, if they did not have actual knowledge of the misrepresentations and

13  omissions alleged, were reckless in failing to obtain such knowledge by

14  deliberately refraining from taking those steps necessary to discover whether those

15  statements were false or misleading.

16      209.   As a result of the dissemination of the materially false and misleading

17  information and failure to disclose material facts, as set forth above, the market

18  price of Semtech's securities were artificially inflated during the Class Period.

19  Unaware that market prices of Semtech's publicly-traded securities were

20  artificially inflated, and relying directly or indirectly on the false and misleading

21  statements made by Defendants, or upon the integrity of the market in which the

22  securities trade, and/or on the absence of material adverse information that was

23  known to or recklessly disregarded by Defendants but not disclosed in public

24  statements by Defendants during the Class Period, Plaintiffs and the other

25  members of the Class acquired Semtech securities during the Class Period at

26  artificially high prices and were damaged thereby.

27      210.   At the time of said misrepresentations and omissions, Lead Plaintiff

28  and other members of the Class were unaware of their falsity, and believed them to

1    be true.  Had Lead Plaintiff and the other members of the Class and the

2    marketplace known the truth regarding Semtech's financial results, which were not

3    disclosed by Defendants, Lead Plaintiff and other members of the Class would not

4    have purchased or otherwise acquired their Semtech securities, or, if they had

5    acquired such securities during the Class Period, they would not have done so at

6    the artificially inflated prices which they paid.

7        211.   By virtue of the foregoing, Defendants have violated Section 10(b) of

8    the Exchange Act, and Rule 10b-5(a), (b) and (c) promulgated thereunder.

9        212.   As a direct and proximate result of Defendants' wrongful conduct,

10   Lead Plaintiff and the other members of the Class suffered damages in connection

11   with their respective purchases and sales of the Company's securities during the

12   Class Period.

<div align="center">

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**

**<u>Against the Individual Defendants</u>**

</div>

16       213.   Lead Plaintiff repeats and realleges each and every allegation

17   contained above as if fully set forth herein.

18       214.   The Individual Defendants acted as controlling persons of Semtech

19   within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By

20   virtue of their high-level positions, and their ownership and contractual rights,

21   substantial participation in and/or awareness of the Company's operations and/or

22   intimate knowledge of the false financial statements filed by the Company with the

23   SEC and disseminated to the investing public, the Individual Defendants had the

24   power to influence and control and did influence and control, directly or indirectly,

25   the decision-making of the Company, including the content and dissemination of

26   the various statements which Plaintiffs contend are false and misleading. The

27   Individual Defendants were provided with or had unlimited access to copies of the

28   Company's reports, press releases, public filings and other statements alleged by

1   Lead Plaintiff to be misleading prior to and/or shortly after these statements were

2   issued and had the ability to prevent the issuance of the statements or cause the

3   statements to be corrected.

4       215.   In particular, each of the Individual Defendants had direct and

5   supervisory involvement in the day-to-day operations of the Company and,

6   therefore, is presumed to have had the power to control or influence the particular

7   transactions giving rise to the securities violations as alleged herein, and exercised

8   the same.

9       216.   As set forth above, Semtech and the Individual Defendants each

10  violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

11  Complaint.  By virtue of their positions as controlling persons, the Individual

12  Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

13  and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other

14  members of the Class suffered damages in connection with their purchases of the

15  Company's securities during the Class Period.

16      **WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

17      (a)   Determining that this action is a proper class action, certifying

18  Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil

19  Procedure and Lead Plaintiff's counsel as Lead Counsel;

20      (b)   Awarding compensatory damages in favor of Lead Plaintiff and

21  the other Class members against all Defendants, jointly and severally, for all

22  damages sustained as a result of Defendants' wrongdoing, in an amount to be

23  proven at trial, including interest thereon;

24      (c)   Awarding Lead Plaintiff and the Class their reasonable costs

25  and expenses incurred in this action, including counsel fees and expert fees; and

26      (d)   Such other and further relief as the Court may deem just and

27  proper.

28

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 30, 2008

Respectfully submitted,

By: _[signature]_

Mark Labaton (#159555)
**KREINDLER & KREINDLER LLP**
707 Wilshire Boulevard
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019

*Local and Liaison Counsel for Plaintiff and the Class*

**CAULEY BOWMAN CARNEY & WILLIAMS, PLLC**
J. Allen Carney
Randall K. Pulliam
Bart Dalton (#187930)
11311 Arcade Dr., Suite 200
Little Rock, AR 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

- and -

**BARON & BUDD, P.C.**
Russell Budd
Burton LeBlanc
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181

*Lead Counsel for Lead Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LABATON SUCHAROW LLP**
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

***Counsel for Lead Plaintiff***

# CERTIFICATE OF SERVICE

STATE OF CALIFORNIA )

COUNTY OF LOS ANGELES )

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 707 Wilshire Boulevard, Suite 4100, Los Angeles, California 90017.

On May 30, 2008,  I served the foregoing document described as follows:

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as

__x__ **BY MAIL:**
I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ **BY FEDERAL EXPRESS OR OVERNIGHT COURIER**

_____ **BY ELECTRONIC MAIL:**
I caused said documents to be transmitted by electronic mail to the e-mail address(es) noted below:

_____ **BY TELECOPIER:**
I caused said documents to be transmitted by facsimile at the numbers listed below:

_____ (State)  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

__x__ (Federal)  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 30, 2008, at Los Angeles, California.

_____Katherine Montenegro_____          _____
(Type of Print Name)                              (Signature)

213401.1

**SERVICE LIST**
*Middlesex County Retirement System v. Semtech Corp., et al.*
Case No.: CV-07-7114-CAS (FMOx)

Catherine A Torell
Cohen Milstein Hausfeld and Toll
150 East 52nd Street
New York, NY 10022

Kevin C. Logue
Paul Hastings, Janofsky & Walker LLP
75 East 55th Street
New York, NY 10022-3205

Christopher H. McGrath
Paul Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA 92130

Thomas A. Zaccaro
Paul Hastings, Janofsky & Walker LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228

John Clarke, Jr.
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020

Robert W. Brownlie
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297

Michele A. Higgins
Kirkpatrick & Lockhart
Preston Gates & Ellis
599 Lexington Avenue
New York, NY 10022-6030

Michael J. Quinn
Kirkpatrick & Lockhart
Preston Gates & Ellis
10100 Santa Monica Blvd, 7th Floor
Los Angeles, CA 90067

Grace L. Chan
HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, NY 10022

Robert E. Gooding, Jr.
HOWREY LLP
2020 Main Street, Suite 1000
Irvine, CA 92614

213401.1

1  | Bert H. Williams
Munger, Tolles & Olson LLP
2  | 355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560

3  |

Cauley Bowman Carney & Williams, PLLC
4  | J. Allen Carney
Randall K. Pulliam
5  | 11311 Arcade Dr., Suite 200
Little Rock, AR 72212

6  |

Barron & Budd, P.C.
7  | Russell Budd
Patrick O'Connell
8  | 3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

9  |

Baron & Budd, P.C.
10 | Burton LeBlanc
6955 Perkins Road, Suite 100
11 | Baton Rouge, LA 70808

12 | Labaton Sucharow LLP
Christopher J. Keller
13 | Andrei V. Rado
Stephen W. Tountas
14 | Alan I. Ellman
Jonathan Gardner
15 | 140 Broadway
New York, NY 10005

16 |

Mark I. Labaton
17 | Kreindler & Kreindler LLP
707 Wilshire Boulevard, Suite 4100
18 | Los Angeles, CA 90017

19

20

21

22

23

24

25

26

27

28

213401.1