1  KREINDLER & KREINDLER LLP
   Mark Labaton (#159555)
2  707 Wilshire Boulevard
   Los Angeles, California  90017
3  Telephone:  (213) 622-6469
   Facsimile:   (213) 622-6019
4
   *Local and Liaison Counsel for Plaintiff*
5  *and the Class*

6  CAULEY BOWMAN CARNEY &
   WILLIAMS, PLLC
7  J. Allen Carney
   Randall K. Pulliam
8  Bart Dalton (#187930)
   11311 Arcade Dr., Suite 200
9  Little Rock, Arkansas 72212
   Telephone:  (501) 312-8500
10 Facsimile:   (501) 312-8505

11 BARON & BUDD, P.C.
   Russell Budd
12 Burton LeBlanc
   3102 Oak Lawn Avenue, Suite 1100
13 Dallas, Texas  75219
   Telephone:  (214) 521-3605
14 Facsimile:   (214) 520-1181

15 *Lead Counsel for Lead Plaintiff*

16 LABATON SUCHAROW LLP
   Jonathan Gardner
17 140 Broadway
   New York, New York  10005
18 Telephone:  (212) 907-0700
   Facsimile:   (212) 818-0477
19
   *Counsel for Lead Plaintiff*
20
                **UNITED STATES DISTRICT COURT**
21
                **CENTRAL DISTRICT OF CALIFORNIA**
22
   IN RE: SEMTECH CORPORATION          )  Civil Action No.:  2:07-CV-07114-
23 SECURITIES LITIGATION               )  CAS (FMOX)
                                       )
24                                     )  Date:    December 8, 2008
                                       )  Time:    10:00 a.m.
25                                     )  Ctrm:    5
                                       )  Judge:   Hon. Christina A. Snyder
26 _____ )
             **LEAD PLAINTIFF'S OMNIBUS OPPOSITION**
27          **TO DEFENDANTS' MOTIONS TO DISMISS**
             **THE CONSOLIDATED CLASS ACTION COMPLAINT**
28
   LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
   TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
   CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 1

II. STATEMENT OF FACTS ............................................................................... 2

    A.  Background ............................................................................................... 2

    B.  Semtech's Stock Option Plans ................................................................ 3

    C.  Semtech's Accounting For Stock Option Grants ................................... 3

    D.  Individual Defendants Received Backdated Options ............................. 4

    E.  The False And Misleading Financial Statements .................................. 5

    F.  Revelation of the Fraudulent Scheme .................................................... 6

    G.  Semtech's Restatement ............................................................................ 7

    H.  Confidential Witness' Account ............................................................... 9

    I.  Professor Lie's Statistical Analysis ........................................................ 9

    J.  The Individual Defendants Benefit From Stock Sales .......................... 10

III. ARGUMENT .................................................................................................. 10

    A.  The Complaint States a Claim Under Section 10(b) of the
        Exchange Act Against Each of the Defendants ..................................... 10

        1. Lead Plaintiffs Have Adequately Alleged Defendants' Scienter ...... 11

            (a)  Legal Standard ................................................................... 11

            (b)  Backdating Is An Intentional Act Which By Itself
                 Strongly Infers the Backdater's Scienter ......................... 13

            (c)  Statistical Data Confirms Beyond Any Doubt That
                 Semtech's Option "Grant Dates" Were Selected
                 Randomly .............................................................................. 15

            (d)  Semtech Admitted That its Employees
                 *Intentionally* Backed Option Grants ........................... 18

            (e)  Lead Plaintiffs Have Adequately Alleged the
                 Scienter of Each Individual Defendant ............................ 20

                (i)  Defendant Poe Acted With Scienter ...................... 20

                (ii) Defendant Franz Acted With Scienter .................. 22

                (iii) Defendant Baumann Acted With Scienter ........... 25

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

i

    (iv) Defendants Carlson and Maheswaran Acted With Scienter ...........................................................27

    (v) Defendant Semtech Acted With Scienter .........................28

    (vi) Defendant Poe, Franz and Baumann's Class Period Stock Sales Further Support The Already Strong Inferences of Their Scienter.....................................28

   (f) Lead Plaintiff Does Not Rely Solely On Semtech's Restatement or GAAP Violations To Establish Scienter ....................................................................30

   (g) Lead Plaintiff's Allegations of Scienter Are Not Based Solely On, But Are Supported By, Defendants' Positions ...........................................32

    (i) The Fact Defendants Signed the Allegedly False and Misleading Statements Supports Scienter .......................35

  2. The Complaint Adequately Alleges Loss Causation Against All Defendants...................................................................36

   (a) The Relevant Pleading Standard ...............................36

   (b) At Least "Some Indication" of Causation is Pled ...................36

  3. The Complaint's Loss Causation Allegations Satisfy *Dura* ............38

   (a) Defendants' Other Arguments are Meritless............................41

   (b) The Reaction of Semtech's Stock Price to Disclosures About the Restatement Confirms Loss Causation For the Earlier Drops ...............................43

  4. Lead Plaintiff Sufficiently Alleges Reliance......................................44

   (a) Lead Plaintiff Has Sufficiently Plead Market Efficiency.................................................................44

 B. Lead Plaintiff Has Standing to Pursue this Securities Class Action ......47

  1. Lead Plaintiff's Claims are Direct in Nature.....................................48

   (a) The Class Suffered the Harm.....................................48

   (b) The Class Will Receive the Benefit of Any Recovery .............................................................51

  2. Direct and Derivative Actions are not Mutually Exclusive .............52

 C. Lead Plaintiff's Claims Are Timely .......................................................53

  1. The Claims Were Brought Within the Two-Year Period Provided by 28  U.S.C. § 1658(b)(1) ...............................................53

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

ii

2.  The Claims Were Brought Within the Five-Year Period
Provided by 28 U.S.C. § 1658(b)(2) .................................................56

D.  The Complaint States Control Person Liability Against Each
Individual Defendant ..............................................................................58

IV.   CONCLUSION ....................................................................................................59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

iii

# TABLE OF AUTHORITIES

## CASES

*In re 2TheMart.Com, Inc. Sec. Litig.*,
  114 F. Supp. 2d 955 (C.D. Cal. 2000) ........................................................ 45, 46

*In re Accredo Health, Inc. Sec. Litig.*
  No. 03-2216 DP, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ................... 46

*In re Adaptive Broadband Sec. Litig.*,
  No. C 01-1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ........... 22, 24, 25

*In re Apple Computer, Inc. Sec. Litig.*
  243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) .................................................. 28

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................ 44, 45

*Batwin v. Occam Networks, Inc.*,
  No. 07-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ............. 12, 31, 44, 58

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................................... 11, 33, 34

*Betz v. Trainer Wortham & Co., Inc.*,
  519 F.3d 863 (9th Cir. 2008) ................................................................. 54, 55

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ....................................................................... 45

*In re Bradley Pharms. Sec. Litig.*,
  421 F. Supp. 2d, 822 (D.N.J. 2006) ............................................................... 40

*In re Bristol-Myers Squibb Sec. Litig.*,
  No. 00-1990, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005) ............... 44

*In re Brooks Automation, Inc. Sec. Litig.*,
  No. 06-11068-RWZ, 2007 WL 4754051 (D. Mass. Nov. 6, 2007) ............. 50, 52

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989): (1) .................................................. 45, 46, 47

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 815 (N.D. Ill. 2000) .............................................................. 45

*In re Comverse Tech., Inc. Sec. Litig.*,
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) ............................................................ 57

*In re Credit Suisse-AOL Sec. Litig.*,
  465 F. Supp. 2d 34 (D. Mass. 2006) ............................................................... 44

*Cromer Fin. Ltd. v. Berger*,
  No. 00-2284, 2003 WL 21436164 (S.D.N.Y. June 23, 2003) ........................... 42

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

iv

*In re Daou Sys. Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................*passim*

*Dura Pharms. v. Broudo*,
544 U.S. 336 (2005) ..........................................................36, 38, 41

*Durning v. Citibank, Int'l*,
990 F.2d 1133 (9th Cir. 1993) ...............................................56, 57

*Falkowski v. Imation Corp.*,
309 F.3d 1123 (9th Cir. 2002) .........................................................57

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ...........................................................42

*In re First Chicago Corp. Sec. Litig.*,
769 F. Supp. 1444 (N.D. Ill. 1991) ................................................50

*Garfinkel v. Memory Metals, Inc.*,
695 F. Supp. 1397 (D. Conn. 1988) ...............................................42

*In re Gilead Scis. Sec. Litig.*,
No. 06-16185, 2008 WL 3271039 (9th Cir. Aug. 11, 2008) ...........37, 38, 41

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..........................................16

*Hayes v. Gross*,
982 F.2d 104 (3d Cir. 1992) ...............................................46, 49, 50

*Howard v. Everex*,
228 F.3d 1057 (9th Cir. 2000) ...............................................26, 35, 58, 59

*Huynh v. Chase Manhattan Bank*,
465 F.3d 992 (9th Cir. 2006) ...........................................................54

*In re Int'l Rectifier Corp. Sec. Litig.*,
No. 97-2544, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) ...........28

*Jablon v. Dean Witter & Co.*,
614 F.2d 677 (9th Cir. 1980) ...........................................................54

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ...........................................*passim*

*Kramer v. W. Pac. Indus., Inc.*,
546 A.2d 348 (Del. 1988) ...............................................................51

*Kronfeld v. Trans World Airlines, Inc.*,
104 F.R.D. 50 (S.D.N.Y. 1984) ......................................................42

*In re LDK Solar Sec. Litig.*,
No. 07-5182, 2008 U.S. Dist. LEXIS 42425 (N.D. Cal. May 29, 2008) .....33, 34

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

v

*Lapidus v. Hecht,*
   232 F.3d 679 (9th Cir. 2000) ............................................................. 48

*Levine v. SkyMall, Inc.,*
   No. 99-166, 2002 WL 31056919 (D. Ariz. May 24, 2002) .............................. 46

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
   513 F.3d 702 (7th Cir. 2008) ............................................................. 9

*In re Maxim Integrated Prods., Inc.,*
   No. 06-3344, 2008 WL 4061075 (N.D. Cal. Aug. 27, 2008) ........................... 57

*In re McKesson HBOC, Inc. Sec. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................... 22, 23, 24, 25, 31

*Middlesex Retirement Sys. v. Quest Software Inc.,*
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................... *passim*

*Miller v. NTN Commc'ns, Inc.,*
   No. 97-CV-1116 TW JAH, 1999 WL 817217 (S.D. Cal. May 21, 1999) ......... 46

*In re Monster Worldwide, Inc. Sec. Litig.,*
   549 F. Supp. 2d 578 (S.D.N.Y. 2008) .................................................. 14

*In re Monster Worldwide, Inc. Sec. Litig.,*
   No. 07 Civ. 2237 (JSR), 2008 WL 623339 (S.D.N.Y. Mar. 4, 2008) ......... 50, 52

*No. 84 Employer-Teamster Joint Council Pension Trust Fund
   v. America West Holding Corp.,*
   320 F.3d 920 (9th Cir. 2003) ............................................. 10, 33, 34

*In re Nortel Networks Corp. Sec. Litig.,*
   No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) .................... 42

*In re Northpoint Commc'ns Group, Inc., Sec. Litig.,*
   221 F. Supp. 2d 1090 (N.D. Cal. 2002) ....................................... 33, 34

*In re Openwave Sys. Sec. Litig.,*
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ............................... 40, 50, 51, 52

*In re Openwave Sys., Inc. S'holder Derivative Litig.,*
   No. C 06-03468 SI, 2008 WL 410259 (N.D. Cal. Feb. 12, 2008) .................... 52

*In re PMC-Sierra, Inc. Derivative Litig.,*
   No. 06-5530, 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007) ........................... 14

*In re PainCare Holdings Sec Litig.,*
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) .............................................. 50

*In re Parmalat Sec. Litig.,*
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................ 45

*In re Peerless Sys. Corp. Sec. Litig.,*
   182 F. Supp. 2d 982 (S.D. Cal. 2002) ............................................... 23

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

vi

*Quintana v. Baca,*
    233 F.R.D. 562 (C.D. Cal. 2005) .................................................................. 6

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
    185 F. Supp. 2d 389 (S.D.N.Y. 2002) ........................................................ 46

*Rudolph v. UTStarcom,*
    560 F. Supp. 2d 880 (N.D. Cal. 2008) ........................................................ 37

*Rudolph v. UTStarcom,*
    No. 07-04578, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ........ 10, 37, 38, 41

*SEC v. Levin,*
    232 F.R.D. 619 (C.D. Cal. 2005) .................................................................. 6

*In re Salomon Analyst Metromedia Sec. Litig.,*
    236 F.R.D. 208 (S.D.N.Y. 2006) ................................................................ 42

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) ........................................................................ 17

*Schuster v. Gardner,*
    127 Cal. App. 4th 305 (2005) .................................................................... 53

*In re Seitel Inc. Litig.,*
    447 F. Supp. 2d 693 (S.D. Tex. 2006) ........................................................ 43

*South Ferry LP #2 v. Killinger,*
    No. 06-35511, 2008 WL 4138237 (9th Cir. Sept. 9, 2008) .............. 12, 30, 33

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
    128 S. Ct. 761 (2008) .......................................................................... 26, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ......................................................................... *passim*

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) ........................................................................ 48

*In re USA Talks.com Sec. Litig.,*
    No. 99-CV-0162-L (JA), 2000 WL 1887516 (S.D. Cal. Sept 14, 2000) .......... 44

*United States v. Reyes,*
    No. 06-556, 2007 WL 2462147 (N.D. Cal. Aug. 29, 2007) .............................. 14

*In re UnitedHealth Group PSLRA Litig.,*
    No. 06-CV-1691, 2007 WL 1621456 (D. Minn. June 4, 2007) ........ 13, 40, 50 52

*In re Unumprovident Corp. Sec. Litig.,*
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ...................................................... 54

*Weiss v. Amkor Technology, Inc.,*
    527 F. Supp. 2d 938 (D. Ariz. 2007) .......................................................... 19

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

vii

*Wiestschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ............................................ 23

*Wool v. Tandem Computers Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ......................................................... 58

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ............................................. 17

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ....................................... *passim*

**UNREPORTED CASES**

*In re Brocade Sec. Litig.*,
    No. 05-2042 (N.D. Cal. Aug. 27, 2007) ..................................... 50, 52

**DOCKETED CASES**

*In re Am. Tower Corp. Sec. Litig*,
    No. 06-CV-10933 (MLW) (D. Mass. filed May 26, 2006) ........................ 50, 52

*In re American Tower Corp. Derivative Litig.*,
    No. 06-11029 (D. Mass. filed June 13, 2006) .................................... 52

*Bacas v. Way*,
    No. 07-456 (S.D. Tex. filed Feb 1, 2007) ..................................... 52

*In re Brocade Commc'ns Sys., Inc. Derivative Litig.*,
    No. C-05-2233-CRB (N.D. Cal. filed June 1, 2005) .............................. 52

*In re Brooks Automation, Inc. Derivative Litig.*,
    No. 06-10943 (D. Mass. filed May 30, 2006) .................................. 52

*Grasso v. Vitesse Semiconductor Corp.*,
    No. 2:06-cv-02639-R-CT (C.D. Cal. filed May 1, 2006) ...................... 50

*Grecian v. Meade Instruments Corp.*,
    No. 06-908 (C.D. Cal. filed Sept. 27, 2006) ............................... 50, 52

*In re HCC Ins. Holdings, Inc. Sec. Litig.*,
    No. 4:07-cv-00801 (S.D. Tex. filed Mar. 8, 2007) ......................... 50, 52

*In re Juniper Derivative Actions*,
    No. 5:06- 03396 JW (N.D. Cal. filed May 24, 2006) ........................ 52

*In re KLA-Tencor Corp. Sec. Litig.*,
    No. 06-4065 (N.D. Cal. filed June 29, 2006) .............................. 50, 52

*In re KLA-Tencor Corp. S'holder Derivative Litig.*,
    No. C06-03445 JW (HRL) (N.D. Cal. filed May 26, 2006) ...................... 52

*In re Meade Instruments Corp. Derivative Litig.*,
    No. 06-CC-205 (Cal. Super Ct. County of Orange filed Oct.6, 2006) .............. 52

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

viii

*In re Monster Worldwide, Inc. Stock Option Derivative Litig.*,
    Master Docket 1:06:cv 04622 (S.D.N.Y. filed June 15, 2006) ..........................52

*In re Newpark Res., Inc. Sec. Litig.*,
    No. 2:06-cv-02150-ML-KWR (E.D. La. filed Apr. 21, 2006) ..................51, 52

*In re Newpark Resources, Inc. Derivative Litig.*,
    No. 06-07340 (E.D. La. filed Oct. 5, 2006) ......................................................53

*Peregrine Litig. Trust v. Moores*,
    No. 788659 (San Diego Super. Ct.) ...................................................................53

*In re Peregrine Sys., Inc. Corp. Derivative Litig.*,
    No. 02-00950 (S.D. Cal. filed May 14, 2002) ..................................................53

*In re Peregrine Sys., Inc. Sec. Litig.*,
    No. 02 CV 870-J (RBB) (S.D. Cal. Nov. 21, 2003) ..........................................53

*In re UnitedHealth Group Inc. S'holder Derivative Litig*,
    No. 06-01216 (D. Minn. filed Mar. 29, 2006) ..................................................52

*In re Wireless Facilities, Inc. Sec. Litig. II*,
    No. 3:07-cv-00482-NLS (S.D. Cal. filed Mar. 15, 2007) ..................................50

## STATUTES AND RULES

15 U.S.C. §78j(b) ..............................................................................1, 10, 47, 49, 53

15 U.S.C. §78t(a) ..........................................................................1, 10, 11, 58, 59

28 U.S.C. § 1658 ......................................................................................................53

28 U.S.C. § 1658(b)(1) ............................................................................................53

28 U.S.C. § 1658(b)(2) ......................................................................................56, 57

17 C.F.R. § 240.10b-5 ...............................................................................................1

Fed. R. Civ. P. 8(a)(2) .......................................................................................36, 58

Fed. R. Civ. P. 9(b) ..................................................................................................13

Fed. R. Civ. P. 12(b)(6) .....................................................................................10, 54

Fed. R. Civ. P. 12(f) ...................................................................................................6

1    Lead Plaintiff Mississippi Public Employees Retirement System ("MPERS")

2    ("Lead Plaintiff")[1] submits this Memorandum of Law in Opposition to

3    Defendants'[2] Motions to Dismiss.  This is a securities fraud action, brought on

4    behalf of a class of investors,[3] for violations of: (1) Section 10(b) of the Securities

5    Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5

6    promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17

7    C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

8    **I.    INTRODUCTION**

9        Semtech has ***admitted*** that for more than seven years, it backdated stock

10   options to dates on which the price of Semtech stock conveniently settled at its

11   lowest point in weeks, if not months.¶ 4.[4]  The Defendants did this intentionally to

12   artificially inflate the Company's reported net income and earnings per share

13   ("EPS") and to generate undisclosed profits for its officers, directors and

14   employees.  Indeed, an analysis completed by the leading expert on options

15   backdating (Professor Erik Lie) established that the mathematical probability (or

---

18   [1] All references to "¶ __" are to paragraph numbers in the Consolidated Amended Class Action Complaint (the "Complaint") (Docket No. 53).

