1  Robert E. Gooding, Jr. (SBN 50617)
   (goodingr@howrey.com)
2  Roman E. Darmer (SBN 212578)
   (darmerr@howrey.com)
3  Todd W. Smith (SBN 223423)
   (smithtodd@howrey.com)
4  HOWREY LLP
   4 Park Plaza, Suite 1700
5  Irvine, CA  92614
   Telephone:  (949) 721-6900
6  Facsimile:  (949) 721-6910

7  Bart H. Williams (SBN 134009)
   (bart.williams@mto.com)
8  Jacob S. Kreilkamp (SBN 248210)
   (jacob.kreilkamp@mto.com)
9  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue, 35th Floor
10 Los Angeles, CA  90071
   Telephone:  (213) 683-9100
11 Facsimile:  (213) 687-3702

12 Attorneys for Defendant
   JOHN D. POE

13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17 IN RE: SEMTECH CORPORATION          ) Master Case No. CA 2:07-CV-07114-
   SECURITIES LITIGATION               ) CAS (FMOx)
18                                      )
                                        )
19                                      ) CLASS ACTION
                                        )
20 This Document Relates To:           ) DEFENDANT JOHN D. POE'S
                                        ) REPLY IN SUPPORT OF MOTION
21 ALL ACTIONS                         ) TO DISMISS CONSOLIDATED
                                        ) AMENDED CLASS ACTION
22                                      ) COMPLAINT
                                        )
23                                      )
                                        ) Courtroom:  5
24                                      ) Judge:      Hon. Christina A. Snyder
                                        ) Date:       December 8, 2008
25 _____   ) Time:       10:00 a.m.

26

27

28

HOWREY LLP

1

## TABLE OF CONTENTS

2

Page(s)

3  I.  INTRODUCTION .................................................................................. 1

4  II.  ARGUMENT ........................................................................................ 2

5      A.  Plaintiff Has Failed to Raise a Strong Inference of Mr.
           Poe's Scienter at the Time of the Alleged Misstatements. ......... 2

6      B.  Whether Viewed Individually or Collectively, the Indicia
7          Identified by Plaintiff Do Not Raise a Strong Inference of
           Scienter. ....................................................................................... 5

8          1.  The Lack of Personal Benefit to Mr. Poe from the
9              Alleged Backdating Negates Any Inference of
               Scienter. .............................................................................. 6

10         2.  Mr. Poe's Stock Sales During the Putative Class
11             Period, in the Absence of Any Allegation of His
               Trading History or Overall Stock Ownership, Fail
12             to Establish Scienter. .......................................................... 8

13         3.  Plaintiff's Reliance on the Special Committee's
14             Assertions Cannot Overcome its Failure to Allege
               Particularized Facts Demonstrating Scienter. .................... 9

15         4.  Plaintiff's Failure to Provide Any Information
16             Regarding the Allegedly Misdated Option Grants
               Dooms Its Statistical Analysis. ......................................... 11

17         5.  Plaintiff Has Failed to Allege Sufficient Facts to
18             Infer Scienter by Virtue of Mr. Poe's Corporate
               Position. ............................................................................. 12

19         6.  Plaintiff's Confidential Witness Statement Further
               Negates Any Inference of Scienter. .................................. 14

20     C.  The Court Should Reject Plaintiff's Self-Serving Efforts
21         to Lower the Loss Causation Pleading Standard. ....................... 15

22     D.  Plaintiff's Stock Purchases *After* the Issuance of the
           Allegedly Corrective Disclosures Are Fatal to Its
23         Causation Allegations. ............................................................... 17

24 III.  CONCLUSION ................................................................................... 19

25

26

27

28

HOWREY LLP

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*Batwin v. Occam Networks, Inc.*,
  No. CV 07-2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal.
  July 1, 2008) ...................................................................................... 9

*Berson v. Applied Signal Tech., Inc.*,
  527 F. 3d 982 (9th Cir. 2007) ............................................................ 13

*Broam v. Bogan*,
  320 F.3d 1023 (9th Cir. 2003) .............................................................. 7

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 348 (2005) ................................................... 15, 16, 17

*In re Asyst Techs., Inc. Derivative Litigation*,
  No. C-06004669, 2008 U.S. Dist. LEXIS 41173 (N.D. Cal.
  May 23, 2008) .................................................................................... 11

*In re Atmel Corp. Derivative Litig.*,
  No. C 06-4592, 2007 U.S. Dist. LEXIS 54058  (N.D. Cal. July
  16, 2007) ............................................................................................... 5

*In re Bally Total Fitness Sec. Litig.*,
  No. 04 C 3530, 2007 U.S. Dist. LEXIS 12060 (N.D. Ill. Feb.
  20, 2007) ........................................................................................... 2, 9

*In re Brooks Automation, Inc. Sec. Litig.*,
  No. 06-11068, 2007 U.S. Dist. LEXIS 88045 (D. Mass. Nov. 6,
  2007) ...................................................................................................... 3

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) .............................................. 14

*In re Daou Sys. Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172
  (2006) ..................................................................................... 15, 16, 17

*In re Exodus Commc'ns., Inc. Sec. Litig.*, No. C 01-2661, 2005 U.S.
  Dist. LEXIS 20222 (N.D. Cal. Aug. 5, 2005) .................................... 12

*In re F5 Networks, Inc. Derivative Litig.*,
  No. C06-794, 2007 U.S. Dist. LEXIS 57464 (W.D. Wash. Aug.
  6, 2007) .................................................................................................. 7

*In re Gilead Sciences Sec. Litig.*,
  536 F. 3d 1049 (9th Cir. 2008) ..................................................... 16, 18

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................ 4

HOWREY LLP

1

## TABLE OF AUTHORITIES (cont.)

2
Page(s)

3 *In re Invision Techs Inc. Sec. Litig.*,
    No. C04-03181, 2006 U.S. Dist. LEXIS 76458   (N.D. Cal.
4   Aug. 31, 2006) ................................................................................ 2

