1  THOMAS A. ZACCARO (SB# 183241)
   (thomaszaccaro@paulhastings.com)
2  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   515 South Flower Street, Twenty-Fifth Floor
3  Los Angeles, CA  90071-2228
   Telephone:  (213) 683-6000
4  Facsimile:  (213) 627-0705

5  CHRISTOPHER H. McGRATH (SB# 149129)
   (chrismcgrath@paulhastings.com)
6  MORGAN J. MILLER (SB# 207896)
   (morganmiller@paulhastings.com)
7  KIMBERLEY A. DONOHUE (SB# 247027)
   (kimberleydonohue@paulhastings.com)
8  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   4747 Executive Drive, 12th Floor
9  San Diego, CA  92121
   Telephone:  (858) 458-3000
10 Facsimile:  (858) 458-3005

11 Attorneys for Defendants
   *Semtech Corporation, Jason L. Carlson,*
12 *and Mohan R. Maheswaran*

13            UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15                  WESTERN DIVISION

16

17 IN RE SEMTECH CORPORATION          CASE NO.  2:07-cv-07114-CAS (FMOx)
   SECURITIES LITIGATION
18  _____       **MOTION BY SEMTECH TO QUASH
                                        AND/OR MODIFY SUBPOENA
19                                      ISSUED BY PLAINTIFF TO ERNST
                                        & YOUNG LLP; JOINT
20                                      STIPULATION OF PARTIES
                                        PURSUANT TO LOCAL RULE 37-2**
21
22                                      Date:       September 9, 2009
                                        Time:       10:00 a.m.
23                                      Ctrm.:      F
                                        Judge:      Hon. Fernando M. Olguin
24
                                        Discovery Cut-Off:  August 9, 2010
25                                      Pre-Trial Conf.:    February 28, 2011
                                        Trial Date:         March 29, 2011
26
27
28

1

# **TABLE OF CONTENTS**

2

**Page**

3

4  I.    DEFENDANT'S INTRODUCTORY STATEMENT .................................... 1

5  II.   PLAINTIFF'S INTRODUCTORY STATEMENT ..................................... 3

6  III.  DISPUTED SUBPOENA ISSUED BY PLAINTIFF TO ERNST & YOUNG LLP ........................................................................... 4

7

8        A.    Disputed Document Requests ................................................. 4

9              1.    Document Request 1 ................................................. 4

10             2.    Document Request 3 ................................................. 5

11             3.    Document Request 4 ................................................. 5

12             4.    Document Request 5 ................................................. 5

13             5.    Document Request 6 ................................................. 6

14             6.    Document Request 7 ................................................. 6

15             7.    Document Request 8 ................................................. 6

16             8.    Document Request 9 ................................................. 7

17             9.    Document Request 10 ............................................... 7

18             10.   Document Request 12 ............................................... 7

19             11.   Document Request 13 ............................................... 8

20             12.   Document Request 16 ............................................... 8

21             13.   Document Request 17 ............................................... 8

22             14.   Document Request 18 ............................................... 9

23             15.   Document Request 19 ............................................... 9

24             16.   Document Request 20 ............................................... 9

25             17.   Document Request 22 ............................................... 9

26             18.   Document Request 23 ............................................. 10

27       B.    Defendant's Contentions ..................................................... 10

28       C.    Plaintiff's Contentions ....................................................... 11

1

### TABLE OF CONTENTS
2
(continued)

Page
3

4    IV.    DEFENDANT'S ARGUMENT ...................................................................... 11

5          A.    Relevant Facts And Background ........................................................ 11

6          B.    The Special Committee Materials And Special Litigation
                  Committee Materials Sought By Plaintiff Are Protected From
7                Disclosure By The Attorney-Client Privilege .................................... 17

8          C.    The Special Committee Materials And Special Litigation
                  Committee Materials Constitute Opinion Work Product Subject
9                To Nearly Absolute Protection ........................................................... 18

10         D.    Plaintiff Cannot Show A "Compelling" Need For The Opinion
                  Work Product Of Fenwick And Morrison ........................................... 22

11
           E.    The Special Committee Materials And Special Litigation
12               Committee Materials Provided To Ernst & Young Retain Their
                  Attorney-Client And Work Product Privileges .................................. 23
13
           F.    The Special Committee's Investigative Report And Related
14               Materials Produced To The Government Retain Their Attorney-
                  Client And Work Product Privileges .................................................. 26
15
                 1.    The Special Committee Had No Effective Choice But To
16                     Cooperate With The Government's Requests .......................... 26

17               2.    The Special Committee And The Government Shared A
                        Common Interest Sufficient To Maintain The Attorney-
18                     Client And Work Product Privileges ....................................... 29

19               3.    The Special Committee's Confidentiality Agreements
                        With The SEC And USAO Maintain The Attorney-Client
20                     And Work Product Privileges As To Third Parties ................. 30

21         G.    The Special Litigation Committee Materials Produced In
                  Connection With The Derivative Litigation Retain Their
22               Attorney-Client And Work Product Privileges .................................. 33

23               1.    Protected Documents Were Produced Only To Facilitate
                        The Court's Assessment Of The Motion To Terminate .......... 33
24
                 2.    The Special Litigation Committee Was Compelled To
25                     Produce The Morrison Report To The Derivative
                        Plaintiffs ................................................................................. 34
26
                 3.    The Protective Order And Filing Of The Morrison Report
27                     Under Seal Preclude Waiver .................................................... 35

28

1

## TABLE OF CONTENTS
(continued)

2

Page

3

4   H.   The Court Should Quash The Subpoena Issued To E&Y For The
Independent Reason That It Places An Undue Burden On A
5   Non-Party ........................................................................................ 36

6   I.   Conclusion ....................................................................................... 37

7   V.   PLAINTIFF'S ARGUMENT ..................................................................... 37

8   A.   Relevant Facts And Background ...................................................... 37

9   B.   Semtech Has Waived Any Attorney-Client and Attorney Work
Product Protection That Might Have Applied To The Reports Or
10   Associated Documents Produced To Third Parties ........................... 37

11   1.   The Production Of Allegedly Protected Documents To
The Government Constitutes A Waiver ................................... 39

12
2.   The Production Of Allegedly Protected Documents To
13   NASDAQ Constitutes A Waiver ............................................. 40

14   3.   The Production Of Allegedly Protected Documents To
Ernst & Young Constitutes A Waiver ..................................... 41

15
C.   Semtech Has Waived The Attorney-Client And Attorney Work
16   Product Protection That Might Have Applied To The Reports Or
Associated Documents Produced In The Derivative Litigation ........ 42

17
1.   The Production Of Allegedly Protected Documents In
18   Support Of Semtech's Motion To Terminate Constitutes
A Waiver .................................................................................. 43

19
2.   The Production Of Allegedly Protected Documents To
20   The Derivative Plaintiffs Constitutes A Waiver ...................... 45

21   3.   The Filing Of Any Allegedly Protected Documents Under
Seal Does Not Preclude Waiver .............................................. 46

22
D.   Conclusion ....................................................................................... 46
23

24

25

26

27

28

## I.   DEFENDANT'S INTRODUCTORY STATEMENT

Semtech Corporation is contesting this subpoena by Lead Plaintiff Mississippi Public Employees' Retirement System because it impermissibly seeks the production of attorney work product from prior investigative efforts undertaken by special committees of Semtech's board of directors — that as a matter of black letter law are afforded near absolute protection by the courts.  Plaintiff should be required to develop its own case in support of the securities fraud allegations it has advanced in this action.  This is not a case where Plaintiff has a demonstrated "compelling need" for information otherwise unavailable to it.  Instead, Plaintiff merely "wants" the investigative attorneys' opinions and mental impressions — and seeks access to privileged and confidential work product generated by other counsel so that it need not pursue its own discovery and analysis.  Unfortunately for Plaintiff "want" is not an adequate substitute for a "compelling need."  This Court should reject Plaintiff's attempted short-cut, and instead quash or modify the subpoena in the manner Semtech urges below.

Like hundreds of other public companies, Semtech learned in May 2006 of issues associated with its historical accounting for stock option grants.  Semtech's board of directors responded by forming a Special Committee of independent directors which promptly undertook an investigation through outside legal counsel Fenwick & West LLP.  The board subsequently also formed a Special Litigation Committee to investigate and assess option-related claims alleged in then pending shareholder derivative actions before this Court.  The Special Litigation Committee retained Morrison & Foerster LLP.  All of these efforts were undertaken in anticipation of litigation.  This discovery dispute with Plaintiff arises from Plaintiff's subpoena efforts to burden Semtech's auditor, non-party Ernst & Young LLP, with overbroad and unduly burdensome discovery requests for the attorney work product generated in connection with both of these investigations.

As courts have repeatedly recognized, public companies operate in a highly regulated arena, and by necessity are frequently forced to disclose in a limited manner the product of such special committee investigations with both governmental regulators and their outside auditors, upon whom their ability to continue to function as a public company depends.[1]  Courts have further recognized that it would be unfair if such compelled disclosure of work product demanded by regulators constituted a waiver as to third-party litigants like Plaintiff, and therefore have frequently declined to impose such a result upon companies like Semtech.[2] That is precisely what occurred here.  Semtech's Special Committee produced work product to governmental regulators in response to threats of increased scrutiny and possible criminal indictment.  The materials were also produced to Ernst & Young, as a necessary prerequisite to file Semtech's financial statements, which could not be accomplished without Ernst & Young's authorization which was withheld absent production.  These selective productions were made pursuant to confidentiality agreements with the regulators, and Ernst & Young was already required to maintain them in confidence under applicable accounting rules.  As the governing case law provides, such "compulsory" productions, whether to the regulators or the auditors, are deemed "involuntary" for waiver purposes.[3]  Moreover, courts declining to impose a waiver under these circumstances also recognize that regulators and auditors share an interest with the Company in investigating the

---

[1]    *See, e.g., United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) (finding the pressure imposed on corporation under investigation to cooperate with the government's investigations as unconstitutional).

[2]    *See, e.g., Regents of the University of California v. Superior Court*, 165 Cal. App. 4th 672 (Cal. Ct. App. 2008) (finding corporate defendant's production of material to a government agency operating under the Thompson Memorandum constituted coercion under California law and thus not a waiver of the privilege).

[3]    *See, e.g., Transamerica Computer Co., Inc. v. Int'l Bus. Mach. Corp.*, 573 F.2d 646 (9th Cir. 1978) ("disclosure of confidential material constitutes a waiver of the attorney-client privilege only if it is voluntary and not compelled").

-2-

1   option grant practices and related accounting practices.[4]  When production is

2   compelled or consistent with the common interests of the parties, as a matter of law

3   the attorney-client and work product privileges are deemed to be maintained.

4          Absent such a waiver, clearly plaintiff cannot demonstrate both that the

5   investigative attorneys' mental impressions are at issue in this case **and** a

6   "compelling" need for these materials necessary to obtain the opinion work product

7   of the special committee counsel.  Plaintiff is free to depose witnesses and review

8   documents at issue in the Semtech investigations and develop its own case.  That is

9   the appropriate outcome here.  Semtech respectfully requests that the Court quash

10  or modify the subpoena issued to Ernst & Young for the reasons detailed herein and

11  maintain the protection of these attorney work product documents from discovery

12  by Plaintiff.