19   [2] The defendants ("Defendants") collectively consist of Semtech Corporation

20   ("Semtech" or the "Company"); John D. Poe ("Poe"), the Company's CEO from October 1985 to October 2003, the interim CEO from September 2005 to April

21   2006 and the Chairman of the Board from 1998 to October 2006 (¶ 17); Jason L. Carlson ("Carlson"), the CEO and director of Semtech from October 2003 to

22   October 2005 (¶ 18); Mohan R. Maheswaran ("Maheswaran"), the President, CEO and a director of Semtech since 2006 (¶ 19); David G. Franz, Jr. ("Franz"),

23   Semtech's Vice President of Finance and CFO from 1993 until November 2006 (¶ 20); and John M. Baumann ("Baumann"), Semtech's Treasurer from 1994 until

24   November 2006 (¶ 21).  The five individual defendants are collectively the "Individual Defendants."  All citations to any Defendant's Motion to Dismiss are

25   referred to herein as ("__ Br. at __").

     [3] The "Class Period" is the period between August 27, 2002 and July 19, 2006.

26   [4] *See also* Semtech Corporation Form 10-K/A filed with the SEC on March 29,

27   2007 for the period ending January 29, 2006 (the "Restatement"), relevant portions of which are attached to Lead Plaintiff's Request for Judicial Notice ("RJN") as

28   Ex. 1.

1  improbability) that Semtech's option grants between 1994 and 2002 were timed

2  without manipulation is 1 in 35,184, 372, 088, 332 — *a probability of 0.0000%.*[5]

3       The Defendants were not accidental beneficiaries of this backdating; instead,

4  they controlled *all* accounting for options — actively deceiving Semtech investors

5  and auditors while enjoying the fruits of their illegal profits.

6       Defendants' misconduct caused Semtech to materially understate

7  compensation expense and overstate earnings throughout the Class Period.  Indeed,

8  once uncovered, the options manipulations perpetrated by the Defendants resulted

9  in *$91 million in pre-tax options related adjustments*.  When this fraudulent

10  scheme was revealed, Semtech stock plummeted resulting in a large financial loss

11  to Lead Plaintiff and the Class.

12       Instead of addressing these detailed allegations directly, the Defendants quip

13  that Plaintiff "arrived dressed in a disguise to a non costume affair." Semtech Br. at

14  1.  But it is the Defendants themselves who have disguised the Company's true

15  EPS and net income by hiding millions of dollars of compensation expense.

16  Deliberately concealed by the Defendants, it took years, an investigation by

17  outsiders into the Company's options practices, and a terrible loss by Semtech

18  shareholders for Defendants' true conduct to come to light.

19  **II.    STATEMENT OF FACTS**

20       **A.    Background**

21       Stock options are agreements that allow individuals to purchase at a later

22  date shares of a publicly traded company at a predetermined, fixed price. ¶ 32.

23  Recipients profit only when the market price of the company's common stock

24  exceeds the price at which the options were granted, known as the "strike price" or

25  "exercise price."  ¶ 32.  Unless otherwise stated, stock options are granted with an

26  exercise price equal to the market value of the common stock on the date which the

27

28

[5] *See* discussion on Professor Lie's statistical analysis *infra*.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

2

1    options are granted.  ¶ 43.  Accordingly, when such options are granted they have

2    no intrinsic value and during the Class Period companies holding such options

3    were not required to recognize any expense associated with such grants.  A major

4    purpose of such options is to incentive employees because if the stock and

5    company grow, so does the value of the employee's stock option. ¶ 36.

6    **B.    Semtech's Stock Option Plans**

7            When a company grants stock options to employees, it must do so under a

8    written stock option plan filed with the SEC and disclosed to the public so that

9    investors have an accurate understanding of: (1) the compensation paid, and (2) the

10   company's financial position.  In granting stock options a company must adhere to

11   its plan. ¶ 34.  Semtech did not adhere to its option plans.

12           By 1998, Semtech had several stock option plans for its employees, officers,

13   directors and consultants (the "Stock Option Plans")[6].   Each of the plans provided

14   that the exercise price of the stock options could not be less than the fair market

15   value of the Company's common stock on the day of the grant.  These plans also

16   included a written agreement (the "Award Agreement") between the option

17   recipient and the Company (¶¶ 35-40) that provided: "each Award Agreement

18   governing an Option shall state the Exercise Price.  ***The Exercise Price of any***

19   ***Incentive Option shall not be less than the Fair Market Value of the Common***

20   ***Stock on the date of the grant***…" (emphasis added) 1994 Plan.  "The applicable

21   date shall be the date on which the award is granted." 1998 Plan.  ¶ 37.

22   **C.    Semtech's Accounting For Stock Option Grants**

23           Semtech's public filings state that it followed Accounting Principles Board

24   Opinion ("APB") No. 25 in accounting for stock options. (¶¶ 64-66, 83-85, 102-

25

26           [6] The Stock Option Plans consist of the 1994 Long Term Stock Inventive Plan
     (the "1994 Plan"); the 1994 Non-Employee Directors Stock Option Plan (the
27   "1994 Director's Plan"); and the 1998 Long Term Stock Inventive Plan (the "1998
     Plan") (¶¶ 35-39).
28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

3

104, 122-124).  APB 25 provided that public companies that grant "in-the-money" stock options must take a compensation expense for the difference between the fair value of the stock on the grant date and the exercise price of the option (i.e., "intrinsic value").  ¶ 42.  The Company need not record a compensation expense if an option is issued at an exercise price equal to the market price of Semtech stock on the date of the grant (i.e., "at-the-money"). ¶ 42.

The date of the grant, or "measurement date," for stock option accounting purposes is the date upon which the compensation cost is to be measured.  ABP 25 defines the measurement date as "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive, and (2) the option or purchase price, if any."  ¶ 46.  Thus, the actual "measurement date" can not occur until the terms (namely the identity of the recipient of the options, the number of shares and the strike price) of the option are actually determined. ¶ 47.

When a company grants an "in-the-money" option, where the market price of the stock is more than the option's exercise price on the "measurement date," the compensation expense is calculated by multiplying the total number of options granted by the difference between the exercise price of the option and the market price of the stock on the measurement date. The resulting compensation cost must be recognized as an expense amortized over the option's vesting period. ¶ 43. Throughout the Class Period, Defendants blatantly and repeatedly violated APB 25.

### D.   Individual Defendants Received Backdated Options

Semtech issued stock options to incentivize Company officers and key employees.  ¶ 36.  But many of these options were illegally backdated.  For example, Individual Defendants Poe, Franz and Baumann received hundreds of

Lead Plaintiff's Omnibus Opposition to Defendants' Motions
to Dismiss the Consolidated Class Action Complaint
Civil Action No.: 2:07-CV-07114-CAS (FMOX)

4

thousands of stock options, at least **_half a million_**[7] of which were backdated, "in-the-money" options.  Significantly, these Individual Defendants' entered into written agreements with the Company detailing the award and the grant.  As per Semtech's Stock Option Plans, the Award Agreement was required to have (1) the grant date, and (2) the designated strike price.  Thus, these Individual Defendants could plainly see on the face of the Agreement that the grant date and designated strike price for their options differed from the actual date the options were granted; each of these defendants, therefore, knew they had received backdated options.[8]

### E.    The False And Misleading Financial Statements

Throughout the Class Period, Semtech falsely accounted for millions of dollars in stock options to its officers, employees, and directors, in contravention of APB 25 and Semtech's own stated accounting policies.  The Complaint details the specific false and misleading statements contained in Semtech's public statements, including its press releases and public filings with the SEC. The Complaint also alleges, in detail, which Individual Defendant signed and swore to each false and misleading financial statement regarding the financial condition of the Company.

As alleged throughout the Complaint, these statements were false and misleading because unknown to the market, Defendants were engaged in a long-term scheme to backdate stock option grants to days on which Semtech stock had reached its lowest point in order to hide compensation expenses and inflate income.  Consequently, each financial statement that Semtech filed during the

---

[7] According to Professor Lie's analysis, *infra*, and a review of Proxy Statements from 1995-2003, Defendant Poe received approximately 375,685 backdated grants, Defendant Franz received approximately 164,466 backdated grants and Defendant Baumann received approximately 18,722 backdated grants (for a total of 558,853 backdated grants to these Individual Defendants).  *See*  RJN Exs. 2-8.

[8] A stock option plan is publicly filed with the SEC.  The Company's management and directors (here, the Individual Defendants), especially those who sign the SEC filings attaching the plan, are (or would be reckless in not being) knowledgeable about how the plan is designed to operate. ¶ 34.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

5

1  Class Period overstated the Company's net income and EPS and understated its

2  compensation costs.[9]

3      **F.**    **Revelation of the Fraudulent Scheme**

4         The surreptitious backdating scheme at Semtech went undiscovered until

5  2006.[10]  In the spring of that year, many corporations began disclosing that they

6  were under investigation by the SEC for backdating stock options. ¶ 48. On May

7  16, 2006 the Center for Financial Research ("CFRA") published a report listing

8  Semtech as a company at risk for options backdating.  ¶ 127.  Over the next several

9  months, Semtech made a number of partial disclosures concerning its backdating

10  practices (including that Semtech, the SEC and the U.S. Attorney's Office were

11  investigating the Company's practices) which negatively impacted Semtech's

12  share price.

13         Semtech's final corrective disclosure occurred on July 20, 2006.  On that

14  day Semtech announced that it expected to record material amounts of additional

15  compensation expense and restate its financial results for FY 2002 through FY

16  2006 to correct errors in accounting for stock options granted in fiscal years 1998-

17  2003.  That day Semtech's stock price closed at $12.37, down from the prior day's

18  close of $13.19, and again closed down at $11.60 on July 21, 2006.  In all,

19

20             [9] ¶¶ 58, 63, 67, 72, 76, 81, 86, 91, 95, 100, 105, 110, 115, 120, 125.

21             [10] In a footnote, Semtech asks the Court to strike paragraphs 32-34, 45 and 48-

22  55 of the Complaint under Rule 12(f), alleging that those paragraphs are "immaterial and impertinent." Semtech Br. at 11 n.8. Such motions are disfavored

23  and require a showing that the challenged material has "no possible bearing on the controversy." *SEC v. Levin*, 232 F.R.D. 619, 624 (C.D. Cal. 2005). The pleadings

24  are read in the light most favorable to the non-movant, and the motion may be denied "if there is any doubt as to whether under any contingency the matter may

25  raise an issue . . . ." *Quintana v. Baca*, 233 F.R.D. 562, 564 (C.D. Cal. 2005) (citations omitted). The challenged paragraphs describe the proper method of

26  accounting for stock options and the recognition over several years of deceptive practices related to stock options.  At a minimum, these allegations are relevant to

27  whether the Defendants truthfully accounted for stock options, the materiality of these misrepresentations and each Defendant's state of mind.  Semtech's challenge

28  does not satisfy the requirements of Rule 12(f).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

6

1  Semtech's stock lost 27.73% from its value between May 21, 2006 and July 21,
2  2006.  ¶¶ 7-10, 134-136.

3      **G.      Semtech's Restatement**

4          On March 29, 2007 Semtech was forced to issue a massive financial
5  restatement as a result of the backdating fraud (the "Restatement").  ¶ 141.
6  According to the Restatement, the Company's investigation uncovered ***over 2,000***
7  ***stock option manipulations that resulted in $91 million in inflated income***.
8  ¶ 141.

9          The Restatement highlighted the impropriety of thousands of option grants
10  made by Defendant Poe—the former CEO of the Company.   As explained, in
11  April 1997 the Compensation Committee delegated authority to Poe to make
12  option grants as agent of the Committee.[11]   Using and abusing this authority, Poe
13  granted options to existing executive and non-executive employees through May
14  2002.[12] With regard to Poe's grants, the Company determined that "the elements of
15  APB 25 were not satisfied as of the stated grant dates for **15 of 17 grant dates**
16  selected [and] there is evidence of ***intentional manipulation*** on 9 of these dates,
17  representing approximately 42% of the shares and 76% of expenses in this
18  category" (emphasis added).[13]   These grants also lacked adequate
19  contemporaneous documentation to corroborate the establishment of the grant
20  date.[14]

21          Regarding new employee grants, the Company found strong evidence that
22  ***management intentionally selected favorable grant dates*** for new hires.  The
23  majority of grants were not made as of the recipients start date, which is required

24

25  _____

26      [11] ¶ 148.  *See also* RJN Ex. 1 at 4.
      [12] *Id.*
27      [13] ¶ 148.  *See also* RJN Ex. 1 at 4-5.
      [14] ¶ 148.  *See also* RJN  Ex. 1 at 5.
28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

7

1   by the Compensation Committee, and these improperly granted options resulted in

2   a *90%-95% more favorable price* for newly hired employees.[15]

3        Semtech also admitted, and its external auditors confirmed, that it did not

4   maintain an effective control environment relating to its stock option grants, which

5   "permitted certain former members of senior management to override controls and

6   retroactively price stock option grants, and ultimately resulted in the Company's

7   failure to properly account for such option grants." ¶ 179.

8        Had these backdated options been properly accounted for, the Company

9   would have recognized additional expenses of $36.4 million, $13.4 million, $9.2

10  million, $5.6 million, and $1.5 million for FY2002 through FY2006, respectively.

11       Particularly damaging to the Company and the Individual Defendants was

12  the revelation in the Restatement that the options manipulation was ***intentional***.

13  The Special Committee concluded that "the ***evidence supports a finding of***

14  ***intentional manipulation of stock option grants" directed by Defendant Poe***

15  (***former CEO***), that "a former Human Resources executive . . . participated in this

16  conduct", and that Defendant Franz (former CFO) and Defendant Baumann

17  (former Treasurer) "knew or should have known of the manipulation ***and initiated***

18  ***or participated in some manipulative acts"***.[16]  In addition, the Restatement stated

19  that Individual Defendants Poe, Franz and Baumann had been effectively fired, and

20  had *not* left the Company voluntarily as previously implied by the Company's

21  Form 8-K.  ¶¶ 137-140, 143.  Another executive who left the Company in 2007,

22  "evidenced a willingness to acquiesce in the manipulative conduct."[17]

23       Finally, the Special Committee "found some personal benefit to these five

24  individuals in the form of options that were "in-the-money," but unvested at the

25

26  ───────────────

    [15] *Id.*

27      [16] *Id.* at 7.

    [17] *Id.*

28

Lead Plaintiff's Omnibus Opposition to Defendants' Motions                    8
to Dismiss the Consolidated Class Action Complaint
Civil Action No.: 2:07-cv-07114-CAS (FMOX)

1   date of the grant" of approximately 4.8 million.[18]  Ultimately, the Special

2   Committee cancelled and rescinded all the outstanding options held by Poe,

3   cancelled one of Franz's grants and re-priced the remaining option grants.[19]

4       **H.    Confidential Witness' Account**

5       A Confidential Witness ("CW 1") corroborated the findings of the Special

6   Committee.  CW 1, a court reporter and legal secretary responsible for preparing

7   the paperwork for Semtech's stock option grants, stated that Defendant Poe and

8   Semtech's human resources personnel ordered CW 1 to use the "hire date" as the

9   strike price date even if the Board of Directors had not approved the option grant

10  until months later. ¶¶ 185, 186.[20]

11      **I.    Professor Lie's Statistical Analysis**

12      Statistical analysis confirms that it was virtually impossible for the

13  backdating to be the result of chance or error.  Indeed, expert analysis conducted

14  by Professor Lie demonstrates that the probability that Semtech's option grants

15  between 1994 and 2002 were selected at random (i.e., without manipulation)

16  would be **1 in 35,184,372,088,332 (i.e., statistically impossible)**.  ¶¶ 4, 154-161.

17

18

---

19      [18] *Id.*

20      [19] The Special Committee found that Defendant Baumann also had one
outstanding grant that expired or lapsed during the restatement process.  *Id.* at 8.