5 *In re Sonus Networks Secs. Litig.*,
    No. 04-10294, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May
6   10, 2006) ........................................................................................ 3

7 *In re The Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ...................................................... 5
8
  *In re Zoran Corp. Derivative Litig.*,
9   511 F. Supp. 2d 986 ................................................................ 11, 12

10 *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.
    W. Holding Corp.*,
11   320 F.3d 920 (9th Cir. 2003) ...................................................... 13

12 *Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................ 8
13
  *South Ferry LP, # 2 v. Killinger*,
14   542 F.3d 776 (9th Cir. 2008) ...................................................... 13

15 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. __, 127 S. Ct. 2499 (2007) ............................................ 7
16
  *Weiss v. Amkor Tech., Inc.*,
17   527 F. Supp. 2d 938 (D. Ariz. 2007) ............................................ 9

18 **STATUTES**

19 Federal Rule of Civl Procedure 9(b) ................................................ passim

20 Federal Rule of Civl Procedure 12(b)(6) .................................... 2, 19

21 Federal Rule of Civl Procedure 8(a)(2) ........................................ 16

22

23

24

25

26

27

28

HOWREY LLP

# I.      INTRODUCTION

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "Reform Act") to deter meritless securities litigation.  In doing so, it erected significant pleading hurdles that a securities plaintiff must overcome before it properly may state a claim sufficient to survive a motion to dismiss.  One such hurdle is a plaintiff's obligation to allege particularized facts raising a ***strong inference*** of scienter ***at the time of the alleged fraud***.  Plaintiff simply has not done so here.  Instead, relying almost exclusively on the conclusory assertions of the Special Committee, Plaintiff attempts to allege that Mr. Poe participated in the manipulation of grant dates between 1997 and May 2002.  Yet, because a claim based on such alleged manipulation would be barred under the applicable statutes of limitation, Plaintiff purports to base its fraud claim on Semtech's financial statements filed months, and in most cases years, later.  In doing so, however, Plaintiff fails to allege any facts showing Mr. Poe's state of mind at the time that Semtech issued the financial statements, much less that Mr. Poe knew that such statements were false.

In an attempt to remedy this fundamental shortcoming, Plaintiff urges the Court to consider the "totality of the circumstances," apparently in the hope that the sum of its flawed allegations collectively will be enough to satisfy the stringent pleading requirements of the Reform Act and Rule 9(b).  But the individual allegations proffered by Plaintiff are similarly deficient.  Its allegations demonstrate that Mr. Poe received almost no personal benefit from the purported "fraudulent scheme to defraud investors," and that many of the so-called backdated options resulted in pricing that was ***unfavorable*** to Mr. Poe and others.  Moreover, Plaintiff's allegations that Mr. Poe sold stock during the Putative Class Period is meaningless, given Plaintiff's failure to put such sales in context in terms of his overall stock ownership or pre-class period trading.  Even for the handful of stock option grants that Plaintiff actually identifies, its failure to allege even the most basic information about such grants, such as the number of options granted, the purported recipients, and the stock option plan under which the options

1   were granted, renders them ineffective and unpersuasive as indicia of scienter.  Finally,

2   the lone confidential witness statement offered by Plaintiff actually defeats an inference

3   of scienter on Mr. Poe's part, as it shows that Mr. Poe merely was complying with a

4   policy openly ratified by the Company's Board.

5          Nor does Plaintiff adequately allege loss causation.  Plaintiff's assertion that the

6   Company's disclosures in May and June 2006 revealed the alleged fraud is flatly

7   contradicted by Plaintiff's continuing to purchase Semtech stock well ***after*** such

8   disclosures.  In attempting to justify its post-revelation purchases, Plaintiff essentially

9   concedes that it has improperly pleaded an overly-inclusive class period.  Even under

10  the relaxed pleading standard that Plaintiff wrongly urges this Court to adopt, Plaintiff's

11  loss causation allegations fail.

12         For all of these reasons, the Court should dismiss the Consolidated Amended

13  Class Action Complaint ("CAC") with prejudice pursuant to Rule 12(b)(6).

14  **II.**    **ARGUMENT**

15      **A.**    **Plaintiff Has Failed to Raise a Strong Inference of Mr. Poe's Scienter**

16            **at the Time of the Alleged Misstatements.**

17         Under the Reform Act and Federal Rule of Civil Procedure 9(b), Plaintiff must

18  allege particularized facts raising a strong inference that, ***at the time Semtech made the***

19  ***allegedly false financial disclosures***, Mr. Poe knew that such disclosures were false.

20  *See In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (dismissing

21  complaint because "we cannot determine whether there is any basis for alleging that the

22  officers knew that their statements were false ***at the time they were made***--a required

23  element in pleading fraud.") (emphasis added).[1]  As set forth below, Plaintiff's failure to

24        _____

25  [1] *See also In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2007 U.S. Dist. LEXIS 12060, at *12 (N.D. Ill. Feb. 20, 2007) ("These new allegations, like the prior ones, do

26  not support an inference of scienter because they are vague and unspecific as well as hindsight conclusions that do not assist in determining the state of mind behind the

27  misstatements ***at the time they were made***." ); *In re Invision Techs Inc. Sec. Litig.*, No. C04-03181, 2006 U.S. Dist. LEXIS 76458, at *25 n. 6 (N.D. Cal. Aug. 31, 2006)

28  ("[Defendant] had the requisite scienter and knew that the statement was false ***at the***
                                                 (Continued...)

1  raise any inference of Mr. Poe's scienter at the time Semtech issued the alleged

2  misstatements – much less a strong one – requires dismissal of the CAC.