13  ## II.   PLAINTIFF'S INTRODUCTORY STATEMENT

14         Neither the attorney-client privilege nor the attorney work product doctrine

15  protects the documents that are covered by Plaintiff's subpoena.  Where, as here,

16  Semtech has produced the allegedly protected documents to numerous third parties,

17  the alleged privileges and protections for those documents are waived.  Semtech

18  produced the allegedly protected documents to the United States Securities and

19  Exchange Commission ("SEC"), the United States Attorney's Office ("USAO"),

20  the NASDAQ, outside auditor Ernst & Young, and filed the allegedly protected

21  documents with the court in support of its motion to terminate the derivative

22  litigation.  Any one of these individual third party productions waives the alleged

23  ───────────────

24  [4]     *See*, *e.g.*, *In re JDS Uniphase Corp., Sec. Litig.*, 2006 WL 2850049, at *1
     (N.D. Cal. Oct. 5, 2006) (identifying the prevailing view that disclosure to an
     outside auditor does not waive the work product protection); *United States v.*

25  *Deloitte & Touche USA LLP*, 2009 WL 1606501 (D.D.C. June 8, 2009) (same); *In*
     *re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150 (S.D.N.Y. Jan. 26, 2007)

26  (upholding privilege on the grounds that the government and a board committee
     shared a "common interest in developing legal theories and analyzing information"

27  regarding potential financial irregularities) (internal citation omitted); *In re*
     *McKesson HBOC, Inc. Sec. Litig.*, 2005 WL 934331 (N.D. Cal. Mar. 31, 2005)

28  (same).

1   privileges and protections claimed by Semtech.  Collectively, these numerous third

2   party productions make it impossible for Semtech to argue that any attorney-client

3   privilege or work product protection still attaches to the requested documents.

4          Even if Semtech had not produced the allegedly protected documents to

5   numerous third parties, the filing of the requested documents in support of the

6   motion to terminate would alone be sufficient to constitute a waiver all privileges

7   and protections.  On this point, the law is clear.  In virtually every decision that has

8   addressed the issue presented here, the court has found that a party waives the

9   attorney-client privilege and attorney work product protection where it voluntarily

10  submits a special litigation committee ("SLC") report and supporting memoranda in

11  connection with a dispositive motion, such as a motion to terminate.  *See e.g. Joy v.*

12  *North*, 692 F.2d 890 (2d Cir. 1982); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302 (7th

13  Cir. 1984); *Zitin v. Turley*, No. CIV 89-2016-PHX-CAM, 1991 U.S. Dist. LEXIS

14  10084 (D. Ariz. June 25, 1991); *In re Oracle Secs. Litig.*, No. C-01-0988 MJJ

15  (JCS), 2005 U.S. Dist. LEXIS 46931 (N.D. Cal. August 5, 2005).  Ninth Circuit

16  precedent is in accord – everyone has a right to inspect documents used in the

17  adjudication stages of litigation.  *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d

18  1122, 1134 (9th Cir. 2003).

19  **III.   DISPUTED SUBPOENA ISSUED BY PLAINTIFF TO ERNST &**
20  **        YOUNG LLP**

21          Pursuant to Local Rule 37-2, the parties have met and conferred, and the

22  disputed document requests in Plaintiff's subpoena issued to E&Y are set forth

23  below:

24          **A.     Disputed Document Requests**

25                  **1.     Document Request 1**

26          All documents, including but not limited to engagement summaries,

27  workpapers, indices and audit memoranda, in connection with the engagement of

28  E&Y by Semtech for the fiscal years 1996 through 2006 relating to: stock options

-4-

including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions,[] APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 2.    Document Request 3

All documents concerning communications between or among (a) E&Y and (b) the Board of Directors or the Audit Committee relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 3.    Document Request 4

All reports, presentation booklets, workpapers, correspondence, memoranda, or other documents prepared or received by E&Y relating to meetings with the Board of Directors, the Audit Committee or any other committee of the Board of Directors relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 4.    Document Request 5

All workpapers or other documents prepared or received by E&Y concerning E&Y's quarterly reviews for Semtech for each quarter during the period from December 31, 1999 through the present relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking

1   evidence of approval, grants modified after ratification, post termination

2   arrangements, and pricing exceptions, APB 25, stock based compensation expense,

3   related party transactions, compensation to Semtech employees and/or directors,

4   and loans to Semtech employees or directors.

5   **5.    Document Request 6**

6   All workpapers or other documents prepared or received by E&Y concerning

7   the internal auditing staff of Semtech  and meetings with and communications to

8   internal auditing staff relating to: stock options including, without limitation, grants

9   to continuing employees, grants to new employees, grants lacking evidence of

10  approval, grants modified after ratification, post termination arrangements, and

11  pricing exceptions, APB 25, stock based compensation expense, related party

12  transactions, compensation to Semtech employees and/or directors, and loans to

13  Semtech employees or directors.

14  **6.    Document Request 7**

15  All documents, including the underlying accounting data and all

16  corroborating information used by E&Y, upon which E&Y relied in assessing the

17  integrity and/or efficiency of Semtech'[s] internal accounting controls relating to:

18  stock options including, without limitation, grants to continuing employees, grants

19  to new employees, grants lacking evidence of approval, grants modified after

20  ratification, post termination arrangements, and pricing exceptions, APB 25, stock

21  based compensation expense, related party transactions, compensation to Semtech

22  employees and/or directors, and loans to Semtech employees or directors.

23  **7.    Document Request 8**

24  All documents concerning Semtech's internal accounting controls or systems

25  of internal controls relating to: stock options including, without limitation, grants to

26  continuing employees, grants to new employees, grants lacking evidence of

27  approval, grants modified after ratification, post termination arrangements, and

28  pricing exceptions, APB 25, stock based compensation expense, related party

transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 8.      Document Request 9

All audit programs, audit plans, procedures, instructions or interpretations for Semtech during the Relevant Time Period relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 9.      Document Request 10

All documents which constitute or are included in E&Y's correspondence files and/or permanent files on Semtech relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 10.     Document Request 12

All documents containing reports, whether financial or otherwise, prepared by E&Y concerning Semtech or its financial statements relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

1          **11.    Document Request 13**

2          All documents which evidence, reflect, summarize or refer to each instance

3   wherein Semtech or any of its employees, officers, directors or agents disagreed

4   with the conclusion, position or recommendations contained in any report, financial

5   statement or other document prepared by E&Y in connection with its engagement

6   of Semtech relating to: stock options including, without limitation, grants to

7   continuing employees, grants to new employees, grants lacking evidence of

8   approval, grants modified after ratification, post termination arrangements, and

9   pricing exceptions, APB 25, stock based compensation expense, related party

10  transactions, compensation to Semtech employees and/or directors, and loans to

11  Semtech employees or directors.

12         **12.    Document Request 16**

13         All documents concerning any accounting errors or irregularities at Semtech

14  and any investigations thereof relating to: stock options including, without

15  limitation, grants to continuing employees, grants to new employees, grants lacking

16  evidence of approval, grants modified after ratification, post termination

17  arrangements, and pricing exceptions, APB 25, stock based compensation expense,

18  related party transactions, compensation to Semtech employees and/or directors,

19  and loans to Semtech employees or directors.

20         **13.    Document Request 17**

21         All documents concerning any possible, potential, or actual restatement of

22  Semtech'[s] previously issued financial statements relating to: stock options

23  including, without limitation, grants to continuing employees, grants to new

24  employees, grants lacking evidence of approval, grants modified after ratification,

25  post termination arrangements, and pricing exceptions, APB 25, stock based

26  compensation expense, related party transactions, compensation to Semtech

27  employees and/or directors, and loans to Semtech employees or directors.

28

### 14.    Document Request 18

All documents concerning or consisting of any communications between E&Y and the Individual Defendants relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors, separately all counsel for defendants, FTI Consulting, Inc.; Kroll, Inc.; Fenwick & West, LLP; and Navigant Consulting, Inc.

### 15.    Document Request 19

All documents sent to, received from, filed with or relating to any communications between E&Y and any other governmental or regulatory agency, including the SEC, concerning or relating to Semtech.

### 16.    Document Request 20

All documents referring, relating to, or constituting any investigations, audits, examinations or studies conducted internally or by any governmental or regulatory agency concerning Semtech relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination arrangements, and pricing exceptions, APB 25, stock based compensation expense, related party transactions, compensation to Semtech employees and/or directors, and loans to Semtech employees or directors.

### 17.    Document Request 22

All documents concerning all Audit Committee and Special Committee investigations during the relevant time period relating to: stock options including, without limitation, grants to continuing employees, grants to new employees, grants lacking evidence of approval, grants modified after ratification, post termination

1   arrangements, and pricing exceptions, APB 25, stock based compensation expense,

2   related party transactions, compensation to Semtech employees and/or directors,

3   and loans to Semtech employees or directors.

4                 **18.    Document Request 23**

5         All documents concerning investigations of Semtech'[s] accounting practices

6   and/or internal controls conducted by any person or entity other than the Audit

7   Committee.

8         **B.    Defendant's Contentions**

9         Semtech objects to Document Requests 1, 3-10, 12-13, 16-20, and 22-23 to

10   the extent Plaintiff seeks documents protected by the attorney-client privilege

11   and/or work product doctrine, including documents related to the special committee

12   investigations of the Company's historical stock option granting practices.  The

13   disputed documents include the investigative reports prepared by counsel for the

14   Special Committee and the Special Litigation Committee; attorney interview

15   memoranda; hardcopy and electronic documents determined to be relevant by

16   counsel for the committees regarding the issues under investigation; email and other

17   communications between counsel for Semtech, the Special Committee and the

18   Special Litigation Committee, and their advisors, and E&Y concerning the matters

19   under investigation; and documents created by E&Y that incorporate, reflect, or

20   describe the aforementioned materials.

21         Semtech further objects to Plaintiff's subpoena to the extent it seeks

22   documents also in the possession of Defendants.  Plaintiff initially issued its

23   subpoena to E&Y only days after serving its First Request for Production of

24   Documents on All Defendants, which requested many of the same documents

25   Plaintiff now seeks from E&Y.  Plaintiff cannot show the necessity of burdening

26   E&Y to produce documents in the possession of defendants when it has not

27   exhausted its efforts to obtain those same documents from the parties to this

28   litigation.  Accordingly, it would be an undue burden to require E&Y to produce

1  documents responsive to the disputed requests.[5]

2  ### C.   Plaintiff's Contentions

3      Semtech has no basis to object to Plaintiff's Third Party Document Requests

4  where the alleged privileges and protections are waived.

5      Semtech cannot reasonably object to Plaintiff's Document Requests as overly

6  burdensome on E&Y.  Aside from having no standing to make this argument,

7  Semtech has no way to determine whether the production by anyone but itself is

8  overly burdensome.

9      Although Semtech object to Plaintiff's Documents Requests as duplicative,

10  Plaintiff has been given no information that indicates the extent to which Semtech

11  is also in possession of documents responsive to Plaintiff's Document Requests.

12  Likewise, Plaintiff cannot ascertain the extent of duplicative responsive documents

13  that may be in the possession of E&Y, Semtech, or other third parties.

14      To efficiently address what will likely be the same or similar objections to

15  Plaintiff's Requests for Documents from other third parties based on substantially

16  the same alleged attorney client privilege and work product protection arguments,

17  Plaintiff respectfully request that this Court determine that any privileges or

18  protections of the requested documents are effectively waived.

19  ## IV.   DEFENDANT'S ARGUMENT

20  ### A.   Relevant Facts And Background

21      On May 16, 2006, a third-party research report was published suggesting that

22  certain stock option grants by Semtech and over thirty other public companies may

23  have been retroactively priced or backdated.  Declaration of Morgan J. Miller in

24  Support of Semtech Corporation's Motion to Quash Subpoena Issued by Plaintiff to

25  Ernst & Young LLP ("Miller Decl.") at ¶ 2.  On May 18, 2006, Semtech received a

26  ---

[5]   E&Y's remaining internal audit workpapers are not the subject of this motion
27  to quash.  During the meet and confer discussions, Semtech notified Plaintiff it does
not contest E&Y's production of such materials to the extent consistent with E&Y's
objections and responses.  This motion does not adjudicate E&Y's objections and
28  responses.

letter from the Securities and Exchange Commission ("SEC") notifying the Company that it had initiated an investigation into Semtech's historical stock option practices.  *Id.* at ¶ 3.  A grand jury subpoena also was issued by the U.S. Attorney's Office for the Southern District of New York ("USAO") notifying the Company of its parallel investigation.  *Id.*  A flood of federal and state court shareholder actions against Semtech and certain of its officers and directors followed, including the instant action.  *Id.* at ¶ 4.  The first lawsuit was filed on May 26, 2006.  Miller Decl. at ¶ 4.