21      [20] Defendants Carlson and Maheswaran contend that *Tellabs, Inc. v. Makor
Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) precludes the use of confidential

22  witnesses.  *See* Carlson/Maheswaran Br. at 13-14.  This is not true. *Tellabs* did not
even preclude the use of confidential witnesses in that case, much less in other

23  securities cases.  And, on remand, the Seventh Circuit held that the plaintiffs could
rely on statements from confidential witnesses and that "the absence of proper

24  names does not invalidate the drawing of a strong inference from informants'
assertions." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th

25  Cir. 2008) (citing, *inter alia*, *In re Daou Sys. Inc.*, 411 F.3d 1006, 1015-16 (9th
Cir. 2005)).  In *Daou*, this Circuit explained that "[n]aming sources is unnecessary

26  so long as the sources are described 'with sufficient particularity to support the
probability that a person in the position occupied by the source would possess the

27  information alleged' and the complaint contains 'adequate corroborating details.'"
*Id.*

28

### J.    The Individual Defendants Benefit From Stock Sales

During the Class Period, Defendants Poe, Franz and Baumann each benefited from their scheme through the following stock sales:

| Insider | Total Shares Sold During the Class Period | Total Proceeds |
|---|---|---|
| John D. Poe | 812,122 | $17,466,467.80 |
| David G. Franz, Jr. | 132,000 | $2,895,655.50 |
| John M. Baumann | 35,000 | $728,162.57 |
| Totals | 979,122 | $21,090,285.87 |

## III.   ARGUMENT

Under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), the reviewing court must accept as true all well-pled allegations in the complaint. *Tellabs*, 127 S. Ct. at 2509.[21]  As set forth below, the Complaint plainly states valid claims against each of the Defendants for violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### A.    The Complaint States a Claim Under Section 10(b) of the Exchange Act Against Each of the Defendants

To plead a claim under Section 10(b), a plaintiff must allege:  (i) a misrepresentation or omission; (ii) of material fact; (iii) made with scienter; (iv) in connection with the purchase or sale of a security; (v) upon which plaintiff relied;

---

[21] "A complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).  In addition, the reviewing court must "draw all reasonable inferences in favor of the nonmoving party…. [and a]ny existing ambiguities must be resolved in favor of the pleading."  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1045 (N.D. Cal. 2008) (quoting *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  As recently stated by Judge Illston in *Rudolph v. UTStarcom*, No. 07-4578, 2008 WL 4002855, at *1 (N.D. Cal. Aug. 21, 2008), "[t]he question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim."

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

10

1   and (vi) that the alleged misrepresentation or omission was the proximate cause of

2   plaintiff's injury.  *Daou*, 411 F.3d at 1014.

3         Significantly, the Defendants do not dispute that the Company disseminated

4   a series of materially false and misleading statements during the Class Period, or

5   that the admitted improper accounting of backdated options caused the Company

6   to overstate its reported net income by more than $91 million during the period

7   between 1996 and 2006, and ultimately prompted the Restatement.  Instead, they

8   argue the Complaint fails to adequately plead scienter, loss causation and reliance,

9   and that Lead Plaintiff and the Class somehow lack standing to bring this case as a

10  securities fraud action.  In addition, Defendants Maheswaran, Carlson and

11  Baumann contend that the Complaint fails to attribute any actionable

12  misrepresentations to them, while Defendants Poe and Baumann allege that the

13  Complaint is untimely.  Finally, each Individual Defendant argues that the

14  Complaint fails to allege control person liability under Section 20(a).  All of these

15  arguments lack merit.

16      **1.**     **Lead Plaintiffs Have Adequately Alleged Defendants'**

17                 **Scienter**

18           **(a)**     **Legal Standard**

19        One can allege scienter through facts "giving rise to a strong inference that

20  defendants acted with the intent to deceive or with deliberate recklessness as to the

21  possibility of misleading investors."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d

22  982, 987 (9th Cir. 2008). "In the Ninth Circuit, recklessness (as a form of

23  intentional conduct) has long sufficed to establish scienter for §10(b) purposes."

24  *Juniper*, 542 F. Supp. 2d at 1046.

25        The Supreme Court recently clarified that in evaluating scienter, courts must

26  consider whether an inference of scienter is "cogent" and ***"at least as likely as"***—

27  but not more likely than—"any plausible opposing inference." *Tellabs*, 127 S. Ct.

28  at 2503, 2510 (emphasis in original).  Moreover, the "inquiry . . . is whether ***all*** of

Lead Plaintiff's Omnibus Opposition to Defendants' Motions
to Dismiss the Consolidated Class Action Complaint
Civil Action No.: 2:07-cv-07114-CAS (FMOX)

11

1   the facts alleged, taken collectively, give rise to a strong inference of scienter, not

2   whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

3   at 2509 (emphasis in original).  Thus, "[i]n determining whether a plaintiff has

4   sufficiently pled scienter, a court must consider whether the total of plaintiffs'

5   allegations, even though individually lacking, are sufficient to create a strong

6   inference that defendants acted with deliberate or conscious recklessness." *Batwin*

7   *v. Occam Networks, Inc.*, No. 07-2750, 2008 WL 2676364, at *8 (C.D. Cal. July 1,

8   2008).

9       As the Ninth Circuit recently opined, *Tellabs* "suggests that perhaps *Silicon*

10  *Graphics*, *Vantive*, and *Read –Rite* are too demanding and focused too narrowly in

11  dismissing vague, ambiguous, or general allegations outright."  *South Ferry LP #2*

12  *v. Killinger*, No. 06-35511, 2008 WL 4138237, at *5 (9th Cir. Sept. 9, 2008).  The

13  Court explained:

14      *Tellabs* suggests that while a high level of detail is required under the

15      PSLRA, a court should look to the complaint as a whole, not to each

16      individual scienter allegation as *Silicon Graphics* suggests.  Thus,

17      *Tellabs* counsels us to consider the totality of circumstances . . .

18  *Id.*

19      The Supreme Court also cautioned "[t]he inference that the defendant acted

20  with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even 'the

21  most plausible of competing inferences,'" *Tellabs*, 127 S. Ct. at 2510, and

22  "emphasize[d], as well, that . . . a plaintiff is not forced to plead more than she

23  would be required to prove at trial."  *Id.* at 2513.

24      Here, Lead Plaintiff has shown through the Company's own admissions,

25  corroborated by powerful statistical data, that the Defendants intentionally

26  manipulated the grant dates of hundreds of thousands of options through

27  backdating.  Lead Plaintiff has also demonstrated that those responsible for the

28  backdating were the same individuals that reviewed, approved, signed and certified

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

12

1  the false and misleading statements alleged in the Complaint.  As discussed below,

2  the totality of the allegations of scienter satisfy Rule 9(b), the PSLRA and *Tellabs*.

3  Accordingly, Defendants' motion should be denied.

**(b)  Backdating Is An Intentional Act Which By
Itself Strongly Infers the Backdater's Scienter**

Backdating, by nature, is intentional conduct that requires the backdater to review the historical trading prices of the company's securities, and then *intentionally* select an opportune date—when the stock traded low—as the "grant date" for the options to be issued.  Like betting on a horserace that has already been run, the backdater assures the options granted bear the lowest possible exercise prices.[22]  In this way, the backdater *intentionally* maximizes the value of those options to their recipient, while at the same time allowing the company to avoid recording compensation expenses for those backdated options (even though in-the-money options require such an expense) because the options *appear* to have been granted at-the-money on the purported "grant date."  Options are thus backdated with the *specific intent* to hide compensation expenses that would otherwise be clearly required by GAAP.  Accordingly, the intent to backdate options is co-extensive with the intent to commit securities fraud.

To distract the Court from this obvious conclusion, Defendants argue that Lead Plaintiff has not demonstrated Defendants understood the proper accounting treatment for options (or backdated options).[23]  This argument ignores the relevant facts and misstates the law.

---

[22] *See In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691, 2007 WL 1621456, at *1-2 (D. Minn. June 4, 2007) (stating, "this case is incredibly simple. Plaintiffs claim defendants were playing a game with a stacked deck.  When awarded options, with deliberately selected grant dates which were already in-the-money, defendants were playing a game…. the patsy was either the hapless corporation, which in varying ways defendants controlled, or the corporation's shareholders, whose equity provided the game's antes and bloated pot.").

[23] Poe Br. at 10-12, Baumann Br. at 16, Carlson/Maheswaran Br. at 12, Semtech Br. at 13.

The primary reason to backdate options has always been to manipulate the cost accounting for such options with the intent to conceal expenses and inflate income.[24]  Put another way, one does not backdate an option without intending to hide expenses and thereby inflate income. There is no other reason to backdate an option.  For instance, if the goal was to afford the employee greater compensation, the grantor would openly grant that employee an in-the-money option or give her some other form of compensation.  The sole reason to hide the fact that the option was granted in-the-money is to hide the corresponding compensation expense.  Thus, by intentionally backdating an option, the defendant reveals his knowledge of the option accounting rules and his intent to subvert them. Accordingly, where the plaintiff sufficiently pleads the defendant intentionally backdated options, it has adequately alleged the defendant's intent to commit securities fraud.[25]

---

[24] *See, e.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 996 (N.D. Cal. 2007)  ("The motive for backdating is to avoid a 'hit to the earnings,' *i.e.*, a compensation expense, while still awarding in-the-money options"); *United States v. Reyes*, No. 06-556, 2007 WL 2462147, at *1 (N.D. Cal. Aug. 29, 2007) ("The chief purpose" of backdating "is to make the grants look as though they were granted at fair market value, and thereby to avoid a compensation charge"); *In re PMC-Sierra, Inc. Derivative Litig.*, No. 06-5530, 2007 WL 2427980, at *1 (N.D. Cal. Aug. 22, 2007) (Backdating allows a company to "improperly avoid the impact of that expense on its bottom line as well as the tax liabilities that otherwise would result from granting 'in the money' stock options"); *In re Monster Worldwide, Inc. Sec. Litig.*, 549 F. Supp. 2d 578, 581-82 (S.D.N.Y. 2008); *Testimony Concerning Options Backdating by Christopher Cox, Chairman, U.S. Securities and Exchange Commission before the U.S. Senate Committee on Banking, Housing and Urban Affairs,* Sept. 6, 2006 ("purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains-- without the company having to show it as compensation on the financial statements") (*See* RJN Ex. 9).

[25] Defendants also argue that APB 25 is inherently complex and difficult to apply. Poe Br. at 10-12, Baumann Br. at 16-17, Carlson/Maheswaran Br. at 12. This is not true, but more important it, too, is a red herring argument because the act of backdating indicates that the party doing the backdating is familiar with the relevant accounting rules.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

14

1

(c)   **Statistical Data Confirms Beyond Any Doubt That Semtech's Option "Grant Dates" Were Selected Randomly**

2

3       Option backdating is evidenced by a pattern of "granting" options on

4   unusually fortuitous dates.  *See, e.g., Zoran* and *Quest.*  The statistical

5   improbability that a company and its executives would by chance select such

6   fortunate "grant dates" is compelling evidence that such grant dates were

7   intentionally manipulated.  The remoter the odds, the stronger the inference of

8   scienter.

9       In *Zoran*, 7 of the 32 grants at issue were priced on the lowest trading day of

10   the relevant month, the odds of which occurring by chance was 1 in 1,151.  511 F.

11   Supp. 2d at 1004.  Based on these facts, the court stated, "[h]itting the most

12   favorable date seven times out of 32 is a striking pattern" and "agree[d] that this

13   pattern seems hugely suspicious."  *Id.*  The Court also recognized that a total of

14   nine in 32 grants were made on one of the two lowest trading days in a month, and

15   two more were made on at least the sixth lowest trading day.  Based on these facts,

16   the Court held, "[c]oupled with the statistical pattern of favorable grant dates and

17   the fact that the grant date could be chosen at the will of the compensation

18   committee, plaintiff has plainly succeeded in pleading that these grants were

19   backdated."  *Id.* at 1005.

20       Likewise, in *Middlesex Retirement Sys. v. Quest Software Inc.*, the company

21   admitted that "most" of the options it granted between 1998 and 2002 were not

22   properly dated.  527 F. Supp. 2d 1164, 1181 (C.D. Cal. 2007).  The court found the

23   "extremely fortunate [grant] dates give rise to a strong inference that backdating

24   has occurred and that it was done intentionally."  *Id.* at 1182.  For additional

25   support, the court considered the graphical representation of the allegedly

26   backdated grants and found it equally remarkable.  *Id.*  The Court stated:

27       The graphical representation lends substantial support to the notion

28       that no amount of "highly technical" accounting treatments can

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

15

1    obscure the obvious: that someone at Quest was engaging in

2    substantial, prolonged, and *intentional* backdating of stock options. In

3    the parlance of the *Tellabs* holding, the Court can definitively state

4    that the inference that intentional backdating occurred at Quest is

5    more "cogent and compelling" than any opposing inference offered by

6    Defendant.

7    *Id.* (emphasis in original).

8         Here, the odds of Defendants having dated the options at issue by chance is

9    an astronomical *1 in 35 trillion*.  ¶¶ 154-160.  In other words, there is virtually no

10   chance (0.00000%) whatsoever that the Defendants randomly selected the

11   purported grant dates.  ¶ 154.  These extreme odds leave little doubt that Semtech

12   executives intentionally selected the most opportune grant dates repeatedly for

13   roughly eight years.

14        To support this analysis, Lead Plaintiff has set forth, in great detail, the

15   statistical methodology behind these results and the data upon which they are

16   founded.  ¶¶ 155-160.  As pleaded, Lead Plaintiff's expert combed all relevant

17   SEC filings between 1994 and 2007 to identify 76 separate grants.[26]  ¶ 155.  He

18

19        [26] *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal.

20   2007), is not analogous.  There, the plaintiffs offered nothing but their own
     analysis comparing defendants' purported option grant dates and the company's

21   trading price ten days after the grant to conclude *Hansen* had backdated.  *Id.* at
     1155-56.  There was no statistical analysis performed as to the likelihood that such

22   grants were chosen by chance, nor was there any description of what plaintiffs
     analytical methods were, what those methods were based on, or whether the same

23   methods had been used by anyone else or had been peer reviewed.  Based on such
     "cursory allegations," the court declined to draw an inference that the grants at

24   issue were backdated.  *Id.*  Here, by contrast, Lead Plaintiff's expert, Erik Lie, is
     the leading statistician on the issue of backdating and has pioneered the analytical

25   techniques for ferreting out backdating at public companies.  His work has been
     discussed extensively since his seminal report, "On the Timing of CEO Stock

26   Option Awards," was published in May 2005. *See* RJN Ex. 10.  Professor Lie,
     using proven methods of statistical analysis of potentially backdated grants, has

27   concluded the chance of the grant dates at issue being selected at random were
     astronomical.  This evidence is far more compelling than that pleaded in *Hansen*,

28   and is much more akin to the evidence of backdating pleaded in *Quest* and *Zoran*.

1    then ranked the trading days in a relevant month, with a rank of 1 indicating the

2    lowest daily closing price and a rank of 20 indicating the highest daily closing

3    price in the month.  ¶156.  Afterward, the expert calculated that the chance these

4    76 options grants were dated at random was a staggering 1 in 10,537,447,360.  ¶¶

5    158-59.  The expert then removed the post-SOX option grants and pre-scheduled

6    option grants from the equation[27] and calculated that the chance of randomly

7    granting discretionary options on the lowest trading day in a month 18 out of 37

8    times was an even more incredible ***1 in 35,184,372,088,832***.  ¶160.  Both

9    calculations leave no doubt that the options could not have been backdated

10   randomly by chance, but rather were "granted" on dates that were intentionally

11   picked by the Defendants.[28]

12        Lead Plaintiff included charts of 16 of the allegedly backdated option grants.

13   ¶ 161.  The charts prove just how successful Defendants were at backdating these

14   option grants to take advantage of both drops and increases in Semtech's stock

15   price.  These charts show that it was not possible that these options dates were

16   selected by chance or by mistake.  Thus, there is no doubt that Semtech's

17   executives intentionally backdated hundreds of thousands of options; indeed, there

18   is no other plausible inference.

19

20   _____

21   [27] The post-SOX and pre-scheduled grant dates were removed because there is
     little opportunity to manipulate these grants.  For pre-scheduled grants the option
22   "grant dates" are chosen ahead-of-time, so backdating these grants is essentially
     impossible.  Following SOX executives were required to file documents with the
23   SEC reflecting their grants within 2 days of the actual grant.  Thus, for executives
     that followed the post-SOX reporting regulations, the window to backdate options
     was reduced to 2 days, essentially prohibiting backdating.

24   [28] Defendants suggest that acts of backdating that pre-date the class period are
     irrelevant.  *See* Poe Br. at 13-14.  That suggestion misstates the law.  *See Zelman v.*
25   *JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) ("The proposed
     class period dates function only to define the plaintiff class, not to restrict the
26   universe of relevant or actionable facts in this case."); *see also In re Scholastic*
     *Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light
27   on whether class period statements were false or materially misleading is
     relevant").

28

1
2
3
4
5
6
7
8

The ostensible "competing" inference offered by Defendants is that they were "merely negligent" in not properly documenting the grant dates and that what appears to be backdating is really just a coincidence.[29]  Not only is this excuse implausible; it also does not constitute a viable defense. Sloppy paper work and lax controls surrounding the granting of options cannot explain how 18 of Semtech's 37 option grants between 1994 and 2002 were purportedly made **on the absolute lowest trading day in the relevant month**, nor does it explain why these wrong grant dates so consistently and substantially benefited the Defendants.

9
10

### (d)    Semtech Admitted That its Employees *Intentionally* Backed Option Grants

11
12
13

Perhaps even more compelling, the Company itself concluded that Defendant Poe *intentionally* backdated options with the help and/or acquiescence of Defendants Franz, Baumann, and a former Vice President in the Human Resources Department.  ¶¶ 142, 150.