3       In an attempt to cobble together a theory that Mr. Poe somehow intentionally

4  defrauded Semtech's shareholders, Plaintiff points to a series of purportedly false

5  financial disclosures included in certain of the Company's SEC filings between August

6  27, 2002 and April 14, 2006.  CAC, ¶¶ 56 – 126.  Plaintiff contends that the Company

7  misled investors in those SEC filings by understating its reported compensation expense

8  and overstating its reported net income.  *Id.*, ¶ 6.  Significantly, it is these purported

9  misstatements that Plaintiff contends is the basis for its securities fraud claim, not the

10 alleged backdating.  Plaintiff's Consolidated Opposition ("Opp.") at 56 ("The

11 Complaint here does not seek damages or other relief based on the backdating itself.

12 Rather, the fraud is the failure to account for the backdating and misrepresenting those

13 financials to the market.").

14      Remarkably, while Plaintiff bases its fraud claim against Mr. Poe on certain

15 alleged misstatements made in SEC filings between August 2002 and April 2006, it fails

16 to allege any facts that tend to show that Mr. Poe knew, ***at the time the Company made***

17 ***the statements***, that they were false.[2]  Instead, Plaintiff attempts to allege scienter by

18 asserting that Mr. Poe participated in the alleged backdating of stock option grants and,

_____

20 (...Continued)

21 ***time that he made it***.");  *In re Sonus Networks Secs. Litig.*, No. 04-10294, 2006 U.S. Dist. LEXIS 28272, at *29 (D. Mass. May 10, 2006) ("Furthermore, the complaint must

22 assert facts supporting a strong inference that each of the Defendants acted with scienter ***at the time the revenue misstatements were made***."); *In re Brooks Automation, Inc. Sec.*

23 *Litig.*, No. 06-11068, 2007 U.S. Dist. LEXIS 88045, at *49 (D. Mass. Nov. 6, 2007) ("The complaint just does not adequately state that any of these defendants believed or

24 knew, ***at the time*** the Merger Registration Statement was signed, that Brooks' financial statements contained material misstatements or otherwise failed to comport with

25 GAAP.") (emphases added).

26 [2] As Plaintiff concedes, Mr. Poe was ***not*** the CEO for the majority of the Putative Class Period, as he resigned from that position in October 2003.  CAC, ¶ 17.  As such, Mr.

27 Poe is alleged to have signed only six of the fifteen allegedly false 10-Q's and 10-K's filed during the Putative Class Period.  CAC, ¶¶ 56-126.

thus, must have known that Semtech's financial disclosures (including the compensation expense relating to stock options) were incorrect.  Opp. at 21 ("Poe knew these statements were false because he intentionally backdated options…").  However, the only allegations of intentional manipulation by Mr. Poe occurred months, and in most cases years, *before* the purported misstatements were issued by Semtech.  For example, Plaintiff points to the Special Committee's conclusions that Mr. Poe intentionally manipulated certain grant dates for stock options issued to employees between April 1997 and May 2002.  CAC, ¶ 148.  The CAC also alleges that a handful of stock option grants were made at "low or near low points," but those grants are dated between January 1994 and May 2002.  CAC, ¶ 161.  Significantly, however, the first of the purported misstatements upon which Plaintiff's fraud claim is based was not made until Semtech filed its Form 8-K on August 27, 2002 and its Form 10-Q on September 11, 2002, with rest of the Company's alleged misstatements occurring over a four-year period from late 2002 through 2006.  CAC, ¶¶ 56-126.

In sum, the CAC is devoid of *any* contemporaneous factual allegations even suggesting that Mr. Poe knew that the August 2002 to April 2006 statements were false or misleading when the Company made them.  Even based on Plaintiff's own allegations, by that time, Mr. Poe would have had no reason to be aware, or even suspect, that the Company was under-reporting its compensation expense.  Indeed, it is undisputed that for each year of the Putative Class Period, Semtech's independent auditors issued unqualified audit opinions that Semtech's financial statements presented the Company's financial position fairly and in conformity with GAAP.  *See* Def. Poe's RJN, Exs. A-D.  Thus, not only did Mr. Poe have no reason to suspect that the financial statements were false, but he had *affirmative assurances* from the Company's outside auditors that the statements were accurate.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (finding auditor's unqualified opinion of financial statements to be "highly probative of an *absence* of scienter") (emphasis added).  Simply put, allegations of an intent to manipulate stock option grant dates

1   between 1994 and 2002, even if properly alleged (which they are not), do not satisfy

2   Plaintiff's obligation to plead facts showing an intent to defraud investors several years

3   later.

4         Rather, to establish scienter as to the later-filed misstatements from the earlier

5   alleged backdating would require (at the very least) an allegation that Mr. Poe

6   understood the intricacies of the stock option accounting rules, such as the amortization

7   of compensation expense over the term of the option.  *See In re The Vantive Corp. Sec.*

8   *Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (Plaintiff must "allege specific

9   contemporaneous conditions known to the defendants that would strongly suggest that

10   the defendants understood" that the company's accounting for stock options was

11   improper).  The CAC contains no such allegations.  While Plaintiff claims that the act of

12   backdating itself "reveals [a defendant's] knowledge of the option accounting rules,"

13   this overly simplistic explanation falls short.  Although the intentional backdating of a

14   stock option may suggest that the backdater appreciates, at some level, certain

15   implications of doing so, it does not demonstrate an understanding, or even an

16   awareness, of the relevant accounting rules.[3]  *See In re Atmel Corp. Derivative Litig.*,

17   No. C 06-4592, 2007 U.S. Dist. LEXIS 54058, at *18 (N.D. Cal. July 16, 2007) (Even

18   where "it appears almost certain that some of the options at issue [] were backdated," a

19   plaintiff still must allege adequate corroborating details to establish scienter against each

20   individual defendant).