Shortly after learning of the government inquiries, on or about June 7, 2006, the Board of Directors charged the Audit Committee with undertaking an internal investigation of Semtech's stock option grant practices and related accounting.  *Id.* at ¶ 5.  On June 9, 2006, the Audit Committee retained outside counsel, Fenwick & West LLP ("Fenwick"), to assist in its investigation and report to the Audit Committee its recommendations, findings and advice.  Declaration of Emmett C. Stanton in Support of Semtech Corporation's Motion to Quash Subpoena Issued by Plaintiff to Ernst & Young LLP ("Stanton Decl.") at ¶ 2.  Fenwick retained Navigant Consulting, Inc. ("Navigant") to provide expert accounting advice and analysis in connection with the investigation.  *Id.* at ¶ 2.  Certain members of the Audit Committee who had previously served on the Compensation Committee recused themselves from the investigation early in July 2006.  Miller Decl. at ¶ 5.  Thereafter, on July 12, 2006, the Board appointed a committee comprised solely of independent directors (the "Special Committee"), providing the Special Committee with the full authority and resources to continue the investigation.  Stanton Decl. at ¶ 5.  Fenwick's investigation was undertaken in anticipation of litigation; in fact, the related shareholder lawsuits and government investigations were pending when Fenwick's investigation began.  *Id.* at ¶ 4.

As part of its investigation, the Fenwick attorneys conducted 26 interviews of 17 Semtech directors, employees and consultants, and prepared interview

memoranda describing those interviews. *Id.* at ¶ 6. The memoranda contained the mental impressions of the Fenwick attorneys and were not, nor intended to be, verbatim transcriptions of the interviews. *Id.* The interview memoranda were provided to Navigant for its comments and review as part of Navigant's role providing expert accounting advice to Fenwick. *Id.* at ¶ 8. Navigant also prepared accounting analysis of the relevant stock option grants at the direction of Fenwick. *Id.* Ultimately, Fenwick's interview memoranda, Navigant's accounting analysis, and other investigative work product formed part of the basis for the report provided by Fenwick to the Special Committee (the "Fenwick Report"). *Id.* at ¶ 9.

Similar to the Special Committee's investigation, the SEC and USAO investigated the facts and circumstances surrounding Semtech's historical stock option grant practices. *Id.* at ¶ 10. The SEC and USAO demanded that the Special Committee produce documents related to its investigation, specifically including Fenwick's work product. *Id.* The Special Committee notified the SEC and USAO that it intended to cooperate fully with the investigation and sought to protect attorney-client and work product privileges as to third parties; however, it had little choice but to acquiesce to the government's demand. *See id.* The policies of the SEC and USAO at the time were articulated in the SEC's October 31, 2001 "Seaboard Report"[6] and the Department of Justice's January 20, 2003 "Thompson Memorandum."[7] These policies effectively required the Special Committee to demonstrate its cooperation by agreeing to produce materials otherwise protected by the attorney-client privilege or attorney work product doctrine. The Thompson Memorandum, named after then-Deputy Attorney General Larry Thompson,

---

[6]     SEC "Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions" (the "Seaboard Report"). Miller Decl., Exhibit C.

[7]     Department of Justice memorandum regarding the "Principles of Federal Prosecution of Business Organizations" (the "Thompson Memorandum"). Miller Decl., Exhibit D.

1    required that federal prosecutors, in determining whether or not to charge a

2    corporation, consider the willingness of a corporation to "disclose the complete

3    results of its internal investigation" and to "waive attorney-client and work product

4    protection."  Miller Decl., Exhibit C at § VI.A.  A public company such as Semtech

5    under threat of criminal indictment effectively had no choice but to "cooperate" and

6    provide the privileged materials demanded by the government.

7         In determining to cooperate with the SEC and USAO, and predicated on the

8    common interests shared between the Special Committee and the government in

9    investigating and uncovering potential wrongdoing, the Special Committee utilized

10   the available safeguards to selectively disclose its work product to the government

11   by first entering into a confidentiality agreement with each agency.  Stanton Decl.

12   at ¶¶ 10-14.  The agreements were consistent with the standard confidentiality and

13   non-waiver agreements routinely executed by the SEC and USAO, and provided

14   that the government would maintain the confidentiality of the documents and not

15   assert that the Special Committee's production constituted a waiver of any attorney-

16   client privileges or attorney work product protections as to any third party.  *Id.* at

17   ¶¶ 11-12.  These agreements also expressed the mutual interests of the government

18   and the Special Committee in investigating and analyzing the events at issue.  *Id.* at

19   ¶ 12.

20        In response to the demands by the SEC and USAO, the Special Committee

21   produced the Fenwick Report, the Fenwick interview memoranda and compilations

22   of selected underlying documents identified by Fenwick attorneys.  *Id.* at ¶ 14.

23   These documents were produced pursuant to the Special Committee's agreements

24   with the SEC and USAO for confidential treatment.  *Id.*  The confidentiality

25   agreements precluded disclosure to third parties except to the extent necessary for

26   the two agencies to discharge their duties, a standard condition required by each

27   agency to enter into the agreements.  *Id.* at ¶ 12.  Neither the SEC nor USAO have

28   notified Semtech that it was a target or subject of the Grand Jury Subpoena.  Miller

-14-

1   Decl. at ¶ 10.  Similarly, there has been no indication to date that either the SEC or

2   USAO intends to prosecute Semtech or to seek disgorgement or penalties from

3   Semtech.  *Id.*

4           Consistent with the recommendations of the Special Committee, in October

5   2006, Semtech's Board established a Special Litigation Committee of disinterested

6   directors to assess the claims in the shareholder derivative suits.  Declaration of

7   Darryl P. Rains in Support of Semtech Corporation's Motion to Quash Subpoena

8   Issued by Plaintiff to Ernst & Young LLP ("Rains Decl.") at ¶¶ 2-3.  The Special

9   Litigation Committee retained Morrison & Foerster LLP ("Morrison") to conduct

10  an investigation concerning the derivative claims and to report to the Special

11  Litigation Committee its recommendations, findings and advice.  *Id.* at ¶¶ 5-6.

12          Morrison's investigation included an analysis of the record previously

13  compiled by Fenwick and Navigant on behalf of the Special Committee, including

14  the Fenwick Report and Fenwick's interview memoranda.  *Id.* at ¶ 8.  In addition,

15  Morrison conducted its own interviews of current and former Semtech employees

16  and directors, collected and reviewed documents relevant to the shareholder

17  derivative suits, and performed legal analysis concerning the derivative claims.  *Id.*

18  On or about March 7, 2007, Morrison prepared a report of its investigation on

19  behalf of the Special Litigation Committee (the "Morrison Report").  *Id.* at ¶ 9.  The

20  Morrison Report was accompanied by two binders of supporting exhibits and

21  reflected Morrison attorneys' mental impressions, thoughts, and legal analysis of

22  the legal and factual issues presented in the investigation and related derivative

23  claims.[8]  *Id.*  Neither the Morrison Report nor the work product of the Morrison

───────────────

24  [8]      On July 17, 2007, Semtech filed a *Motion to Dismiss the Derivative
    *Complaints Pursuant to Rule 23.1 or in the Alternative Motion for Summary*
25  *Judgment* ("Motion to Terminate") in the consolidated derivative litigation, *In re
    Semtech Corporation Derivative Litigation*, Case No. CV-06-03510, which was
26  pending in the United States District Court for the Central District of California.  In
    connection with the Motion to Terminate, Semtech filed the Morrison Report and
27  certain of the exhibits thereto, including portions of the Fenwick Report and
    excerpts from certain of Fenwick's interview memoranda.  These materials were
28  filed under court-ordered seal and pursuant to a protective order.  Production of

1  attorneys have been requested by or produced to the SEC or USAO.  *See* Miller

2  Decl. at ¶ 10.

3        Ernst & Young has served as Semtech's outside auditor since 2003, and was

4  Semtech's outside auditor with respect to the restatement of the financial statements

5  in question.  Declaration of Matthew Snow in Support of Semtech Corporation's

6  Motion to Quash Subpoena Issued by Plaintiff Ernst & Young LLP ("Snow Decl.")

7  at ¶¶ 2-3.  E&Y did not participate in the Special Committee's investigation but

8  requested information about the investigation in connection with its audit of the

9  restatement.  Stanton Decl. at ¶ 18; Snow Decl. at ¶ 4.  Based upon E&Y's

10  statement that its consideration of the internal investigations was necessary to

11  complete its audit of Semtech's restatement, the Special Committee provided the

12  Fenwick Report, Fenwick's interview memoranda and other investigative materials

13  previously produced to the government.[9]  Stanton Decl. at ¶ 18; Snow Decl. at ¶ 4.

14  The Special Litigation Committee likewise produced the Morrison Report and its

15  related exhibits to E&Y in connection with its audit.  Rains Decl. at ¶ 10; Snow

16  Decl. at ¶ 5.  Specifically, the disputed documents maintained by E&Y that are

17  sought by Plaintiff consist of several thousands of pages of electronic and hard

18  copy documents, including:

19          o  The Fenwick Report, Fenwick's interview memoranda, and

20             hardcopy and electronic documents determined by Fenwick

21             and/or Navigant to be relevant to the issues under investigation;

22          o  The Morrison Report and its related exhibits;

23          o  Email and other communications between counsel for Semtech,

24  these materials was required for the Court to adjudicate the Motion to Terminate.
   This litigation was subsequently settled.  Miller Decl. at ¶¶ 8-9; Rains Decl. at ¶ 11.

25
   [9]     The Special Committee also provided the Fenwick Report to Paul, Hastings,

26  Janofsky & Walker LLP, the company's outside counsel, Nasdaq, and certain
   members of Semtech's Board and senior management to whom disclosure was

27  necessary for the Company to complete its restatement and related disclosures, with
   the understanding that the Fenwick Report would remain confidential.  Stanton

28  Decl. at ¶ 15.

1  the Special Committee and the Special Litigation Committee

2  and E&Y concerning the matters under investigation; and

3  o  Documents created by E&Y that incorporate, reflect, or describe

4  the aforementioned materials.

5  E&Y holds these documents as confidential pursuant to its ethical duties, and

6  has not disclosed them to any third parties.  Snow Decl. at ¶ 9; Stanton Decl. at ¶

7  19; Rains Decl. at ¶ 10.

8  **B.     The Special Committee Materials And Special Litigation
   Committee Materials Sought By Plaintiff Are Protected From
   Disclosure By The Attorney-Client Privilege**

9

10  In the Ninth Circuit, the attorney-client privilege is defined as follows:

11  "1) Where legal advice of any kind is sought 2) from a professional legal adviser in

12  his capacity as such, 3) the communications relating to that purpose, 4) made in

13  confidence 5) by the client, 6) are at his instance permanently protected 7) from

14  disclosure by himself or by the legal adviser, 8) unless the protection be waived."

15  *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (internal

16  citation omitted); *see also United States v. Martin*, 278 F.3d 988, 999 (9th Cir.

17  2002).  The privilege "extends to [] papers prepared by an attorney or at an

18  attorney's request for the purpose of advising a client, provided the papers are

19  based on and would tend to reveal the client's confidential communications."

20  *United States v. Margolis (In re Fischel)*, 557 F.2d 209, 211 (9th Cir. 1977) (citing

21  *United States v. Judson*, 322 F.2d 460 (9th Cir. 1963).