14
15
16
17
18
19
20
21
22

After almost a year of intense investigation, the Company completed its review, directed by a Special Committee, into backdating and concluded that Poe and another former executive intentionally backdated options.  ¶¶ 142, 146.  The Special Committee, informed by numerous experts retained by the Company, found that ***nearly half of all grants issued by Defendant Poe were manipulated (i.e. backdated)***.  ¶ 148.  This committee also found that Defendants Franz and Baumann "knew, or should have known, of the manipulation ***and initiated or participated in some manipulative acts."***  ¶¶ 142, 150.[30]

23
24
25
26
27
28

---

[29] Poe Br. at 12, Franz Br. 20.
[30] The Committee also provided telling details regarding the circumstances upon which Poe, Franz and Baumann left the Company.  ¶¶ 143, 150.  The Committee explained that Poe resigned his post as Chairman of the Board in August 2006, but then refused to cooperate with the Committee's investigation.  ¶ 150.  Following the Committee's report, the Board accepted the Committee's recommendation to ask Poe to resign, and, if he refused, to preclude him from seeking re-election.  *Id.*  Poe was then asked to immediately resign.  *Id.*  The Committee also recommended that, based on their findings, Franz and Baumann be

*(continued . . .)*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

18

1    The Defendants' argument that these findings were made in hindsight is not

2  persuasive.[31]  Every investigation looks at evidence in hindsight.  That is the job of

3  investigators;  they don't predict events that will happen in the future, they

4  investigate events that already occurred.  What the Defendants ignore is that the

5  Special Committee's findings were based on compelling *contemporaneous*

6  evidence of Defendants' fraud, including emails, correspondence, personnel

7  records, accounting ledgers and other option-related documents.  Based on this

8  evidence and a thorough investigation that took a year to complete, Semtech

9  announced that some current and former Semtech executives committed fraud.

10  Such an admission, supported by strong evidence, carries enormous weight.

11    Poe relies on *Weiss v. Amkor Technology, Inc.,* and erroneously suggests this

12  case somehow undermines Semtech's powerful conclusion of his guilt. Poe Br. at

13  9-10.  It does not.  In *Amkor*, the special committee's findings could not be linked

14  to a*ny* of the Individual Defendants.  *See* 527 F. Supp. 2d 938, 949 (D. Ariz. 2007).

15  Here, in contrast, they can.  In a section entitled "Findings as to Individual

16  Conduct,"[32] Semtech and its Special Committee specifically identified Poe, Franz

17  and Baumann by name or title and described their culpability based on

18  contemporaneous evidence, thus raising a strong inference that these Defendants

19  acted with the requisite scienter.

20    Based upon the strong statistical data, the visual representations of

21  intentional backdating, and the Company's admission that many of its option

22  grants were intentionally backdated by one or more of the Individual Defendants,

23  the only two remaining relevant legal inquiries are: Who at Semtech participated in

24

25  *( . . . continued)*
   asked to resign, and they did.  *Id.*  The Committee further directed the Board to

26  cancel and rescind all of Poe's outstanding options, and to cancel some of Franz's
   options and re-price others.  *Id.*

27    [31] Poe Br. at 9-10, Baumann Br. at 17-18.

28    [32] *See* RJN Ex. 1. _

1   or was aware of the backdating? Were these participants the same persons who

2   helped prepare and/or signed and certified the false and misleading financial

3   reports?

### (e)   Lead Plaintiffs Have Adequately Alleged the Scienter of Each Individual Defendant

### (i)   Defendant Poe Acted With Scienter

It is beyond dispute that Defendant Poe acted with scienter.  Indeed, following its thorough investigation, Semtech concluded Poe *intentionally manipulated* the grant dates on thousands of options.  ¶¶ 142, 150.  As mentioned, one backdates option grants to assure the option has intrinsic value when issued, and to hide that expense from investors.  By backdating grants, Poe clearly intended to commit securities fraud.  Semtech's conclusion that Poe acted intentionally is supported by the statistical evidence demonstrating the extreme improbability that Poe selected the grant dates randomly. ¶ 154-160.

Fully aware of his fraud, Poe signed and certified at least six financial statements during the Class Period which, as intended, falsely hid compensation expenses and inflated income as a result of the backdating scheme.  ¶¶ 58, 62, 65, 68, 71, 75, 77, 119.  The evidence of Poe's fraudulent intent is further corroborated by Lead Plaintiff's confidential witness, an employee in Semtech's Human Resources department, who had direct interaction with Poe (¶¶ 185-86), and recounted a specific instance in which Poe reprimanded her for *properly* dating a series of option grants and then ordered her to backdate them.  *Id.*

Not surprisingly, Poe was the beneficiary of at least 375,685 backdated options. RJN Exs. 2-7.  And, seven of the ten grants he received between 1995 and the end of 2002 were backdated.  *Id.*  It defies logic and common sense to suggest

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

20

1   Poe did not know statements accounting for those options were false and

2   misleading.[33]

3       Poe also made knowingly false statements when he certified Class Period

4   financial statements pursuant to SOX.  ¶¶ 68, 77 and RJN Exs. 11-13.  In those

5   certifications he stated the reports did not contain any materially false statements

6   or omissions, and that the reports fairly presented in all material respects the

7   financial condition, results of operations and cash flows of Semtech.  *Id.*  This was

8   not true, and Poe knew these statements were false because he intentionally

9   backdated options in violation of Semtech's Stock Option Plans, then falsely stated

10  in the Company's financial reports that all options were properly accounted for in

11  accordance with APB 25.  He then certified financial statements he knew did not

12  properly account for those backdated options.  *Id.*[34]

13      Additionally, the certifications Poe signed falsely affirmed that he and Franz

14  had designed adequate disclosure controls to ensure that all material information

15  regarding Semtech was properly reported, that he and Franz had tested those

16  controls and deemed them adequate, and that all deficiencies in those controls, as

17  well as any known frauds (whether material or not), were reported to Semtech's

18  audit committee and its auditors.  ¶¶ 71, 75, 119.

19      Yet, despite these certifications, Poe knew that Semtech's controls regarding

20  option grants had glaring weaknesses because he was well aware *of his own*

21

22  ───────────────

23  [33] *See Quest*, 527 F. Supp. 2d at 1183-84 ("the Court finds that the substantial number and value of the option grants given to Defendants that consistently had measurement dates on either the lowest prices of the year or immediately preceding rapid rises in the Company's stock, combined with Defendant's key positions relating both to the granting of and/or accounting for stock options gives rise to a compelling inference of either Defendants' actual knowledge or deliberate recklessness").

26  [34] "When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Zoran*, 511 F. Supp. 2d at 1013 (citing *Howard v. Everex*, 228 F.3d 1057, 1061 (9th Cir. 2000)).

1   intentional backdating.  Thus, he knew that his and Franz's statements

2   characterizing and accounting for those backdated option grants were false and

3   misleading, that the Company had no controls in place to protect against

4   backdating, and that the frauds attendant thereto had not been reported to the

5   Company's auditors.  As Semtech admitted in its Restatement, the principle

6   weakness in its internal controls was that "the Company was under the leadership

7   of the Former CEO [Defendant Poe], who was found by the Special Committee to

8   have manipulated option grants in prior fiscal years…."  ¶ 182.  Also indicative of

9   Poe's scienter are the fact that he refused to be interviewed by the Committee

10  investigating the backdating (RJN Ex. 1, p. 7) and that he was forced to resign as a

11  result of the Special Committee's findings.  ¶¶ 143, 150.[35]

12       These allegations leave no doubt that Poe intentionally committed securities

13  fraud, and they create a strong inference of his scienter, one that is cogent and

14  compelling and far more plausible than any inference offered by Defendants.

15                    **(ii)    Defendant Franz Acted With Scienter**

16       Franz tries to escape the Special Committee's findings by trying to paint his

17  conduct as merely negligent rather than intentional or deliberately reckless.  Franz

18  Br. at 15.  In so doing, he mischaracterizes the Special Committee's finding that he

19  and Defendant Baumann "knew, or should have known, of the manipulation" by

20  completely ignoring the rest of that finding— that both Defendants ***"initiated or***

21  ***participated in some manipulative acts."***  ¶¶ 142, 150.

22       This case is squarely on-point with *McKesson*, which rejected the same

23  "mere negligence" argument under similar, though less compelling, circumstances.

24

25  [35] *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274
    (N.D. Cal. 2000). *See also In re Adaptive Broadband Sec. Litig.*, No. C 01-1092
26  SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (inference of scienter raised
    because "[a] Adaptive's financial difficulties were coming to light" by a
27  restatement and an internal investigation "three of the named individual defendants
    either left the company or were moved to new positions").
28

1   Not surprisingly, Franz completely ignores this case.  In *McKesson*, the complaint

2   relied heavily on the reported conclusions of the company's own investigators to

3   establish the former management's scienter.  126 F. Supp. 2d at 1273-74.  The

4   court found that scienter was strongly evidenced by the investigators' statements

5   that management "knew or should have known" about accounting improprieties –

6   the very language that Franz argues supports a finding only of "mere negligence."

7   That court found such investigative findings (coupled with terminations of the

8   senior management involved) to be "much more direct evidence of scienter" even

9   than allegations of an "improper [accounting practice] . . . so widespread . . . that

10  senior management must have known of" it.  *Id.* at 1273.  As the court explained:

11          The company's statements about the fired employees and their

12          participation in [the company's] improper accounting practices . . are,

13          however, strong circumstantial evidence of fraud.  *Companies do not*

14          *routinely announce massive restatements of revenue accompanied by*

15          *press releases announcing that various employees have been fired*

16          *"for cause."  It certainly is not routine to state that the terminated*

17          *employees "knew or should have known" about accounting*

18          *improprieties*.  One can only assume that [the company] had a factual

19          basis for such statements.

20  *Id.* at 1274 (emphasis added).[36]

21  _____

22  [36] Franz cites only *Wiestschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102,
    1115 (N.D. Cal. 2003) and *In re Peerless Sys. Corp. Sec. Litig.*, 182 F. Supp. 2d

23  982, 995 (S.D. Cal. 2002) for the proposition that blanket allegations that a
    defendant "knew or should have known" are insufficient to allege scienter.  In

24  those cases, however, statements at issue were merely plaintiffs' allegations that
    the defendants "knew or should have known" certain information.  Here, the

25  Defendant Company, after expending great effort and assets to review its historical
    stock option practices concluded that Franz "knew or should have known" of the

26  backdating *and* that he participated in or initiated manipulative acts.  As explained
    in *McKesson*, it is quite a different thing when the company admits to this level of

27  culpability.  When combined with the additional finding of the Committee that
    Franz performed manipulative acts relating to the fraud, the cases cited by Franz

28  are clearly inapposite.

1   Here, not only did the Special Committee find Franz "knew or should have

2   known" of the backdating fraud, it also concluded that he "initiated or participated

3   in manipulative acts" relating to the fraud.  ¶¶ 142, 150.  The Committee also

4   recommended his termination and the Company asked him to resign, which he did.

5   ¶¶ 143, 150.  These findings, establishing that Franz acted with scienter, are

6   stronger than those determined to be sufficient in *McKesson*.[37]

7   In addition, Franz received at least 164,466 backdated options.  RJN Exs. 2-

8   7.  Six of the nine option grants Franz received between 1995 and the end of 2002

9   were backdated.  *Id.*  Franz was also Semtech's CFO during the relevant period.  ¶

10   20.  As the recipient of thousands of options that were patently in-the-money when

11   issued to him, it is not plausible that Franz did not know his options were

12   backdated or that the statements accounting for his options were false and

13   misleading.  *See Quest*, 527 F. Supp. 2d at 1183-84.

14   Despite his knowledge of the backdating scheme and its impact on the

15   Company's financial reports, Franz certified each of the 15 Class Period quarterly

16   and annual reports, all of which the Company admitted overstated reported income

17   and hid compensation expenses.  His certifications included false assurances that

18   the Company maintained adequate internal controls so that its publicly released

19   financial reports were true and accurate in all material respects.  ¶¶ 58, 62, 65, 68,

20   71, 75, 77, 80, 82, 84, 87, 90, 92, 94, 96, 99, 101, 103, 106, 109, 111, 114, 116,

21   119, 121, 123, 126.  As Semtech later admitted, those controls contained glaring

22   material weaknesses.  ¶¶ 179-83.  "The Ninth Circuit has held that scienter is

23   properly alleged when the complaint alleges both false statements and the

24   defendant's close involvement in the preparation of those statements."  *Zoran*, 511

25

26   ───────────────

    [37] *See also Adaptive Broadband*, 2002 WL 989478, at *14 (inference of

27   scienter raised because "[a]s Adaptive's financial difficulties were coming to light"
    by a restatement and an internal investigation "three of the named individual

28   defendants either left the company or were moved to new positions").

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

24

1  F. Supp. 2d at 1013 (citing *Daou*, 411 F.3d at 1022-24).  Here, Lead Plaintiff has

2  alleged both.

3       Accordingly, based on the totality of the allegations against Franz, including

4  the Company's admission that he "knew or should have known" of the backdating

5  and "initiated or participated in deceptive acts," his forced resignation, his receipt

6  of thousands of backdated options and his accounting and financial expertise,

7  Plaintiffs have raised at least a strong inference of his scienter.

8             **(iii)**    **Defendant Baumann Acted With Scienter**

9       Baumann also tries to escape from the Special Committee's findings by

10  suggesting they "undermine" his scienter because the committee concluded only

11  that he "knew or should have known" of the backdating.  Baumann Br. at 17-18.

12  Yet, as *McKesson* held, even a statement that the defendant "knew or should have

13  known" is highly indicative of scienter.  *See McKesson*, 126 F. Supp. 2d at 1273-

14  74.  Baumann also ignores the Committee's finding that he "initiated or

15  participated in manipulative acts," which is evidence that he was at a minimum

16  deliberately reckless. ¶¶ 142, 150.

17       Baumann also received close to 19,000 backdated options.  In fact, more

18  than half the options granted to Baumann prior to 2003 were backdated.  RJN Ex.

19  8.  His receipt of these backdated options, particularly in light of his role as

20  Semtech's Treasurer, strongly suggests his knowledge of the backdating fraud and

21  its intended impact.  *See Quest*, 527 F. Supp. 2d at 1183-84.  His forced resignation

22  as Company Treasurer following disclosure of the fraud constitutes further

23  evidence of his involvement in the fraud and adds significantly to a strong

24  inference of his scienter. ¶¶ 143, 150.[38]

25

26

27      [38] *See McKesson*, 126 F. Supp. 2d  at 1274.  *See also Adaptive Broadband*,

28  2002 WL 989478.

1    In the face of considerable evidence of his scienter, Baumann attempts to

2    avoid liability for the fraud by claiming not to have "made" any of the false and

3    misleading statements at issue, and by arguing that "[a] defendant must actually

4    make a false or misleading statement in order to be held liable under Section

5    10(b)."  Baumann Br. at 8-9.  *Stoneridge Investment Partners, LLC v. Scientific-*

6    *Atlanta, Inc.*, 128 S. Ct. 761 (2008) ("*Stoneridge*"), however, rejects the argument

7    that there must be a "specific oral or written statement before there [can] be

8    liability under Section 10(b) or Rule 10b-5" as "*erroneous*."  *Id.* at 769.  In

9    *Stoneridge*, the Supreme Court expressly acknowledged that "*[c]onduct itself can*

10   *be deceptive.*" *Id.* (emphasis added); *see also id.* at 773-74.  As Baumann admits,

11   "an individual may become a primary violator through substantial participation or

12   intricate involvement in the preparation of fraudulent statements."  Baumman's Br.

13   at 8-9.  Moreover, "an actor is reckless if he had reasonable grounds to believe

14   material facts existed that were misstated or omitted, but nonetheless failed to

15   obtain and disclose such facts although he could have done so without

16   extraordinary effort."  *See Howard*, 228 F.3d at 1064.

17   As admitted in the Special Committee Report, Baumann participated in the

18   backdating scheme, having at the very least "initiated or participated in deceptive

19   acts." ¶¶ 142, 150.  Moreover, as the Treasurer of Semtech, he was responsible for

20   maintaining adequate and accurate accounts of the Company's common stock.

21   ¶ 21, RJN Ex. 14 at 25-26.  He or the Secretary were also required to sign each

22   stock certificate issued by the Company.  *Id.* at 27  Thus, Baumann was a gate

23   keeper of Semtech's common stock and could have prevented or disclosed the

24   fraud at any time.  *Id.*  At the very least, given his responsibilities over monitoring

25   and issuing shares of Semtech's common stock, investors had a right to expect he

26   would protect against improprieties in the granting and exercise of options that

27   would divest the Company of that stock at an inadequate or fraudulently induced

28   price.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

26

Significantly, Baumann is also named as the press contact on each of the 11 false and misleading quarterly earnings releases during the Class Period.  ¶¶ 56, 60, 69, 73, 78, 88, 93, 97, 107, 112, 117. [39]  As the press contact and purportedly a member of Semtech's Investor Relations department, not only did he help prepare Semtech's press releases, but he was responsible for answering inquiries relating to the announcements.  His role and position placed him at the forefront of Semtech's backdating unlike the far more remote role played by *third parties* in *Stoneridge*.

In view of his public role at Semtech and role as a corporate fiduciary, it was foreseeable to Baumann that disclosure of the backdating scheme would give rise to liability.  Thus, Baumann knew and/or actively participated in the backdating fraud and made false statements to conceal the fraud.  Accordingly, Plaintiffs have raised a strong inference of his scienter.