21         **B.**     **Whether Viewed Individually or Collectively, the Indicia Identified by**

22               **Plaintiff Do Not Raise a Strong Inference of Scienter.**

23         In an effort to mask the deficiency of the CAC's scienter allegations, Plaintiff

24   urges the Court to focus on the "totality" of the circumstances, as if that will cure the

25

26   [3] For example, one may backdate an option so as to ensure that the option is compliant

27   with a company policy or stock option plan, without any understanding of the
    accounting consequences of such an action.

28

1  glaring flaws in the individual allegations relied upon by Plaintiff. As set forth below,

2  all of the "indicia of scienter" in the CAC are based on false premises and conclusory

3  allegations, and are devoid of any particularized facts raising a strong inference of

4  scienter as to Mr. Poe. Viewing those deficient allegations in their totality does not

5  remedy the essential failure of the CAC to allege scienter as to Mr. Poe.

6               **1.    The Lack of Personal Benefit to Mr. Poe from the Alleged**

7                       **Backdating Negates Any Inference of Scienter.**

8               Among the most conspicuous omissions from Plaintiff's scienter allegations is the

9  lack of personal benefit to Mr. Poe as a result of the alleged backdating. The CAC

10 concedes that, while the Company canceled and rescinded over 1.2 million of Mr. Poe's

11 outstanding stock options, the vast majority of Mr. Poe's options (81%) had "no

12 intrinsic value." CAC, ¶ 150 at p. 106. This means that, for 81% of Mr. Poe's

13 outstanding options, the Special Committee determined either that (i) the option's stated

14 measurement date was correct as granted, or (ii) the option's stated measurement date

15 was misdated such that it was ***unfavorable*** to Mr. Poe (*i.e.*, the option ultimately was re-

16 priced to a ***lower*** exercise price). *Id.*, ¶ 150 at p. 104-05. Moreover, of the small

17 percentage of options that the Special Committee determined to have some "intrinsic

18 value," it was concluded that Mr. Poe actually exercised only $19,000 worth of them.

19 *Id.*, ¶ 151. Plaintiff offers no explanation for why Mr. Poe, who allegedly was involved

20 in an elaborate fraudulent scheme to backdate stock options, would engage in such

21 conduct while failing to bestow upon himself even a moderate personal gain.[4] Nor does

22 _____

23 [4] In its Opposition, Plaintiff makes the conclusory and wholly unsupported assertions
24 that Mr. Poe "received approximately 375,685 backdated grants" and that "seven of the
   ten grants he received between 1995 and the end of 2002 were backdated." Opp. at fn.
25 7 & p. 20. The Court should reject these unfounded assertions because they have no
   basis in fact. As "support" for these figures, Plaintiff cites only to Semtech's proxy
26 statements for the fiscal years 1995-1998, 2000, and 2002. *See* Plaintiff's Request for
   Judicial Notice ("Plaintiff's RJN"), at Exs. 2-7. These filings, which purport to show
27 only the total number of options that Mr. Poe received during each fiscal year, are
28 devoid of any facts suggesting that any of these options were backdated. Nor does
                                                                    (Continued...)

1    Plaintiff explain why Mr. Poe would engage in a backdating scheme only to receive

2    **unfavorably** priced options at artificially **high** exercise prices.  *See, e.g.*, *In re F5*

3    *Networks, Inc. Derivative Litig.*, No. C06-794, 2007 U.S. Dist. LEXIS 57464, at

4    \*\*25-26 (W.D. Wash. Aug. 6, 2007) (Defendant's receipt of "out of the money" options

5    **undermines** allegations of backdating).

6          Indeed, throughout the Form 10-K/A, the Company acknowledges that the

7    Special Committee identified several option grants that were "unfavorably priced" or

8    whose misdating was the result of "administrative error."  CAC, ¶ 148 at p. 97 ("The

9    lack of evidence is believed to be the result of administrative issues."); p. 98 (most

10   "appear to be the result of administrative error"); p. 100 (noting various "pricing

11   exceptions that resulted in pricing unfavorable to the employee.")  These

12   determinations, which Plaintiff ignores, are consistent with the alternative cogent

13   inference offered by Mr. Poe – namely, that Semtech's stock option granting practices

14   during the relevant time period, while sometimes flawed and inconsistent, were devoid

15   of any intent to defraud or mislead investors.  *See Tellabs, Inc. v. Makor Issues &*

16   *Rights, Ltd.*, 551 U.S. __, 127 S. Ct. 2499, 2505 (2007) ("An inference of fraudulent

17   intent may be plausible, yet less cogent than other, non-culpable explanations for the

18   defendant's conduct.").

19   _____

20   (...Continued)

21   Plaintiff allege any facts tending to show that such grants were backdated.  Rather,
     Plaintiff makes the blanket assumption that any and all grants received by Mr. Poe
22   during those years must have been backdated.  The Court should reject such speculation.
     *In re Invision Techs., Inc. Sec. Litig.*, No. C04-03181, 2006 U.S. Dist. LEXIS 7645,
23   \*\*22-23 (N.D. Cal. Aug. 31, 2006) ("[T]he PSLRA does not permit conclusory
     allegations of scienter.").  In any event, these allegations do not even appear in the
24   CAC.  Instead, Plaintiff raises them for the first time in its Opposition.  Accordingly,
     even if they were based in fact, they are not part of the allegations being tested by
25   Defendants' motions to dismiss.  *Broam v. Bogan*, 320 F.3d 1023, 1026 (9th Cir. 2003)
26   ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond
     the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a
27   defendant's motion to dismiss.").

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2. Mr. Poe's Stock Sales During the Putative Class Period, in the Absence of Any Allegation of His Trading History or Overall Stock Ownership, Fail to Establish Scienter.

With misplaced reliance on the *Quest* decision, Plaintiff attempts to avoid its obligation to allege facts regarding Mr. Poe's trading history, the percentage of shares sold, and the timing of his sales. Without such factual context, however, the bare allegation that Mr. Poe sold stock during the Putative Class Period is meaningless.