22  Fenwick was retained by the Special Committee specifically to provide legal

23  advice in connection with its investigation of Semtech's stock option grant

24  practices.  Fenwick in turn retained Navigant as its agent to assist it in providing

25  legal advice to the Special Committee.[10]  Fenwick communicated its legal advice to

---

26  [10]     The attorney-client privilege extends to communications involving an
   attorney's agent, such as a forensic accountant, in which the agent assists the

27  attorney in providing legal advice to a client.  *See e.g.*, *United States v. Kovel*, 296
   F.2d 918, 922 (2d Cir. 1961) (applying the attorney-client privilege to

28  communications with an accountant who served as an agent of the attorney,

-17-

the Special Committee through various means, including the Fenwick Report and its interview memoranda.  Similarly, Morrison was retained by the Special Litigation Committee to provide legal advice concerning its investigation of the claims asserted in the derivative litigation.  The Morrison attorneys' legal advice to the Special Litigation Committee was summarized in the Morrison Report.

Thus, the investigative reports and memoranda prepared by Fenwick and Morrison fall squarely under the protections of the attorney-client privilege.  *See Sutherland v. Sutherland*, 2007 WL 1954444, at *4 (Del. Ch. July 2, 2007) (holding that discovery of investigative materials "would set dangerous precedent with the potential collateral effect of chilling communications between a special committee and its legal advisors"); *Lawrence E. Jaffe Pension Plan v. Household Intl., Inc.*, 244 F.R.D. 412, 426-29 (N.D. Ill. 2006) (applying the attorney-client privilege and attorney work product protections to investigative reports and information communicated by the audit committee's counsel to the company and the company's board of directors).

C.    **The Special Committee Materials And Special Litigation Committee Materials Constitute Opinion Work Product Subject To Nearly Absolute Protection**

The attorney work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A).[11]  The work product doctrine is

reasoning that "the presence of an accountant . . . while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . ."); *see also United States v. Jacobs*, 322 F. Supp. 1299, 1305 (C.D. Cal. 1971) (applying the attorney-client privilege to communications involving a certified public accountant who was hired by an attorney to provide the attorney with technical assistance in providing legal advice to his client).

[11]      The Fenwick and Morrison materials requested by Plaintiff were undoubtedly prepared in anticipation of litigation.  *See In re Grand Jury Investigation*, 357 F.3d 900, 909-10 (9th Cir. 2004) (documents created in connection with a company's investigation conducted during the pendency of a related federal government investigation are created in anticipation of litigation); *Ross v. Abercrombie & Fitch Co.*, 2008 WL 1844357, at *1 (S.D. Ohio Apr. 22,

-18-

1    designed to permit attorneys to prepare their cases "with a certain degree of

2    privacy, free from unnecessary intrusion by opposing parties and their counsel."

3    *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).  Attorney work product is reflected

4    in "interviews, statements, memoranda, correspondence, briefs, mental impressions,

5    personal beliefs, and countless other tangible and intangible ways . . . ."  *Id*. at 511.

6    "One of the primary purposes of the work product doctrine is to prevent one party

7    exploiting the other party's efforts to prepare for litigation."  *O'Connor v. Boeing*

8    *North America, Inc.*, 216 F.R.D. 640, 642 (C.D. Cal. 2003) (citing *Holmgren v.*

9    *State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992)).

10          The Federal Rules of Civil Procedure distinguish between "opinion" work

11   product and "fact" work product.  Fed. R. Civ. P. 26(b)(3)(B).  Fact work product

12   includes raw "factual material" prepared in anticipation of litigation.  *Baker v. GM*

13   *Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000); *Kintera, Inc. v. Convio, Inc.*, 219

14   F.R.D. 503, 507 (S.D. Cal. 2003).  Opinion work product reflects the "mental

15   impressions, conclusions, opinion, and legal theories" of an attorney or other

16   representative of a party.  *Kintera*, 219 F.R.D. at 507 ("Where the selection,

17   organization, and characterization of facts reveals the theories, opinions, or mental

18   impressions of a party or the party's representative, that material qualifies as

19   opinion work product.").[12]  A report of investigation and back-up materials

20   2008) ("Given the fact that [the special litigation committee report and associated
     documents] appear to have been prepared exclusively for use in litigation (i.e. the
21   derivative action) either at the request of or with the direct participation of
     attorneys, . . . they fall within the scope of the work product doctrine."), *aff'd*, 2008
22   WL 3286346 (S.D. Ohio Aug. 8, 2008).  Here, the Special Committee and Special
     Litigation Committee investigations were initiated after shareholder suits had been
23   filed against Semtech alleging improprieties in the Company's stock option grant
     practices, and the SEC and USAO had initiated inquiries into the Company's stock
24   option grant practices.  Miller Decl. at ¶¶ 4, 5, 7; Stanton Decl. at ¶ 4; Rains Decl.
     at ¶ 7.  Therefore, throughout the pendency of the Special Committee and Special
25   Litigation Committee investigations, Semtech faced not only the mere threat of
     litigation but actual litigation.
26
     [12]      The attorney work product doctrine extends to materials prepared by the
27   attorney's representatives and agents.  *See United States v. Nobles*, 422 U.S. 225,
     238 (1975) (finding "attorneys often must rely on the assistance of investigators and
28   other agents in the compilation of materials in preparation for trial.").  Thus, the

1    prepared by counsel in connection with an investigation for the purpose of

2    addressing issues raised in regulatory inquiries and pending litigation constitute

3    opinion work product. *See*, *e.g.*, *In re Vecco Instruments, Inc. Sec. Litig.*, 2007 WL

4    210110, at *2 (S.D.N.Y. Jan. 25, 2007) (sustaining attorney work product

5    protection over an investigative report and its associated materials); *In re McKesson*

6    *HBOC, Inc. Sec. Litig.*, 2005 WL 934331, at *5 (N.D. Cal. Mar. 31, 2005) (citing

7    *Hickman*, 329 U.S. at 511).

8         Likewise, "[n]otes and memoranda of an attorney, or an attorney's agent,

9    from a witness interview are opinion work product entitled to almost absolute

10   immunity." *Baker*, 209 F.3d at 1054 (denying motion to compel production of

11   attorney's notes of interviews of company employees). As the Supreme Court

12   recognized, "[f]orcing an attorney to disclose notes and memoranda of witnesses'

13   oral statements . . . tends to reveal the attorney's mental processes." *Upjohn v.*

14   *United States*, 449 U.S. 383, 399 (1981).

15        Fenwick's Report and interview memoranda, which reflect the mental

16   impressions and opinions of Fenwick attorneys, are exactly the type of opinion

17   work product that the United States Supreme Court and Federal Rule of Civil

18   Procedure 26(b)(3) designated for heightened protection. The Fenwick attorneys

19   relied on their understanding of the important facts learned during the Special

20   Committee investigation and the applicable legal theories in forming the Fenwick

21   Report. Stanton Decl. at ¶¶ 6-7. *See Hickman*, 329 U.S. at 511 (noting that to

22   prepare his case, an attorney must "sift what he considers to be the relevant from

23   the irrelevant facts").

24        Similarly, the Morrison Report reflects the mental impressions and thoughts

25   of the Morrison attorneys and their legal analysis of the claims asserted in the

26   derivative complaints. Rains Decl. at ¶ 9. The Morrison Report embodies the

27   _____
     attorney work product doctrine extends to the efforts of Navigant, which was
28   retained by Fenwick to assist it in rendering legal advice to the Special Committee
     at its direction. Stanton Decl. at ¶ 2.

Morrison attorneys' understanding and analysis of the legal and factual issues presented in the investigation and related derivative claims, and therefore constitutes opinion work product. *Id.  See Farber v. Publ. Svc. Co. of New Mexico*, 1991 WL 208460, at *1 (D.N.M. Apr. 4, 1991) (protecting notes of a special litigation committee, communications between the committee and third parties, and reports to the committee by experts and consultants from disclosure "on the basis of work product or applicable privilege").

In addition, the underlying documents compiled by Fenwick and Morrison were selected out of the many thousands of pages reviewed by attorneys during the investigations.  Stanton Decl. at ¶ 14; Rains Decl. at ¶ 9.  While the underlying documents are not attorney work product, the selection process represents counsel's mental impressions and legal opinions as to how the evidence in these documents relates to the issues in the investigations.  *Sporck v. Peil*, 759 F.2d 312, 315-16 (3d Cir. 1985) ("[T]he selection and compilation of documents by counsel in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product."); *In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997) ("The work product rule would apply to documents, records, reports, exhibits, and the like which may be contained in the Report . . . ."); *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 144 (D. Del 1982) ("In selecting and ordering a few documents out of thousands counsel could not help but reveal important aspects of his understanding of the case.").  Compilations of documents selected by counsel are even "more critical than pure legal research" and are entitled to the strict protections afforded to opinion work product.  *Raytheon*, 93 F.R.D. at 144.  The determination by Fenwick and Morrison concerning which documents were important to their investigations was an exercise of legal analysis and opinion that is protected by the strictest attorney work product protection.

-21-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.     **Plaintiff Cannot Show A "Compelling" Need For The Opinion Work Product Of Fenwick And Morrison**

As opinion work product, the investigative materials prepared by Fenwick and Morrison are subject to near absolute protection from disclosure.  A party seeking ***fact*** work product must show substantial need for the materials in preparation for the party's case and that the party is unable without "undue hardship to obtain the substantial equivalent of the materials by other means."  *Holmgren*, 976 F.2d at 576 (quoting Fed. R. Civ. P. 26(b)(3)).  However, in the Ninth Circuit, an attorney's ***opinion*** work product is discoverable only if the attorney's own mental impressions are at issue, and the need for the material is "compelling."  *Id.* at 577; *Upjohn*, 449 U.S. at 399-400 ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."); *see also Hickman*, 329 U.S. at 513-14 (describing the production of attorney work product as a "rare situation" and a "harsh and unwarranted result"); *O'Connor*, 216 F.R.D. at 642-43 ("[O]pinion work product enjoys almost absolute immunity . . . .").

Neither element is met here.  First, the mental impressions of the Fenwick and Morrison attorneys are not at issue in Plaintiff's complaint.  *See Holmgren*, 976 F.2d at 577-78 (distinguishing bad faith insurance cases in which "the lawyers who managed and supervised the former litigation for the defendants [were] being called as witnesses to express their opinions as to the merits of the prior suits") (internal citation omitted).

Neither can Plaintiff establish a "compelling" need for the attorneys' opinion work product.  Even if the Court were to determine some of their investigative materials were fact work product, which they are not, Plaintiff cannot show even a "substantial need for the [information nor] that the substantial equivalent of the information could not be procured through other means."  *O'Connor*, 216 F.R.D. at 643 (internal citation omitted) ("A party also does not demonstrate substantial need

-22-

1    when it merely seeks corroborative evidence.").  In fact, pursuant to Plaintiff's

2    recent Request for Documents, defendants are in the process of producing to

3    Plaintiff the same stock option grant documentation underlying these investigations.

4    Miller Decl. at ¶¶ 13-15.

5           Rather, Plaintiff in this action should conduct its own discovery and form its

6    own assessment of the material.  In *In re Dayco Corp. Derivative Securities*

7    *Litigation*, 99 F.R.D. 616, 621 (S.D. Ohio 1983), the court denied production of a

8    special committee report to plaintiffs for their failure to demonstrate undue hardship

9    and substantial need for the materials because, *inter alia*, plaintiffs could depose the

10   same witnesses and obtain the same documents through the discovery process.  *See*

11   *also Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 687

12   (W.D. Mich. 1996) (holding that class action plaintiffs who sought access to a

13   special litigation committee report from an earlier derivative action failed to

14   establish undue hardship because they had not shown that information was not

15   available through other means); *Farber*, 1991 WL 208460, at *1 ("It is not the job

16   of the special litigation committee to assemble and analyze data for use by other

17   litigants in other suits against the corporation.").  Plaintiff cannot demonstrate a

18   "compelling" need for information it can obtain, or is in the process of obtaining,

19   through other means.

20          **E.    The Special Committee Materials And Special Litigation**
                    **Committee Materials Provided To Ernst & Young Retain Their**
21                  **Attorney-Client And Work Product Privileges**

22          The attorney-client privilege and attorney work product protections continue

23   to apply to the Special Committee and Special Litigation Committee materials in

24   the possession of E&Y.  Disclosures to outside auditors do not have the "tangible

25   adversarial relationship" requisite for waiver.  *Merrill Lynch & Co. v. Allegheny*

26   *Energy, Inc.*, 229 F.R.D. 441, 448 (S.D.N.Y. 2004) (finding "a business and its

27   auditor can and should be aligned insofar as they both seek to prevent, detect, and

28   root out corporate fraud").