### (iv)  Defendants Carlson and Maheswaran Acted With Scienter

On April 14, 2006, Defendant Maheswaran, as Semtech's CEO, signed and certified the Company's Annual Report for 2005.  ¶ 123.  As later admitted by the Company, that report included millions of dollars in hidden expenses and inflated income.  The report also came nearly a year after Professor Erik Lie published his statistical analysis on CEO stock option grants which uncorked backdating scandals across the country.  RJN Ex. 10.  Considering the degree to which Semtech engaged in backdating fraud, the many backdated grants, the statistical improbability that those grant dates were selected at random (1 in 35 trillion), and the Restatement resulting from the admission of backdating by Semtech executives ($91 million), one can strongly infer that Defendant Maheswaran knew of the backdating fraud when he issued the 2005 annual report.

[39] *See also* RJN Exs. 15-25.

1  Similarly, Defendant Carlson signed and certified eight annual and quarterly

2  reports during his tenure as Semtech's CEO, each including millions of dollars in

3  inflated income and hidden expenses.  ¶¶ 80, 84, 90, 94, 99, 103, 109 and 114.  At

4  least two of these reports were issued after Professor' Lie's article.  It is

5  unreasonable to suggest Carlson was not aware of the backdating fraud when he

6  issued the aforementioned reports.  *See Zoran*, 511 F. Supp. 2d at 1013.

7  **(v)     Defendant Semtech Acted With Scienter**

8  A plaintiff adequately alleges the scienter of the corporate defendant by

9  sufficiently alleging the scienter of any employee or agent of the corporation.  *See*

10  *In re Int'l Rectifier Corp. Sec. Litig.*, No. 97-2544, 2008 U.S. Dist. LEXIS 44872,

11  at *66 (C.D. Cal. May 23, 2008) and  *In re Apple Computer, Inc. Sec. Litig.*, 243 F.

12  Supp. 2d 1012, 1023 (N.D. Cal. 2002).  Thus, if the Court finds Lead Plaintiff has

13  sufficiently alleged even one of the Individual Defendants acted with scienter, then

14  it must find that Semtech also possessed the requisite scienter. Here, because Lead

15  Plaintiff has sufficiently alleged the scienter of at least one Individual Defendant, it

16  has also adequately alleged Semtech's scienter.

17  **(vi)    Defendant Poe, Franz and Baumann's Class**
    **Period Stock Sales Further Support The**
18  **Already Strong Inferences of Their Scienter**

19  Defendants argue that the stock sales do not give rise to a strong inference of

20  scienter because Lead Plaintiff has not alleged these sales were "unusual" or

21  "suspicious" in number or timing, or relative to their past trading behavior.[40]  The

22  prototypical guidelines regarding the relevance of a defendant's stock sales to

23  scienter, however, are not applicable to backdating cases.  *See Quest*, 527 F. Supp.

24  2d at 1184-87.

25

26

27  _____

   [40] Poe Br. at 17-18, Franz Br. at 22-24, Baumann Br. at 18-19.
28

1    First, the percentage of shares sold is irrelevant in the backdating context

2    because the long duration of the fraud alleviates any need to sell large numbers of

3    shares quickly. *Id.* at 1185. Where a defendant believes the fraud will continue

4    undetected for years or decades, there is no compulsion to sell shares quickly. *Id.*

5    Moreover, large sales may have actually raised suspicion, causing early detection

6    of defendant's scheme. *Id.* "Thus, the requirement that percentages be pled is only

7    relevant when the insider is aware of the time that the inside information will be

8    disclosed and there will be a resulting effect on the stock price." *Id.* at 1185.

9    Here, Lead Plaintiff has alleged how many shares Defendants Poe, Franz

10    and Baumann sold during the Class Period and the proceeds generated by the sales.

11    In all, Defendants sold more than $21 million worth of Semtech stock during the

12    Class Period. ¶ 191.  It is not relevant whether these sales amounted to a large

13    percentage of the Defendants' Semtech holdings, the only consideration is whether

14    these sales are large enough to raise suspicion. *Quest*, 527 F. Supp. 2d at 1185.

15    "Because Plaintiff has pled the amount of stock sales with the appropriate degree

16    of specificity, and the amount is substantial enough to justify an inference of

17    motive, this sub-factor leans in favor of finding the stock sales 'suspicious.'" *Id.* at

18    1186.

19    The issue of timing is also irrelevant in the backdating context because "the

20    nature of Defendants' … scheme was such that there was no preordained date on

21    which the allegations of improper backdating would be revealed with the resulting

22    drop in stock price." *Id.*  Additionally, once the backdating became public, any

23    large stock sales by the Defendants would have caused a strong appearance of

24    impropriety. *Id.* "Thus, the fact that Plaintiff has not pled facts relating to the

25    timing of Defendants sales[ ] is of little significance and this factor neither weighs

26    for nor against a finding of suspicious stock sales." *Id.*

27    Likewise, whether the Defendants' sales were consistent with their prior

28    trading history is also moot because Defendants have allegedly been backdating

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

29

1   options since Semtech went public.  *Id.*  Thus, Defendants' entire trading history

2   has been influenced by the backdating fraud, rendering any comparison to their

3   pre-class period trading histories irrelevant.  *Id.* at 1187.  Therefore, this factor

4   does not weigh against a finding of suspicious stock sales either.  *Id.*

5          Accordingly "[g]iven that the first factor, 'amount of shares sold' weighs in

6   favor of a finding that the stock sales provided a motive for Defendants'

7   backdating, and that the second and third factors neither weigh for nor against a

8   finding of suspicious stock sales…the stock sales are 'suspicious,' and thus

9   provide a possible motive for Defendants' actions."  *Id.*  At the very least, under

10  *Tellabs* and *South Ferry*, these allegations add to the totality of the scienter

11  averments against Poe, Franz and Baumann.

12         **(f)    Lead Plaintiff Does Not Rely Solely On Semtech's**
              **Restatement or GAAP Violations To Establish**
13            **Scienter**

14         Defendants argue that Semtech's Restatement alone does not create a strong

15  inference of scienter.[41]  Aside from departing completely from the admonition of

16  *Tellabs* and *South Ferry* to consider *all* of Lead Plaintiff's allegations

17  "holistically," Defendants' arguments regarding the Restatement are misplaced.

18         Defendants argue simply that the mere allegation that a company restated its

19  financial statements alone does not give rise to an inference of scienter.  But Lead

20  Plaintiff has not alleged that the mere presence of Semtech's Restatement

21  demonstrates scienter.  Rather, Lead Plaintiff has alleged that *within* the

22  Restatement, Defendants have *admitted* elements of the claims.  ¶¶ 4, 7, 142, 150.

23  Specifically, Semtech admitted that Poe backdated options for nearly a decade with

24  the assistance of Franz, Baumann and another former executive.  ¶¶ 142, 150.

25  Moreover, Defendants' GAAP violations were regularly repeated for nearly a

26

27         [41] Franz Br. at 18-20, Baumann Br. at 16-17, Carlson/Maheswaran Br. at 12-
       13.

28

1  decade and resulted in a considerable restatement which erased $91 million in

2  previously reported income.  ¶ 141.  "Although, as the [Semtech] defendants note,

3  the mere publication of inaccurate accounting figures, or a failure to follow GAAP,

4  without more, does not establish scienter, this does not mean that the

5  misapplication of accounting principles is irrelevant to the question of scietner.

6  This is particularly so where there are specific allegations of significant GAAP

7  violations."  *Batwin*, 2008 WL 2676364, at *13 (citing *McKesson*, 126 F. Supp. 2d

8  at 1273) (stating, "When significant GAAP violations are described with

9  particularity in the complaint, they may provide powerful indirect evidence of

10 scienter.  After all, books do not cook themselves").

11      Defendants' GAAP violations are well detailed in the Complaint.  ¶¶ 162-

12 78.  As explained above, the accounting standards violated were straight forward

13 and simple to apply.  *See supra,* at 3-4.  These violations, as intended, increased

14 reported income and hid compensation expenses.[42]  The fraudulent accounting

15 occurred consistently throughout the Class Period and resulted in a significant

16 Restatement (¶ 162), larger than the one this Court found significant in *Batwin*.[43]

17 At the very least, these violations augment the totality of Plaintiffs' scienter

18 allegations.

19

20      _____

      [42] Franz erroneously avers that Plaintiffs failed to explain which line items of
21 Semtech's financial statements were false and misleading.  Franz, Br. at 19.
   Plaintiffs, however, alleged numerous times that Defendants' backdating fraud
22 inflated *net income* by hiding *compensation expense.* ¶¶ 6, 56, 59, 60, 63, 64, 67,
   69, 72, 73, 76, 78, 81, 83, 86, 88, 91, 93, 95, 97, 100, 102, 105, 107, 110, 112, 115,
23 117, 120, 122, 125, 147-49, 152-53, 162, 171.

24      [43] *See Batwin*, 2008 WL 2676364, at *13 (stating,"[a]lthough, as the [Semtech]
   defendants note, the mere publication of inaccurate accounting figures, or a failure
25 to follow GAAP, without more, does not establish scienter, this does not mean that
   the misapplication of accounting principles is irrelevant to the question of scietner.
26 This is particularly so where there are specific allegations of significant GAAP
   violations.") (citing *McKesson*, 126 F. Supp. 2d at 1273) (stating, "When
27 significant GAAP violations are described with particularity in the complaint, they
   may provide powerful indirect evidence of scienter.  After all, books do not cook
28 themselves").

1

2

      (g)    **Lead Plaintiff's Allegations of Scienter Are Not Based Solely On, But Are Supported By, Defendants' Positions**

3           Defendants pretend their corporate positions were completely irrelevant to

4  the issue of scienter.[44]  These positions, however, are germane.  They put the

5  Defendants at the scene of the crime so to speak, and demonstrate their control

6  over the granting of options at Semtech.

7           As Defendants suggest, allegations of scienter based *solely* on the

8  defendant's position are insufficient to create a strong inference of scienter.  "On

9  the other hand, allegations that the defendant signed false financial documents,

10  approved options grants, oversaw the option granting process, or was intimately

11  involved in deciding when and to whom options would be granted may support a

12  strong inference of scienter."  *Juniper Networks,* 542 F. Supp. 2d at 1047.

13          Here, Lead Plaintiff does not rely solely on the Defendants' positions to

14  establish their knowledge of backdating, but also probes the specific terms of the

15  Stock Option Plans at issue and Defendants' own statements of who was

16  responsible for the allegedly backdated option grants and which Defendants were

17  otherwise aware of them.  ¶¶ 142, 148, 150.  In other words, Lead Plaintiff has

18  pleaded direct evidence of Defendants' knowledge based on their admissions, not

19  based solely upon their positions at Semtech.

20          Nevertheless, the law does not state that allegations of a defendant's position

21  are irrelevant to scienter, nor does it preclude a finding of scienter based in part on

22  the defendant's position.  Indeed, the Ninth Circuit has consistently found that

23  where the information at issue was critical to the company's core business, those in

24  positions of responsibility and authority may be presumed to have knowledge of it.

25

26

27        [44] Poe Br. at 14, Franz Br. 20-22, Baumann Br. at 14-15, Carlson/Maheswaran Br. at 10.

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

32

1   *See*, *e.g.*, *Applied Signal*, 527 F.3d at 987-88; *America West*, 320 F.3d 920.  *See*

2   *also South Ferry*, 2008 WL 4138237, at *6.

3          In *Applied Signal*, the plaintiffs did not allege that the CEO and CFO

4   actually knew about four undisclosed stop-work orders that would later

5   significantly impair the company's revenue stream.  But "plaintiffs *infer[ed]* that

6   these high-level managers must have known about the orders because of their

7   devastating effect on the corporation's revenue."  527 F.3d at 987.  The Ninth

8   Circuit found that the significance of the stop-work orders in conjunction with the

9   defendant's leadership positions was sufficient to raise a strong inference of

10  scienter.  *Id.* at 987-88.

11         The Ninth Circuit has even extended this line of reasoning to reach a

12  company's outside directors.  *America West,* 320 F.3d 920.  In *America West*, the

13  plaintiffs did not allege particular facts that the company's outside directors were

14  aware of maintenance problems that had plagued the airline.  Instead, they relied

15  on an inference that the maintenance issues were significantly important to that

16  company such that even the outside directors must have been aware of them.  The

17  Court agreed, finding it "was absurd to suggest the Board of Directors would not

18  discuss" such issues. *Id.* at 943 n.21.[45]

19         Here, the Company's option grants were essential to its future viability and

20  so central to the duties of each of the Individual Defendants, that their knowledge

21  of those grants can be inferred by their positions of control and authority.  For

22

23      [45] *See also In re LDK Solar Sec. Litig.*, No. 07-5182, 2008 U.S. Dist. LEXIS
    42425, at *44 (N.D. Cal. May 29, 2008) (stating "[i]t could be reasonably and
    strongly inferred that LDK's responsible officers were aware of major
24  discrepancies in how much inventory was being reported to the public and how
    much was actually present. In sum, there was sufficient evidence to generate a
25  'strong inference' of scienter for the moving defendants"); and *In re Northpoint
    Commc'ns Group, Inc., Sec. Litig.,* 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002)
26  (finding, "upon the laying of a proper factual foundation that information was
    known within a corporation, it may be inferred that facts critical to a business's
27  core operations or an important transaction are known to a company's responsible
    officers").

28

Lead Plaintiff's Omnibus Opposition to Defendants' Motions
to Dismiss the Consolidated Class Action Complaint
Civil Action No.: 2:07-cv-07114-CAS (FMOX)                                    33

1    instance, the Stock Option Plans describe the purpose of granting options as "to

2    promote the longer-term financial success of Semtech Corporation by providing a

3    means to attract, retain and award individuals who can and do contribute to such

4    success."  ¶ 36.  As the Special Committee found, the vast majority of backdated

5    options were those issued to newly hired employees.  ¶147.  Because attracting

6    talented employees was critical to the future success of Semtech, stock option

7    grants were the means by which the Defendants ensured Semtech's success.

8    Backdating the options made them even more potent.

9           Considering the importance placed upon options to the future success of

10   Semtech, and the fact that the terms of the Stock Option Plans and Defendants'

11   own admissions put administration of the plans and the granting of options

12   squarely within their control, "it is absurd to suggest" these Defendants were not

13   aware of the backdating alleged.  *See America West*, 320 F.3d at 943 n.21  *See also*

14   *Applied Signal*; *LDK*; and *Northpoint.*

15          As in *Juniper*, the Complaint "alleges more than that [the CEO and the

16   CFO] held high executive positions. Rather, it alleges (1) that [the CEO and the

17   CFO] signed false financial documents, (2) that they knew or were reckless in not

18   knowing that these documents were false, and (3) that they placed themselves in a

19   position of oversight over [the Company's] options granting practices such that

20   they knew or were reckless in not knowing that options were being granted

21   inconsistent with the representations in the financial documents."  542 F. Supp. 2d

22   at 1048.  Accordingly, as in that case, the Defendants' motions to dismiss here

23   should be denied.  *Id.*

24

25

26

27

28

1

2

**(i)    The Fact Defendants Signed the Allegedly False and Misleading Statements Supports Scienter**

Defendants argue that signing public filings alone does not give rise to a strong inference of scienter.[46]  Again, they attack a single piece of scienter evidence as if it stands alone.  They also denigrate the signature requirements of the SEC reporting rules and SOX, wrongly ignoring that these requirements impose duties upon the signer to review and approve the documents signed.  *See Howard*, 228 F.3d at 1061.  As explained in *Quest*:

> For these certifications to have any substance, signatories to the certifications must be held accountable for the statements. It would be wholly inappropriate to permit a signatory to evade liability because he/she did not prepare the financial report, as Defendants argue, on the ground that the signatory was unaware of the misstatements made therein. To hold otherwise would effectively eviscerate the entire substance of 18 U.S.C. § 1350, the purpose of which is to ensure that regardless of who prepared the statements, the signatories are attesting to their accuracy and reliability. Additionally, several Defendants also signed proxy forms and other publicly reported financial disclosures. The financial disclosures, proxy statements, and SOX Certifications are clearly "statements" for the purposes of establishing contemporaneous knowledge. Given that the Company is currently in the process of restating numerous financial reports, contemporaneous knowledge of the financial reports signed by the Individual Defendants can be inferred.

*Quest*, 527 F. Supp. 2d at 1189-90 (citations omitted).

---

[46] Poe Br. at 15, Franz Br. at 17-18, Carlson/Maheswaran Br. at 10-11.

1    Here, Semtech admitted that Poe, Franz and Baumann knew of the
2    backdating fraud.  ¶¶ 142, 150.  This is corroborated by Semtech's later firings and
3    by these Defendants' receipt of backdated options which were memorialized in a
4    written option agreement that clearly displayed the fraudulently induced "grant
5    date" and strike price.  ¶¶ 39, 143; RJN Exs. 2-8.  The fact that these Defendants
6    then signed and certified publicly issued financial reports, or in the case of
7    Baumann, were the investor relations contact on press releases announcing those
8    financial results further supports the scienter allegations.

9    For the foregoing reasons, Lead Plaintiff has adequately alleged each
10   Defendants' scienter.

### 2. The Complaint Adequately Alleges Loss Causation Against All Defendants

#### (a) The Relevant Pleading Standard

13   The Complaint more than adequately alleges 'loss causation'—i.e., that
14   Defendants' stock option backdating and accounting fraud inflated the value of
15   Semtech shares during the Class Period, and that the revelation of their fraud
16   removed that inflation.