Contrary to Plaintiff's argument that *Quest* established that the "prototypical guidelines regarding the relevance of a defendant's stock sales to scienter…are not applicable to backdating cases" (Opp. at 28), *Quest* actually holds just the opposite. "[T]hese facts alone [the number of shares sold during the class period and resulting proceeds], without qualification or explanation, are ***insufficient*** under Ninth Circuit precedent." *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1184 (emphasis added), citing *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) ("[I]nsider trading is suspicious ***only when*** it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'") (emphasis added). "Courts ***must consider*** three relevant factors: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Quest*, 527 F. Supp. 2d at 1184-85 (emphasis added).

Although the court in *Quest* found, based on the specific facts of that case, that certain of the *Ronconi* factors were inapplicable, the facts here are distinguishable in at least one significant respect. In *Quest*, the Court found that defendant's pre-class period trading practices were effectively moot because plaintiff alleged that the backdating had been going on ever since the company had gone public. *Id.* at 1186-87. In other words, there was no trading period without the influence of allegedly backdated options with which to compare the class period sales. Here, in contrast, Semtech went public in 1967, and the CAC alleges that Mr. Poe has been an officer since 1985. CAC, ¶ 17;

1  Defendant Poe's Supplemental Request for Judicial Notice filed concurrently herewith

2  ("Def. Poe's Supp. RJN"), Ex. U at 11 (Semtech has been "publicly traded since

3  1967."); Ex. V at 16 (same).  Thus, at least ***nine years of public trading*** elapsed

4  between when Mr. Poe first joined Semtech and when the first allegedly backdated

5  option was granted.  CAC, ¶ 4 (alleging that Semtech's misdating of options dates back

6  to 1994).  Accordingly, unlike the situation in *Quest*, there is ample pre-class period

7  trading to which Plaintiff could have compared the class period activity, but did not.

8  Plaintiff's failure to do so is telling and defeats any inference of scienter based on

9  Defendants' stock sales during the class period.

10          **3.        Plaintiff's Reliance on the Special Committee's Assertions**

11                      **Cannot Overcome its Failure to Allege Particularized Facts**

12                      **Demonstrating Scienter.**

13          Without alleging any independent facts that tend to show Mr. Poe's supposed

14  intent to defraud, Plaintiff improperly relies on the contentions of the Special

15  Committee to raise an inference of scienter.  This approach fails for several reasons.

16          First, contrary to Plaintiff's mischaracterization of the Special Committee's

17  conclusions, these assertions – even if true – are insufficient to infer that Mr. Poe

18  intended to commit securities fraud.  Even Semtech itself (which Plaintiff contends

19  "admitted" Mr. Poe's intentional backdating in its restatement) concedes that "courts do

20  not automatically deem [special committee] references or characterizations of conduct

21  in such a report as sufficient to satisfy the rigorous pleading standards dictated by the

22  Reform Act."  Semtech's MTD at 12; *see, e.g.*, *Weiss v. Amkor Tech., Inc.*, 527 F. Supp.

23  2d 938, 952 (D. Ariz. 2007); *In re Read-Rite Corp. Sec. Litig.*, 335 F. 3d 843, 847-49

24  (9th Cir. 2003); *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 U.S. Dist.

25  LEXIS 93986, at **22-23 (N.D. Ill. July 12, 2006).  Indeed, in its recent *Batwin*

26  decision, this Court recognized that "a court need not accept as true….conclusory legal

27  allegations cast in the form of factual allegations."  *Batwin v. Occam Networks, Inc.*,

28  No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *7 (C.D. Cal. July 1, 2008).  In

1   short, it is well settled that a special committee's hindsight findings of misconduct on

2   the part of former executives are not sufficient to infer scienter under the Reform Act or

3   Rule 9(b).

4         Second, included among the Special Committee's assertions are a number of

5   *exculpatory* conclusions, such as misdated options that were *unfavorably* priced and

6   options that were misdated as a result of administrative errors.[5]  CAC at pp. 97, 98 and

7   100.  The CAC also acknowledges that certain grants were determined to have been

8   intentionally manipulated despite the absence of any "specific documentary evidence of

9   manipulation."  *Id.* at p. 94.  These concessions, which are found throughout the

10  restatement, erase any tenuous inference of scienter that might otherwise arise from the

11  Special Committee's hindsight assertions.

12        Third, Plaintiff concedes that for many years the Company employed a one-day

13  lookback period, meaning that an option grant could properly be priced as of the date of

14  the grant *or* as of the prior day's closing price.  *Id.* at pp. 100-101.  This one-day

15  lookback methodology, although technically "backdating," was expressly permitted

16  under the Company's stock option plans and ratified by the Board.  *Id.* at p. 101.  The

17  Company's unqualified approval and application of the one-day lookback period is

18  another example of how the Special Committee's assertions of "intentional

19  manipulation of grant dates," even if true, do not necessarily show an intent to defraud.

20        Finally, as discussed more fully above, even if the Special Committee's assertions

21  regarding backdating were correct, they do not establish Mr. Poe's scienter at the time

22  of the alleged misstatements.  Plaintiff's failure to allege any facts to bridge the gap

23  between the alleged manipulation of certain stock option grant dates from April 1997 to

24  May 2002, on the one hand, and Mr. Poe's purported intent to deceive investors by

25  _____

26  [5] Indeed, one of the factors found significant by the court in *Quest* in reaching a
    determination of scienter from the improper dating of options was "[t]he fact that none

27  of the option grant dates resulted in less-than-favorable results for Defendants…"  527
    F. Supp 2d at 1182.

28

1  issuing false financial disclosures in SEC filings between August 2002 and April 2006,

2  on the other hand, is fatal to the CAC.