-23-

1    The Special Committee and Special Litigation Committee shared a common
2    interest with E&Y in analyzing the information obtained during the investigations
3    and in developing legal theories relevant to Semtech's restatement and the related
4    disclosures.  Sharing protected documents with an outside auditor during the course
5    of an internal investigation does not result in a waiver.  *In re JDS Uniphase Corp.,*
6    *Sec. Litig.*, 2006 WL 2850049, at *1 (N.D. Cal. Oct. 5, 2006) (identifying the
7    prevailing view that disclosure to an outside auditor does not waive the work
8    product protection); *see also Lawrence E. Jaffe Pension Plan v. Household Intern.,*
9    *Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006) (holding that a corporation's disclosure
10   of work product to its auditors does not increase the chances of potential disclosure
11   to the corporation's adversaries, so it does not waive the work product protection);
12   *Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533, 534-35 (D.S.C.
13   2005) (same); *In re Pfizer Inc. Sec. Litig.*, 1993 WL 561125, at *6 (S.D.N.Y. Dec.
14   23, 1993) (same).

15   Recently, in *United States v. Deloitte & Touche USA LLP*, the Department of
16   Justice moved to compel Deloitte to produce the attorney work product of its audit
17   client, Dow Chemical, in response to a subpoena.  2009 WL 1606501, at *1
18   (D.D.C. June 8, 2009).  The District of Columbia held Dow's disclosure to Deloitte
19   "was not inconsistent with the maintenance of secrecy, because Deloitte USA, as
20   Dow's independent auditor, was not a potential adversary, and no evidence
21   suggested that it was unreasonable for Dow to expect Deloitte USA to maintain
22   confidentiality."  *Id.*  The court also recognized that Deloitte documents which
23   recorded the contents of the privileged information were likewise entitled to work
24   product protection.  *Id.* at *2 n.1 (citing *Regions Fin. Corp. v. United States*, 2008
25   WL 2139008, at *1-2, *7-8 (N.D. Ala. May 8, 2008), for the proposition that the
26   work product privilege extended to materials created by an independent auditor
27   who "discussed, quoted, or explained documents containing the legal evaluations of
28   petitioner's outside counsel").

-24-

1      Nothing about the Special Committee's or the Special Litigation

2  Committee's relationship with E&Y was adversarial.  The mere fact that E&Y

3  served as Semtech's independent auditor does not create an adversarial relationship.

4  *See Merrill Lynch*, 229 F.R.D. at 448 ("[A]ny tension between an auditor and a

5  corporation that arises from an auditor's need to scrutinize and investigate a

6  corporation's records and book-keeping practices simply is not the equivalent of an

7  adversarial relationship contemplated by the work product doctrine.").  The Special

8  Committee and Special Litigation Committee disclosed the privileged information

9  and documents concerning their investigations to permit E&Y to complete its audit

10  of Semtech's restatement.  Stanton Decl. at ¶ 18; Rains Decl. at ¶ 10.  Consistent

11  with the interests of the Special Committee and the Special Litigation Committee,

12  E&Y's review and analysis of the investigative materials was necessary to

13  determine whether Semtech's accounting for stock options was proper, both

14  historically and for purposes of the Company's restatement.  Snow Decl. at ¶ 6.

15  The disclosures here were no different than the disclosure of internal investigation

16  reports by Merrill Lynch to Deloitte in order for Deloitte to "identif[y] any potential

17  internal control, accounting or audit issues" arising from the matters under

18  investigation.  *Merrill Lynch*, 229 F.R.D. at 444 (internal citation omitted).

19      The Special Committee and the Special Litigation Committee also had a

20  reasonable expectation that E&Y would maintain the confidentiality of its work

21  product.  *See Deloitte*, 2009 WL 1606501, at *1.  In fact, E&Y is required to

22  maintain the documents in confidence, pursuant to its ethical obligations under the

23  guidelines of the American Institute of Certified Public Accountants ("AICPA").

24  Snow Decl. at ¶ 8.  An auditor is under an "ethical and professional obligation to

25  maintain materials received from its client confidential, unless disclosure [is]

26  required by law or accounting standards."  *Merrill Lynch*, 229 F.R.D. at 448.  The

27  AICPA guidelines provide that auditors have an "ethical and, in some situations, a

28  legal obligation to maintain the confidentiality of client information . . . ."  AICPA

-25-

AU § 339.33; AICPA AU § 301.  Thus, the protected material produced by Fenwick and Morrison to E&Y, as well as any E&Y documents reflecting such materials, remain protected from disclosure to third parties, including Plaintiff.

**F.    The Special Committee's Investigative Report And Related Materials Produced To The Government Retain Their Attorney-Client And Work Product Privileges**

Fenwick's investigative materials produced to the SEC and USAO retain their attorney-client privilege and attorney work product protections for several independent reasons: (1) the Special Committee was effectively compelled to "cooperate" consistent with the SEC and USAO guidelines at the time for determining whether to charge a corporation, which expressly considered whether the corporation produced privileged materials; (2) the Special Committee and the SEC and USAO shared a common interest in analyzing the evidence and identifying potential wrongdoers; and (3) the Special Committee produced its attorneys' work product to the government pursuant to a confidentiality agreement.

**1.    The Special Committee Had No Effective Choice But To Cooperate With The Government's Requests**

An involuntary or compelled production does not waive the attorney-client privilege.  *Transamerica Computer Co., Inc. v. Int'l Bus. Mach. Corp.*, 573 F.2d 646, 650-52 (9th Cir. 1978) (recognizing that "disclosure of confidential material constitutes a waiver of the attorney-client privilege only if it is voluntary and not compelled").  The Special Committee's production of Fenwick's investigative work product to regulators under extraordinary pressure to "cooperate" with their investigations constituted an involuntarily disclosure, and does not result in a waiver.

In 2006, at the time of the Special Committee's production to the SEC and USAO, federal prosecutors evaluated a corporation's cooperation pursuant to the SEC's Seaboard Report and the DOJ's Thompson Memorandum.  Among other factors, these guidelines effectively required corporations under investigation to

1   demonstrate their cooperation by agreeing to produce relevant materials irrespective

2   of privilege.  Specifically, the Thompson Memorandum required criminal

3   prosecutors to consider "the willingness of a corporation to waive [the attorney-

4   client privilege and work product protection] when necessary to provide timely and

5   complete information" as a factor in evaluating the company's cooperation.  Miller

6   Decl., Exhibit C at § VI.B.  The SEC's Seaboard Report similarly provided that

7   production of privileged materials was a factor in evaluating a corporation's level of

8   cooperation with its investigation.  Miller Decl., Exhibit D at n.3.  In practice,

9   companies under threat of being labeled uncooperative have no real choice but to

10  produce the requested documents to the government regardless of whether the

11  documents are privileged.  This is particularly true in the context of a special

12  committee in which a board member exercising his fiduciary duty to the

13  corporation is more likely to acquiesce to the government's pressure to waive rather

14  than put the company at risk of increased government scrutiny.  *See Weinberger v.*

15  *UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503,

16  510 (Del. 1939)) ("'[P]ublic policy . . . has established a rule that demands of a

17  corporate officer or director, peremptorily and inexorably, the most scrupulous

18  observance of his duty, not only affirmatively to protect the interests of the

19  corporation committed to his charge, but also to refrain from doing anything that

20  would work injury to the corporation . . . .'").

21       The subsequent policies of the DOJ recognize the coercive nature of the

22  directives under the Thompson Memorandum.[13]  Following the lead of the DOJ, the

---

[13]       Following a deluge of criticism that the DOJ's guidelines exerted undue pressure on corporations to waive privilege, the DOJ replaced the Thompson Memorandum with the December 12, 2006 Paul McNulty memorandum (the "McNulty Memorandum").  Miller Decl., Exhibit E.  The McNulty Memorandum significantly reduced the pressure imposed on corporations to produce privileged materials by limiting the "cooperation credit" that could be afforded to a company for producing privileged documents.  Miller Decl., Exhibit E at § VII.B.2. Recognizing that the McNulty Memorandum did not go far enough, the latest iteration of the DOJ's guidelines, the August 28, 2008 Mark Filip memorandum (the "Filip Memorandum"), mandates that federal prosecutors now may not even request that a corporation produce privileged materials.  Miller Decl., Exhibit F at §

1   SEC revamped its guidelines in October 2008 in a revision of its Enforcement

2   Manual, which directed its staff not to ask a company to waive its privileges.

3   Miller Decl., Exhibit G at § 4.3.  The Enforcement Manual now dictates that "the

4   staff should not ask a party to waive attorney-client or work product privileges and

5   is directed not to do so."  *Id.*  The Enforcement Manual also provides that a

6   company's decision to assert privilege "will not negatively impact [its] claim of

7   credit for cooperation."  *Id.*  The sea change associated with the publication of the

8   Filip Memorandum and the SEC Enforcement Manual evidenced a significant

9   departure from the pressure to produce privileged documents that had been imposed

10  on companies such as Semtech under the prior policies of the SEC and USAO

11  contemporaneous with Semtech's production in 2006 to the government.

12      The California Court of Appeal's recent decision in *Regents of the University*

13  *of California v. Superior Court*, 165 Cal. App. 4th 672 (Cal. Ct. App. 2008),

14  recognized the coerciveness of the policies under the Thompson Memorandum.

15  The Court of Appeal held that the corporate defendants' production of privileged

16  material to a government agency operating under the Thompson Memorandum

17  constituted coercion under California law, and thus did not result in a waiver of the

18  privilege.  *Id.* at 683.

19          [W]hen privileged documents have been disclosed either
            in response to the request of a government agency or
20          inadvertently in the course of civil discovery, no waiver
            of the privilege will occur if the holder of the privilege
21          has taken reasonable steps under the circumstances to
            prevent disclosure.  The law does not require that the
22          holder of the privilege take "strenuous or Herculean
            efforts" to resist disclosure.
23

24  *Id.*  In *United States v. Stein*, the Southern District of New York found that the

25  cooperation factor in the Thompson Memorandum required a corporation to comply

26  "because the government held the proverbial gun to its head."  435 F. Supp. 2d 330,

27  336 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008).

28  9-28.710.  These developments, however, post-dated the Special Committee's
    production to the DOJ.

-28-

1      Here, the regulators demanded that the Special Committee produce
2  documents related to its investigation, specifically including privileged documents.
3  Stanton Decl. at ¶ 10.  Against the backdrop of the Thompson Memorandum and
4  the Seaboard Report, the Special Committee was effectively required to produce the
5  requested documents to the regulators or risk increased scrutiny, delisting from the
6  market, and possible prosecution.  Accordingly, the Special Committee's
7  production was not voluntary and cannot be deemed a waiver of the attorney-client
8  privilege or work product protections.

9          **2.      The Special Committee And The Government Shared A**
                   **Common Interest Sufficient To Maintain The Attorney-**
10                  **Client And Work Product Privileges**

11      Disclosure of work product to another person who has an interest in the
12  information but is not reasonably viewed as a "conduit" to a potential adversary is
13  not deemed to be a waiver of the attorney work product protections.  *McKesson*,
14  2005 WL 934331, at *6 (quoting *Bowne, Inc. v. AmBase Corp.*, 150 F.R.D. 465,
15  479 (S.D.N.Y. 1993)).  If two parties share a common interest, a party does not
16  waive the work product protections by disclosing documents.  *United States v. Am.*
17  *Tel. & Tel. Co.*, 642 F.2d 1285, 1300 (D.C. Cir. 1980) (finding no waiver of work
18  product protections by sharing documents with the government due to the common
19  interest with the government "in developing legal theories and analyses of
20  documents").  A common interest can occur even when the parties' interests are
21  adverse in "substantial respects."  *See, e.g.*, *Modesto Irrigation District v.*
22  *Gutierrez*, 2007 WL 763370, at *15 (E.D. Cal. Mar. 9, 2007) ("The [common
23  interest] privilege does not require a complete unity of interests among the
24  participants, and it may apply where the parties' interests are adverse in substantial
25  respects.").