#### (b) At Least "Some Indication" of Causation is Pled

19   According to the Supreme Court, plaintiffs are required to plead only a
20   "short and plain statement," pursuant to Rule 8(a)(2), that provides defendants with
21   "*some indication* of the loss and the causal connection that the plaintiff has in
22   mind."  *Dura Pharms. v. Broudo*, 544 U.S. 336, 337 (2005) (emphasis added).  In
23   *Dura* the Supreme Court specifically acknowledged that pleading loss causation
24   "[is] not meant to impose a great burden upon a plaintiff."  *Dura*, 544 U.S. at 347;
25   *see Daou*, 411 F.3d at 1026 (applying *Dura*).

26   In *Daou*, the Ninth Circuit's leading case applying *Dura*, the Ninth Circuit
27   held that so long as the "allegations, if assumed true, are sufficient to provide
28   [defendants] with *some indication* that the drop in [] stock price was causally

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

36

1    related to [defendants'] financial misstatement" that are a result of the fraudulent

2    conduct, the motion to dismiss is to be denied.  411 F.3d at 1026.

3         Most recently, the Ninth Circuit reaffirmed its holding in *Daou*, concluding

4    that the plaintiff must only allege "facts that, if taken as true, ***plausibly establish***

5    ***loss causation***" and that "so long as the plaintiff alleges facts to support a theory

6    that is not facially implausible" the motion to dismiss must be denied.  *In re Gilead*

7    *Scis. Sec. Litig.*, No. 06-16185, 2008 WL 3271039, at *8 (9th Cir. Aug. 11, 2008)

8    (emphasis added).

9         Ultimately, loss causation is an issue of fact not properly resolved on a

10   motion to dismiss.  As the Ninth Circuit recently clarified, "[s]o long as the

11   plaintiff alleges facts to support a theory that is not facially implausible, the court's

12   skepticism is best reserved for later stages of the proceedings when the plaintiff's

13   case can be rejected on evidentiary grounds."  *Id.*[47]  "[If] the complaint alleges

14   facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6)

15   dismissal is inappropriate."  *Id.,*[48] citing with approval *Emergent Capital Inv.*

16   *Mgmt. LLC, v. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation

17   "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to

18   dismiss'"); *see also Rudolph v. UTStarcom*, No. 07-04578, 2008 WL 4002855, at

19   *4 (N.D. Cal. Aug. 21, 2008) (citing *Gilead* as supporting that "loss causation is a

20   fact-intensive inquiry better suited for determination at trial than at the pleading

21   stage").[49]

22

23   _____

     [47] Tellingly, despite being reported seven days before Defendants filed their
     motions, no mention of *Gilead* is made in Defendants' briefs.

24   [48] Importantly, unlike the comparative analysis for scienter under *Tellabs*,
     discussed in detail above, for loss causation, there is "not 'a probability

25   requirement … it simply calls for enough fact[s] to raise a reasonable expectation
     that discovery will reveal evidence of' loss causation."  *Gilead*, 2008 WL 3271039,

26   at *8 (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

27   [49] Defendants rely on *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880 (N.D. Cal.
     2008) ("*Rudolph I*"),  rendered prior to the Ninth Circuit's decision in *Gilead*, as

28   supportive of its loss causation analysis.  However, just days after Defendants'

*(continued . . . )*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

37

1    As detailed below, the allegations of loss causation far exceed the *Dura-*

2    *Daou* pleading standard, as they allege a *direct* connection between the stock drop

3    and the disclosure of Defendants' fraudulent conduct.  Defendants' attempts to test

4    the statistical significance of the stock drops or to parse the disclosures at issue and

5    reassign causation to their non-culpable aspects is unavailing, premature and must

6    be reserved for the ultimate trier of fact after the conclusion of expert discovery.

7    **3.      The Complaint's Loss Causation Allegations Satisfy *Dura***

8    The Complaint's well-pled allegations provide the Defendants with ample

9    indication of Lead Plaintiff's loss causation theory.  Here, in addition to alleging

10   that the Defendants' backdating scheme artificially inflated the Company's stock

11   price during the Class Period, Lead Plaintiff: (i) details how the Company's failure

12   to properly account for its issuance of backdated options caused the Company to

13   misstate its audited financial statements by understating expenses and overstating

14   its reported net income and EPS; (ii) identifies several corrective disclosures

15   concerning the Defendants' backdating fraud and the Company's improper

16   accounting of its backdated option grants; (iii) connects these disclosures to the

17

18   *( . . . continued)*

19   filing here the court revisited the issue in *Rudolph v. UTStarcom*, No. 07-04578, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ("*Rudolph II*"), analyzing the same

20   disclosure (now in the plaintiffs' amended complaint) and reached the opposite conclusion in light of *Gilead*.  The issue in both decisions was whether a press

21   release announcing an internal investigation into the Company's stock option practices (but that did not reveal that UTStarcom's prior financial statements

22   would actually need to be restated) was sufficient to plead loss causation. Rejecting the exact argument advanced by Defendants here, in *Rudolph II*, Judge

23   Illston concluded that it did stating:
         Pursuant to the Ninth Circuit's recent clarification

24            regarding allegations of loss causation, the Court now
         finds that the November 7, 2006 press release could

25            plausibly establish loss causation.  While it is true that
         the press release did not definitively state that backdating

26            had occurred or that UTStarcom would adjust its
         financial statements as they related to equity grants, the

27            press release did, for the first time, put the market on
         notice that such disclosures might be forthcoming."  2008

28       WL 4002855, at *4.

alleged misstatements or deceptive conduct; and (iv) identifies the resulting stock drops following successive corrective disclosures and as the artificial inflation dissipated from the Company's stock price.  ¶¶ 127-36.

The Complaint specifies a number of partial disclosures regarding Defendants' backdating fraud which resulted in partial adjustments to Semtech's stock price as the artificial inflation in the share price was gradually removed:

- On May 22, 2006 the Company issued a press release announcing: (i) the SEC had requested "information regarding stock options granted since January 1, 1997" and (ii) Semtech was named in a May 16, 2006 report (the CFRA Report) as a company that was at risk for the timing of its historic stock option grants.  (¶¶ 127-128) (RJN Ex. 26);

- On June 9, 2006 the Company announced in a SEC filing that it could not timely file its Form 10-Q for the quarter ended April 30, 2006, and that the Company was "also conducting [its] own internal review of these stock option grants" (¶ 129) (RJN Ex. 27);

- On June 14, 2006 the Company announced further details of the fallout from its historic options backdating, including that (i) the Company's Audit Committee had commenced its own independent investigation; (ii) the Company received a subpoena, dated June 8, 2006, from the United States Attorney's Office for the Southern District of New York regarding its historic stock options practices; (iii) filing of the Company's Form 10-Q for the quarter ended April 30, 2006 would be delayed past the deadline given by the SEC; (iv) the Company expected a delisting notification from NASDAQ; and (v) two derivative lawsuits were filed against the Company and certain of its present and former directors and executive officers relating to the Company's past stock option practices (¶ 130) (RJN Ex. 28);

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

39

- On July 20, 2006 the Company filed a Form 8-K which revealed that the Company's Board of Directors, on July 12, 2006, formed a Special Committee to continue the Audit Committee's investigation, and that the investigation's "initial phase" concluded that the measurement dates pursuant to the requirements of ABP 25 for certain stock option awards granted from 1998 through 2003 differ from the measurement dates previously recorded for such awards by the Company, and that as a result "*the Company expects to record additional non-cash compensation expenses and expects such additional expenses to be material.*"  The Company also revealed for the first time that it "expects to restate its financial statements for fiscal years 2002-2006" – which will affect financial statements for earlier years and as a result its previously issued financial statements should not be relied upon.  The Company further revealed that expenses arising from the option backdating investigation, related litigation and other activities were expected to be significant. Finally, the Company revealed that it was evaluating its internal financial reporting and disclosure controls and procedures (¶ 132) (RJN Ex. 29).

Each of these disclosures provided additional information to the market regarding Semtech's exposure as an option backdater and, as such, each is sufficient to plead loss causation.[50]

---

[50] *See, e.g.*, *In re Bradley Pharms. Sec. Litig.*, 421 F. Supp. 2d, 822, 828-29 (D.N.J. 2006) (SEC's informal inquiry "partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what the [subsequent disclosures] later confirmed"); *Juniper*, 542 F. Supp. 2d at 1049 (reports that identified Juniper as a high risk for options backdating and announcements that the company's prior financial statements could not be relied upon, were sufficient to plead loss causation); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253-54 (S.D.N.Y. 2007) (announcements that the SEC was investigating Openwave's stock option grant practices and that the company had received subpoenas from two United States Attorneys concerning option grants were each sufficient to plead loss causation); *In re Unitedhealth Group PSLRA Litig.*, No. 06-cv-1691, 2007 WL 1621456 (D. Minn. June 4, 2007) (*Wall Street Journal* article reporting the United Health executives had received

(continued . . .)

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

40

1     The Complaint goes on to detail the effect these partial disclosures had on

2  Semtech's stock price (¶¶ 134-136) as follows: (i) Semtech's stock price dropped

3  on May 22 and 23, 2006 (losing $0.78 from its closing on May 19) following the

4  Company's May 22 press release and issuance of the CFRA report; (ii) Semtech's

5  stock price dropped on June 13-16 (losing $0.76 from its closing on June 12) as a

6  result of the Company's June 9 and June 14, 2006 disclosures; and (iii) Semtech's

7  stock price dropped on July 20 and 21 (losing $1.59 from its closing on July 19,

8  2006) following the Company's press releases on July 20, 2006.[51]

9     These allegations plainly demonstrate that each partial disclosure of

10 Defendants' fraud caused a decrease in Semtech's stock price.  Accordingly, Lead

11 Plaintiffs' allegations more than suffice under *Dura* and *Daou* to plead loss

12 causation.

### (a)      Defendants' Other Arguments are Meritless

14    Defendants argue that Lead Plaintiffs' continued stock purchases on June 19

15 and 27, 2006 -- after the Company's partial disclosures -- somehow undercut loss

16 causation.  This argument, however, is premised on the erroneous presumption that

17 a shareholder would never buy a company's stock after that company has disclosed

18

19

20 *( . . . continued)*
   backdated options sufficient to plead loss causation); *Rudolph II*, 2008 WL
21 4002855, at *4 (press release announcing investigation into past options practice
   sufficient to allege loss causation).

22    [51] With respect to a disclosure-by-disclosure analysis of loss causation, and the
   temporal connection between disclosures and stock price movement advocated by
23 Defendants, the Ninth Circuit expressly rejected "a bright-line rule requiring an
   immediate market reaction" because "[t]he market is subject to distortions that
24 prevent the ideal of a free and open public market from occurring."  *Gilead*, 2008
   WL 3271039, at *9.  Indeed, a "limited temporal gap . . . and the subsequent
25 decline in stock value does not render a plaintiff's theory of loss causation per se
   implausible."  *Id.*  In *Gilead*, the "temporal gap" amounted to ***three months***.  Here,
26 as discussed, the reaction of Semtech's share price occurred within a day or two of
   the disclosures in most cases, and the persistent loss initiated on May 16 came to a
27 close by July 20, when the Company announced that it would restate years of
   financial statements to correct for underreporting compensation expense.

28

1    a fraud. (Poe Br. at 21, n.13; Carlson/Maheswaran Br. at 19-20).[52]  The truth is that

2    many investors purchase stock *after* the artificial inflation caused by a fraud has

3    been removed from the stock when the remaining fundamentals of the company's

4    future profitability appear promising.  Defendants' argument also places far too

5    much emphasis on the *subjective* investment strategy of one shareholder where loss

6    causation is an *objective* standard not properly assessed through the myopic lens

7    Defendants argument provides.  *Cromer Fin. Ltd. v. Berger*, No. 00-2284, 2003

8    WL 21436164, at *7 (S.D.N.Y. June 23, 2003) ("the issue of loss causation is an

9    objective one").

10          Defendants also attempt to neutralize the July 20, 2006 press release and

11   concomitant stock price drop on the specious grounds that the Class Period ends on

12   July 19, 2006 – the day before this press release.  (Carlson/Maheswaran Br. at 20;

13   Poe Br. at 21-22)  As the July 20, 2006 press release is the final corrective

14   disclosure, Lead Plaintiff appropriately ended the Class Period on the day before –

15   the last day that the Company's stock price contained any artificial inflation due to

16

17

18       [52] Defendants alternatively argue that Lead Plaintiff's continued stock
     purchases undercut its reliance argument.  (*Id.*)  Defendants posit this argument as
19   follows:  Lead Plaintiff could not have relied upon the misrepresentations if it
     continued to purchase after the truth was revealed.  However, "[a]s numerous
20   courts have held, the fact that a putative class representative purchased additional
     shares in reliance on the integrity of the market *after* the disclosure of corrective
21   information has no bearing on whether or not the representative relied on the
     integrity of the market during the class period, that is *before* the information at
22   issue was corrected or changed." *In re Salomon Analyst Metromedia Sec. Litig.*,
     236 F.R.D. 208,  216 (S.D.N.Y. 2006) (citing *In re Frontier Ins. Group, Inc. Sec.
23   Litig.*, 172 F.R.D. 31, 42 (E.D.N.Y. 1997)); *see also In re Nortel Networks Corp.
     Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464, at *3 n.4 (S.D.N.Y. Sept. 8,
24   2003) (finding typicality requirement for class certification satisfied despite
     plaintiff's purchases the defendant's stock "well after the alleged fraud was
25   exposed"); *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 n.4 (S.D.N.Y.
     1984); *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1404 (D. Conn.
26   1988); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005).  Any
     purchases by Lead Plaintiff after partial disclosure of the truth is only a reflection
27   of Lead Plaintiff's reliance upon the integrity of the market and a determination
     that the Company's lower share price was an appropriate risk.

28

1  Defendants' fraud.  The June 20, 2006 press release caused the last of the artificial

2  inflation to be removed from the share price.

3          Ending the Class Period on the day of the final disclosure is consistent with

4  the cases cited by Defendants, as Defendants are only being charged with

5  misrepresentations made during the Class Period.

6                  **(b)      The Reaction of Semtech's Stock Price to Disclosures
                              About the Restatement Confirms Loss Causation For
7                              the Earlier Drops**

8          After ignoring the corrective impact of the earlier disclosures, the

9  Defendants contend that the Complaint fails to establish loss causation because the

10  stock price only decreased one penny after Semtech finally quantified the amount

11  of its Restatement.  Carlson/Maheswaran Br. at 20.  In addition to again

12  improperly raising questions of fact as to whether any inflation remained in the

13  Company's stock price as of the date of this announcement, this argument is

14  irrelevant to loss causation because Lead Plaintiff has not alleged any loss was

15  caused by this statement.

16          The market's reaction to Semtech's *post-Class Period* announcements about

17  the Restatement *confirms* that the Company's earlier disclosures fully corrected

18  Defendants' prior statements concerning the accuracy and completeness of

19  Semtech's financial statements.  Moreover, the partial disclosures preceding the

20  Restatement created the expectation that Semtech, like many others, would be

21  forced to restate and recognize a material reduction of its previously reported

22  income.  *See, e.g., In re Seitel Inc. Litig.*, 447 F. Supp. 2d 693, 711-13 (S.D. Tex.

23  2006) (denying motion to dismiss where stock did not drop on announcement of

24  restatement, but did drop due to other disclosures).  Indeed, these earlier corrective

25  disclosures in May – July 2006 resulted in precisely the persistent loss expected of

26  an efficient market.

27          The disclosures in May – July 2006 revealed to investors that options

28  backdating had occurred at Semtech and that Semtech would have to restate past

1  earnings materially to account properly for the fraudulently dated options.

2  Naturally the market expected a restatement of Semtech's audited financial

3  statements, along with tax implications and criminal and civil actions, to follow.

4  Indeed, "[t]he fact that the stock price fell without more complete and detailed

5  disclosure, if anything, only goes to show that the tip of the iceberg was enough

6  [to] cause the loss." *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005

7  U.S. Dist. LEXIS 18448, at *58 (D.N.J. Aug. 17, 2005). Simply put, by the time

8  Semtech got around to announcing the exact dollar impact of the backdating

9  scheme, they were merely confirming the material risks that investors had

10  anticipated from the earlier disclosures.

11       For these reasons, the reaction of Semtech's stock price to the Company's

12  announcement on March 29, 2007 does not have any bearing on the sufficiency of

13  the Complaint's loss causation allegations.

14            **4.     Lead Plaintiff Sufficiently Alleges Reliance**

15       To take advantage of the presumption of reliance applicable in securities

16  class actions, a plaintiff must allege that a "defendant made material

17  representations or omissions concerning a security that is actively traded in an

18  'efficient market,' thereby establishing a 'fraud on the market.'" *Batwin*, 2008 WL

19  2676364, at *15 n.10 (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir.

20  1999)). Lead Plaintiff has satisfied this minimal burden.

21        **(a)     Lead Plaintiff Has Sufficiently Plead Market
22                Efficiency**

23       At the motion to dismiss stage, the plaintiff's burden to plead market

24  efficiency is satisfied by merely alleging that an efficient market exists – as any

25  further inquiry would require an evidentiary search that is better suited for a later

26  stage in the litigation.[53]  Indeed, the Supreme Court recognized in *Basic Inc. v.*

---

27       [53] *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 n.18 (D.
28  Mass. 2006) ("Market efficiency is not, however, an appropriate inquiry for a

*(continued . . . )*

1  *Levinson*, 485 U.S. 224 (1988) that proof of market efficiency "is a matter for

2  trial." *Id*. at 249 n.29.