3      **4.**  **Plaintiff's Failure to Provide Any Information Regarding the**

4      **Allegedly Misdated Option Grants Dooms Its Statistical**

5      **Analysis.**

6      Although Plaintiff makes the dramatic and unsupported claim that its paid expert

7  has calculated that there is a "0.00000%" probability that certain option grants were

8  dated absent manipulation, Plaintiff fails to identify a single stock option grant that

9  allegedly was analyzed.  CAC, ¶¶ 154-160.  While the CAC includes a series of charts

10  purporting to reflect certain stock option grant dates, Plaintiff never alleges that any of

11  them were among the grant dates considered by its expert, or even that such grants were

12  backdated.  *Id.*, ¶ 161 (merely alleging that the charted grants "coincided with low or

13  near low points in Semtech stock price").  Additionally, even for those option grants

14  reflected in the charts, the CAC fails to identify the "proper" measurement dates, the

15  number of options granted, any of the alleged recipients, or even the stock option plan

16  under which the option was purportedly granted.  *Id.*  Nor has Plaintiff alleged whether

17  such grants were discretionary or non-discretionary.  *See In re Asyst Techs., Inc.*

18  *Derivative Litigation*, No. C-06004669, 2008 U.S. Dist. LEXIS 41173, at **12-13

19  (N.D. Cal. May 23, 2008) ("Although Plaintiffs have alleged a statistical analysis in an

20  attempt to show backdating…, Plaintiffs have not made any allegations regarding

21  whether the stock option grants were discretionary or nondiscretionary, which is often

22  an important aspect of backdating.").

23      These omissions stand in stark contrast to the detailed analysis of grants in *Zoran*

24  and *Quest*, the cases principally relied on by Plaintiff to legitimize its so-called

25  statistical analysis.  In *Zoran*, the plaintiff alleged detailed information about each of the

26  allegedly backdated grants, including the grant recipients (which it corroborated by

27  submitting the corresponding Form 4's filed by the recipients with the SEC), the

28  circumstances surrounding the grant (such as the timing of the grant in relation to

1   significant corporate events), and the stock option plan under which the grant was made.

2   *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1008 ("For all grants he

3   alleges were backdated, plaintiff should also take care to allege the stock-option plan

4   under which they were granted.").

5       The plaintiff in *Quest* alleged the backdated option grants with a similar level of

6   specificity, which is notably absent here.  527 F. Supp. 2d at 1171-73 ("Plaintiff has

7   provided a highly detailed time line documenting the alleged backdating that occurred at

8   Quest.").  In *Quest*, the plaintiff alleged the stock option plan under which the subject

9   grants were made, as well as the number of options received by each defendant in

10  connection with each allegedly backdated grant.  *Id.*  In contrast, Plaintiff's charting of a

11  handful of "low point" grants and the bare allegation that Mr. Poe "received 376,865

12  backdated grants," without any explanation or corroborating information, simply cannot

13  survive a motion to dismiss.[6]  *In re Exodus Commc'ns., Inc. Sec. Litig.*, No. C 01-2661,

14  2005 U.S. Dist. LEXIS 20222, at *12 (N.D. Cal. Aug. 5, 2005) ("Conclusory

15  allegations, unsupported by the facts alleged, need not be accepted as true" in analyzing

16  a motion to dismiss.).

17           **5.      Plaintiff Has Failed to Allege Sufficient Facts to Infer Scienter**

18                  **by Virtue of Mr. Poe's Corporate Position.**

19      Although Plaintiff concedes that allegations of a defendant's corporate position

20  are insufficient to establish scienter, it asserts that because stock options were an

21  important tool in attracting potential employees to Semtech (and thus, part of Semtech's

22  "core business"), Mr. Poe must have been aware of the Company's alleged backdating.

23

24  _____

25  [6] In addition to the CAC's wholesale failure to allege particularized facts regarding the
    purportedly backdated grants, the CAC's backdating allegations suffer from the same
26  flaw as the other so-called "indicia of scienter."  Namely, Plaintiff fails to raise any
    inference as to Mr. Poe's mindset ***at the time*** of the alleged misstatements, as each of
27  the purportedly backdated grants substantially pre-date the allegedly false financial
    disclosures.

28

1   Opp. at 32-33.  Yet, in *South Ferry*, a case relied on by Plaintiff, the Ninth Circuit held

2   that this "core operations inference" generally is not enough to raise a strong inference

3   of scienter.  *South Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784-86 (9th Cir. 2008).

4   Rather, the Ninth Circuit held that "absent some additional allegation of specific

5   information conveyed to management and related to the fraud," general awareness of a

6   company's core business operations does ***not*** establish scienter.  *Id.* at 785 (emphasis

7   added).  Here, the CAC's vague allegations that, by virtue of his position, Mr. Poe was

8   "involved the day-to-day operations of the Company" and had access to "adverse

9   undisclosed information" fall well short of the standard articulated in *South Ferry*.

10          The other cases relied upon by Plaintiff to support its "core operations inference"

11   are also distinguishable.  In *Applied Signal*, stop work orders halted millions of dollars

12   of work with one of the company's most important customers and caused the company

13   to reassign between 50 and 75 employees.  *Berson v. Applied Signal Tech., Inc.*, 527 F.

14   3d 982, 988 (9th Cir. 2007).  The effect of the stop work orders was so dramatic that

15   they transformed the company's facilities into a "ghost town."  *Id.*  Given the

16   devastating impact on the company's business and operations, the Court inferred that

17   management was aware of stop work orders for scienter purposes.  *Id.* at 989.  Here,

18   unlike the stop work orders in *Applied Signal* that suddenly and radically transformed

19   the company's business, Semtech's stock option grants were a routine part of Semtech's

20   employee compensation, and often the result of administrative acts.  Given this glaring

21   distinction, *Applied Signal* is inapposite, and Plaintiff's attempt to "infer" knowledge of

22   the alleged backdating to Mr. Poe by virtue of his corporate position must be rejected.