26      The Special Committee and the SEC and USAO shared a common interest in
27  investigating and uncovering any potential wrongdoing associated with Semtech's
28  stock option grants.  *See In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 495150,

-29-

1   at *9 (S.D.N.Y. Jan. 26, 2007) (denying plaintiff's motion to compel on the

2   grounds that the government and a board committee shared a "common interest in

3   developing legal theories and analyzing information" regarding potential financial

4   irregularities) (internal citation omitted).  Courts have recognized that strong public

5   policy considerations underlie the application of the common interest doctrine

6   between a board committee conducting an internal investigation and the

7   government, and thus work product should be "***protect[ed] . . .  in these***

8   ***circumstances to encourage cooperation between the private and public sectors***

9   ***acting with a common interest*.**  *Id.* (emphasis added) (citing *In re Steinhardt*, 9

10  F.3d 230, 236 (2d Cir. 1993) (adopting a case-by-case approach to the selective

11  waiver doctrine, and recognizing the applicability of the doctrine when the

12  corporation and the government have a common interest)).  To date, the SEC and

13  USAO have not brought any civil, criminal, or administrative proceedings against

14  Semtech or its board.  Miller Decl. at ¶ 10.  Nor has either agency ever notified

15  Semtech that it was a target or subject of the Grand Jury Subpoena.  *Id.*  In the past

16  38 months since Semtech was notified of these investigations, the relationship

17  between the government and Semtech was cooperative and consistent with the

18  common interests of the parties.  *Id.*

19          **3.      The Special Committee's Confidentiality Agreements With**
                      **The SEC And USAO Maintain The Attorney-Client And**
20                    **Work Product Privileges As To Third Parties**

21          To the extent the Special Committee's production of Fenwick's work product

22  to the SEC and USAO would have constituted a waiver, the waiver was limited to

23  the government and not a waiver as to third parties.  While the Ninth Circuit has not

24  ruled on the application of the "selective waiver" doctrine, it has recognized the

25  possibility that a corporation can "selectively waive" the attorney-client privilege

26  by "disclos[ing] the results of an internal investigation to an investigating

27  government agency without waiving attorney client privilege or work product

28  protection as to the outside world."  *United States v. Bergonzi*, 403 F.3d 1048, 1050

-30-

(9th Cir. 2005).[14]  This view is consistent with the strong public policy considerations served by encouraging companies to cooperate with government investigations without having to choose between exercising good corporate citizenship and waiving privileges as to all future adversaries.  *See*, *e.g.*, *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F. Supp. 368, 372-73 (E.D. Wis. 1979) ("[V]oluntary cooperation with [the government] investigation would be substantially curtailed if such cooperation were deemed to be a waiver of a corporation's attorney-client privilege."); *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *10-11 (Del. Ch. Nov. 13, 2002) (invoking the selective waiver doctrine with respect to an investigative report and related documents based on the "strong public interest such a rule would serve"), *aff'd*, 870 A.2d 1192 (Del. 2005); *Cardinal Health*, 2007 WL 495150, at *9 (finding no waiver of the work product protection under a common interest theory).

Several courts have upheld the selective waiver doctrine in the context of a confidentiality agreement between the parties, such as the agreements reached here between the Special Committee and the SEC and USAO.  *See McKesson*, 2005 WL 934331, at *9 (permitting disclosure to the government, without waiver, where documents are produced pursuant to a confidentiality agreement, because disclosure in this manner "[does] not undermine the underlying principles of the work product doctrine"); *Cardinal Health*, 2007 WL 495150, at *9 (finding that a company's confidentiality agreement with the SEC precluded waiver of the work product protections); *In re Natural Gas Commodity Litig.*, 2005 WL 1457666, at *8 (S.D.N.Y. June 21, 2005) (same); *Lawrence E. Jaffe Pension Plan*, 244 F.R.D. at

---

[14]    Even assuming, *arguendo*, that the attorney-client privilege was waived, which it was not, it does not follow that the attorney work product protection also was waived.  *In re Broadcom Corp. Sec. Litig.*, 2005 WL 1403513, at *3 (C.D. Cal. Apr. 7, 2005) (citing *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926, 929-30 (N.D. Cal. 1976) ("Since protections afforded work product and attorney-client communications address different goals, it does not follow that a waiver of one automatically results in a waiver of the other."), *aff'd*, 2005 WL 1403508 (C.D. Cal. May 10, 2005).

-31-

1    433 (same); *Maruzen Co. v. HSBC USA, Inc.*, 2002 WL 1628782, at *2 (S.D.N.Y.

2    Jul. 23, 2002) (same); *see also In re Subpoena Duces Tecum*, 738 F.2d 1367, 1375

3    (D.C. Cir. 1984) (finding that a party can avoid waiver by "insist[ing] on a promise

4    of confidentiality before disclosure to the SEC").[15]

5         In *McKesson*, the Northern District of California held that disclosure of

6    privileged materials to the government pursuant to a confidentiality agreement was

7    only a "selective waiver" as to the government agency and not as to all future

8    adversaries.  2005 WL 934331, at *10.  Judge Whyte found that "taking into

9    consideration the benefit to the public of permitting disclosure of work product to

10   the government," it did not result in a broader waiver as to third parties.  *Id.*

11        Under circumstances similar to those facing McKesson, the Special

12   Committee utilized the available protections to comply with the government's

13   request, while minimizing the potential for disclosure to Semtech's adversaries.

14   The confidentiality agreements reached with the SEC and USAO provided that the

15   government would maintain the confidentiality of the documents and would not

16   assert that the Special Committee's production constituted a waiver of any attorney-

17   client privileges or work product protections.  Stanton Decl. at ¶¶ 11-12.

18   "Permitting disclosure to the government under a confidentiality agreement [does]

19   not undermine the underlying principles of the work product doctrine." *McKesson*,

20   2005 WL 934331, at *9 ("The work product privilege rests on the belief that . . .

21   promotion of adversary preparation ultimately further the truth-finding process.")

22   (internal citation omitted).  Accordingly, the Special Committee never waived the

23   privilege as to Plaintiff.

24

25   ───────────────

26   [15]     Certain other California District Court cases considered but did not
     adjudicate the merits of the selective waiver doctrine, finding the attorney-client
     and work product privileges did not attach.  *See*, *e.g.*, *In re Syncor Erisa Litig.*, 229

27   F.R.D. 636 (C.D. Cal. 2005) (finding no privilege ever attached to the documents in
     the first instance); *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003)

28   (same).

### G.     The Special Litigation Committee Materials Produced In Connection With The Derivative Litigation Retain Their Attorney-Client And Work Product Privileges

When a company files a motion to terminate derivative litigation, Delaware law requires the company to produce "a thorough written record of the investigation and its findings and recommendations" in order to sustain its burden of proving the independence and good faith of the special litigation committee, as well as the reasonableness of its investigation. *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del. 1981). Producing the special litigation committee report and supporting documents is required by the unique nature of the special litigation committee process and does not amount to a voluntary waiver of protected information, such that plaintiffs in subsequent lawsuits may demand production of that information. *See Picard*, 951 F. Supp. at 687 (noting that disclosure of a special litigation committee report in a derivative action did not require disclosure in a subsequent class action since the class action plaintiffs had no need to rebut the presumption that the special litigation committee acted in good faith and made a reasonable investigation; furthermore, because production of the report was compelled in the derivative action, there was no waiver of the attorney-client privilege or work product protections).

### 1.     Protected Documents Were Produced Only To Facilitate The Court's Assessment Of The Motion To Terminate

Limited discovery in the context of a motion to terminate is for the benefit of the court for the purpose of evaluating the independence, good faith, and reasonableness of the special litigation committee's investigation and conclusions.

> The "opportunity" to make a record on the motion also includes the potential for limited discovery. The only purpose of such limited discovery in this setting, however, is to assist the Court in its inquiries into the good faith and independence of the Committee as well as its inquiry into the bases supporting the conclusions of the Committee. This is indicated by the statement [of the Delaware Supreme Court in *Zapata*] that "[l]imited discovery *may be ordered* to facilitate such inquiries" . . . . The discovery permitted for the purpose of making a record on the

-33-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

motion does not amount to discovery by either the
plaintiff or by the Special Litigation Committee as a
matter of right.  Rather, such discovery may be had only
by order of the Court.

*Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del.
1985).

The limited production of the Morrison Report and related exhibits in
Semtech's derivative litigation was consistent with the underpinnings of the
attorney-client privilege and work product protection.  Semtech maintained these
documents in confidence and produced them to the Court under seal and derivative
plaintiffs pursuant to a protective order only to the extent required under *Zapata* to
facilitate the Court's consideration of the independence and good faith of the
Special Litigation Committee and the reasonableness of the Committee's
investigation and conclusions.[16]  Miller Decl. at ¶ 9; Rains Decl. at ¶¶ 11-12.
Testing the Morrison Report was the exclusive role of the derivative plaintiffs,
which is now moot following the Motion to Terminate and settlement of the
derivative suits.

## 2.    The Special Litigation Committee Was Compelled To Produce The Morrison Report To The Derivative Plaintiffs

The disclosure of the Morrison report to derivative plaintiffs amounts to a
compelled production that not constitute a waiver as to third parties.  *See*
*Abercrombie*, 2008 WL 1844357, at *3 (citing *In re Perrigo*, 128 F.3d at 441, for
the proposition that "disclosure of the report . . . is essentially involuntary, at least
in the sense that once the corporation chooses to take advantage of the statutory
procedure and move to dismiss the derivative case, it *must* . . . disclose it to the

---

[16]    Moreover, the Special Litigation Committee and the derivative plaintiffs
shared a common interest in determining whether it was in the best interests of the
Company, i.e., the shareholders, to pursue the derivative litigation.  As noted in
*Kaplan*, "The [special litigation committee] procedure…asks the Court to consider
dismissing the case *prior to* the time that the facts pertaining to the plaintiff's
allegations are developed in an adversarial context . . . ."  484 A.2d at 509
(emphasis added).  Therefore, production of any work product to the derivative
plaintiffs did not constitute a waiver of the attorney-client privilege or work product
protection as to other individuals or entities in subsequent litigation.

-34-

derivative plaintiffs"); *see also Kaplan*, 484 A.2d at 506 (citing *Zapata*, 430 A.2d 779) (holding that a corporation's motion to terminate derivative litigation "*must* be supported by a thorough written record," which describes the special litigation committee's investigation, findings, and recommendation) (emphasis added).

Because the Special Litigation Committee's disclosure of otherwise privileged documents to the Court and plaintiffs in the derivative litigation was compelled by Delaware law, the Special Litigation Committee's production falls within the compelled disclosure exception and does not waive the privilege with respect to any other entities or individuals in subsequent litigation, including this matter. *Transamerica*, 573 F.2d at 650-52 (recognizing that compelled production of confidential material does not constitute a waiver of the attorney-client privilege).

### 3. The Protective Order And Filing Of The Morrison Report Under Seal Preclude Waiver

Producing a special litigation committee report and related documents to derivative plaintiffs under a protective order maintains the confidentiality of the documents. *In re Perrigo*, 128 F.3d at 440-41 (holding that production of a special litigation committee report pursuant to a protective order, and filing of the report under seal, provided the parties in the derivative case access to the protected materials, but did not act as a waiver which would give confidential report information to the public domain, which included "plaintiffs in a hostile securities action"); *Abercrombie*, 2008 WL 1844357, at *4-5 (applying Delaware law to hold that privilege was not waived as to securities plaintiffs who sought a special litigation committee report that was filed under seal in a related derivative action).