3       Asking the Court to decide this question of fact now, Defendants Carlson

4  and Maheswaran argue that Lead Plaintiff cannot rely on the "fraud on the market"

5  theory endorsed by the Supreme Court in *Basic* for an alleged failure to

6  "*demonstrate"* the existence of an efficient market.  Carlson/Maheswaran Br. at

7  22.  Even if this Court were to entertain Defendants' invitation, which it should

8  not, Lead Plaintiff has satisfied this burden.

9       The Ninth Circuit has indicated that certain factors may be helpful in

10  inferring an efficient market, as announced in *Cammer v. Bloom*, 711 F. Supp.

11  1264 (D.N.J. 1989): (1) whether the stock trades at a high weekly volume; (2)

12  whether securities analysts follow and report on the stock; (3) whether the stock

13  has market makers and arbitrageurs; (4) whether the company is eligible to file

14  SEC registration Form S-3, as opposed to Form S-1 or S-2; and (5) whether there

15  are empirical facts showing a cause and effect relationship between unexpected

16  corporate events or financial releases and an immediate response in the stock price.

17  *Binder*, 184 F.3d at 1065.  *See Cammer,* 711 F. Supp. at 1286-87; *see also In re*

18  *2TheMart.Com, Inc. Sec. Litig*., 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000) (J.

19  Carter).  Defendants argue that at most Lead Plaintiff has alleged two factors,

20  which they contend is not sufficient evidence of an efficient market.

21  Carlson/Maheswaran Br. at 23.   But to adequately allege an efficient market, this

22

23  ———————————

24  *( . . . continued)*
    motion to dismiss."); *see also In re USA Talks.com Sec. Litig.*, No. 99-CV-0162-L
    (JA), 2000 WL 1887516, at *6 (S.D. Cal. Sept 14, 2000) (holding that "[a]

25  showing of whether the *Cammer* elements are met requires a factual exploration
    which is premature at the motion to dismiss stage."); *In re Parmalat Sec. Litig.*,

26  376 F. Supp. 2d 472, 508 (S.D.N.Y. 2005) ("Whether a market is efficient often is
    a question of fact");  *Chu v. Sabratek Corp.*,  100 F. Supp. 2d 815, 826 (N.D. Ill.

27  2000) ("the question on a motion to dismiss is not whether [the] plaintiff has
    proved an efficient market, but whether he has pleaded one.")

28

1    Court has previously held that plaintiffs need not plead all five of these factors,[54]

2    and that alleging only two of the *Cammer* factors can be sufficient.[55]

3          In addition to the *Cammer* factors, allegations that a stock traded on the

4    NASDAQ (or another national stock exchange) also strongly supports a finding of

5    an efficient market.[56]

6          Here, Lead Plaintiff has more than adequately plead market efficiency.

7    Among other allegations in the Complaint, Lead Plaintiff alleges:

8      • Semtech stock traded on the NASDAQ (¶ 198(a));

9      • several securities analysts employed by major brokerage firms reported

10        on the stock (¶ 198(d));

11     • Semtech's stock price reacted swiftly in direct response to

12        announcements by the Company in connection with the backdating

13        scheme (pleading the crucial cause and effect factor) (¶¶ 8-10, 134-136);

14

15     [54] *See 21TheMart.Com*, 114 F. Supp. 2d at 964 (J. Carter)("each [*Cammer*]
       factor need not be alleged in order to give rise to the inference that the stock was
16     traded in an efficient market").

17     [55] *See Cammer*, 711 F. Supp. at 1287; *Miller v. NTN Commc'ns, Inc.*, No. 97-
       CV-1116 TW JAH, 1999 WL 817217, at *10 (S.D. Cal. May 21, 1999) (holding
18     that plaintiffs pleaded an efficient market after analyzing only two points – decline
       in the company shares immediately after the warning was issued and the fact that
19     the shares were trading on the AMEX). Additionally, the court in *2TheMart.com*
       has held that while each factor need not be alleged, "the fifth factor may be the
20     most significant factor in determining market efficiency as it is 'the essence of an
       efficient market and the foundation for the fraud on the market theory.'" 114 F.
21     Supp. 2d at 964. This "cause and effect" factor can be alleged through statements
       regarding the stock price moving in response to certain disclosures by the
22     company. *See, e.g., id.* at 964-65; *Miller*, 1999 WL 817217, at *10.

       [56] *See, e.g., Levine v. SkyMall, Inc.*, No. 99-166, 2002 WL 31056919, at *5 (D.
23     Ariz. May 24, 2002) ("[T]here should be a presumption ... that certain markets are
       developed and efficient for virtually all the securities traded ... [on] the
24     NASDAQ…."); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992) (allegations of
       stock trading on the NASDAQ suggested an efficient market); *RMED Int'l, Inc. v.
25     Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002) (holding
       "numerous courts have held that stocks trading on the AMEX are almost always
26     entitled to the presumption") (citations omitted); *Miller*, 1999 WL 817217, at *10
       (same); *In re Accredo Health, Inc. Sec. Litig.* No. 03-2216 DP, 2006 WL 1716910,
27     at *8 (W.D. Tenn. April 19, 2006) ("based on this court's research, the
       overwhelming case authority holds that securities listed on the NASDAQ trade in
28     an efficient market").

1       •   Semtech regularly communicated with public investors via established

2          market communications mechanisms, including major newswire services

3          (¶ 198(c));

4       •   as a regulated issuer, Semtech filed periodic reports with the SEC and the

5          NASDAQ (¶ 198(b));

6       •   Semtech traded on an efficient market (¶ 198); and

7       •   the market for Semtech securities promptly digested current information

8          from public sources and reflected such information in Semtech's stock

9          price (¶ 199).

10       Furthermore, a review of publicly filed SEC documents demonstrate that

11 Semtech was eligible to file Form S-3s from 1996 through the end of 2006, after

12 which it lost its eligibility in the fallout from the disclosure of the options

13 backdating scandal as disclosed in Defendants' 2007 Form 10-K.[57] *See Cammer*,

14 711 F. Supp. at 1264 (holding one factor for determining market efficiency is

15 determining whether the company is eligible to file SEC registration form S-3, as

16 opposed to form S-1 or S-2).

17       Accordingly, Lead Plaintiff has satisfied its minimal burden at the motion to

18 dismiss stage of pleading that Semtech stock traded on an efficient market.

19       **B.**     **Lead Plaintiff Has Standing to Pursue this Securities Class Action**

20       Lead Plaintiff has properly brought this class action for violations of Section

21 10(b) and Rule 10b-5 of the Exchange Act, to seek remedy for the substantial

22 losses that they and the Class, as Semtech shareholders, independently suffered as

23 a result of the false and misleading statements Defendants made in connection with

24 their options backdating scheme.

25

26

27       [57] *See* Form S-3s for 1996-2000 (RJN Ex. 30) and Semtech's 2007 Form 10-K

28 (RJN Ex. 31).

### 1.   Lead Plaintiff's Claims are Direct in Nature

Whether an action is derivative or direct is an issue governed by the law of the state in which the corporation is incorporated. *See Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000). Under Delaware law, Semtech's state of incorporation (¶ 16), Lead Plaintiff's claims are direct.

*Tooley v. Donaldson, Lufkin & Jenrette, Inc*. provides the framework to determine whether an action is direct or derivative in nature. *See* 845 A.2d 1031, 1035-40 (Del. 2004). Under *Tooley*, courts must address two issues: (1) who suffered the alleged harm (the shareholder or the corporation); and (2) who would receive the benefit of any recovery or other remedy (the shareholder or the corporation). *See* 845 A.2d at 1033. The answers compel a finding that Lead Plaintiff's claims are direct.

### (a)   The Class Suffered the Harm

The first prong of *Tooley* is satisfied by Lead Plaintiff's allegations that the Class suffered financial harm caused by Defendants' fraudulent conduct.

As articulated by Arthur Levitt, former Chairman of the SEC, backdating "is stealing" and results in the "ripping off [of] shareholders in an unconscionable way." ¶ 53. Defendants' conduct here is no exception. As alleged, Lead Plaintiff "purchased Semtech securities at artificially inflated prices and suffered an economic loss when the artificial inflation was removed from Semtech's stock price." ¶¶ 195-197. This price inflation was the result of Defendants' fraudulent activity which caused the Company to materially overstate its reported net income and materially understate its reported compensation expense, misrepresenting its compliance with its own stated Stock Option Plans, misleading investors as to the value of Defendants' compensation, and misrepresenting its compliance with GAAP. ¶ 2, 6, 171, 178, 195-197. Upon the staged disclosure of the truth, this inflation was gradually removed and Lead Plaintiff and the Class suffered massive losses in response. ¶ 197. Although Lead Plaintiff and the Class suffered

1  significant financial losses, Defendants reaped benefits including over $21 million

2  in Class Period stock sales, the receipt of hundreds of thousands of backdated

3  options, and the ability to attract, retain and motivate its officers and key

4  employees through an undisclosed measure of compensation.  ¶¶  6, 36, 191.

5       Defendants try to misdirect the Court by arguing that the Company also

6  suffered harm. Semtech Br. at 6-7.  This is irrelevant.  Companies often suffer

7  harm when they commit fraud.  What is important is that Lead Plaintiff seeks

8  redress *only for the harm clearly and directly suffered by Lead Plaintiff and the*

9  *Class as a result of their purchase of inflated Semtech stock*.  ¶¶  6, 15, 195-197,

10  209-210.

11       Defendants' also unsuccessfully attempt to paint the Complaint as one

12  merely alleging mismanagement, a claim Defendants contend belongs only to the

13  corporation. *See* Franz Br. at 7-8.  Once again, the fallacy of Defendants' argument

14  is evident from a review of the Complaint.  Specifically, although the Complaint

15  alleges there were material weaknesses in the Company's internal controls, this

16  allegation does not stand alone.  Instead, the Complaint seeks redress for financial

17  losses sustained by the putative class as a result of Defendants' affirmative

18  misrepresentations *of Semtech's income and expenses* through "intentional

19  manipulation" (as found by Semtech's Special Committee) in connection with their

20  backdating scheme. ¶¶ 2, 6, 142, 171, 178, 196.  Accordingly, far from

21  "bootstrapping" allegations of fraud to a mismanagement claim, these allegations

22  unequivocally demonstrate that this is a ***paradigm case of a violation of § 10(b)***

23  ***and Rule 10b-5*** seeking redress for artificial inflation of Semtech's stock price

24  during the Class Period.[58]  *See Hayes*, 982 F.2d at 105-07 (holding plaintiffs'

25

26  [58] The cases cited by Defendant Franz in support of its argument that
    mismanagement claims are better brought as derivative actions are inapposite as
27  they deal largely with allegations where the claims are purely that the corporation
    had insufficient internal controls and failed to report that these controls were
28  deficient. *See* Franz Br. at 7-8.  The principal case that Defendant Franz relies on

*(continued . . . )*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

49

1    suffered "direct injury" from artificial inflation of corporate stock price despite

2    defendant's arguments that mismanagement allegations made the action

3    derivative).[59]   The foregoing allegations clearly allege a direct injury for harm

4    suffered by Lead Plaintiff and the Class.

5            Further demonstrating the fallacy of Defendants' arguments, and that these

6    facts more than support a direct claim for losses suffered by these shareholders, are

7    the sheer number of similar options backdating suits which have been brought as

8    direct claims and favorably resolved on similar allegations as those alleged here.[60]

9

10   *( . . . continued)*
     actually supports Lead Plaintiff's position by stressing the "distinction between
11   claims that arise from acts of corporat[e] mismanagement" and claims (such as
     here) that "contain an element of manipulation and or deception."  *In re First*
12   *Chicago Corp. Sec. Litig.*,  769 F. Supp. 1444, 1449 (N.D. Ill. 1991) (holding that
     plaintiffs Rule 10b-5 allegations amounted to more than a mismanagement claim
13   for purposes of passing 12(b)(6) muster).  Similarly, the case here deals with
     "manipulation" and "deception" as noted by the Company's own Special
14   Committee, which concluded that "the evidence supports a finding of intentional
     manipulation" and implicated certain Defendants.  ¶ 142.
15   [59] Similar to the allegations here, the *Hayes* plaintiff alleged that defendants made
     misrepresentations that resulted in artificial inflation of the corporate stock price,
16   and that under the federal securities laws that plaintiff and others similarly situated
     were injured as a result.  *See id*. at 105. The Third Circuit held that the amended
17   complaint alleged "direct injury to plaintiff" despite defendants arguments that it
     was a derivative action.

18      [60] *See, e.g.,  Juniper*, 542 F. Supp. 2d 1037 (motion to dismiss direct claims
     brought by aggrieved shareholders under Section 10(b) denied in part); *In re*
19   *Brocade Sec. Litig.*, No. 05-2042 (N.D. Cal. Aug. 27, 2007) (motion to dismiss
     direct claims brought by aggrieved shareholders under Sections 10(b) and 20(a)
20   denied);  *In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-2237, 2008 WL
     623339, at *1 (S.D.N.Y. Mar. 4, 2008) (individual defendant's motion to dismiss
21   direct claims brought by aggrieved shareholders under sections 10(b) and 20(a)
     denied); *In re PainCare Holdings Sec Litig.*, 541 F. Supp. 2d 1283 (M.D. Fla.
22   2008) (motion to dismiss direct claims brought by aggrieved shareholders of
     sections 10(b) and 20(a) denied); *In re Brooks Automation, Inc. Sec. Litig.*, No. 06-
23   11068-RWZ, 2007 WL 4754051 (D. Mass. Nov. 6, 2007) (same); *Openwave*, 528
     F. Supp. 2d at 249 (same);  *In re UnitedHealth Group PSLRA Litig.*, No. 06-1691,
24   2007 WL 1621456 (D. Minn. June 4, 2007) (same); *Grecian v. Meade Instruments*
     *Corp.*, No. 06-908 (C.D. Cal. filed Sept. 27, 2006) (direct claims brought by
25   aggrieved shareholders of Section 10(b) resolved in settlement); *In re KLA-Tencor*
     *Corp. Sec. Litig.*, No. 06-4065 (N.D. Cal. filed June 29, 2006) (same); *Grasso v.*
26   *Vitesse Semiconductor Corp.*, No. 2:06-cv-02639-R-CT (C.D. Cal. filed May 1,
     2006) (same); *In re Wireless Facilities, Inc. Sec. Litig. II*, No. 3:07-cv-00482-NLS
27   (S.D. Cal. filed Mar. 15, 2007) (same); *In re Am. Tower Corp. Sec. Litig*, No. 06-
     CV-10933 (MLW) (D. Mass. filed May 26, 2006) (same); *In re HCC Ins.*
28                                                                                    *(continued . . . )*

**(b)**     <u>The Class Will Receive the Benefit of Any Recovery</u>

Given that the harm complained of was suffered by Lead Plaintiff and the Class, the benefit of any recovery will go to them. This is an independent harm suffered by those shareholders who purchased Semtech stock during the Class Period – and these same shareholders will receive the benefit of recovery.[61] *See, e.g.*, *Openwave*, 528 F. Supp. 2d at 252 (loss causation found where post disclosure substantial price decline removed the artificial inflation from the stock price, causing real economic loss to investors who had purchased during the Class Period); *Juniper*, 542 F. Supp. 2d at 1049 (holding that shareholders adequately plead loss causation based on similar facts as alleged here).

Ignoring these allegations, Defendants argue a recovery would go only to Semtech because it, and not its shareholders, allegedly suffered losses as a result of receiving less than it should have for the option grants when they were exercised at below market value prices. Semtech Br. at 8. Therefore, Defendants' argue, any alleged damages in the underpayment of the exercise price for the backdated stock options belong to the Company. *Id.* Notably, Defendants fail to point to any allegations where Lead Plaintiff seeks to recover any alleged underpayment on backdated options that may have been exercised. Indeed, the Lead Plaintiff only seeks damages suffered by the Class as a direct and proximate cause of

---

(. . . continued)
*Holdings, Inc. Sec. Litig.*, No. 4:07-cv-00801 (S.D. Tex. filed Mar. 8, 2007) (same); *In re Newpark Res., Inc. Sec. Litig.*, No. 2:06-cv-02150-ML-KWR (E.D. La. filed Apr. 21, 2006) (same).

[61] In support of the argument that the "shareholders would not receive any damages from such a claim" Semtech incorrectly relies on *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352-53 (Del. 1988). *See* Semtech Br. at 10. However, this case is wholly inapposite as it neither involves an options backdating matter nor a Section 10(b) and Rule 10b-5 claim. Instead, it involves a state court action where the courts considered the "consequences of a cash-out merger upon the standing of a shareholder to pursue a claim of wrongdoing against management." *Kramer*, 546 A.2d at 349. *Kramer's* claim for corporate waste bears no relevance on the instant Section 10(b) action where Lead Plaintiff seeks redress to harms they directly suffered from their purchase of shares inflated as a result of Defendants' deception.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

51

1    Defendants' false and misleading statements and their purchase of Semtech's

2    artificially inflated stock.  ¶¶ 6, 15, 171, 195-197, 209-210.

3         Accordingly, where, as here, the Class has been directly harmed by their

4    purchase of inflated corporate stock, they, not the Company, will receive the

5    benefit of any recovery, thus satisfying *Tooley's* second prong.