23          *America West* is similarly inapposite.  There, it was inferred that certain of the

24   company's directors knew about aircraft maintenance problems because such problems

25   repeatedly had been raised by the FAA, including numerous inspections, warning

26   letters, and meetings to that effect.  *No. 84 Employer-Teamster Joint Council Pension*

27   *Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 926 & 942-43 (9th Cir. 2003).

28   Thus, although it may have been reasonable to infer that America West's directors were

aware of these significant and recurring maintenance problems, there were no such warnings for the officers and directors of Semtech at the time of the alleged backdating. Just the opposite; for each year of the Putative Class Period, Semtech's outside auditors issued unqualified audit opinions that Semtech's financial statements presented the Company's financial position fairly and in conformity with GAAP. *See* Def. Poe's RJN, Exs. A-D. Indeed, the only events that even arguably could be considered "warnings" did not occur until May 2006, when the first of the alleged "corrective disclosures" was issued. CAC, ¶ 127. In short, Plaintiff has alleged no facts to warrant an inference that Mr. Poe was somehow aware of the alleged backdating by virtue of his corporate position.

Finally, the Court should reject Plaintiff's baseless suggestion that Mr. Poe was "fired" from the Company. Opp. at 36 (referring to Semtech's "firings"). This mischaracterization is refuted by Semtech's public filings which demonstrate that in August 2006, Mr. Poe stepped down as Chairman of the Board and took a voluntary leave of absence from his directorship "to avoid even the appearance of a conflict of interest" while the Company investigated its stock option practices. Def. Poe's RJN, Ex. K. Mr. Poe permanently resigned his directorship on April 16, 2007. *Id.*, Ex. M. In any event, Mr. Poe's departure from the Company, however it is characterized, does not create a strong inference of scienter. *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) ("[W]hether [the defendants] were terminated or resigned, these notable departures are not in and of themselves evidence of scienter" because "most major stock losses are often accompanied by management departures.").

### 6. Plaintiff's Confidential Witness Statement Further Negates Any Inference of Scienter.

The only confidential witness ("CW") statement offered by Plaintiff actually *negates* any inference of scienter on Mr. Poe's part. Instead, the CW's statement corroborates the opposing inference that Semtech's stock option granting procedures,

1  although sometimes flawed and inconsistently applied, are devoid of any intent to
2  defraud.  According to the CAC, Mr. Poe informed the CW that a particular stock
3  option grant should be dated as of "the date of hire."  CAC, ¶ 186 (Plaintiff fails to
4  specify the grant date, grant recipient, exercise price, applicable stock option plan, or
5  any other relevant information about the grant that purportedly was discussed).  Yet,
6  Plaintiff concedes that "the Compensation Committee stated that all option grants
7  communicated via an offer letter would be granted to each employee *on his or her start*
8  *date*."  *Id.*, ¶ 148 at p. 95 (emphasis added). Thus, the allegation that Mr. Poe asked an
9  employee to do just that – *i.e.*, grant a stock option as of an employee's start date –
10  negates any inference that he was intending to defraud or mislead anyone.  At most, the
11  CW's statement shows that Mr. Poe was merely ensuring compliance with an express
12  Company policy.  Under no scenario does it infer, or even suggest, scienter on the part
13  of Mr. Poe.

14  **C.     The Court Should Reject Plaintiff's Self-Serving Efforts to Lower the**
15  **Loss Causation Pleading Standard.**

16  As a preliminary matter, Plaintiff is flatly wrong that loss causation is not
17  properly resolved on a motion to dismiss.  Opp. at 37.  In *Dura*, a case repeatedly cited
18  by Plaintiff, the United States Supreme Court reversed the Ninth Circuit and held that
19  the subject complaint's allegations of loss causation were legally insufficient to survive
20  a motion to dismiss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 348 (2005)
21  (holding that allegations of inflated purchase price are insufficient to survive a motion to
22  dismiss for lack of loss causation).  *Dura* is unquestionably still the governing law, and
23  Plaintiff has provided no reason why its holding should be ignored by this Court.

24  Additionally, Plaintiff's efforts to circumvent the pleading requirements of Rule
25  9(b) by latching onto the "some indication" language of *Dura* and *Daou* are on legally
26  flimsy ground, at best.  Plaintiff contends that it should be required to allege only "some
27  indication" of the economic loss and the causal connection between the purported loss
28  and the alleged misstatements.  Opp. at 36-37, *citing Dura*, 544 U.S. at 337*; In re Daou*

HOWREY LLP

1   *Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172

2   (2006).  In doing so, Plaintiff interprets *Dura* as holding that Rule 8(a)(2) (which

3   requires only a "short and plain statement"), as opposed to Rule 9(b) (which requires

4   that fraud allegations be "stated with particularity"), is the applicable pleading standard

5   for the element of loss causation.  Opp. at 36.  What Plaintiff ignores is the fact that the

6   Supreme Court in *Dura* openly acknowledged that it was applying the Rule 8(a)(2)

7   standard only "for argument's sake."  544 U.S. at 346.  Indeed, because *Dura*

8   determined that plaintiff's allegations of loss causation were insufficient even under the

9   less stringent Rule 8 pleading standard, it had no reason to apply the heightened Rule 9

10  standard.  *Id.*  Nor does *Gilead* conclusively resolve the issue of which pleading

11  standard applies to the element of loss causation.  *In re Gilead Sciences Sec. Litig.*, 536

12  F. 3d 1049, 1056 (9th Cir. 2008) ("We need not resolve this issue today….under either

13  Rule 8 or Rule 9, the Investors have sufficiently pleaded loss causation.").

14       Thus, while the issue has yet to be resolved by the courts, given the Reform Act's

15  emphasis on strict pleading standards to deter abusive securities fraud litigation, there is

16  no principled reason why loss causation, or any other element of a Section 10(b) claim,

17  should be subject to a lesser pleading standard.  *See Silicon Graphics*, 183 F.3d at 977-

18  78 (The Reform Act was "prompted by significant evidence of abuse in private

19  securities lawsuits.").  Indeed, one of the driving forces behind the Reform Act was

20  Congress' concern that even the heightened requirements of Rule 9(b) were inadequate

21  to deter meritless litigation.  *See* Joint Explanatory Statement of the Committee of

22  Conference, H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. 31 (1995), at 41 ([Rule

23  9(b)] has not prevented abuse of the securities laws by private litigants…").