The protective order which governed discovery in the Semtech derivative litigation designated as confidential — and, therefore, only to be disclosed to entities involved in the derivative litigation — the Morrison Report and its exhibits, which included portions of Fenwick's work product, and all documents pertaining

1   to the investigation of stock option grants that were "created, reviewed or obtained

2   by persons or entities acting on behalf of or for the benefit of those Committees."

3   Miller Decl. at ¶ 9, Exhibit H at 3.  These materials also were filed with the Court

4   under seal.  *Id.*  Despite the fact that Semtech was required to make the documents

5   available to the Court and the derivative plaintiffs in order to meet its obligations

6   under *Zapata*, production under the ambit of the protective order, and filing under

7   seal, maintained the confidentiality of the documents as to anyone else "in the

8   public domain."  *In re Perrigo*, 128 F.3d at 441.

9         **H.**    **The Court Should Quash The Subpoena Issued To E&Y For The Independent Reason That It Places An Undue Burden On A Non-**

10                  **Party**

11         The Court also should quash Plaintiff's subpoena to E&Y pursuant to Federal

12   Rule of Civil Procedure 26(b)(3) for the independent reason that it subjects E&Y to

13   an undue burden.  *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal.

14   2005) (granting motion to quash subpoena as unduly burdensome).  Courts read

15   discovery restrictions even more broadly when a plaintiff seeks documents and

16   information from a non-party to the litigation under Federal Rule of Civil Procedure

17   45.  *Id.* at 638 (citing *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649

18   (9th Cir. 1980)).  Requiring a non-party such as E&Y to produce documents that

19   could have been sought from defendants constitutes an undue burden on E&Y,

20   especially when Plaintiff did not exhaust its efforts to obtain the documents from

21   defendants.  *See id.* at 638.

22         Plaintiff's premature request for investigative materials from E&Y places an

23   undue burden on a non-party to this litigation.  Indeed, many of the documents

24   requested in the subpoena to E&Y will be produced through the course of party

25   discovery.  Miller Decl. at ¶¶ 13-15.  To require a non-party to produce the same

26   documents at this stage in the litigation amounts to an undue burden and waste of

27   resources.  *See Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal.

28   2005) (granting motion to quash under Federal Rules of Civil Procedure 26 and 45

1  finding "no reason to burden nonparties when the documents sought are in the
2  possession of the party defendant").

3  **I.      Conclusion**

4        For the foregoing reasons, this Court should quash and/or modify the

5  subpoena issued to non-party Ernst & Young LLP, or in the alternative enter a

6  protective order denying production of documents responsive to the disputed

7  document requests.

8  **V.     PLAINTIFF'S ARGUMENT**

9        **A.      Relevant Facts And Background**

10        To the extent that Semtech has set forth the procedural history of this action,

11  Plaintiff does not wish to engage in a duplicative discussion of those same facts.

12  The facts articulated by Semtech are sufficient for the Court to determine that

13  Semtech's motion to quash should be denied, as discussed herein.

14        **B.      Semtech Has Waived Any Attorney-Client and Attorney Work
            Product Protection That Might Have Applied To The Reports Or
15            Associated Documents Produced To Third Parties**

16        There are two types of waivers of the attorney-client privilege and work

17  product doctrine: express and implied.  *Bittaker v. Woodford*, 331 F.3d 715, 719

18  (9th Cir. 2003).  "An express waiver occurs when a party discloses privileged

19  information to a third party who is not bound by the privilege by making it public."

20  *Id.*[17]  The court does not typically force or encourage a party to make the disclosure

21  effecting an express waiver.  *Id.*  Instead, the actions that give rise to express

22  waivers are usually within the full control of the party waiving the privilege.  *Id.*

23        The Ninth Circuit has noted that the question as to whether a party who

24  expressly waives privilege as to one party waives such privileges as to all parties is

25  not settled law.  *United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir.

26  2005)(dicta).  In its analysis, the Ninth Circuit has cited the Third Circuit on

27  ───────────
     [17]     Although the decision in *Bittaker v. Woodford* "is couched in the terms of the
28  attorney-client privilege, it applies equally to work product privilege…." *Bittaker*,
     331 F.3d 715, 722 n.6.

express waiver. *See Bittaker*, 331 F.3d at 719 (citing *Westinghouse Elec. Corp. v. Republic of Phillipines*, 951 F.2d 1414, 1423-27 (3d Cir. 1991) ("*Westinghouse*")). In *Westinghouse*, the Third Circuit rejected the limited waiver argument, concluding instead that a corporation's voluntary disclosure of a report to the SEC and Department of Justice ("DOJ") waived attorney-client privilege and work product protection in regards to a third party who seeks those documents for the purposes of civil trial against the corporation. *Westinghouse*, 951 F.2d at 1417-18, 1425. The Third Circuit noted that the purpose of the attorney-client privilege is to encourage open communication between attorneys and their clients as long as such communication is aimed at obtaining legal advice. *Id.* at 1423. However, "when a client voluntarily discloses privileged communication to a third party, the privilege is waived." *Id.* Even though the corporation in *Westinghouse* submitted documents to the DOJ in response to a grand jury subpoena, the Third Circuit considered the submission to be voluntary. *Id.* 1427 n.14. While the corporation initially objected to the subpoena, it relented and voluntarily produced the documents. *Id.* In dicta, the court stated that had the corporation objected to the subpoena and only produced the documents under order of the court, the submission would not have been voluntary. *Id.* Thus, the court concluded that corporation waived its attorney-client privileges over the documents it submitted to the DOJ and allowed plaintiffs in the civil litigation to discover them. *Id.* at 1431.

In *Westinghouse*, the Third Circuit applied a different standard to the waiver of work product protections because the attorney-client privilege and work product protection have different purposes. *Westinghouse*, 951 F.2d at 1428. Because the purpose underlying the work product protection is to prevent disclosure of protected documents to an adversary, the protection is only waived when disclosure enables an adversary to gain access to the information. *Id.* The court concluded that the SEC and DOJ were adversaries of the corporation because the agencies were investigating the corporation. *Id.* Thus, the voluntary disclosure of documents to

-38-

the SEC and DOJ waived the work product protection as against all other

adversaries, including the plaintiffs in the civil action. *Id.* at 1429.

Additionally, district courts in the Ninth Circuit have held that a *potential*

adversarial relationship is sufficient to support a waiver of the work product

protection. *In re Oracle Sec. Litig.*, No. C-01-0988 MJJ (JCS), 2005 U.S. Dist.

LEXIS 46931 at *28-29 (N.D. Cal. Aug. 5, 2005)("*Oracle*") (citing *McMorgan &*

*Co. v. First Cal. Mortgage Co.*, 931 F. Supp. 703, 710 (N.D. Cal. 1996) ("Because

the DOL ["Department of Labor"] was at least a potential adversary of the plaintiff,

submission of the documents to the DOL also waived work product protections as

to the defendant.")).

### 1.     The Production Of Allegedly Protected Documents To The Government Constitutes A Waiver

Semtech admits that it produced the Fenwick Report, Fenwick's interview

memoranda, and selected documents identified by Fenwick to the SEC and USAO

pursuant to requests for documents by these agencies. (*See* Stanton Decl. at ¶ 14.)

To date, the SEC and USAO have not brought any civil, criminal, or administrative

proceedings, against Semtech.  (*See* Miller Decl. at ¶ 10.)  Neither the SEC nor the

USAO have notified Semtech that it was a target or subject of the Grand Jury

subpoena, and there has been no indication that either the SEC or USAO intends to

prosecute Semtech or seek disgorgement or penalties from Semtech. *Id.*  There is

no indication that Semtech ever objected to the requests of the SEC and USAO, nor

was Semtech's production compelled by any court order.

In its voluntary production to the SEC and USAO, Semtech waived any

attorney-client privileges that may have attached to the produced documents.

Unlike the defendants in *Westinghouse*, Semtech admits that it was never under

Grand Jury subpoena, and Semtech never made any objection to the production.

The simple fact that Semtech was the object of a governmental investigation does

not render any production "compelled."  Indeed, Semtech itself acknowledges that

1   it was never the target of a Grand Jury subpoena, and there has never been any

2   indication that the SEC or USAO intends to prosecute Semtech.  Thus, Semtech

3   made a voluntary production to the SEC and USAO that effectively waived any

4   attorney-client privilege that may have applied to any of the produced documents.

5       Semtech waived any work product protection that may have attached to the

6   produced documents because the SEC and USAO are adversaries to Semtech.

7   While Semtech argues that it was acting cooperatively with the SEC and USAO,

8   the fact remains that both agencies were ***investigating*** Semtech for potential

9   wrongdoing.  Although each agency may ultimately decline to bring formal

10   proceedings against Semtech, there existed the possibility that the investigations

11   conducted by the SEC and USAO could have led to action taken against Semtech.

12   Thus, the positions of the SEC and USAO as potential adversaries to Semtech are

13   sufficient to constitute a waiver of the work product privilege.

14          **2.      The Production Of Allegedly Protected Documents To
                        NASDAQ Constitutes A Waiver**

15

16       Semtech acknowledges that it produced the Fenwick Report to NASDAQ,

17   upon demand from NASDAQ's Office of General Counsel and determination by

18   Semtech that production was necessary to prevent Semtech's common stock from

19   being delisted on the NASDAQ market. (*See* Stanton Decl. at ¶ 15.)  This

20   production was voluntary and cannot be properly characterized as "compelled."

21   Semtech made a business decision that the production of the Fenwick Report to

22   NASDAQ was advisable in order to continue to list its common stock on the

23   NASDAQ exchange.  Therefore, Semtech's production to NASDAQ was voluntary

24   and constituted a waiver of any attorney-client privilege that may have applied to

25   the produced documents.

26       When Semtech produced the Fenwick report, NASDAQ was in an

27   adversarial or potentially adversarial position to Semtech.  NASDAQ regulates and

28   enforces its own requirements for the companies that list their securities on the

NASDAQ exchange.  Although Semtech attempted to avoid a potential confrontation with NASDAQ over the delisting of its securities on the NASDAQ exchange, such attempt does not change the potentially adversarial positions of the parties when Semtech produced the Fenwick Report to NASDAQ.  Therefore, by producing the Fenwick Report to NASDAQ, Semtech waived any work product protections that may have applied to the produced documents.

### 3. The Production Of Allegedly Protected Documents To Ernst & Young Constitutes A Waiver

Ernst & Young ("E&Y") served as Semtech's outside auditor with respect to the consolidated balance sheets of Semtech and its subsidiaries as of January 29, 2006 and January 30, 2005, and the related consolidated statements of operations, stockholder's equity, and cash flows for each of the three years in the period ended January 29, 2006.  (*See* Miller Decl. at ¶ 11.)  In order to complete its audit of Semtech's restated financials, E&Y requested and received documents from Semtech, from Semtech's Special Committee, and from Semtech's SLC relating to the internal investigations into Semtech's historical stock option grant practices.  (*See* Miller Decl. at ¶ 12.)  Semtech made no objection to the request by E&Y and such production was not "compelled" by court order.  Semtech's production to E&Y was voluntary, and constituted a waiver of any privileges that may have applied to the produced documents.

Further, it is clear that E&Y withheld authorization of the audit absent the production of these documents.  Notwithstanding the fact that any privileges that may have attached to these documents were already waived, Semtech's production of documents to E&Y constituted an additional waiver of any attorney-client or work product protections that may have applied.