6         **2.    Direct and Derivative Actions are not Mutually Exclusive**

7         Defendants argue that "direct and derivative actions 'are mutually

8    exclusive'" and that the existence of parallel derivative and direct actions

9    illustrates that this case should have been filed as a derivative case. *See* Semtech

10   Br. at 6 (citing *Schuster v. Gardner*, 127 Cal. App. 4th 305 (2005)).  The fallacy of

11   this argument is best demonstrated by the enormous number of options backdating

12   actions in which parallel derivative and direct claims are pursued to compensate all

13   those aggrieved – including both the corporation and the shareholders.[62]

14

15        [62] *See, e.g., Juniper*, 542 F. Supp. 2d 1037 (direct) and *In re Juniper Derivative Actions*, No. 5:06- 03396 JW (N.D. Cal. filed May 24, 2006)
16   (derivative); *In re Brocade Sec. Litig.*, No. 05-2042 (N.D. Cal. Aug. 27, 2007) (direct) and *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, No. C-05-2233-
17   CRB (N.D. Cal. filed June 1, 2005) (derivative); *Monster*, 2008 WL 623339 (direct) and *In re Monster Worldwide, Inc. Stock Option Derivative Litig.*, Master
18   Docket 1:06:cv 04622 (S.D.N.Y. filed June 15, 2006) (derivative); *In re Brooks Automation, Inc. Sec. Litig.*, No. 06-11068-RWZ, 2007 WL 4754051 (D. Mass.
19   Nov. 6, 2007) (direct) and *In re Brooks Automation, Inc. Derivative Litig.*, No. 06-10943 (D. Mass. filed May 30, 2006)  (derivative); *Openwave*, 528 F. Supp. 2d at
20   249 (direct) and *In re Openwave Sys, Inc.' S'holder Derivative Litig.*, No. C 06-03468 SI, 2008 WL 410259, at *1 (N.D. Cal. Feb. 12, 2008) (derivative); *In re
21   UnitedHealth Group PSLRA Litig.*, No. 06-1691, 2007 WL 1621456 (D. Minn. June 4, 2007) (direct) and *In re UnitedHealth Group Inc. S'holder Derivative Litig*,
22   No. 06-01216 (D. Minn. filed Mar. 29, 2006) (derivative); *Grecian v. Meade Instruments Corp.*, No. 06-908 (C.D. Cal. filed Sept. 27, 2006) (direct) and *In re
23   Meade Instruments Corp. Derivative  Litig.*, No. 06-CC-205 (Cal. Super Ct. County of Orange filed Oct.6, 2006) (derivative); *In re KLA-Tencor Corp. Sec.
24   Litig.*, No. 06-4065 (N.D. Cal. filed June 29, 2006) (direct) and *In re KLA-Tencor Corp. S'holder Derivative  Litig.*, No. C06-03445 JW (HRL) (N.D. Cal. filed May
25   26, 2006) (derivative); *In re American Tower Corp. Sec. Litig*, No. 06-CV-10933 (MLW) (D. Mass. filed May 26, 2006) (direct) and *In re American Tower
26   Corp. Derivative Litig.*, No. 06-11029 (D. Mass. filed June 13, 2006) (derivative); *In re HCC Ins. Holdings, Inc. Sec. Litig.*, No. 4:07-cv-00801 (S.D. Tex. filed Mar.
27   8, 2007) (direct) and *Bacas v. Way*, No. 07-456 (S.D. Tex. filed Feb 1, 2007) (derivative); *In re Newpark Resources, Inc. Sec. Litig.*, No. 2:06-cv-02150-ML-
28   KWR (E.D. La. filed Apr. 21, 2006) (direct) and  *In re Newpark Resources, Inc.*

*(continued . . . )*

1    Semtech's attempt to support this argument by citing *Schuster v. Gardner* is

2    unavailing.  *See* 127 Cal. App. 4th 305 (2005).   In fact, *Schuster* supports well-

3    settled authority that direct and derivative actions can be maintained in parallel to

4    seek redress for injuries to different parties.  *Schuster* involves a state court action

5    against Peregrine System, Inc. for certain accounting improprieties.  The *Schuster*

6    action was filed along with a series of law suits, alleging violations of, among

7    other things, Section 10(b), Section 11, Section 14, and breaches of fiduciary duty.

8    These actions sought relief for injuries sustained by the shareholders (the direct

9    actions) and injuries sustained by the corporation (the derivative actions). *See In re*

10   *Peregrine Sys., Inc. Sec. Litig.*, No. 02 CV 870-J (RBB) (S.D. Cal. Nov. 21,

11   2003)(direct action); *Peregrine Litig. Trust v. Moores*, No. 788659 (San Diego

12   Super. Ct.) (civil action); *In re Peregrine Sys., Inc. Corp. Derivative Litig.*, No. 02-

13   00950 (S.D. Cal. filed May 14, 2002) (derivative action).  Accordingly, where

14   Lead Plaintiff has satisfied the elements of a 10(b) claim (as alleged here) parallel

15   derivative and shareholder lawsuits naturally co-exist.

16         **C.    Lead Plaintiff's Claims Are Timely**

17         28 U.S.C. § 1658 provides two limitations periods, both of which are

18   satisfied in this case.

19         **1.    The Claims Were Brought Within the Two-Year Period**
           **Provided by 28 U.S.C. § 1658(b)(1)**

20

21         28 U.S.C. § 1658(b)(1) provides that an action involving "a claim of fraud,

22   deceit, manipulation . . . of a regulatory requirement concerning the securities

23   laws" must start within two years "after the discovery of the facts constituting the

24   violation." The period begins when the plaintiff (1) has actual knowledge of the

25

26   *( . . . continued)*
     *Derivative Litig.,* No. 06-07340 (E.D. La. filed Oct. 5, 2006) (derivative) (The

27   foregoing list of direct and derivative actions does not include reference to all
     derivative actions filed in connection with the corporation's options backdating

28   practices).

1   fraud or (2) should have, in the exercise of reasonable diligence, discovered the

2   fraud. *Betz v. Trainer Wortham & Co., Inc*. 519 F.3d 863, 871 (9th Cir. 2008).  The

3   second test, known as "inquiry notice," is a two part test.  First, the facts "must be

4   sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere

5   suspicion ... to incite the victim to investigate." *Id*. at 871.  If that is established,

6   the question is "in the exercise of reasonable diligence," when should the plaintiff

7   have discovered the facts constituting the alleged fraud.  *Id*.  The statute does not

8   begin to run until both prongs of the "inquiry notice" test are satisfied.  *Id.*  In the

9   context of a Rule 12(b)(6) motion, the defendant bears the greater burden of

10   showing "beyond doubt that the plaintiff can prove no set of facts that would

11   establish the timeliness of the claim."[63]

12        Baumann and Poe simply assert, without any evidence, that Lead Plaintiff

13   was on "inquiry notice" of the Defendants' misrepresentations concerning

14   compensation expense and net income years before their backdating scheme came

15   to light.  *See* Baumann Br. at 21 n.3; Poe Br. at 24-25.  These Defendants have not

16   identified any facts that could be considered "sufficiently probative of fraud" under

17   the rigorous standard set out in *Betz*. *See* 519 F.3d at 876.  As the court explained

18   in *Zoran*, 511 F. Supp. 2d at 1014, the existence of publicly available information

19   on stock options is irrelevant to the question of inquiry notice unless such

20   information gives some reason to suspect fraud.  After all, outsiders do not have

21   "superpowers to detect secret backdating inside the company," and the law does

22   not require a reasonable investor to "engage in complicated statistical analysis in

23

24   ─────────────────

25   [63] *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006); *see also Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (a motion to

26   dismiss based on the statute of limitations can be granted "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to

27   prove" a timely claim); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 884 (E.D. Tenn. 2005) (declining to reach "the somewhat extraordinary

28   conclusion" that the plaintiff was on inquiry notice as a matter of law).

1    order to uncover alleged malfeasance." *Id.* at 1014 (quoting *Ryan v. Gifford*, 918
2    A.2d 341, 359 (Del. Ch. 2007)).

3         The first indication that Semtech was engaged in fraud in reporting its
4    compensation expenses and net income came on May 16, 2006, when the Center
5    for Financial Research and Analysis ("CFRA") published a research report listing
6    Semtech as a company "at risk" for such practices. ¶ 127. Two days later, the
7    SEC requested information from Semtech on its stock options, and the Company
8    announced an internal review on June 9, 2006. ¶¶ 128-129. Afterward the
9    Company publicly claimed that "*[w]e first learned of* issues associated with our
10   past stock option grants on May 17, 2006 when Nasdaq alerted us to a research
11   report published on May 16, 2006 by the Center for Financial Research and
12   Analysis." *Id.* at ¶ 144 (quoting 2006 Form 10-K/A) (emphasis added).

13        Assuming that the May 2006 report was sufficient to satisfy the first prong
14   of the "inquiry notice" test, the second question is when should the plaintiff have
15   reasonably discovered the fraud. *Betz*, 519 F.3d at 876. After the May 2006 report
16   first raised suspicions of fraud, further investigation was required to discover the
17   actual fraud. Lead Plaintiff used statistical analysis to determine whether the
18   options were backdated. ¶¶ 154-161. Then Lead Plaintiff reviewed the
19   Company's financial statements to find out whether the compensation expense for
20   such options was properly "amortized and recognized as an expense over the
21   option's vesting period," in accordance with APB 25. ¶¶ 42-44. A reasonable
22   investor could not have discovered these misrepresentations until, at the earliest,
23   the second half of 2006. Even assuming Lead Plaintiff was on "inquiry notice" as
24   early as May 26, 2006, this lawsuit, brought on August 10, 2007, was initiated well
25   within the two-year limitations period.

26
27
28

2.      **The Claims Were Brought Within the Five-Year Period**
**Provided by 28 U.S.C. § 1658(b)(2)**

28 U.S.C. § 1658(b)(2) provides that a private securities action must be brought no later than five years after the "violation." This five-year limitations period does not begin to run until the defendant commits the "violation" for which the plaintiff seeks redress. *See Zoran*, 511 F. Supp. 2d at 1014 (explaining that "the statute of limitations accrues as of when the violation itself occurs").

*Zoran* involved a derivative suit in which plaintiffs sought damages based directly on the granting of backdated stock options. *See id*. at 1000. Based on the nature of the claims, the court concluded that the "violation" was the granting of the stock options, and disallowed claims based on grants more than five years before the suit was filed. *Id*. at 1014. Ignoring the nature of the claims, the Defendants argue that the logic of *Zoran* bars fraud claims if the misrepresentations involve transactions that occurred more than five years before the suit was filed. *See* Baumann Br. at 21; Poe Br. at 24. Nothing in the relevant case law supports such an odd and unreasonable application of section 1658(b)(2).

The Complaint here does not seek damages or other relief based on the backdating itself. Rather, the fraud is the failure to account for the backdating and misrepresenting those financials to the market. The crux of the Complaint is Semtech's misrepresentation of its compensation expenses, EPS and net income causing "Lead Plaintiff and other members of the Class to purchase Semtech securities at artificially inflated prices." ¶ 202. These misrepresentations occurred less than five years before the lawsuit was filed.

Defendant Poe cites *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136 (9th Cir. 1993) for the proposition that in securities cases "a cause of action accrues at the completion of the sale of the instrument." Poe Br. at 24 n.15. This generic statement of the law, even if correct, does nothing to advance Poe's argument because the "instruments" at issue in this case are shares of stock purchased or

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

56

1    otherwise acquired "between August 27, 2002 and July 19, 2006," within the five-

2    year period. ¶ 26. In *Durning*, the "instruments" at issue were bonds, and the

3    court held that the cause of action accrued at the time the bonds were purchased.

4    *See Durning*, 990 F.2d at 1136.[64]

5        With respect to securities fraud claims, the cause of action accrues "when

6    the last alleged misrepresentation was made by the defendants." *Id.* at 1136. For

7    purposes of section 1658(b)(2), the "violation" is the false representation, and

8    "[s]uch a violation is considered to have occurred on the date that the false

9    representation was made, not the date of the conduct which gave rise the

10    representation." *In re Maxim Integrated Prods., Inc.*, No. 06-3344, 2008 WL

11    4061075 (N.D. Cal. Aug. 27, 2008). In *Maxim*, also a backdating case, the court

12    held "[e]ach false representation may constitute a separate violation of § 10(b); the

13    five-year period begins to run with respect to each violation when it occurs." *Id*.[65]

14        The Complaint alleges that the Defendants made false statements about

15    Semtech's net income, EPS and compensation expense on numerous occasions in

16    2002, 2003, 2004, 2005 and 2006. ¶¶ 56-126. Because each of those misleading

17    statements occurred after August 2002 (within five years of the filing of the

18    Complaint), the fraud claims are timely.

19

20

21      [64] Poe also cites *Falkowski v. Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002), for the equally unremarkable proposition that the granting of a stock option is considered a "purchase or sale" under Securities Litigation Uniform Standards Act. Poe Br. at 24 n.15. Again, this proposition, even if correct is irrelevant to any

22   argument in this case. The plaintiffs in *Falkowski* were employees who had

23   received stock options, claiming fraudulent inducement in connection with those options and therefore subject to preemption under SLUSA. *See Falkowski*, 309 F.3d at 1131. Lead Plaintiff, by contrast, purchased Semtech *common stock* on the

24   NASDAQ and is claiming that fraudulent representations made between 2002 and 2006 artificially inflated the price of that stock.

25      [65] Citing *Zoran*, 511 F. Supp. 2d at 1014; *see also In re Comverse Tech., Inc.*

26   *Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) (with respect to claims based on "misleading disclosures about options backdating or other accounting

27   practices, the 5-year period specified in section 1658(b)(2) begins to run on the date of such disclosures, not on the date of grant of the backdated options.").

28

1

### D.      The Complaint States Control Person Liability Against Each Individual Defendant

2

3      Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), imposes liability on

4   individuals who "control" any person that is liable under any provision of the

5   Exchange Act.  To state a Section 20(a) claim, a plaintiff must allege: (1) a primary

6   violation of the federal securities laws (which as established above, Lead Plaintiff

7   has done); and (2) that the defendant exercised actual power or control over the

8   primary violator.  *Howard,* 228 F.3d at 1065.  It is not necessary to show "actual

9   participation or the exercise of power" in order to make out a *prima facia* case.  *Id.*

10   Plaintiff need only allege an ability to control or influence a primary violator.  *See*

11   *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)[66].

12      Individual Defendants Poe, Franz, Baumann, Maheswaran, and Carlson held

13   powerful positions at Semtech.  These Individual Defendants were each personally

14   involved in the daily management of the Company, had access to and control over

15   the financial information pertaining to the Company and, during the Class Period,

16   engaged in the preparation, signing, and issuance of the false and misleading

17   financial statements at the core of this matter.  Not only were the Individual

18   Defendants responsible for the issuance of false and misleading financial

19   information to the public and Lead Plaintiff, but they also controlled the conduct

20   complained of herein.[67] ¶¶ 206-207.

21

22

23

24

[66]Plaintiffs are not required to plead "control person liability" with particularized facts, as plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing.  *Howard*, 228 F.3d at 1065 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).  Instead, Section 20(a) claims must be pleaded in accordance with Federal Rule of Civil Procedure 8(a)(2) requiring "a short and plain statement of the claim showing the pleader is entitled to relief."  *Batwin*, 2008 WL 2676364, at *24.

25

26

27

28

[67] Defendant Maheswaran's argues that the Section 20(a) claim should be dismissed as to him because he joined Semtech "long after" the options grants identified in the Complaint were made.  This argument is not compelling given that the fraud here is not simply the backdating, but also the false and misleading statements that resulted from the illegal backdating, and for which Maheswaran *was* responsible.  The financial statements Maheswaran signed and swore to were

*(continued . . .)*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

58

Given that the Individual Defendants each had the power to oversee and direct the management and policies of the Company –including the stock options practices and public filings, each Individual Defendant is presumptively a "control person" under Section 20(a). *See Juniper*, 542 F. Supp. 2d. at 1053 (an options backdating case where court denied defendants' motions to dismiss Section 20(a) claim finding that defendants "participated in the operation and management of the company…[ as well as] in the conduct of its business affairs."); *Howard*, 228 F.3d at 1066 (finding a *prima facia* case of "control person" liability where defendant had actual authority over the *preparation and presentation to the public* of financial statements).

Further, the Company itself found that "the evidence supports a finding of intentional manipulation by [Defendant Poe]…and that [Defendant Franz] and [Defendant Baumann] … knew, or should have known, of the manipulation and initiated or participated in some manipulative acts." ¶ 142; RJN Ex. 1 at 7. Thus, Defendants controlled the backdating scheme. With respect to Poe, this finding is supported by the account of CW 1 whose account demonstrates the former CEO's control over her option dating duties.

## IV.   **CONCLUSION**

For the foregoing reasons Defendants' motions should be denied in their entirety.

Dated:  October 6, 2008

---

*( . . . continued)*
false and misleading because they failed to account for the amortization in the backdated options' subsequent vesting period. *Quest*, 527 F. Supp. 2d at 1194 (C.D. Cal. 2007) (sustaining control person liability on a motion to dismiss where defendant joined the company nearly a year and a half after the last backdated option was granted).

By: ____/s/ Mark Labaton_____
            Mark Labaton (#159555)
**KREINDLER & KREINDLER LLP**
707 Wilshire Boulevard
Los Angeles, California  90017
Telephone:  (213) 622-6469
Facsimile:   (213) 622-6019

*Local and Liaison Counsel for Plaintiff*
*and the Class*

**CAULEY BOWMAN CARNEY &**
**WILLIAMS, PLLC**
J. Allen Carney
Randall K. Pulliam
Bart Dalton (#187930)
11311 Arcade Dr., Suite 200
Little Rock, AR 72212
Telephone:  (501) 312-8500
Facsimile:   (501) 312-8505

          - and -

**BARON & BUDD, P.C.**
Russell Budd
Burton LeBlanc
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Telephone:  (214) 521-3605
Facsimile:   (214) 520-1181

*Lead Counsel for Lead Plaintiff*

**LABATON SUCHAROW LLP**
Jonathan Gardner
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Counsel for Lead Plaintiff*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT
CIVIL ACTION NO.: 2:07-CV-07114-CAS (FMOX)

60