24  Accordingly, to adopt the lesser pleading standard of Rule 8(a)(2), and thereby permit a

25  securities plaintiff to survive a motion to dismiss by alleging a "short and plain

26  statement" of loss causation, necessarily would frustrate Congressional intent.  Plaintiff

27  should be required to allege loss causation with same particularity as it would any other

28  element of a Section 10(b) claim.

**D.   Plaintiff's Stock Purchases *After* the Issuance of the Allegedly Corrective Disclosures Are Fatal to Its Causation Allegations.**

Regardless of the applicable pleading standard, Plaintiff's ability to allege causation is foreclosed by the fact that it continued to purchase Semtech stock even after the allegedly corrective disclosures were issued.  To properly allege a Section 10(b) claim, Plaintiff must allege causation on two separate levels:  transaction causation and loss causation.   "To prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction…." *Daou*, 411 F.3d at 1025; *Dura*, 544 U.S. at 343-44 (fraud plaintiff must allege that "had he known the truth, he would not have acted").  To prove loss causation, Plaintiff must allege an economic loss that was proximately caused by the Company's alleged misrepresentations.  *Dura*, 544 U.S. at 342-43.

Here, Plaintiff argues that loss causation is established by a number of "partial disclosures regarding Defendants' backdating fraud which resulted in partial adjustments to Semtech's stock price."  Opp. at 39-40.  Yet, in spite of this series of "partial disclosures" that purportedly "exposed" Semtech as an "option backdater," Plaintiff admittedly continued to purchase Semtech stock up through at least June 27, 2006, months *after* the first allegedly corrective disclosure was issued.  Def. Poe's RJN, Ex. T at 307, 310.

Simply put, Plaintiff cannot have it both ways.  If the disclosures issued in May and June 2006 truly were "corrective" in nature, yet Plaintiff nevertheless continued to purchase Semtech stock, Plaintiff cannot adequately allege transaction causation as to any purchases made after such disclosures.  As to these post-disclosure purchases, Plaintiff cannot allege that "but for" the revelation of the fraud, it would not have purchased Semtech stock, because ***that is precisely what it did***.  Alternatively, if Plaintiff alleges that the disclosures in May and June were not corrective disclosures (such that "but for" causation is satisfied for its stock purchases in late June 2006), these disclosures cannot form the basis of loss causation.  Either way, Plaintiff has failed to

1   properly allege a fundamental element of its Section 10(b) claim, and the Court should
2   dismiss the CAC accordingly.[7]

3        Finally, with respect to the very minimal price movements on the dates of the
4   allegedly corrective disclosures (including price *increases* on certain disclosure dates),
5   Plaintiff attempts to attribute this deficiency to "[market] distortions that prevent the
6   ideal of a free and open public market from occurring."  Opp. at fn 51.  Setting aside
7   Plaintiff's failure to allege any facts explaining what these "market distortions" might
8   be, its position directly contradicts the CAC's allegations that the market for Semtech's
9   stock was "highly efficient" and "promptly digested current information regarding
10  Semtech from all publicly available sources and reflected such information in Semtech's
11  stock price."  CAC, ¶ 199.  Moreover, *Gilead*, which Plaintiff relies on to rationalize the
12  time delay between the allegedly corrective disclosures and the decline in stock price, is
13  squarely distinguishable.  Opp. at fn 51.  In *Gilead*, the Court found that an FDA
14  warning letter plausibly caused a drop in stock price three months after the letter was
15  issued, but only because the effect of the warning letter was disclosed in a press release
16  issued immediately before the stock price drop.  536 F.3d at 1058.  Here, on the other
17  hand, Plaintiff has alleged no such delayed disclosure which could even conceivably
18  explain the lack of stock price drop on the various disclosure dates.  Rather, the only
19  plausible explanation is that the disclosures were not "corrective" at all and, thus, cannot
20  properly form the basis of Plaintiff's loss causation allegations.

21

22  ─────────────────

23  [7] In an apparent attempt to justify its post-disclosure purchases, Plaintiff posits that such
    purchases are justified because "many investors purchase stock *after* the artificial
24  inflation caused by a fraud has been removed from the stock when the remaining
    fundamentals of the company's future profitability appear promising."  Opp. at 42
25  (emphasis in original).  If that is the case (and Plaintiff certainly has not alleged any
    facts or authority to suggest that it is), then the Putative Class Period necessarily extends
26  too long.  Put another way, if the "artificial inflation" already had been removed
    sometime *before* July 19, 2006 (the end of the Putative Class Period), then Plaintiff
27  needs to allege when such correction occurred, and re-plead the class period
    accordingly.

28

**III.   CONCLUSION**

For all of the reasons set forth above, Defendant John D. Poe respectfully requests that the Court grant his motion to dismiss the Consolidated Amended Class Action Complaint with prejudice pursuant to Rule 12(b)(6).

Dated:  November 3, 2008

HOWREY LLP
Robert E. Gooding, Jr.
Roman E. Darmer
Todd W. Smith


By:  /s/ Roman E. Darmer
     ROMAN E. DARMER

MUNGER, TOLLES & OLSON LLP
Bart H. Williams
Jacob S. Kreilkamp

Attorneys for Defendant
JOHN D. POE

HOWREY LLP