/ / /

/ / /

/ / /

1

**C.  Semtech Has Waived The Attorney-Client And Attorney Work Product Protection That Might Have Applied To The Reports Or Associated Documents Produced In The Derivative Litigation**

2

3       The overwhelming weight of authority states that where a Defendant

4   voluntarily submits an SLC report to support a motion to terminate – as the

5   Defendants did here – the attorney-client privilege and attorney work product

6   protection for the report and all related memoranda are waived for all purposes.  *Joy*

7   *v. North*, 692 F.2d 890, 893 (2d Cir. 1982); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d

8   1302, 1314 (7th Cir. 1984) ("*Continental*"); *Zitin v. Turley*, No. CIV 89-2016-PHX-

9   CAM, 1991 U.S. Dist. LEXIS 10084 at *15 (D. Ariz. June 25, 1991).

10       Both the Second and Seventh Circuits are in accord, "if the special litigation

11   committee recommends termination and a motion for judgment follows, the

12   committee must disclose to the court and the parties not only its report but all

13   underlying data.  To the extent that communications arguably protected by the

14   attorney-client privilege may be involved in that data, a motion for judgment based

15   on the report waives the privilege."  *Joy*, 692 F.2d at 893; *Continental*, 732 F.2d at

16   1313-14 ("[W]e agree with the Second Circuit, that special litigation committee

17   reports used in the adjudication stages of derivative litigation should be available

18   for public inspection unless exceptional circumstances require confidentiality.").

19   Courts in this circuit have similarly followed this analysis.  *See Dreiling v. Jain*, 93

20   P.3d 861, 871 (D. Wash. 2004)("We hold that motions to terminate derivative

21   litigation suits are analogous to motions for dispositive judgment.  Accordingly,

22   any material submitted to the trial court in support of a motion to terminate is

23   presumptively accessible….").[18]

---

24       [18]     *See also Zitin v. Turley*, No. CIV 89-2061-PHX-CAM, 1991 U.S. Dist.
25   LEXIS 10084 at *15 (D. Ariz. June 25, 1991) ("Any privilege or work product
     immunity which existed was waived for documents that were communicated to the
26   committee and formed the basis of its decision that pursuing the claims is not in the
     best interest of the corporation.  It would be unequitable for the corporation to
27   establish a committee to issue a report which determines the advisability of the suit,
     fail to provide to the plaintiffs/shareholders most of the underlying information as
28   privileged and work product and yet rely on the Report as the basis for ending the
     case in a motion for summary judgment.")

-42-

1    In a case remarkably similar to this one, the United States District Court for

2    the Northern District of California agreed with the Second and Seventh Circuits and

3    held "Oracle filed the special litigation committee report and memoranda in support

4    of its motion to terminate the Delaware Plaintiffs' shareholder's derivative suit.

5    This action waved the attorney-client privileges and work product protection over

6    those documents." *In re Oracle Sec. Litig.*, No. C-01-0988 MJJ (JCS), 2005 U.S.

7    Dist. LEXIS 46931, at *31-32 (N.D. Cal. Aug. 5, 2005) ("*Oracle*"*)*.  In *Oracle*, the

8    Court found nothing in Delaware law that required an SLC to rely on attorney

9    communications or work product in order to file a motion to terminate. *Id.*

10   However, Oracle chose to retain outside counsel to investigate and assist the SLC –

11   as did the Defendants in this case.  When Oracle filed its motion to terminate the

12   derivative action based on these documents, it voluntarily filed those documents,

13   expressly waiving any attorney-client privilege or work product protection it might

14   have had over those documents. *Id.* at 32.

15   In this case, Semtech has made almost an identical voluntary waiver as the

16   defendants in *Oracle* when it filed the Morrison Report, certain exhibits thereto,

17   portions of the Fenwick Report, and excerpts from certain of Fenwick's interview

18   memoranda in support of its motion to terminate.  (*See* Miller Decl. at ¶¶ 8-9, Rains

19   Decl. at ¶ 11.)  Nevertheless, Semtech ignores the enormous weight of authority

20   that clearly indicates any privileges and a protection were waived, and asserts that

21   the requested documents are entitled to protection based on three flawed premises.

22   
23   **1.    The Production Of Allegedly Protected Documents In Support Of Semtech's Motion To Terminate Constitutes A Waiver**

24   Semtech argues that the production of protected documents to facilitate its

25   Motion to Terminate was consistent with the underpinnings of the attorney-client

26   privilege and work product protection.  *See Supra* IV(G)(2). To this end, Semtech

27   argues that the derivative plaintiffs and Semtech shares a common interest in

28   determining the best interest of the Company.  *Id.*  This exact argument was

rejected by the *Oracle* district court.  *In re Oracle Secs. Litig.*, 2005 U.S. Dist. LEXIS 46931, at *34 ("Defendants argue that the Delaware Plaintiffs and Oracle did not have a 'tangential adversarial relationship' because a plaintiff who files a derivative suit represents the best interests of the corporation.  The Court rejects this argument.")

It is clear that an SLC's motion to terminate "does not automatically place at issue attorney communications or work product."  *In re Oracle Sec. Litig.*, 2005 U.S. Dist. LEXIS 46931, at *33.  Further, there is nothing in Delaware law that requires an SLC to rely on attorney communications or work product in support of its motion to terminate.  *Id.*  Instead, the SLC makes the decision about whether to conduct its own investigation, or whether to retain outside counsel to assist in the investigation and draft either the SLC Report or supporting memoranda.  *Id.* District courts in the Ninth Circuit make it clear that where the SLC decides to retain outside counsel to prepare reports or supporting memoranda, and later files those reports or supporting memoranda in support of a motion to terminate, such action waives the attorney-client or work product protection over those documents. *Id.* at *32-33; *Zitin v. Turley*, No. CIV 89-2016-PHX-CAM, 1991 U.S. Dist. LEXIS 10084 at *15 (D. Ariz. June 25, 1991).

Here, Semtech's SLC retained outside counsel to assist in the investigation and prepare memoranda in the creation of the Morrison and Fenwick Reports. Thereafter, Semtech filed the Morrison Report, portions of the Fenwick Report, and excerpts from certain of Fenwick's interview memoranda in support of its motion to terminate. (*See* Miller Decl. at ¶¶ 8-9, Rains Decl. at ¶ 11.)  When Semtech filed those documents in support of its motion to terminate, any attorney-client privileges and work product protections were effectively waived for all purposes.

/ / /

/ / /

/ / /

2.      **The Production Of Allegedly Protected Documents To The Derivative Plaintiffs Constitutes A Waiver**

In an attempt to remedy the waivers that occurred when it filed its motion to terminate, Semtech argues erroneously that its disclosure "amounts to a compelled production" and does not constitute a waiver. *See Supra* IV(G)(2).  In support of its argument, Semtech only cites one authority for this assertion, the Sixth Circuit case, *In re Perrigo Co.*, 128 F.3d 430 (6th Cir. 1997) ("*Perrigo*"), upon which the Defendants in *Oracle* also relied, and which was ultimately deemed unpersuasive by the California Northern District Court.[19]  Likewise, Semtech makes the misguided argument that it was "compelled" to produce the Morrison Report, among other materials, by Delaware's requirement that an SLC must be supported by a thorough record.  *See Supra* IV(G)(2). To the contrary, as explained in the preceding paragraphs, Delaware law "does not automatically place at issue attorney communications or work product." *In re Oracle Sec. Litig.*, 2005 U.S. Dist. LEXIS 46931, at *33.  Semtech's SLC placed those communications at issue when it submitted the Morrison Report, portions of the Fenwick Report, and Fenwick's interview memoranda in support of its motion to terminate the derivative litigation.

Semtech, unlike the Defendants in *Perrigo*, took the steps necessary that gave rise to a public right of inspection of the documents by filing them in support of their motion to terminate.  Semtech filed the materials ***voluntarily*** pursuant to the SLC's decision to retain outside counsel to assist in its investigation and to later

---

[19]      In declining to rely on *Perrigo*, the *Oracle* court employed reasoning that is equally applicable here:

"[t]he Court rejects Defendants' reliance on *In re Perrigo*, 128 F.3d 430 (6th Cir. 1997) in support of a contrary result… In contrast to *Perrigo*, the Court here does not base its holding on the mere fact that the SLC report and memoranda were filed in the Delaware Action. Rather, the Court has conducted the appropriate balancing in determining that there is a public right of access to these documents. Defendants themselves took the steps that gave rise to this right: they filed the documents.  Accordingly, Defendants are in no position to assert that copies of the documents in their possession may be withheld on the basis of privilege or work product." *In re Oracle Secs. Litig.*, 2005 U.S. Dist. LEXIS 46931, at *59-60.

-45-

include the reports of outside counsel in the materials submitted with its motion to terminate.

### 3. The Filing Of Any Allegedly Protected Documents Under Seal Does Not Preclude Waiver

Again, Semtech relies on case law in the Sixth Circuit, namely *Perrigo*, to support the argument that filing documents under seal protects those documents from waiver. *See Supra* IV(G)(2). Again, Semtech ignores the massive weight of authority against this argument, including several holdings from district courts in the Ninth Circuit. In all of the cases cited by Plaintiffs that found waivers of the attorney client privilege and work product protections, the subject documents were filed under seal in the derivative litigations. *Joy v. North*, 692 F.2d 890 (2d Cir. 1982); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302 (7th Cir. 1984); *Zitin v. Turley*, No. CIV 89-2016-PHX-CAM, 1991 U.S. Dist. LEXIS 10084 (D. Ariz. June 25, 1991); *In re Oracle Secs. Litig.*, 2005 U.S. Dist. LEXIS 46931 (N.D. Cal. Aug. 5, 2005).

As explained by the court in Oracle, "[t]o the extent Defendants may have relied on the state court's order sealing the documents, that reliance was, as in *Continental*, misplaced in light of the strong policy favoring public access to documents that are filed in support of dispositive motions." *In re Oracle Secs. Litig.*, 2005 U.S. Dist. LEXIS 46931, at *33. Citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1134 (9th Cir. Or. 2003). The same analysis holds sway here, Semtech filed the allegedly protected documents in support of the dispositive motion to terminate, and public policy strongly favors the production of documents whether or not such documents were originally filed under seal.

### D. Conclusion

Semtech has failed numerous times to protect the secrecy of the documents requested by Plaintiff in this action. First, Semtech voluntarily disclosed its allegedly privileged communications to third parties on several occasions. Second,

-46-

1    Semtech waived any privileges or protections that may have applied to documents

2    when it produced allegedly protected documents in support of its motion to

3    terminate.

4           For all of the foregoing reasons, Plaintiff respectfully requests that the Court

5    deny the motion to quash and/or modify the subpoena issued on Ernst & Young.

6

7    DATED:  August 18, 2009          CHRISTOPHER H. McGRATH
                                      MORGAN J. MILLER
8                                     KIMBERLEY A. DONOHUE
                                      PAUL, HASTINGS, JANOFSKY
9                                        & WALKER LLP

10

11                                    By:    /s/ Christopher H. McGrath
                                             CHRISTOPHER H. McGRATH
12
                                      4747 Executive Drive, 12th Floor
13                                    San Diego, CA  92121
                                      Telephone:  (858) 458-3000
14                                    Facsimile:  (858) 458-3005

15                                    THOMAS A. ZACCARO
                                      PAUL, HASTINGS, JANOFSKY
16                                       & WALKER LLP
                                      515 South Flower Street, Twenty-Fifth Floor
17                                    Los Angeles, CA  90071-2228
                                      Telephone:  (213) 683-6000
18                                    Facsimile:  (213) 627-0705

19                                    Attorneys for Defendants
                                      *Semtech Corporation, Jason L. Carlson,*
20                                    *and Mohan R. Maheswaran*

21   DATED:  August 18, 2009          MARK I. LABATON
                                      KREINDLER & KREINDLER LLP
22

23

24                                    By:    /s/ Mark I. Labaton
                                             MARK I. LABATON
25
                                      707 Wilshire Blvd., Suite 4100
26                                    Los Angeles, CA  90017
                                      Telephone:  (213) 622-6469
27                                    Facsimile:   (213) 622-6019

28

                                      -47-

ALLEN CARNEY
MARCUS BOZEMAN
RANDALL PULLIAM
CARNEY WILLIAMS BATES
    BOZEMAN & PULLIAM, PLLC
11311 Arcade Drive, Suite 200
P.O. Box 25438
Little Rock, AR  72212
Telephone:  (501) 312-8500
Facsimile:   (501) 312-8505

*Local and Liaison Counsel for Plaintiff and the Class*

LEGAL_US_W # 62256843.10